CLIFFORD BAIR C95079

L3 346 P.O. BOX 20

TRACY, CA 95378 0600

**FILED**

MAR - 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT

| | |
|---|---|
| CLIFFORD BAIR | E-filing |
| PRO SE PETITIONER | PETITION FOR WRIT OF |
| V. | HABEAS CORPUS |
| CLAUDE FINN WARDEN | |
| DVI TRACY, CA | CV 08 1389 |
| BOARD OF PRISON | CASE NO# |
| HEARINGS et al | **JSW** |
| RESPONDENTS | |

CASE NO#  SCR 12451 C

SONOMA COUNTY SUPERIOR COURT  **(PR)**

CASE NO#  A 119294 Division ONE

1ST DISTRICT APPELLATE COURT

CASE NO# S155879 BAIR ON H.C.

CALIFORNIA SUPREME COURT

PETITIONER CLIFFORD BAIR PRO SE DECLARES UNDER PENALTY OF PERJURY

THAT THE FORGOING IS TRUE AND CORRECT TO THE BEST OF HIS

KNOWLEDGE.

EXCUTED ON THIS DATE: 2/25/2008    RESPECTFULLY SUBMITTED

SIGN

This petition concerns:

- [ ] A conviction          [X] Parole
- [ ] A sentence            [ ] Credits
- [ ] Jail or prison conditions    [ ] Prison discipline
- [ ] Other *(specify):* _____

1. Your name: CLIFFORD BAIR

2. Where are you incarcerated? DEUEL VOCATIONAL INSTITUTION TRACY CALIFORNIA

3. Why are you in custody?  [X] Criminal Conviction  [ ] Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

FIRST DEGREE MURDER
FALSE IMPRISONMENT

b. Penal or other code sections: _____

c. Name and location of sentencing or committing court: SONOMA COUNTY SUPERIOR COURT
SANTA ROSA, CALIFORNIA

d. Case number: SCR-12451-C

e. Date convicted or committed: 9/30/84

f. Date sentenced: 9/30/84

g. Length of sentence: 27 YEARS TO LIFE

h. When do you expect to be released? _____

i. Were you represented by counsel in the trial court?  [X] Yes.  [ ] No. If yes, state the attorney's name and address:

EDWARD KRUG
SONOMA COUNTY, CALIFORNIA

4. What was the LAST plea you entered? *(check one)*

[X] Not guilty  [ ] Guilty  [ ] Nolo Contendere  [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

[X] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

6. GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

1. PAROLE BOARD FAILED TO PROVE UNSUITABILITY WITH EVIDENCE.
2. VIOLATED 14TH AMENDMENT RIGHTS TO THE U.S. CONSTITUTION.
3. CONTINUE RELIANCE ON UNCHANGING FACTORS TO DENIE PAROLE,
4. CONTINUES TO VIOLATE PEN CODE SEC 3041 (a)(b).

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at *what* time *(when)* or place *(where)*. (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)

MARCH 30TH 2007 WAS PETITIONERS 3rd PAROLE BOARD HEARING TO WHICH HE RECEIVED A 3 YEAR DENIAL, THERE HAS BEEN NO EVIDENCE PRODUCED AT ANY OF PETITIONERS PAROLE BOARD HEARINGS AT 2000 OR 2003 OR AT HIS 2007 PAROLE BOARD HEARINGS TO PROVE THAT PETITIONER IS A THREAT TO SOCIETY OR A RISK TO PUBLIC SAFETY. THE PAROLE BOARDS CONTINUED RELIANCE ON PETITIONERS COMMITMENT OFFENSE AND ON UNCHANGING FACTORS THAT PETITIONER CAN'T AND WILL NEVER BE ABLE TO CHANGE PUTS PETITIONERS 27 YEAR TO LIFE SENTENCE AT LIFE WITHOUT THE POSSIBILITY OF PAROLE. THE PAROLE BOARD FAILED TO EXAMINE PETITIONERS ENTIRE RECORD OF PSYCH REPORTS - PAROLE PLANS - SUPPORT LETTERS JOB OFFERS - AA AND NA CHRONOS THAT CLEARLY PROVE THAT PETITIONER IS SUITABLE FOR PAROLE. SEE EXHIBITS A, B, C, D, E, F, G, H

b. Supporting cases, rules, or other authority (optional):

SEE TABLE OF CONTENTS FOR SUPPORTING CASES

2

GROUNDS FOR RELIEF CONTINUED

5. PC 3041 (b) STATES THE PANEL SHALL SET A DATE... UNLESS CONSIDERATION OF PUBLIC SAFETY... THE U.S. SUPREME, 9TH CIR & U.S.D.C. HAVE ALL UPHELD THE LIBERTY INTEREST BASED ON THIS PENAL CODE. (SEE RULE OF PAROLE HEARINGS IN MEMORANDUM OF POINTS & AUTHORITIES.) CALIFORNIA CODE OF REGULATIONS (CCR) BEING AD-MINISTRATIVE LAW SECTION 2400 STATES THEY'LL IMPLEMENT PC 3041 AND CCR 2401(A) DEFINES CONSIDERATION FOR PUBLIC SAFETY AS AN UNREASON-ABLE RISK OF DANGER TO SOCIETY IF RELEASED & THAT (CCR 2402 b) THEY'LL CONSIDER ALL THE RELEVANT & RELIABLE INFORMATION PRESENTED TO MAKE THEIR DECISION. CCR 2000 (b)(48) GIVES THE BOARDS BENCHMARK AS GOOD CAUSE A FINDING SHALL BE BASED ON A PREPONDERANCE OF THE EVIDENCE FACTUAL BASIS & GOOD CAUSE FOR THEIR DECISION BEING MADE. THERE IS NOT A PREPONDERANCE OF EVIDENCE (CONSIDERING ALL THE EVIDENCE) THAT IT WOULD BE AN UNREASONABLE RISK OF DANGER TO SOCIETY IF PETITIONER WAS RELEASED FROM PRISON. THERE WAS NO CONSIDERATION FOR PUBLIC SAFETY SO THE BPH PANEL MUST SET A DATE, THEY DID NOT SO THEY HAVE VIOLATED PETITIONERS U.S.C. FEDERALLY PROTECTED INTEREST. THIS PANEL DID NOT FOLLOW THEIR OWN RULES, DUE PROCESS REQUIRES THEY DO IN CONDUCTING PAROLE HEARINGS. THIS COURT MUST FIND THAT THIS PANEL DID NOT FOLLOW THEIR OWN RULES IN CONDUCTING THIS HEARING SO ANY DECISION MADE BY THIS BPH PANEL IS FALSE. THERE WAS NO EVIDENCE OF ANY THREAT TO THE PUBLIC PRODUCED BY THIS BPH PANEL, THIS COURT MUST ORDER THAT THERE IS SUFFICIENT EVIDENCE TO ORDER A FORMAL SHOW CAUSE AND APPOINT COUNSEL TO REPRESENT PETITIONER IN THIS MATTER AND ORDER AND EVIDENTIARY HEARING. ORDER A NEW HEARING WITHIN 30 DAYS AND ORDER THE BPH TO FOLLOW THEIR RULES IN GRANTING THIS PETITIONER HIS LEGAL RELEASE DATE.

3

7. Ground 2 or Ground _____ (if applicable):

SEE GROUNDS 1 THROUGH 4 AND 5

a. Supporting facts:

SEE EXHIBITS A, B, C, D, E, F, G, H
FOR PROOF OF PETITIONERS PAROLE SUITABILITY

~~THE CLEAR AMENDMENT TO THE KELL BY STATE CONSIDERATION
THERE IS TO IMPOSE A SENTENCE UPON A PARTY
DISPROPORTIONATE TO THE CRIMES [...] FOR A [...] DEL, COST, ASSAULT V. CALIFORNIA, BURNIE [...] 1718~~

THE FOURTEENTH AMENDMENT → A SENTENCE MUST BE
BASED ON RELIABLE INFORMATION; "IF IT IS NOT," IT VIOLATES
THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.
SEE GENERALLY UNITED STATES V. SMITH (9TH CIR 1991) 994
F.2d 645, 622 CERT. DENIED 503 U.S. 9521 (1992) [RECOGNIZING
THAT THE DUE PROCESS CLAUSE ENSURES FUNDAMENTAL FAIR-
NESS. A CONVICTION (DENIAL OF PAROLE) NOT SUPPORTED BY
SUBSTANTIAL EVIDENCE VIOLATES THE FOURTEENTH AMENDMENT
RIGHT TO DUE PROCESS OF LAW (JACKSON V. VIRGINIA (1979) 443
U.S. 307, 319(6) LEd. 2d 560, 573].)

b. Supporting ~~facts~~ cases, rules, or other authority:

THE AEDPA IS AN EX POST FACTO ISSUE. A CHANGE IN THE
LAW WHICH ALTERS THE RULES OF EVIDENCE, SO THAT LESS OR
DIFFERENT EVIDENCE IS NEEDED FOR CONVICTION THAN BEFORE OR WHICH
CRIMINALIZES AN ACT WHICH WAS NOT AN OFFENSE BEFORE THE CHANGE
OR INCREASES THE PUNISHMENT VIOLATES EX POST FACTO CLAUSE
OF THE CONSTITUTION (LYNCE V. MATHIS (1997) 519 U.S. 433 441 EN 13 [137 LEd

2d 633].

8. Did you appeal from the conviction, sentence, or commitment?  ☐ Yes. ☐ No. If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
   _SONOMA COUNTY SUPERIOR COURT_

b. Result _DENIED_                           c. Date of decision: _5/21/2004_

d. Case number or citation of opinion, if known: _SCR 12451 C_

e. Issues raised: (1) _SAME AS GROUNDS 1 THROUGH 4_

   (2) _____

   (3) _____

f. Were you represented by counsel on appeal?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:

   _____

9. Did you seek review in the California Supreme Court?  ☒ Yes ☐ No. If yes, give the following information:

a. Result _DENIED_                           b. Date of decision: _9/15/2004_

c. Case number or citation of opinion, if known: _S - 126016_

d. Issues raised: (1) _SAME AS GROUNDS 1 THROUGH 4_

   (2) _____

   (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

   _____

   _____

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

   _____

   _____

   _____

   _____

   _____

   _____

   _____

   _____

   _____

b. Did you seek the highest level of administrative review available?  ☒ Yes. ☐ No.
   Attach docu    that show you have exhausted your administrative remedies.

_5_

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☐ Yes. If yes, continue with number 13.  ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

b. (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:

17. SUPERIOR COURT WRIT ENDORSED FILED MAY 25, 2007, ISSUE CONCERNING TIME CREDIT DUE TO LATE PAROLE BOARD HEARINGS

17. Do you have any petition, appeal, or other matter pending in any court?  ☒ Yes.  ☐ No. If yes, explain:
ISSUES 1 THROUGH 4 ARE ON APPEAL IN THE 9TH CIRCUIT COURT OF APPEAL FROM MY 2003 PAROLE BOARD HEARING/CASE NO 06-15718

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 6/19/07

(SIGNATURE OF PETITIONER)

MC-275 (Rev. July 1, 2005)          PETITION FOR WRIT OF HABEAS CORPUS          Page six of six

6

1 | HON. RENÉ AUGUSTE CHOUTEAU
JUDGE OF THE SUPERIOR COURT
2 | Hall of Justice, Room 223-J
600 Administration Drive
3 | Santa Rosa, CA 95403
Telephone: (707) 521-6724
4
5
6
7

# F I L E D

### SEP 2 1 2007

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA
By_____
Deputy Clerk

8 | SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA

9 | In re the Matter of

No. SCR-12451-C

10 | CLIFFORD BAIR

CDC No. C-95079

11 | for Writ of Habeas Corpus.
_____/

ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS

12

13 |     The Court has read and considered Petitioner's Petition for Writ of Habeas

14 | Corpus filed on July 16, 2007.

15 |     The Petition for Writ of Habeas Corpus is denied. The Parole Board considered

16 | all relevant factors, and concluded that petitioner was unsuitable for parole. The Parole

17 | Board's March 30, 2007, decision is supported by "some evidence," including the

18 | callous and cruel nature of the offense, petitioner's prior criminal history, and his

19 | unstable social history. The Parole Board's finding of lack of insight and need for family

20 | therapy are not supported by the psychological evaluation in the record. However,

21 | courts will uphold the denial of parole when it appears that the Board would have

22 | reached the same conclusion based on the supported factors and those factors

23 | individually or collectively justify that conclusion. *In re Luna* (2005) 126 Cal.App.4th

24 | 585, 598. In the present case, the record demonstrates that the Board would have

25 | reached the same conclusion based on the factors supported by the evidence.

26 | DATED:

27 | SEP 2 1 2007

28 |

_____
RENÉ AUGUSTE CHOUTEAU
JUDGE OF THE SUPERIOR COURT

GA

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re CLIFFORD LEE BAIR,<br>on Habeas Corpus. | A119294<br><br>(Sonoma County<br>Super. Ct. No. SCR-12451-C) |

By the Court:[1]

We take judicial notice of the opinion filed January 29, 1987 in People v. Clifford Lee Bair (A029732), a copy of which is attached to this order. (Evid. Code § § 452, subd. (d) and 459, subd. (a).)

The petition for writ of habeas corpus is denied.

Dated: ___NOV 2 8 2007___    ___MARCHIANO, P.J.___ P.J.

---

[1] Before Marchiano, P.J., Stein, J., and Swager, J.

6B.

Court of Appeal, First Appellate District, Div. 1 - No. A119294
**S158879**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re CLIFFORD LEE BAIR on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

FEB 1 3 2008

Frederick K. Ohlrich Clerk

Deputy

GEORGE

Chief Justice

TABLE OF CONTENTS

1. INTRODUCTION.
2. GROUNDS FOR RELIEF.
3. COURT DENIALS
4. INTRODUCTION.
5. PRESENTENCE REPORT.
6. PETITIONERS RESPONSE TO ATTORNEY GENERALS OPPOSITION
7. TABLE OF AUTHORITIES.
8. SUMMARY OF THE CASE.
9. REASNOS FOR REVIEW.
10. TABLE OF AUTHORITIES CONTINUED.
11. CALIFORNIA CODE OF REGULATIONS (15 CCR)
12. EXHIBIT (A) PENAL CODE 1168 "FIXING TERM OF IMPRISONMENT.
13. EXHIBIT (A) PENAL CODE 1170 "LEGISLATIVE FINDINGS" DETERMINING LENGHT
    TERM.
14. EXHIBIT (A) MATRICES CHART FOR DETERMINING BASE TERMS FOR SPECIFIC
    OFFENSES CONTAINED IN (15 CCR 2403).
15. EXHIBIT (B) THE 128A WRITE UP PETITIONER RECEIVED ON JUNE 1ST 2005.
16. ARGUMENTS.
    PENAL CODE 3041 (a) (b) CREATES A DUE PROCESS LIBERTY INTEREST IN A
    PRESUMPTIVE PAROLE RELEASE DATE, OF WHICH IS IGNORED BY THE PAROLE BOARD.
    THE BPH PRESENTED NO EVIDENCE TO PROVE THAT THIS PETITIONER IS A RISK
    TO PUBLIC SAFTEY, OR THAT HE POSES A DANGER TO SOCIETY IF RELEASED ON
    PAROLE TODAY.
    THE BPH'S CONTINUED RELIENCE ON THE OFFENSE AFTER ALMOST 24 YEARS OF
    INCARCERATION IS IN VIOLATION OF PETITIONERS CONSTITUTIONAL RIGHT TO
    A FAIR DUE PROCESS OF LAW.
    THE BPH HAS (DEFACTO) SET PETITIONERS TERM AT LIFE WITHOUT PAROLE.
    THE BPH MUST SET PETITIONERS TERM ACCORDING TO PENAL CODE 1168 and PENAL
    CODE 1170.
    PETITIONERS EIGHT AND FOURTEENTH AMENDMENTS RIGHTS ARE BEING VIOLATED
17. MEMORANDUM OF POINTS AND AUTHORITIES.
18. CONCLUSION.
19. PRAYER FOR RELIEF.
20. PROOF OF SERVICE.
21. EXHIBIT
22. EXHIBIT
23. EXHIBITS AA BB CC DD.
24. PETITIONERS PROOF THAT HE IS SUITABLE FOR RELEASE ON PAROLE.
    EXHIBITS A B C D E F G H.

EXHIBIT AA IS THE COMPLETE TRANSCRIPTS OF PETITIONERS MARCH 2007 PAROLE BOARD
HEARING.
EXHIBITS BB, CC, THESE ARE THE PAROLE BOARDS DECISIONS RENDERED IN 2000 AND
IN 2003.
EXHIBIT DD IS IN RE LAWERENCE 59 CAL.RPTR.3d 537 (CAL.APP.2 DIST. 2007) WHICH
SHOWS THE STANDARD OF REVIEW USED BY THE STATE AND FEDERAL COURTS IN DETERMINIG
THE SOME EVIDENCE STANDARD TO BE USE TO DETERMINE LIFE PRISONERS RELEASE
DATES.

## INTRODUCTION

Petitioner, Clifford Lee Bair, a California prisoner serving a sentence of 25 years to life for first degree murder, with a 2 year enhancement for false imprisonment is challenging the Board of Parole hearings denial of his parole date. Petitioner's 3rd parole consideration hearing was held on March 30, 2007, where petitioner received his 3rd three (3) year denial of a parole release date. The Board of Parole Hearings has denied petitioner a parole date based on his commitment offense for the third time and because the panel says he needs more therapy. Petitioner contends that the reasons used by the Board of Parole Hearings violates his Due Process rights under Penal Code 3041 (a)(b). This code creates a Due Process liberty interest, where petitioner's eighth and fourteenth amendment rights have been violated.

1. Petitioner's psychosocial assessments show that he does not need therapy, nor is he a threat to society. (Exhibit G).

2. Petitioner has parole plans and family support (Exhibit A).

The Board of Parole Hearings has failed to prove from petit — ioner's incarceration record of the past 23 plus years that he would pose an unreasonable risk of danger to the public as required by law.

PETITIONER SUBMITS TO THIS HONORABLE COURT HIS PRESENTENCE REPORT TO PROVE EXACTLY WHAT HE WAS CONVICTED OF. TO PROVE THAT HE WAS NOT CONVICTED OF HAVING A SHOT GUN. PETITIONER WAS NOT CONVICTED OF BURNING ANY VEHICLES. PETITIONER HAS ADMITTED TO THE BPH PANNEL THAT HE DID HAVE A SHOT GUN AND THAT HE DID BURN THE VEHICLE.

8

<table>
<tr><td>1</td><td></td><td>HEARING DATE:<br>October 30, 1984<br>8:30 AM<br>Dept. V</td></tr>
</table>

1

2

                                                    HEARING DATE:
                                                    October 30, 1984
                                                    8:30 AM
                                                    Dept. V

3

4                                                   FILING DATE:
                                                    October 19, 1984

5                                                   DA File No. 90130

6              SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA

7    THE PEOPLE OF THE STATE OF CALIFORNIA )  PRESENTENCE REPORT
                                           )
8                                          )
                                Plaintiff, )  Court No.  12451-C
9              vs.                         )  Probation File  75481
                                           )  CII No.  3 918 183
10                                         )
     CLIFFORD LEE BAIR                      )
11                                         )  By:  Ronald S. Nesset
                                Defendant  )  Deputy Probation Officer
12   _____

13   OFFENSES:  (First Amended Information) Count I: felony violation
     of Penal Code Section 187, murder in the first degree; Count II:
14   felony 459 PC, burglary in the first degree; Count III: felony 236
     PC, false imprisonment; Count IV: felony 236 PC, false
15   imprisonment; Count V: felony 459 PC, burglary in the second
     degree; Count VI: felony 487(3) PC, grand theft; Count VIII:
16   felony 487(1) PC, grand theft; Count IX: felony 591 PC,
     destruction of telephone lines; Count X: felony 496 PC, receiving
17   stolen property.
     ORIGINAL CHARGE:  Count I also charged 1203.075 PC and 1203.09 PC
18   preclusions; Count II also charged 1203.09 preclusion; Count VII
     which charged 459 PC of a vessel was dismissed by the Court on
19   9-19-84.
     DATES OF OFFENSES:  Counts I through IX: 1-26-84; Count X: 1-25-84
20   CONVICTION BY:  Jury trial, verdicts rendered on 9-28-84.
     PLEA NEGOTIATIONS:  None
21   CODEFENDANT:  None
     CUSTODIAL STATUS:  Incarcerated    DAYS IN CUSTODY:  See page two
22   ATTORNEY:  Edward Krug
     =================================================================
23   AGE:  40    BIRTHDATE:  9-14-44    BIRTHPLACE:  Kentfield, CA

24   ADDRESS:  825 East Cambridge Avenue, Visalia, CA

25   EDUCATION:  1 yr. college        MARITAL STATUS:  Divorced

26   OCCUPATION:  Laborer              EMPLOYED:  No

9

Petitioner submits:

In re Lawrence, 59 Cal.Rptr 3rd 537 (Cal.App.2 Dist.2007) Prisoner incarcerated for 1st degree murder since 1983.

Petitioner submits this case for consideration to this honorable court to show the "some evidence" standard that is to be used by the BPH in parole suitability hearings. Petitioner submits that the Court in In re Lawrence, supra utilized the proper analysis in assessing Lawrences' crime to others of a more heinous, cruel, and egregious nature. Petitioner submits that his crime of felony murder does not rise to the level of Lawrence or any of the supporting cases cited in the Lawrence ruling.

These aforementioned cases were of a deliberate and intentional nature and not inadvertent as in petitioner's case.

Both the California state standard and the federal standard of "some evidence" are explained and defined in Lawrence. (See exhibit DD pages 561-567 for cases interpreting the state "some evidence" standard).

(See exhibit DD pages 567-569 for cases interpreting the federal "some evidence" standard.)

Petitioner's case presents a stronger case for a release date and release from prison than any of the cases listed in Lawrence and in the Lawrence case itself. Petitioner was convicted of 1st degree murder under the felony murder rule, where a human being died inadvertently of a heart attack rather than intentionally or deliberately.

CLIFFORD BAIR C95079
L3 346 P.O.Box 20
TRACY, CA 95378 0600

STATE OF CALIFORNIA

COURT OF APPEAL FIRST APPELLATE DISTRICT

CLIFFORD BAIR

PETITIONER PRO SE                       CASE NO A 119294 DIVISION

V.                                      One

WARDEN D.V.I. TRACY,CA

BOARD OF PRISON HEARINGS                PETITIONERS RESPONSE TO

et al   RESPONDENTS                     ATTORNEY GENERALS OPPOSITION

THE TEST IS NOT WHETHER "SOME EVIDENCE" OR A MODICUM OF
EVIDENCE SUPPORTS THE REASONS FOR DENIAL, BUT WHETHER "SOME
EVIDENCE" INDICATES THAT PETITIONERS RELEASE UNREASONABLY ENDANGE —
RS PUBLIC SAFETY.(CCR TITLE 15 2402 (a), IN RE SCOTT (2005)
133 CAL. APP. 4TH 573 595 3d4 CAL. Rptr.3d 905.) [THE COMMITMENT
CAN NEGATE PAROLE SUITABILITY "ONLY" IF CIRCUMSTANCES OF THE
CRIME...          RATIONALLY INDICATE THAT THE OFFENDER "WILL"
"PRESENTLY" PRESENT AN UNREASONABLE RISK TO PUBLIC SAFETY IF
RELEASED. (IN RE LOWE 130 CAL. APP.4th 1405,31 Cal.Rptr.3d 1)
"SOME EVIDENCE" OF THE EXISTENCE OF A PARTICULAR FACTOR DOES
NOT NECESSARILY EQUATE TO"SOME EVIDENCE" THAT THE PETITIONERS
RELEASE UNREASONABLY ENDANGERS PUBLIC SAFETY.  THE APPELLATE
COURT (SECOND DISTRICT), HAS SAID IN RE LAWRENCE" THAT UNLESS
THERE IS AN UNREASONABLE RISK, THE PAROLE APPLICANT WILL RE_
OFFEND AND THUS POSE A RISK TO PUBLIC SAGETY, HE OR SHE IS TO
BE RELEASED ON PAROLE. NEITHER THE BOARD OR THE GOVERNOR PROPERLY
TAKES INTO ACCOUNT WHETHER RELEASE ON PAROLE WILL IMPAIR THE
RETRIBUTIVE OR THE DETERRENT VALUE OF CONTINUED IMPRISONMENT
AT THIS LATE STAGE OF THE INMATES INCARCERATION."(IN RE LAWRENCE
B 190874 COURT OF APPEAL SECOND DISTRICT).

THE PETITIONER CONTENDS THAT THE COURT MUST REVIEW THE

1.

RECORD TO DETERMINE IF THERE ARE OTHER FACTORS STILL CURRENTLY
PRESENT IN DECIDING IF PETITIONER CURRENTLY POSES AN UNREASONABLE
RISK TO PUBLIC SAFETY IF RELEASED. SIMPLY FROM THE PASSAGE OF
TIME, PETITIONERS CRIME HAS LITTLE OR NO USEFULNESS IN
DETERMINING FUTURE OFFENSES. (ESPECIALLY SINCE IT HAS BEEN ALMOST
24 YEARS SINCE HIS OFFENCE OCCURED),THAN IT WOULD HAVE IF IT
HAD OCCURED 5 OR 10 YEARS AGO. (SCOTT SUPRA, PREDICTIVE VALUE
OF AN OFFENSE IN DETERMINING FUTURE DANGEROUSNESS DIMINISHES
WITH TIME) AND(ESPECIALLY WITH THE NUMEROUS ACCOMPLISHMENTS) (AS
HAS BEEN SUBSMITTED INTO THE RECORD AS EXHIBITS), IN THE AREA
OF REHABILITATION AS PETITIONER HAS ACCOMPLISHED. AS TO
PETITIONER, THE "SOME EVIDENCE" TEST WHEN APPLIED HERE DOES
NOT SATISFY THE STATUTES ULITMATE TEST, THAT THE RELEASE OF
THE PETITIONER WOULD POSE AN UNREASONABLE RISK TO PUBLIC SAFETY.

     IF THE CRIME COMMITTED IN THE WEN LEES CASE (B 188831 ),
WHERE TWO VICTIMS WERE SHOT AND ONE WAS KILLED IN A RAGE, OR
"ESPECIALLY"IN THE CASE OF ROSENKRANTZ WHERE THERE WAS STALKING
LENGTHY PLANNING ECT ECT ETC, DOSE NOT RISE TO THE "SOME EVIDENCE
STANDARD OF ENDANGERING PUBLIC SAFETY, THEN THERE IS NO
REASONABLE WAY THAT "PETITIONERS" CRIME CAN BE DEEMED TO DO SO.

     PETITIONER CONTENDS THAT THE STANDARD BEING APPLIED TO
HIS CASE IS AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED
STATUTES UNDER PC 3041 AND CCR 2402(D). THIS VIOLATES FEDERAL
LAW UNDER THE GUARANTEES OF DUE PROCESS OF THE 5TH AND 14TH
AMENDMENTS TO THE UNITED STATES CONSTITUTION, AS HAS ALREADY
BEEN DECIDED BY PRIOR COURT RULINGS.

     THE 5TH AND 14TH AMENDMENTS PROHIBITS THE GOVERNMENT FROM
DEPRIVING AN INMATE OF LIFE, LIBERTY AND PROPERTY, WITHOUT DUE
PROCESS OF LAW. U.S.CONST.AMENDS V,XIV. IN THE PAROLE CONTEXT
A VIOLATION OF AN INMATES DUE PROCESS OCCURES WHEN(1) DEPRIVED
OF A CONSTITUTIONALLY PROTECTED LIBERTY INTEREST IN PAROLE,
(2) DENIED ADEQUATE PROCEDURAL PROTECTIONS IN THE PAROLE PROCESS.
SEE e.g. BIGGS V. TERHUME, 334 F. 3d 910,913 (9th CIR.2003).
GREENHOLTZ V. INMATES OF NEBRASKA PENAL AND CORRECTIONAL COMPLEX
442, U.S. 1,7,99 S. Ct 2100, 60 L.Ed. 2d.668 (1979). CONSTITUTION-
ALLY PROTECTED LIBERTY INTEREST, BOARD OF PARDONS· V, ALLEN 482

U.S. 369,377,78,107 S. Ct. 2415 96L. Ed. 2d. 303(1987).
CALIFORNIA PENAL CODE SECTION 3041 (a) STATES THAT THE PANEL
OR BOARD SHALL NORMALLY SET A RELEASE DATE UNLESS IT DETERMINES
THAT STATUTORILY DEFINED DETERMINATIONS ARE MET. THUS UNDER
GREENHOLTZ AND ALLEN THE NINTH CIRCUIT FOUND THAT `CALIFORNIAS
PAROLE SCHEME GIVES RISE TO A COGNIZABLE LIBERTY INTEREST IN
A PAROLE RELEASE DATE.

THE INMATE MUST BE AFFORDED AN OPPORTUNITY TO BE HEARD
BEFORE AN "UNBIASED" DECISION MAKER AND IN THE CASE OF A DENIAL
OF PAROLE, MUST BE INFORMED OF THE REASONS UNDERLYING THE DECISION.
(SEE JANCSEK V. ORGEN Bd OF PAROLE 833 F. 2d. 1389 (9th CIR.
1987).

SECOND "SOME EVIDENCE" MUST SUPPORT THE DECISION TO GRANT
OR DENIE PAROLE. Id (ADOPTING THE "SOME EVIDENCE" STANDARD
ESTABLISHED BY THE SUPREME COURT IN SUPERINTENDENT V. HILL,
472 U.S. 445, 457, 105 S. Ct 2768, 86L. Ed. 2d. 356(1985). The
EVIDENCE UNDERLYING THE GRANT OR DENIAL OF PAROLE MUST HAVE
"SOME INDICIA OF RELIABILITY,

Id THE "SOME EVIDENCE" STANDARD APPLIES EQUALLY TO THE BOARDS
DECISION AND THE GOVERNORS REVIEW. SEE e.g. IN RE ROSENKRANTZ
29 Cal. 4th 616, 656, 660, 661 128 Cal. Rptr. 2d 104, 59, P.3d
174 (2003).     IN BIGGS, 334 F.3d. at 916 (CITING MORRISSEY
V. BREWER, 408 U.S. 471, 481, 92, S. Ct. 2593, 33 2d.484 (1972)
AND GREENHOLTZ 442, U.S. at 7, 8, 99, S. Ct. 2100). IN BIGGS
THE NINTH CIRCUIT APPLIED THE SUPREME COURTS LANGUAGE IN
MORRISSEY AND GREENHOLTZ WHEN ANALYZING WHETHER THE DENIAL OF
AN INMATES PAROLE VIOLATED HIS CONSTITUTIONAL DUE PROCESS RIGHTS.
THE COURT RECOGNIZED THAT IN THE CONTEXT OF DENYING AN INMATE
PAROLE, RELIANCE "ON AN UNCHANGING FACTOR" SUCH AS THE CIRCUM –
STANCES OF THE OFFENSEOR CONDUCT PRIOR TO IMPRISONMENT RUNS
CONTRARY TO THE REHABILITIVE GOALS EXPOUSED BY THE PRISON SYSTEM
AND COULD RESULT IN A DUE PROCESS VIOLATION."Id AT 912.

THE EASTERN DISTRICT COURT OF CALIFORNIA HAS ALSO CONSIDERED
THE PROBLEM OF CONTINUING TO RELY ON UNCHANGING FACTORS IN DENYING
PAROLE RELEASE DATES. SEE IRONS V. WARDEN CALIFORNIA STATE PRISON
SOLANO 358, F. Supp. 2d 936, 947 E.D. CAL. 2005). the court
IN IRONS NOTED THAT IF RELIANCE ON AN UNCHANGING FACTOR WERE
ENOUGH TO CONSTITUTE A VALID DENIAL OF PAROLE, PETITIONER WOULD
HAVE NO HOPE FOR EVER OBTAINING PAROLE. EXCEPT PERHAPS A PANEL
IN THE FUTURE WILL ARBITRARILY HOLD THAT THE CIRCUMSTANCES WERE
NOT THAT SERIOUS.

PETITIONER WOULD POINT OUT THAT IN THE CASE OF MARTIN V.
MARSHSLL (N.D. CAL. C 05 3486 MPH ) WHERE THIS INDIVIDUAL
RECEIVED A RELEASE DATE AFTER HAVING 20 DISCIPLINARY VIOLATIONS
UP TO 1995 (POSSESSION OF DRUGS, POSSESSION OF WEAPONS MATERIALS
GAMBLING PARAPHERNALIA, THIS INDIVIDUAL WAS ALSO STABBED 3 times
FROM 1987 To 1990 AS A RESULT OF BEING ENVOLVED WITH LOAN SHARKS.
WITH THIS BEING THE CASE, THERE BEING NO EVIDENCE IN THE RECORD
TO SHOW THAT THIS INDIVIDUAL IS NOT A THREAT TO PUBLIC SAFETY
OR A RISK TO SOCIETY, ITS DIFFICULT FOR PETITIONER TO SEE HOW
THERE COULD BE "ANY EVIDENCE" FROM HIS RECORD OF OVER 23 Years
OF INCARCERATION TO DENIE PETITIONER HIS RELEASE DATE.

UNITED STATES DISTRICT COURT C.D. CALIFORNIA JAMES MASONER
NO  CV 03 1261 ER, ALSO MASONER V. WITEK NO CV 95 1814 IH.

THE MANDATORY LANGUAGE OF P.C. 3041 (b) IMPOSES AN
AFFIRMATIVE OBLIGATION TO GRANT PAROLE, CREATING A LEGALLY COGNIZ-
ABLE LIBERTY INTEREST IN PAROLE AND A PRESUMPTION THAT PAROLE
RELEASE WILL BE GRANTED IF CERTAIN CONDITIONS ARE MET.
( PETITIONER MEETS AND OR EXCEEDS ALL OF THE REQUIREMENTS OF
CCR 2402 (D) AS IS SHOWN FROM HIS EXHIBITS IN THE RECORD).
McQUILLIAN V. DUNCAN 306 F. 3d 895 (9th CIR. 2002), BIGGS V.
TERHUME 334, F. 3d. 910 (9th CIR 2003). THE DEPRIVATION OF THIS
IS "PERMISSIBLE" "ONLY" WHEN THE BOARD OF PRISON HEARINGS CAN
PROVIDE THE EVIDENCE FROM THE RECORD SUPPORTING ITS DECISION.
IN RE ROSENKRANTZ 29.Cal. 4th 616, 128,Cal.Rptr. 2d 104 59 P.
3d 174 (Supp. Ct 2002). BIGGS 334 F. 3d at 919.)

"THE SOME 'EVIDENCE STANDARD"

THE COURTS HAVE SAID THAT THE EVIDENCE HAS TO INDICATE (PROVE) THAT PETITIONER IS AN UNREASONABLE RISK TO SOCIETY OR A DANGER TO PUBLIC SAFETY TODAY". (SEE LEE SUPRA 143 Cal. App. 4th at P. 1408). THE FACTS MUST INDICATE A PRESENT DANGER TO THE COMMUNITY "TODAY" IF RELEASED (BAIR V. FOLSOM STATE PRISON 2005 WL 2219220, 12 n. 3 E.D. 2005)

IN RE SANDRA DAVIS LAWRENCE 59 Cal. Rptr. 3d. 537 Cal.app 2nd DISTRICT. 2007). IT IS SAID THAT ITS DIFFICULT TO FIND LAWRENCES COMMITMENT CRIME SUPPLIES "SOME EVIDENCE" RATIONALLY DEMONSTRATING SHE REPRESENTS AN UNREASONABLE DANGER TO THE PUBLIC. SAFETY AT THE PRESENT TIME. THAT IS, HOW CAN IT BE SAID HER CRIME IS MORE PREDICTIVE OF FUTURE DANGEROUSNESS THAN THE MURDERS FOUND TO BE INSUFFICIENT FOR THAT PURPOSE BY OUR FELLOW APPELLATE COURTS.

IN RE SMITH SUPRA 109 Cal.App 4th at 492,1-34 Cal.Rptr,2d781.

IN RE SCOTT SUPRA 133 Cal.App.4th 579,34 Cal.Rptr.3d 905

IN RE LEE SUPRA 143 Cal.App.4th 1404,49 Cal.Rptr.3d,931

IN RE WIEDER SUPRA,145 App.4th,575,576,52 Cal.Rptr.3d,147

IN RE ELKINS SUPRA,144 Cal.App.4th 480,481,50 CAl.Rptr,3d,50
IN THE FEDERAL DISTRICT COURTS:

IN RER ROSENKRANTZ V. MARSHALL,SUPRA 444F.Supp.2d 1065
IN RE ROSENKRANTZ SUPRA, 29,Cal,4th,627,29,128.CAl.Rptr2d.104,59P 3d.174.

IN RE MARTIN V. MARSHALL SUPRA 431 F.SUPP.2d 1040.

IN RE WILLIS V. KANE 485.F. SUPP.2d. N.D. CAL 2007.

PETITIONER ASK IN ASSESSING JUST THESE CASES ABOVE (AND THERE ARE HUNDREDS MORE WHO HAVE HAD DATES) WHY THERE IS "NO EVIDENCE" FOUND IN THESE CASES AND YET THERE WAS "SOME EVIDENCE" FOUND IN PETITIONERS CASE TO DENIE HIM HIS RELEASE DATE.

DUE PROCESS DEMANDS A FINDING OF SOMETHING MORE THAN "SOME (ANY) EVIDENCE" TO PROTECT WHAT IS NOW DEFINED AS A VESTED LIBERTY INTEREST PROTECTED BY THE DUE PROCESS CLAUSE.

THE BORADS DECISIONS HAVE TO BE BASED ON A PERPONDERANCE
OF THE EVIDENCE OF PAROLE SUITABILITY. GOOD CAUSE IS THE STANDARD
(IN RE POWELL SUPR 45 CAL.3d. at 901).(IN RE BROWN 1967 CAL.
2d. 339, 342). (IN RE McCAIN 1960 55 CAL. 2d. 78, 87). (IN RE
CASWELL 2001, 92, CAL. APP. 4th. 1017, 1024, 1026). ( IN RE
CLUTCHETTE 1974 39, CAL. APP.3d. 561, 565). (IN RE MONZO 1973
33 CAl. APP. 144, 147 15 CCR 2450).

IN THE DISTRICT COURT, PATEL J. HELD THAT SOLE RELIENCE
ON THE CIRCUMSTANCES OF A PETITIONERS OFFENSE AND CONDUCT PRIOR
TO THE OFFENSE DENYING PAROLE CONSTITUTED A DUE PROCESS
VIOLATION.

CONSTITUTIONAL LAW 272.5 PARDON AND PAROLE (46) IN THE
PAROLE CONTEXT , A VIOLATION OF AN INMATES DUE PROCESS OCCURES
WHEN (1) THE INMATE HAS BEEN DEPRIVED OF A CONSTITUTIONALLY
PROTECTED LIBERTY INTEREST IN PAROLE, AND (2) THE INMATE HAS
BEEN DENIED ADQUATE PROCEDURAL PROTECTIONS IN THE PAROLE PROCESS,
U.S. C.A. CONST. AMEND 14.

PETITIONER CONTENDS THAT IF THE BOARD OF PRISON HEARINGS
WOULD HAVE SERIOUSLY CONSIDERED "FROM THE RECORD" PETITIONERS
ACCOMPLISHMENTS OVER HIS PAST 23 YEARS OF INCARCERATION, THEY
WOULD HAVE CLEARLY FOUND IN THE RECORD THAT THIS PETITIONER
IS MORE THAN SUITABLE FOR PAROLE ACCORDING TO "ALL THE REQUIRE-
MENTS" OF CCR 2402 (D).

PETITIONER SUBMITS TO THIS HONORABLE COURT THAT HIS SENTENCE HAS BECOME DISPROPROTIONATE TO HIS OFFENSE ACCORDING TO THE 8th AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES, IN THAT HE IS SUITABLE FOR PAROLE ACCORDING TO "ALL"OF THE REQUIREMENTS OF CCR 2402 (D) AND 3041 (A)(B). IN THAT PETITIONER IS 7 YEARS PAST HIS MINIMUN ELIGIBLE PAROLE RELEASE DATE OF SEPTEMBER 17th 2000. BEING DENIED HIS RELEASE DATE FOR A PERIOD OF 10 YEARS AND 7 MONTHS PAST HIS MEPD ACCORDING TO CCR 3041 WHEN THERE HAS BEEN NO EVIDENCE PRODUCED FROM THE RECORD TO PROVE THAT THIS PETITIONER IS A THREAT TO SOCIETY OR A RISK TO PUBLIC SAFETY AT ANY OF PETITIONERS PAROLE BOARD HEARINGS, THIS IS THE CUREL AND UNUSAL PUNISHMENT ACCORDING TO THE 8th AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA.

PENAL CODE 1168, ENTITLED "FIXING TERM OF IMPRISONMENT" READS AS FOLLOWS:

(a) EVERY PERSON WHO COMMITS A PUBLIC OFFENSE FOR WHICH ANY SPECIFICATION OF THREE TIME PERIODS OF IMPRISONMENT IN ANY STATE PRISON IS NOW PRESCRIBED BY LAW... SHALL BE SENTENCED PURSUANT TO CHAPTER 4.5 (COMMENCING WITH SECTION 1170) OF TITLE 7 OF PART 2.

PENAL CODE 1170 ENTITLED "LEGISLATIVE FINDINGS" DETERMINING LENGTH OF TERM, RESENTENCING "STATES IN PERTINENT PARTS THAT:

(a)(1) THE "LEGISLATURE" FINDS AND DECLARES THAT THE PURPOSE OF IMPRISONMENT FOR CRIME IS PUNISHMENT.

THIS PURPOSE IS BEST SERVED BY TERMS PROPROTIONATE TO THE SERVIOUSNESS OF THE OFFENSE WITH THE PROVISIONS FOR UNIFORMITY IN THE SENTENCES OF OFFENDERS COMMITTING THE SAME OFFENSE UNDER SIMILAR CIRCUMSTANCES. THE

LEGISLATURE FURTHER FINDS AND DECLARES THAT THE ELIMINATION OF DISPARITY AND PROVISIONS OF UNIFORMITY OF SENTENCES CAN BEST BE ACHIEVED BY DETERMINATE SENTENCES FIXED BY STATUTE IN PROPROTION TO THE SERIOUSNESS OF THE OFFENSE AS DETERMINED BY THE LEGISLATURE TO BE IMPOSED BY THE COURT WITH SPECIFIED DISCRE-TION.

THE MATRICES FOR DETERMINING BASE TERMS (PLEASE SEE EXHIBIT
A THE MATRIX OF BASE TERMS FOR FIRST DEGREE MURDER COMMITTED
ON OR AFTER NOVEMBER 8th 1978 ), ALSO  NOTE THAT THESE MATRIXS
DO NOT "INCLUDE POST CONVICTION CREDITS AS PROVIDED IN 2410.

THE BASE TERMS FOR SPECIFIC OFFENSES ( EXHIBIT A ) CONTAINED
IN THE 15 CCR 2403 INCLUDE THE LOWEST SUGGESTED BASE TERM TO
REFLECT THE MINIMUN TERM SET FORTH BY STATUTE (PENAL CODE 3046)
THE MATRICES INCLUDE THE CATEGORIES RELATING TO THE RELATIONSHIP
OF THE PRISONER TO THE VICTIM AND THE GRAVITY AND CIRCUMSTANCES
OF THE CRIME TO BE USED IN CONSIDERING MITIGATING AND AGGRAV-
ATING FACTORS. THE TERMS SPECIFIED IN THE MATRICES WERE
ESTABLISHED IN ACCORDENCE WITH PENAL CODE 3041 "IN A MANNER
THAT WILL PROVIDE UNIFORM TERMS FOR OFFENSES OF SIMILAR GRAVITY
AND MAGNITUDE" IN RESPECT TO THEIR THREAT TO THE PUBLIC AND
THAT WILL COMPLY WITH THE SENTENCING RULES THAT THE JUDICIAL
COUNCIL MAY ISSUE AND ANY SENTENCING INFORMATION RELEVENT TO
THE SETTING OF "PAROLE RELEASE DATES".

PETITIONER SUBMITS THAT HE HAS HAD A MINIMUN ELIGIBLE PAROLE
RELEASE DATE FOR 23 YEARS FOR A REASON (MEPD OF 9-17-2000).
THIS REASON WAS HANDED DOWN BY THE LEGISLATURE TO THE BOARD
OF PRISON HEARINGS AS A GUIDE LINE FOR THE BPH TO USE IN GIVING
LIFE PRISONERS A FAIR AND UNBIASED PAROLE BOARD HEARING. FOR
THE BOARD OR PANEL TO USE THE MATRIX WITH POST CONVICTION CREDITS
TO SET LIFE TERM INMATES THEIR SENTENSES AT THEIR INITIAL PAROLE
BOARD HEARINGS. THIS WAS DONE SO THE LIFE TERM INMATES WOULD
KNOW IN YEARS ( THAT IF THEY PROGRAMED AND STAYED OUT OF TROUBLE)
WHEN THEY WERE GOING HOME.

THE LAW IN THIS PROCESS IS BRIEF AND STRAIGHT FORWARD.
IT BEGINS WITH PC 3041 (a) WHICH REQUIRES THE BOARD TO CONDUCT
A PAROLE CONSIDERATION HEARING A YEAR BEFORE THE LIFE PRISONERS
MEPD (ACTUAL TIME FOR GOOD/WORK TIME CREDITS TOTALES) IN MY
CASE IT WAS AUGUST OF 1999. AT THIS POINT I HAVE SERVED THE
TIME FOR THE CRIME I WAS CONVICTED OF. PC 3041 (b) BREIFLY STATES
THAT THE BOARD IS TO "SET A DATE" UNLESS CONSIDERATION FOR PUBLIC
SAFETY IS AN ISSUE. WITHIN THIS PENAL CODE SECTION THERE IS
A FEDERALLY PROTECTED LIBERTY INTEREST AND A PRESUMPTION OF

RECEIVING A PAROLE DATE PROVIDING THE "UNLESS CONSIDERATION
FOR PUBLIC SAFETY" HAS BEEN PROVEN.

UP TO THIS POINT THERE ARE FEDERAL AND STATE CONSTITUTUONAL
RIGHTS TO UPHOLD AND FEDERAL AND STATE LAW (USC 2254 (d)(1)
(2) AND PC 3041 (a)(b). THEN THE PROCESS IS HANDED OVER TO THE
BOARD OF PRISON HEARINGS PANEL WHICH IN THIS CASE WAS THE BOARD
OF PRISON TERMS (BPT) WHICH IS NOW THE BOARD OF PRISON HEARINGS
(BPH). OVER 30 YEARS AGO THEY WERE INSTRUCTED TO PUT ALL OF
THEIR RULES, POLICIES, PROCEDURES, AND PRACTICES INTO CODE, ADMINI-
STRATIVE LAW. BY VIRTUE OF THIS, MY RIGHTS UNDER THE
ADMINISTRATIVE LAW IS NOW PROTECTED UNDERTHE DUE PROCESS CLAUSES
OF THE STATE AND FEDERAL CONSTITUTIONS PROCEDURAL DUE PROCESS
OR THE DVE COURSE OF LAW.

BREIFLY THE PERTINENT RULES COVERNING PAROLE HEARINGS FALL
UNDER CALIFORNIAS CODE OF REGULATIONS TITLE 15 DIVISION TWO:(CCR)

THE FIRST AND MOST IMPORTANT IS:
CCR 2000 (b) (48) GOOD CAUSE; A PAROLE AUTHORITY DECISION SHALL
BE BASED UPON A PREPONDERANCE OF EVIDENCE. FACTUAL BASIS AND
GOOD REASON FOR THE DECISION BEING MADE.

FOR MURDERS AFTER 10-8-1981 WE MOVE FORWARD TO ARTICILE
11 CCR 2400 WHICH STATES "WE SHALL NOW IMPLEMENT PC 3041 " DEFINI-
-ING PC 3041 CCR 2402 (a) STATES WE WONT SET A DATE IF WE FIND
THE PRISONER IS AN "UNREASONABLE"RISK OR A DANGER TO SOCIETY
IF RELEASED ON PAROLE AND CCR 2402 (b)STATES THAT THEY WILL
CONSIDER "ALL RELEVANT AND RELIABLE INFORMATION AVAILABLE" SUCH
AS THE FACTORS IN 2402 (c and d ). HERE CCR 2402 (a) REASSERTS
A PRESUMPTION OF SUITABILITY UNLESS THERE IS A FINDING BY A
"PREPONDERANCE OF THE EVIDENCE" FACTUAL BASIS AND GOOD REASON
(CCR 2000(b)(48) THAT PETITIONER IS AN UNREASONABLE RISK OR
DANGER TO SOCIETY TODAY IF RELEASED ON PAROLE". NO SUCH INFOR_
MATION HAS BEEN PROVEN BY THE CCR 2000 (b)(48) PREPONDERANCE
AND FACTUAL BASIS STANDARD OR EVEN A COMMON SENSE STANDARD,
THEREFORE THE PANEL OR BOARD WAS REQUIRED TO FIND PETITIONER
SUITABLE IN ORDER TO COMPLY WITH THE FEDERALLY PROTECTED LIBERTY
INTEREST REQUIREMENT OF "SET A DATE UNLESS CONSIDERATION FOR
PUBLIC SAFETY IS A CONCERN (PC 3041)(b). THE BOARD FAILED TO
FIND THAT PETITIONER IS AN UNREASONABLE RISK TO PUBLIC SAFETY
OR THAT PETITIONER IS A THREAT TO SOCIETY IF RELEASED ON PAROLE
BY A PREPONDERANCE OF EVIDENCE SO PC 3041(b) WAS NOT PROVEN.     19.

FEDERAL AND STATE AND ADMINISTRATIVE LAW REQUIRES THE PANEL
OR THE BORAD TO SET A RELEASE DATE.

NOW COMES CCR 2403 (b) MATRIX AS DESCRIBED ABOVE. HAD THE
BOARD FOLLOWED THE RULES, PETITIONER WOULD HAVE BEEN FOUND
SUITABLE FOR PAROLE AND WOULD HAVE HAD A RELEASE DATE SET ACCORD-
ING TO CCR 2403 (b) WHICH IS THE CATEGORY A/1 (BOX) MATRIX SCALE
(EXHIBIT A ) SETTING A TERM FOR A MAXIMUN OF 27 YEARS TO LIFE.
MY MEPD (OR THE 25 YEAR MARK; ACTUAL TIME PLUS GOOD TIME CREDITS
IS 9-17-2000) THE TWO YEAR ENHANCEMENT WAS COMPLETED IN APRIL
OF 1985 WITH THE 419 DAYS CREDIT PETITIONER WAS GIVEN AT HIS
SENTENCING IN OCTOBER OF 1984. PC -2930-2932 ( POST MONIGOLD
REQUIRE THAT I SERVE 8 MONTHS PER YEAR, EQUALS 4 MONTHS PER
YEAR FOR GOOD TIME CREDITS. PETITIONER WAS GIVEN HALF TIME CREDIT
FROM 11-2-1984 UNTIL 2-9-1989 WHICH ADDS UP TO A TOTAL OF A
LITTLE OVER 6 YEARS FOR THAT TIME PERIOD. AS OF THIS DATE PETITIO-
NER (11-2-2007) HAS SERVED 30 YEARS OF HIS 27 YEARS TO LIFE
SENTENCE ACCORDING TO HIS SCALE ON THE MATRIX CHART, WHICH IS
25 OR 26 OR 27 Years. PETITIONER IS 7 YEARS AND ONE MONTH PAST
HIS PAROLE RELEASE DATE ACCORDING TO THE LAW UNDER WHICH HE
WAS SENTENCED TO PRISON. THIS IS VIOLATION OF PETITIONERS 14th
AMENDMENT RIGHT TO THE CONSTITUTION OF THE UNITED STATES. PET-
ITIONER IS BEING HELD IN PRISON FOR REASONS THAT ARE ALMOST 24
YEARS OLD AND FOR REASONS THAT HE WILL NEVER BE ABLE TO DO ANYTHI-
-ING ABOUT. PETITIONER WAS NOT SENTENCED TO LIFE WITHOUT THE
POSSIBILITY OF PAROLE.

THE EXPOST FACTO ISSUE OF THE AEDPA.

APPLICATION OF A NEW LAW , OR RULE , OR PROCEDURE THAT
ADDS ADDITIONAL PUNISHMENT TO PETITIONERS SENTENCE WITHOUT AN
ADDITIONAL CRIME BEING COMMITTED IS IN VIOLATION OF THE EXPOST
FACTO LAW.

(1) IS HELD RETROACTIVELY
(2) INCREASES THE MEASURE OF PUNISHMENT.

GARNER V. JONES U.S. 2000 SAYS ALSO IF IT SUBSTANT-
IALLY INCREASES THE RISK OF INCREASING THE PUNISHMENT AS APPLIED

20.

TO PETITIONER. PETITIONER HAS READ THAT THIS AEDPA LAW IS BEING
APPLIED DUE TO THE FACT THAT HE DIDNT FILE HIS WRIT UNTIL AFTER
THIS AEDPA LAW CAME INTO EFFECT. PETITIONER SUBMITS TO THIS
HONORABLE COURT THAT HIS READING OF THIS EXPOST FACTO LAW IS
THAT ALL THE PUNISHMENT THAT PETITIONER IS TO **PAY** FOR THIS
CRIME THAT HE COMMITTED WAS HANDED DOWN TO HIM ON THE DAY HE
WAS SENTENCE TO PRISON, ANYTHING ADDED TO HIS SENTENCE AFTER
BEING SENTENCED TO PRISON IS EXPOST FACTO.

PETITIONER WAS SENTENCED TO PRISON IN OCTOBER OF 1984,
AND THIS AEDPA LAW DIDNT COME INTO EFFECT UNTIL 1996.
' THIS AEDPA IS EXPOST FACTO AND CANNOT BE APPLIED TO HIS
CRIME OR HIS CASE.

PETITIONER DECLARES UNDER PENALTY OF PERJURUY THAT TO ?
THE BEST OF HIS KNOWLEDGE ALL OF THE ABOVE IS TRUE AND CORRECT.

EXCUTED ONTHIS DATE: /0/29/2007

SIGN:

21

THE ATTORNEY GENERAL HAS BROUGHT UP THE FACT THAT PETITIONER
WAS GIVEN A 128 COUNSELING CHRONO IN 2005 FOR DISRESPECTING
STAFF. PETITIONER IS SUBMITTING HIS EXPLANATION OF THE WRITE
UP   EXHIBIT (B).

PETITIONER HAD A SEVER MEDICAL PROBLEM AT THE TIME HE WAS
IN THE DENTAL OFFICE ON JUNE 1st, 2005. THIS IS PROVEN BY THE
EVIDENCE THAT PETITIONER HAS SUBMITTED IN EXHIBIT (B) FROM THE
MEDICAL DEPARTMENT.

AS IS EXPLAINED BY PETITIONER IN HIS EXPLANATION OF THIS
WRITE UP. THE DENTIST NOR WAS THE DENTAL ASSISTANT ANYWHERE
NEAR WHERE PETITIONER COULD SEE THEM WHEN HE WAS IN SEVER PAIN
IN THE DENTAL CHAIR AND HE HAD TO ADJUST HIS GROIN AREA. IN
PETITIONERS EXPLAINATION OF OVER TWO YEARS AGO HE STATES THAT
THE DENTIST NOR THE ASSISTANT WAS ANYWHERE NEAR WHERE HE COULD
SEE THEM.

AS IS ALSO EVIDENCED IN PETITIONERS 602, ITS CLEAR THAT THE
DENTIST NOR THE ASSISTANT WAS ANYWHERE NEAR PETITIONER WHEN
HE HAD TO ADJUST HIS GROINING AREA. EVEN WITH THE EVIDENCE FORM
THE MEDICAL DOCTORS, PETITIONER FAILED TO GET A FAIR HEARING
TO REMOVE THIS 128 CHRONO FROM HIS RECORD.

PETITIONER DECLARES UNDER PENALTY OF PERJURY THAT THE ABOVE
AND THAT EXHIBIT (B) IS TRUE AND CORRECT.

EXCUTED ON THIS DATE: 10/31/07          RESPECTFULLY SUBMITTED

SIGN

228

# TABLE OF AUTHORITIES

1)    U.S. Constitution 14th Amendment; Due Process / Liberty Interest, Equal Protection
2)    CA State Constitution Due Process / Liberty Interest, Equal Protection
3)    CA Penal Code 1484
4)    CA Penal Code 3041.2
5)    CA Penal Code 3041 (a) (b)
6)    CA Penal Code 3042 (b)
7)    CA Penal Code 5076.2
8)    Evidence Code 115
9)    Evidence Code 452
10)   CA Code of Regulations Div.2; Section 2000(b)(48)
11)   CA Code of Regulations Div.2; Section 2280-2282
12)   CA Code of Regulations Div.2; Section 2400-2403
13)   CA Civil Code 1060
14)   CA Code of Procedures 2019 (b)
15)   In Re Aremu; LA County Case#BH002661
16)   In Re Cortez; LA County Case #BH001953
17)   Coleman v. Board of Prison Terms ; USDC ED CAL (2004) CIV S-96-0783 LKK PAN P
18)   Biggs v. Terhune ;     334 F.3d 910-917 (Cal 9TH Cir 2003)
19)   Brown v. Poole ;      337 F.3d ,1155 (Cal 9TH Cir 2003)
20)   Cato v. Rushen ;     825 F.2d 703,705 (Cal 9TH Cir 1987)
21)   Jancsek v. Oregon Board of Parole ; 883 F.2d 1389 ( Oregon 9TH Cir 1987)
22)   Masoner v. State of Cal      USDC CD CAL (2004) #WL 1080177
23)   Masoner v. State of Cal      USDC CD CAL (2004) #WL 1080176
24)   McQuillion v. Duncan(I)      306 F.3d 895,901-903 (Cal 9TH Cir 2002)
25)   McQuillion v. Duncan(II)     342 F.3d 1012 (Cal 9TH Cir 2003)
26)   Morrissey v. Brewer   (1972) 408 US 471,481
27)   Newton v. Rumery    (1987) 480 US 386,394
28)   Santobello v. New York      (1971) 404 US 257,261
29)   Santobello v. New York      92 S. Ct. 495, 30 L.Ed.2d 427
30)   Superintendent v. Hill (1985) 472 US 445,456
31)   People v. Calloway   (1974) 37 Cal. App. 3d 905,908
32)   In Re Capistran       (2003) 107 Cal. App. 4th 1299
33)   In Re Caswell (2001) 92 Cal. App. 4th 1017, 1030
34)   In Re Cortinas (2004) 92 Cal. App. 1153, 1169
35)   People v. Cunningham        (1996) 49 Cal. App. 4th 1044, 1047
36)   In Re Davis   (1979) 25 Cal. 3d 384,387
37)   People v. Gonzales   (1990) 51 Cal. 3d 1179,1258-1261
38)   Horning v. Superior Court   (2000) 81 Cal. App. 4th 1095, 1099

## TABLE OF AUTHORITIES

39)  In Re Ibarra   (1983) 34 Cal. 3d 277,289
40)  People v. Klaess      (1982) 129 Cal. App. 3d 820,823
41)  People v. Leroy      (1984) 155 Cal. App. 3d 602,606
42)  People v. Olivas      (1976) 17 Cal. 3d 236,245
43)  In Re Powell  (1988) 45 Cal. 3d 894,903
44)  In Re Ramirez (2001) 94 Cal. App. 4th 549,569,570
45)  In Re Rosenkrantz    (2002) 29 Cal. 4th 616
46)  In Re Scott    (2004) 19 Cal. App. 4th 871, 891
47)  People v. Scott      (2003) 29 Cal. 4th 783,814
48)  In Re Sena    (2001) 94 Cal. App. 4th 836
49)  In Re Ernest Smith    (2003) 144 Cal. App. 4th 343,366
50)  In Re Mark Smith    (2003) 109 Cal. App. 4th 489
51)  Terhune v. Superior Court    (1998) 65 Cal. App. 4th 864, 872-873
52)  In Re Shauputis      (2005) Cal. App. 4th #D046356
53)  Elijah Clay v. Warden Kane  USDC CD CAL (2005) Mag. F&R
54)  Buckley v. Terhune    9th Cir 2006 #03-55045
55)  Kunkler v. Muntz      USDC CD CAL (2006) #CV 05 6473 TJH (E)
56)  Eugilio Martin v. John Marshall      USDC ND CAL (2006) #CV 05 03486 MHP
57)  Robert E. Johnson v. Claude Finn et.al.      USDC ED CAL (2006) #CIV 05 0385 DFL GGH P
58)  Fernando Sanchez v. A.P. Kane    USDC CD CAL  #CV 04 9403 AHS (RC)
59)  Rosenkrantz v. Marshall      USDC CD CAL (2006) #CV 05 3836 GAF (AJW)
60)  In Re Rosenkrantz    LA Superior Ct #BH003529 (2006)
61)  Sass v. Board of Prison Terms      9th Cir (2006) #05-16455
62)  In Re Wen Lee      CAL 2nd Dist. App Ct #188831
63)  In Re Jeffrey Elkins   CAL 1st0 Dist. App Ct #A111925
64)  Scott II Supra,      133 Cal. App. 4th at pp. 595-596 (587-596)(2005)
65)  Jerome Thomas II v. Jill Brown Warden      USDC ND CAL (2006) #C05-132 MHP (pr)
66)  In RE Sandra Lawrence      CAL 2nd Dist. App Ct #B190874 /CA SUPREME #S154018
67)  In Re John Dannenberg      Cal. App. 4th  (2007)WK3408290 CAB 11/16/2007
65)  Jerome Thomas II v. Jill Brown Warden      USDC ND CAL (2006) #C05-132 MHP (pr)

Hayward v. Marshall F.3d 2008 WL 43716 9th Cir. No 06-55392

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

McQuillon V. Duncan 306 F.3d 895,901-902 (9th Cir.2002);

Biggs V. Terhune 334 F.3d 910 (9th Cir.2003)

In Re Rosenkrantz 29.Cal.4th 616 (Sup.Ct.2002)

Biggs 334 F.3d at 919,910 (9th Cir.2003)

    (Ibid) United States District Court Central District of

    California (Masoner V. State of California Et al case no.

    CV-03-1261 ER          .

Supt.V. Hill 472 U.S. 445

In Re Ramirez 94 Cal. 4th 549 at P.550,568 (2001) 564

In Re Dayan 231 Cal. App.3d 184

In Re Minnis (1972) 7 Cal.3d 639 (at P.646,647)

Strum 11 Cal.3d 258,268,269

Greenholtz V. Nebraska Penal Inmates (1979) 442 U.S.1.

Board of Pardons V. Allen (1987) 482 U.S. 369

Perveller V. Estelle 974 F.2d 1132,1134 (9th Cir.1992)

Way V. Superior Court (1977) 74 Cal.App.3d 164,171

In Re Rosenkrantz 2002 DJDAR 14087, at P.14098

Biggs V. Terhune 2003 DJDAR 7245

Rosenkrantz 80 Cal.App.4th 409

People V. Sanders (1990) 51 Cal.3d 471,272, Cal.Rptr. 537

People V. Superior Court (1982) 31 Cal.3d 797,803

In Re Powell (1988) 45 Cal.3d 894,901,248 CR 431,435

Trop V. Dulles 356 U.S. 86,100, 78 S.Ct.590,597 (1958)

Furman V. Georgia 408 U.S. 238,92 S.Ct. 2726,33 L.Ed 2d 346 (1972)

In Weems V. U.S. 217 U.S. 349; 30 S.Ct. 544,549

Furman Supra at P.2742,2744

In Re Rodriguez (1975) 14 Cal. 3d 639; 122 Cal.Rptr 552

Rodriguez Supra at P.654,652

Weems Supra at P.549

Solem V. Helm 463 U.S. 277; 103 S.Ct.3001; 77 L.Ed.2d 637

In Harmelin V. Michigan 501 U.S. 957; 111 S.Ct. 2680; 115 L.Ed 2d 863

Harmelin Supra at 2702, 2705

Ramirez Supra at 570,569

In Re Dayan 231 Cal. App.3d 184

In Re Rosenkrantz 2002 DJDAR at P.1440, 14111

## SUMMARY OF THE CASE

In the present case the prisoner was received by the California California Department of Corrections on 2 November, 1984, for the crime of First degree murder. (PC 187(a), case number 12451C). Petitioner was sentenced to 25 years to life including a 2 year enhancement for false imprisonment. The prisoner has a MEPD of 9-17-2000.

The petitioner has had five documentation hearings. The initial parole hearing and two (2) subsequent parole hearings. Petitioner has not had a parole release date set.

The conviction case involves the theft of a truck in Visalia, the theft of the victim's auto, the death of Mrs Aikens and the false imprisonment of Miss Fomasi. Miss Fomasi arrived at Mrs Aikens residence while petitioner was tying up Mrs Aikens. Petitioner knew Mrs Aikens from before, due to the fact that he had been employed by her. Petitioner went to her home because he believed she would lend him her car. When she answered the door petitioner asked to borrow the car. She told petitioner that she did not remember who he was. At that time petitioner walked into her home and walked Mrs Aikens to the bedroom, where he pulled the telephone from the wall and tied her up. Petitioner then pulled the top mattress half way off the bed to hide her. At that time there was a knock on her front door. Petitioner waited, but Ms Fomasi was persistent. Petitioner then opened the door and had her come into the front room where petitioner tied her up. Petitioner then went into the garage and opened the outside door. Petitioner came back into the house and found Ms Fomasi was almost completely untied. Petitioner retied her and then left with Mrs Aikens car. About forty miles from her residence the car became stuck on the side of the road, so petitioner left it there. Petitioner saw a bar and noticed that there was a boat dock very near it. There was a boat at the dock so petitioner took it. Petitioner used it over night, during which time the boat drifted back to shore where the owner found,

it, as well as petitioner. The owner informed petitioner that the
police were on their way, at which time petitioner left the boat
and began walking away. About twenty minutes later petitioner was
arrested. It was soon after that time that petitioner was
informed that Mrs Aikens had died from the trauma.

REASON FOR REVIEW

PETITIONERS PAROLE BOARD HEARING OF MARCH 30TH 2007

THE PANEL OPENED PETITIONERS HEARING BY SWEARING IN PETITIONER FOR THE RECORD. THEN READ A SERIES OF INFORMATIONAL INSTRUCTIONS THAT INCLUDED A STATEMENT THAT PETITIONER DID NOT HAVE TO DISCUSS OR ADMIT TO THE COMMITMENT OFFENSE. THE COMMISSIONER STATED WE ARE NOT HERE TO RETRY YOUR CASE. THIS PANEL EXCEPTS THE FINDINGS OF THE TRIAL COURT. PETITIONER IS ASK IF HE WILL BE DISCUSSING HIS CRIME TODAY. AS SOON AS PETITIONER SAYS YES, THE COMMISSIONER CONTRADIC'S HIMSELF AND BEGINS RETRYING PETITIONER REGARDING HIS CRIME. THE COMMISSIONER READS WHAT HE CALLS THE FACTS OF THE CASE INTO THE RECORD (I.E. A DESCRIPTION OF THE CRIME) AND THEN QUESTIONS PETITIONER AS TO HIS FACTS. THIS LINE OF QUESTIONING IGNORS PETITIONERS RIGHTS TO BE HEARD REGARDING MATTERS OF SUITABILITY AND TOTALLY FOCUSES ON THE COMMITMENT OFFENSE TO BUILD A RECORD OF UNSUITABILITY RATHER, THAN TO COVER THE MATERIALS IN THE RECORD AND THE VOLUME OF MATERIALS PETITIONER HAS BROUGHT TO THE HEARING TO PROVE PETITIONER IS SUITABLE FOR HIS LEGAL RELEASE DATE. OF WHICH BY LAW IS THE TRUE PURPOSE OF PETITIONERS PAROLE BOARD HEARING. (15 CCR SECS 2281/2402).

PETITIONER IS BEING DENIED HIS RELEASE DATE WITHOUT ANY CONSIDERATION BEING GIVEN TO HIS INCARCERATION RECORD OF THE PAST 23 YEARS, WHICH PROVES THAT PETITIONER IS NOT A THREAT TO SOCIETY NOR A RISK TO PUBLIC SAFETY.          BIGGS V. TERHUNE, 334 F. 3d 910 (9TH CIR. 2003) STAND FOR THE PROPOSITION THAT CONTINUED RELIANCE UPON UNCHANGING FACTORS SUCH AS THE NATURE OF THE OFFENSE "WITHOUT MORE" WILL CONTRAVENE THE DUE PROCESS CLAUSE. THIS PRINCIPLE WAS NOT REVERSED IN IRONS. IN SASS AND IN IRONS AND HERE IN PETITIONER'S CASE THERE IS SUBSTANTIAL EVIDENCE IN THE RECORD DEMONSTRATING REHABILITATION. IN ALL THREE CASES THE BOARD OF PRISON HEARING'S GAVE NO WEIGHT TO THIS EVIDENCE IN

26

~ REASON FOR REVIEW ~

IN REACHING ITS CONCLUSION THAT SABS AND IBANS AND NOW PETITIONER PRESENTLY CONSTITUTED A DANGER TO SOCIETY AND THUS WERE NOT SUITABLE FOR PAROLE.

THE COURT STATED: WE HOPE THAT THE BOARD WILL COME TO RECOGNIZE THAT IN SOME CASES, INDEFINITE DETENTION BASED SOLELY ON AN INMATES COMMITMENT-OFFENSE, REGARDLESS OF HIS REHABILITATION, WILL AT SOME POINT VIOLATE DUE PROCESS, GIVEN THE LIBERTY INTEREST THAT FLOWS FROM THE RELEVANT CALIFORNIA STATUTES. BIGGS 334 F. 3d AT 910 (9TH CIR. 2003) ITS CLEAR THAT A DUE PROCESS VIOLATION HAS OCCURED IN PETITIONERS CASE.

PETITIONER CONTENDS THAT THE POINT OF TIME TO WHERE PETITIONERS DUE PROCESS RIGHTS HAS BEEN VIOLATED HAS BEEN REACHED BY THE BPH AFTER RECEIVING HIS 3rd 3 YEAR DENIAL WITH NO EVIDENCE PRODUCED BY THE BPH TO SHOW OR PROVE THAT PETITIONER IS A THREAT TO SOCIETY OR A RISK TO PUBLIC SAFETY. PETITIONERS MEPD WAS 9/17/2000 HE HAS HAD 3 PAROLE BOARD HEARINGS 4/2000  7/2003  3/2007 WHERE THERE HAS BEEN NO EVIDENCE PRODUCED TO SHOW OR PROVE THAT THIS PETITIONER IS A RISK TO PUBLIC SAFETY OR A THREAT TO SOCIETY. JUST SAYING THE WORDS BY THE BPH OVER AND OVER AND OVER AGAIN THAT THIS PETITIONERS NEEDS MORE THERAPY IS NOT EVIDENCE THAT PROVES THAT ALL OF PETITIONERS PSYCHOSOCIAL EVALUATIONS OVER THE PAST 10 YEARS ARE WRONG. PETITIONER HAS FURNISHED THE BPH WITH ALL THE EVIDENCE NECESSARY OVER THESE PAST 3 BOARD HEARINGS (EXHIBITS A, B, C, D, E, F, G, H.) TO PROVE HE IS MORE THAN SUITABLE TO BE RELEASED BACK TO SOCIETY. THE BPH HAS TOTALLY IGNORED AND REFUSED TO CONSIDER THIS EVIDENCE.

27

SEE EXHIBIT AA FOR COMPLETE HEARING TRANSCRIPTS.
SEE EXHIBITS BB AND CC FOR PETITIONERS 2000 & 2003 HEARING
DECISIONS.
PETITIONER SUBMITS HIS MARCH 30TH 2007 PAROLE BOARD HEARING
TRANSCRIPTS ALONG WITH EXHIBITS A, B, C, D, E, F, G, H THAT PROVE
THERE IS NO EVIDENCE PRODUCED BY THE BOARD OF PAROLE HEARINGS
(BPH) TO SHOW OR PROVE THAT PETITIONER IS A THREAT TO SOCIETY OR
THAT HE IS A RISK TO PUBLIC SAFETY.

   REASONS FOR DENIAL PAGE 97

THE DECISION STATES: SIR, THIS PANEL HAS REVIEWED ALL INFORM-
ATION RECEIVED FROM THE PUBLIC AND RELIED ON THE FOLLOWING
CIRCUMSTANCES IN CONCLUDING THAT YOU ARE NOT SUITABLE FOR
PAROLE AND WOULD POSE AN UNREASONABLE RISK OF DANGER
TO SOCIETY OR A THREAT TO PUBLIC SAFETY IF RELEASED FROM
PRISON. AND LOOKING AT THE CRIME, WE FIND THAT THE OFFENSE
WAS CARRIED OUT IN AN ESPECIALLY CRUEL OR CALLOUS MANNER.
THERE WERE MULTIPLE VICTIMS IN THIS CASE (LINES 8 THROUGH 13).

   PAGE 98 THE AGE AND CIRCUMSTANCES OF YOUR INITIAL CONTACT
WITH MRS AIKENS (ASSULT UPON) INDICATES A PARTICULAR CRUELTY
AND DISREGARD FOR THE SAFETY OF OTHERS AND A DISREGARD FOR
HUMAN SUFFERING. IN FACT MRS AIKENS DIED OF HEART FAILURE
WHILE SHE WAS BOUND BY YOU (LINES 2 THROUGH 6).

   WE ALSO MAKE A FINDING THAT YOUR SOCIAL HISTORY BEFORE
THIS CRIME WAS VERY UNSTABLE IN THAT YOU HAD HAD MANY FAILED
MARRIAGES (14 THROUGH 16).

   PAGE 99 YOU STOLE OTHER PEOPLES CARS, YOU BURNED THEM.
WE ALSO FIND THAT YOUR MOTIVATION FOR THIS CRIME WAS JUST
REALLY INEXPLICABLE (LINES 17 AND 18).

28

PAGE 101 BEFORE THIS CRIME WAS COMMITTED, YOU HAD A RECORD THAT INVOLVED CARRYING A SAWED-OFF SHOTGUN THAT WAS LOADED. ON THIS CASE HERE, YOU BROUGHT A SHOTGUN WITH YOU FROM VISALIA TO BODEGA BAY (LINES 21 THROUGH 24). THERE IS NO WHERE IN THE RECORD OF PETITIONERS CRIME WHERE IT IS PROVEN THAT HE HAD A SHOT GUN WITH HIM. THE ONLY EVIDENCE THAT PETITIONER HAD A SHOTGUN WITH HIM WAS HIS CONFESSION AT HIS PAROLE BOARD HEARINGS.

PAGE 102. SHOTGUNS INVOLVING HUMAN BEHAVIOR AND NOT RELATED TO FISHING OR HUNTING CAN ONLY HAVE ONE DEADLY ENDING, (LINES 2 THROUGH 4). THERE IS NO RECORD ANYWHERE IN PETITIONERS CASE OR HISTORY WHERE HE HAS HARMED OR INJURED ANYONE WITH A SHOTGUN.

ANOTHER DISTURBING FACTOR IS THAT IN 1982, YOU DROVE YOUR VEHICLE INTO THE STORE THAT WAS OWNED BY YOUR IN-LAWS (LINES 5 AND 6). AND UNDER THE CIRCUMSTANCES AND THE TOTALITY, THATS A CRIME OF VIOLENCE (LINES 7 AND 8). THERE COULD HAVE BEEN A CUSTOMER THERE JUST STANDING BEHIND THE DOOR. THATS WHY I CALL THIS A CRIME OF VIOLENCE (LINES 13 THROUGH 15). PETITIONER SUBMITS THE ABOVE INFORMATION AS A PRIME EXAMPLE OF THE BPH USING (WHAT IF) (IF ONLY) (COULD HAVE HAPPEN) KINDS OF PHARSES AND LANGUAGE TO RAISE THE LEVEL OF PETITIONERS CRIME TO DENIE PETITIONER HIS LEGAL RELEASE DATE. THE REASONS GIVEN ON PAGE 102 ARE FALSE INFORMATION PUT INTO THE RECORD OF THINGS THAT DID NOT HAPPEN. ITS THIS KIND OF PHARSES AND LANGUAGE THAT THE BPH USES TO DENIE PETITIONER HIS LEGAL AND JUST RELEASE DATE THAT MAKES A SHAM OUT OF THE ENTIRE PAROLE SYSTEM.

PAGE 103. IN THIS CASE THERE WERE MULTIPLE VICTIMS ATTACKED WHO WERE PARTICULARLY VULNERABLE. YOU HAD AN OPPORTUNITY TO CEASE. AND IT APPEARS FROM THE STEALING OF THE CAR TO THE BURNING OF THAT PICK UP (ANOTHER ISSUE I WAS NOT CONVICTED OF) (BUT DID CONFESS TO AT MY BOARD HEARINGS), THAT EVERY - THING YOU DID ON THAT TRIP WAS PREMEDITATED AND DELIBERATED AND PLANNED AND CALCULATED. THIS IS NOT TRUE AND THE ENTIRE RE- CORD OF EVENTS PROVE'S THAT PETITIONER HAD NO IDEA OF WHAT HE WAS GOING TO DO FROM ONE MINUTE TO THE NEXT (LINES 4 THROUGH 9).

WE BELIEVE THAT YOU CONTINUE TO NEED THERAPY TO FACE, UNDER- STAND, AND COPE WITH STRESS IN A NON-DESTRUCTIVE MANNER, AS WELL AS TO COME TO TERMS WITH OTHER ISSUES (LINES 16 THROUGH 19). THESE REASONS ARE THE VERY SAME REASONS USED TO DENIE PETI- TIONER HIS RELEASE DATE AT HIS 2000 AND 2003 BOARD HEARINGS WITH ABSOLUTELY NO EVIDENCE PRODUCED AT ANY OF PETITIONERS LAST 3 HEARINGS TO SHOW OR PROVE HE NEEDS MORE THERAPY. THE EVIDENCE THAT PETITIONER HAS PRODUCED IN HIS EXHIBITS OF HIS PHYSIOLOGICAL EVALUATIONS OF 1998 THROUGH 2006 PROVE THAT PETITIONER IS NOT IN NEED OF THERAPY AND IN FACT PROVE THAT PETITIONER IS MORE THAN READY TO BE RELEASE BACK INTO SOCIETY AS A PRODUCTIVE HUMAN BEING. JUST SAYING THE WORDS THAT PETITIONER NEEDS MORE THERAPY, IS NOT EVIDENCE.

ALTHOUGH YOU'VE NEVER PHYSICALLY ABUSED WOMEN WITHIN THE MEANING OF 273.5, THAT IS IN REGARD TO THE PERSON YOU WERE LIVING WITH, YOUR DESCRIPTION OF YOUR RELATIONSHIPS WITH YOUR OTHER WIVES INDICATE THAT THERE WAS MANY, MANY ARGUEMENTS. THAT ALL OF YOUR RELATIONSHIPS WITH WOMEN INVOLVED ARGUING AND

36

Page 103 Continued.

And ultimately deteriorated in the form of a Divorce. (Lines 1 through 4). I ask this Honorable Court with all Due Respect what may having arguements with my ex-wives over 23½ years ago has to do with my suitability for a Parole Release date today. When all the evidence is looked at and taken seriously (exhibits A, B, C, D, E, F, G, H) that Petitioner has presented to this Honorable Court. It is clear to see with all the work in anger control, Victim's awareness, stress management, know thyself, looking at all the self help work this petitioner has done and continues to do over the past 23½ years, with these exhibits Petitioner has proven his suitability for Parole Release. Page 104. And to that extent, sir, you continue to need more therapy and more insight and more work in regard to establishing that your not a threat to anybody else (Lines 5 through 7). These kinds of statements made by this BPH panel prove that everything that this petitioner has accomplished over these past 23½ years has been totally and completely ignored in their decision making process. This petitioner has been sober and drug free since the day of his arrest, as has been proven by the many drug and alcohol test that he has passed over these past 23½ years. His disciplinary record is also a testament that proves this petitioner is serious about his release back into society, in that he has had only one 115 in 23½ years of incarceration and this was for smoking a cigarette in an unauthorized area in 1998.

37

PAGE 104 CONTINUED

YOUR MARRIED NOW, BUT WE FIND THAT YOUR CONTACT WITH YOUR CURRENT WIFE, VALERIE, THAT YOU MET WHILE YOU WERE IN- CARCERATED (NOT TRUE) IS NOT A SOURCE OF STABILITY TO YOU AS WAS SAID BY THE MOST RECENT PSYCHOLOGIST BECAUSE YOU HAVE NEVER HAD A RELATIONSHIP WITH HER AS HUSBAND AND WIFE OUTSIDE THIS FACILITY. SO ITS IS ERROR TO SAY THAT, YEAH, THAT MARRIAGE IS A SOURCE OF STABILITY TO YOU (LINES 11 TO 18).

AND THROUGH THAT RELATIONSHIP, YOU'VE PROVEN YOU'VE WORKED OUT A LOT OF YOUR ISSUES WITH WOMEN (LINES 18 THROUGH 20).

PETITIONER SUBMITS AGAIN THAT THE ABOVE KINDS OF STATEMENTS MADE BY THIS BPH PANEL PROVE THAT ALL OF THE EVIDENCE PRODUCED BY PETITIONER TO PROVE HIS SUITABILITY FOR PAROLE WAS TOTALLY AND COMPLETELY IGNORED.

FOR THE BPH PANEL TO CONTINUE TO DENIE PETITIONER HIS RELEASE DATE USING THE REASONS STATED IN THEIR DECISION OF PETITIONER'S MARCH 30TH 2007 PAROLE BOARD HEARING IS A VIOLATION OF PETITIONER'S DUE PROCESS RIGHTS AS IS GUARANTEED BY THE CONSTITUTIONS 8TH AND 14TH AMENDMENTS TO THE UNITED STATES. GIVEN THE LIBERTY INTEREST THAT FLOWS FROM THE CALIFORNIA STATUTES (BIGGS 334 F. 3d AT 910 (9TH CIR 2003), CAL PENAL CODE 3041 (a)(6). McQUILLIAN V. DUNCAN 306 F. 3d 885, 901-902 (9TH CIR 2003). IN RE ROSENKRANTZ 29 CAL. 4TH 616 (SUPT. CT. 2002). IN RE ROSENKRANTZ (2000) 80 CAL. 4TH 409, 95 CAL. RPTR. 2d 279 (IBID) UNITED STATES DISTRICT COURT CENTRAL DISTRICT CALIFORNIA. MASONER V. CALIFORNIA ET AL CASE NO. CV-03-1061 ER.

ALL OF THE REASONS TO DENIE PETITIONER HIS RELEASE DATE USED BY THIS BPH PANEL HAVE NO EVIDENCE TO JUSTIFY PETITIONERS PAROLE RE- LEASE DATE.

TABLE OF AUTHORITIES

PROFFITT V. FLORIDA 428 U.S. 242, 251-52 (1976)

BOARD OF PARDONS V. ALLEN 482. U.S. 369 377-78 (1987)

GREENHOLTZ V. INMATES OF NEBRASKA 442 U.S. 1, 60 L. Ed. 2d 688, 99 S. Ct. 2100

BOARD OF PARDONS V. ALLEN 96 L. Ed. 2d 303, 107 S. Ct 2415 (1987)

McQUILLION V. DUNCAN 306 F. 3d 895, 902 (9TH CIR., 2002).

BIGGS V. TERHUME 334 F. 3d 910, 914-15 (9TH CIR., 2003).

CASWELL V. CALDRON 363 F. 3d 832, 838 (9TH CIR 2004) 234 F. 3d AT 916-17

RE ROSENKRANTZ 29 CAL 4TH 616, 657 (CA 2002), 80 CAL. APP. 4TH 409

RE SCOTT 119 CAL. APP. 4TH 871 (CA. APP. 2004).

GREENHOLTZ 442 AT 7 AT 12-15.

BOARD OF REGENTS V. ROTH 208 U.S. 564, 570-71 (1972)

DANNENBERG AT 1079-80; 1082-83

RE ROSENKRANTZ 29 CAL. 4TH 616, 683 (2002)

RE PREWITT 8 CAL. 3d 470 (CA. 1973)

RE STRUM 11 CAL, 3d 258 (CA. 1984) 268, 269

SUPERINTENDENT V. HILL 472 U.S. 445 449, 86 L. Ed. 356, 357 (1985)

JANCSEK V. OREGON BOARD OF PAROLE 833 F.2d. 1389, 1390 (9TH CIR. 1987)

CAFETERIA WORKERS V. McELROY 367 U.S. 886, 895 (1961)

MORRISEY V. BREWER 468 U.S, 471 (1972)

DANNENBERG 34 CAL. 4TH AT 1084-1094, 23 CAL, RPTR. 3d 445, 104 P. 3d 783

DANNENBERG 23 CAL, 4TH AT 1098 n. 18. - 34 CAL. 4TH AT RE 1098

ROSENKRANTZ II 444 F. SUPP. 2d AT 1078 - 1080 FN 14.

IRONS V. WARDEN CAL. STATE PRISON - SOLANO 358 F. SUPP. 2d 936, 947 (E.O. CAL. 2005)

MJAOGHER V. CARRE 2004 WL 1080176 (C.D. CAL. MAR. 4 2004) (NO CV-03 1261 - EO)

SCOTT II 133 CAL. APP. 4TH AT 598 (CITING ROSENKRANTZ 29 CAL. 4TH AT 683)

ROSENKRANTZ 29, CAL. 4TH AT 480 - II 444 F. SUPP. 2d AT 1082 - 83

UNITED STATES V. OLSENUS . 888 F. 2d 636 634 (9TH CIR. 1989)

PEOPLE V. RAMIREZ 25 CAL. 3d 260 (CA. 1979) 84 CAL, 4TH 549 AT 550, 568 (2001) 564

HUBBARD V. SUPERIOR COURT 19 CAL. 4TH 1138-1151 n. 19.

36

CALIFORNIA CODE OF REGULATIONS (15 CCR)

15 CCR 2403 (3)      2280

3375.5               2400

2000 (b) (66)        2402 (c)

2403                 2402 (d)

2401                 2281 (c)

2402                 2402 (a)

OTHER SUTHORITIES

CALIFORNIA RULES OF COURT.

SEE EXHIBIT A FOR PENAL CODE 1168 ENTITLED "FIXING  TERM OF IMPRISONMENT.

SEE EXHIBIT A PENAL CODE 1170 ENTITLED "LEGISLATIVE FINDINGS" DETERMINING
LENGTH OF TERM.

SEE EXHIBIT A FOR MATRICES CHART FOR DETERMINING BASE TERMS FOR SPECIFIC
OOFFENSES CONTAINED IN 15 CCR 2403.

SEE EXHIBIT B FOR THE 128A WRITE UP THAT PETITIONER RECEIVED ON JUNE 1ST
2005.

# EXHIBIT A

comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates."

Furthermore, the initial statement of reasons in this regulatory action stated as follows:

> *In keeping with triad sentencing structure of the determinate sentencing law, each category contains a mitigated, middle and aggravated term.    Mitigating and aggravating factors are contained in 15 CCR §§ 2404 and 2405.  Each ascending category contains circumstances more egregious than the last, therefore, the suggested terms increase.*

Finally, historically, society has condemned a violent crime committed against a victim unknown to a perpetrator more so than a crime committed on a victim known to the perpetrator.  This is due to society's fear of random individuals becoming victims for no explicable reason.  This is evidenced by the matrices established approximately 30 years ago in §§ 2403(b) and (c).

Accommodation to Commenter No. 1: For the reasons stated above, the Board does not believe that further modification to the regulations is necessary as a result of this comment. The Board thanks Mrs. Ramierez for her comments and participation in the rulemaking process.

Commenter #2 — Donald A. Miller, letter dated May 29, 2004, received June 14, 2004

Commenter requests the following:

1.    The correct definition of attempted willful, deliberate, and premeditated murder be re-incorporated into the final paragraph of proposed section 2400.

Response:

The proposed amendments to 15 CCR § 2400 did not delete the definition of "attempted willful, deliberate, and premeditated murder" from the final paragraph. The proposed amendments to 15 CCR § 2400 deleted the definition of "life prisoner" from the final paragraph. Subsection (b)(3) of 15 CCR § 2000, entitled "Rules of Construction and Definitions" provides, in pertinent parts, that the definition of "life prisoner" is:

> *[a] prisoner serving a sentence of life with the possibility of parole. . . . Life sentences may be imposed for the following crimes or conspiracy to commit any of the following crimes: . . .*
>
> *(K) Attempted willful, deliberate, and premeditated murder as defined in Penal Code section 189.*

36

-7

As to her general comments contending the matrices contained in 15 CCR § 2403 increase the sentences for crimes and her questions regarding the categories relating to the relationship of the prisoner to the victim and the gravity and circumstances of the crime, BPT responds as follows:

Penal Code § 1168, entitled "Fixing Term of Imprisonment," reads as follows:

(a)    *Every person who commits a public offense, for which any specification of three time periods of imprisonment in any state prison is now prescribed by law . . . shall, be sentenced pursuant to Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2.*

(b)    *For any person not sentenced under such provision, but who is sentenced to be imprisoned in the state prison, . . ., the court imposing the sentence shall not fix the term or duration of the period of imprisonment.*

Penal Code § 1170, entitled "Legislative Findings—Determining Length of Term—Resentencing," states in pertinent parts that:

(a)(1)  *The Legislature finds and declares that the purpose of imprisonment for crime is punishment. This purpose is best served by terms proportionate to the seriousness of the offense with provision for uniformity in the sentences of offenders committing the same offense under similar circumstances. The Legislature further finds and declares that the elimination of disparity and provision of uniformity of sentences can best be achieved by determinate sentences fixed by statute in proportion to the seriousness of the offense as determined by the Legislature to be imposed by the court with specified discretion.*

(b)    *When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime.*

The matrices for determining base terms for specific offenses contained in 15 CCR § 2403 include the lowest suggested base term to reflect the minimum term set forth by statute (Penal Code § 3046). The matrices include the categories relating to the relationship of the prisoner to the victim and the gravity and circumstances of the crime to be used in considering mitigating and aggravating factors. The terms specified in the matrices were established in accordance with Penal Code § 3041, "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will

*ADDITIONS TO THE PROPOSED TEXT ARE INDICATED IN UNDERLINE AND DELETIONS IN STRIKETHROUGH ("——") FORMAT*

(b) Matrix of Base Terms for First Degree <u>Murder committed</u> on or after November 8, 1978.

### CIRCUMSTANCES

| FIRST DEGREE MURDER Penal Code § 189 (in years and do~~es~~ not include post conviction credit as provided in § ~~2290~~ <u>2410</u>) | A. *Indirect* Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force; e.g., shock producing heart attack, a crime partner actually did the killing. | B. *Direct or Victim Contribution* Death was almost immediate *or* resulted at least partially from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include victim acting in defense of self or property. | C. *Severe Trauma* Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim. | D. *Torture* Victim was subjected to the prolonged infliction of physical pain through the use of nondeadly force prior to act resulting in death. |
|---|---|---|---|---|
| I. *Participating Victim* Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g., crime partner, drug dealer, etc. | 25-26-27 | 26-27-28 | 27-28-29 | 28-29-30 |
| II. *Prior Relationship* Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 26-27-28 | 27-28-29 | 28-29-30 | 29-30-31 |
| III. *No Prior Relationship* Victim had little or no personal relationship with prisoner *or* motivation for act resulting in death was related to the accomplishment of another crime, e.g., death of victim during robbery, rape, or other felony. | 27-28-29 | 28-29-30 | 29-30-31 | 30-31-32 |
| IV. *Threat to Public Order or Murder for Hire* The act resulting in the victim's death constituted a threat to the public order includ~~e~~ing th~~e~~ murder of a police officer, ~~prison~~ | 28-29-30 | 29-30-31 | 30-31-32 | 31-32-33 |

# EXHIBIT B

39

602 INFORMATION

40

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128-A

**BAIR**                    **C-95079**                    **L-346**

On **Wednesday, June 01, 2005**, at approximately **0830** hours, **Inmate BAIR, C-95079, housed in L-346,** was seated in the Dental Chair for a scheduled appointment in Mainline Dental Clinic. During the appointment I observed him fondling his private area. This was observed by the Dental Assistant, Vasmine Rhodes, RDA who was present during the appointment. I told him to stop and that if this behavior were observed again, he would be dismissed immediately from the Dental Clinic.

Orig:  C-File
  cc:  Counselor
       Inmate

DIEHL, R.
Dentist
Mainline Dentist office, 2nd Watch

**3005(a) Behavior**

Date: 6-1-05          **3004(b) Inmate's Respect towards Staff**          128-A Counseling Chrono DVI

Clifford Bair C95079
L3    346
P.O. Box 600
Tracy, California 95378-0600

To the State of California Board of Prison Hearings,
To whom It May Concern.

Subject: The 128-A That I Received On June 1st 2005.

On June the 1st 2005 I was written a 128-A Counseling Chrono Here At DVI Tracy California. I Received This Chrono On July 5th 2005. On July the 5th 2005 I wrote a Detailed Description of My Medical Problem And I Apologized To Doctor Diehl And Miss Rhodes. I Sent A Copy To My Counselor And To My Wife, To Doctor Diehl And Miss Rhodes.

At This Time I Had No Idea That I Could 602 This 128-A I Do Know That Ignorance Of The Law Or The Rules Of The Title 15 Are No Excuse. But I Still Had No Idea, At This Time

In May Of 2006 When I Was Having My Psychological Evaluation For My 2006 Board Hearing. I Was Telling The Psychologist About My 128-A That I Had Received In June Of 2005. I Told Him About My Written Response And He Told Me How Worthless That Was, And Told Me That I Needed To 602 That 128-A. This Is When I Found Out That I Should Have As Soon As I Received It.

I Filed My 602 (Log No. 06-01264) On May The 10th 2006.

462

B. 5/10/06

THE ACTION REQUESTED WAS: I WANTED A COPY OF MY MEDICAL RECORDS AS OF JULY 1st THROUGH JULY THE 5th 2005 THAT WILL PROVE THAT I WAS SEEN BY DOCTOR FOX AND THAT HE WROTE ME A PRESCRIPTION FOR MY MEDICAL CONDITION IN MY GROIN AREA. ALSO TO HAVE THE 128-A REMOVED FROM MY RECORDS

THE 602 (C. INFORMAL LEVEL 5/17/06) PARTIALLY GRANTED. APPROPRIATE MEDICAL STAFF HAVE BEEN NOTIFIED AND THE REQUESTED COPIES WILL BE FORWARDED TO YOU AT THE EARLIEST CONVIENCE. MEDICAL STAFF DO NOT HAVE THE AUTHORITY TO REMOVE DOCUMENTS FROM YOUR FILE.

D. FORMAL LEVEL 5/25/06 602

SIR I AM RESPECTFULLY SUBMITTING A COPY 3 PAGES OF MY DOCTORS APPOINTMENT WITH DR FOX ON JUNE 16th 2005 AND THE COPY OF THE PRESCRIPTION THAT HE ORDERED FOR ME FOR MY GROIN INFECTION. WITH THIS EVIDENCE I AM ASKING THAT THIS 128-A BE REMOVED FROM MY FILE 5/25/06

E. REVIEWERS ACTION  FIRST LEVEL PARTIALLY GRANTED

· PAUL HAYTER, OFFICE ASSISTANT MEDICAL RECORDS - YOU WERE PROVIDED DESIRED COPIES OF YOUR MEDICAL FILE. YOU NEED TO FILE (SUBMIT) ANOTHER CDC 602 TO THE INSTITUTION APPEALS OFFICE ALONG WITH THE SUPPORTING DOCUMENTS WITH YOUR REQUEST. THE MEDICAL APPEALS PROCESS DOES NOT ALLOW AUTHORIZATION OF REMOVAL OF DOCUMENTS FROM THE CENTRAL FILE.

I FILED MY SECOND 602 ON 7/19/06 ASKING THAT THE 128-A BE REMOVED FROM MY C-FILE AND NOW MY COUNSELORS REPORT FOR MY PAROLE BOARD HEARING.

43

On July 24th 2006 my 602 appeal was rejected. It was stated that there had been too great a time lapse between when the action or decision occurred.

On July 24th 2006 my second 602 was rejected. It stated that I had submitted an appeal that duplicates a previous appeal upon which a decision has been rendered or is pending.

With this second 602 I was only doing what I was told to do in my first 602.

On 6/10/06 I submitted a letter to the appeals coordinator asking for an update on my original 602. On 6/20/06 I received my letter back saying it was (It is in progress Signed: C. Zuniga 6/20/06).

On 7/00/06 I submitted another letter to the appeals coordinator asking for an update.

I do not believe I was given a fair due process decision in my efforts to get this 128-A removed from my C file and my counselors parole board report. The decision that my 602 was well beyond the time limits should have been made immediately when I filed my 602 on May the 10th 2006.

I believe my letter of July the 5th 2005 and my medical records of June the 10th 2005 support the facts that there was absolutely no wrong doing on my part when I was at the dentist on June the 1st 2005.

44 - 5

I will say again that I know that ignorance of the law, and the rules of that Title 15 concerning the 602 process is no excuse. But I also want to say that in my 22½ years of incarceration I have never filed a 602. I also will admit that if it wasn't for my psychologist I would not have filed this one. I would have let this 128-A go and sat in my cell and coming board hearing and suffered knowing that I received this write up and I didn't do anything about it. Even though my 602 has been rejected, I have done all I can do.

I respectfully submit these documents to you.

Clifford Blair C95079
VK3      346
P.O. Box 600
Tracy, California
          95378 0600

Richard Russel / Christel Isler                6/19/06
Appeals Coordinator
Deuel Vocational Institution

Re: Clifford Bair C85079
     Log Number DUI-X-06-01264

Assign Staff Reviewer: HCM
Appeal Issue: Case Issue 128-A Removel/Records
Due Date 7/13/06

To Whom It May Concern,

     I Submitted my Supporting Documents to you on
5/25/06 Showing That With These Documents It Proves That I
Had A Serious Medical Problem on June 1st 2005 When I
Was At The Dentist Here At DUI. This Sever Medical Con-
Dition Was Located In My Groin Area As Has Been Showd
By The Medical Records I Have Submitted.
     I Am Requesting An Up-Date on my 602 So That I
Can Resolve This Issue, Or Proceed To The Next Level.

     It is in progress              I Thank You

     C. Zuniga ☞ 6 2006             Cliff Bair
                                     h3 346

                                     46

Richard Russell/Christel Islas                                    7/10/06
Appeals Coordinator,
Deuel Vocational Institution
DVI Tracy, California

Re: Clifford Baile C95079
    Log Number # DVI-X-06-01264

Assign Staff Reviewer: HCM
Appeals Issue: 128-A Removed From Case Records
              And Counselors Board Report

To Whom It May Concern,

    I Submitted A 602 on 5/10/06 To Secure My Medical Records
From June 18th 2005 That Proves I Had A Sever Medical Condition
In My Groin Area. I Recieved These Records on 5/17/06 And Submitted
Them To You on 5/25/06. I Wrote To You Asking For An Up Date on
My 602 on 6/19/06 To Get This 128-A Removed From My C-File.
My Counselor, Mr Lawson Has Now Excluded This 128-A Into My
Parole Board Report.
    My Last Response Was From Mr C. Zuniga CCI on 6/30/06
Stating (It Is In Progress).
    I Do Not Know What It Is In Progress Means, So I Am Re-
Questing Another Up Date, So That I Can Resolve This Issue.

                              I Thank You
                              Cliff Baile C95079

                                              47

Cliff Bair C95079
L3    346
P.O. Box 600
Tracy, California 95378-0600

My Response to the CDC 128-A that I Received on approximately July the 5th 2005.

On May the 27th or 28th I came down with a severe medical condition in my groin area and on the right side of my thigh area. This condition was so bad that I in fact had blisters on the side of my leg and on my groin area

On the 28th I put in a medical slip to see the doctor about getting some medical attention for this problem that was causing me a great deal of pain and discomfort.

On Wednesday June the 1st 2005 I went to my dental appointment. I was in a great deal of pain, and wearing a pair of pants that were too tight did not help my problem. When I was seated in the dental chair my condition became unbearable I waited for Doctor Diehl to get done talking to me and when she stepped out of my line of sight. I reached into my pants and adjusted my groin area to where I wasn't suffering so much pain. My groin area was wet from the blisters that had broken

The 128-A write up is this

State of California Department of Corrections CDC 128-A Bair C95079 L346 On Wednesday June 01, 2005 at approximately 0830 hours inmate Bair C95079 housed in L 346 was seated in the dental chair for a scheduled appointment in the mainline dental clinic

48   11A

128-A WRITE UP CONTINUED

During the appointment I observed him fondling his private area. This was observed by the dental assistant Jasmine Rhodes RDA who was present during the appointment. I told him to stop and that if this behavior were observed again he would be dismissed immediately from the dental clinic. ORG: C-FILE CC: Counselor, Inmate: 6-1-05 3005(a) Behavior 3004(b) Inmates respect towards staff 128-A Counseling Chrono Dot Diehl, R, Dentist Dentist Mainline Office 2nd Watch,

I moved my hand and Doctor Diehl pulled 3 of my upper teeth. I apologized and the doctor said she had forgiven me. Up until I received this 128-A I thought this whole misunderstanding was over with.

On approximately June the 3rd I was able to see Doctor Michael Fox concerning my medical problem. After Doctor Fox examined me, he gave me a prescription of Mikonazole Nitrate that has my condition under control

I would like to apologize to Doctor Diehl and apologize to Ms. Rhodes for any embarrassment that my actions have caused them.

ORG - Counselor - C File
    Dr. Diehl
    Ms. Rhodes
    Mrs. Bair

I'm Sincerely Sorry
Cliff Bair
July 5th 2005
49

## INMATE APPEAL ASSIGNMENT NOTICE

To: INMATE BAIR, C95079                                Date: May 31, 2006
Current Housing: WLT300000000046U

From: INMATE APPEALS OFFICE

Re: APPEAL LOG NUMBER: DVI-X-06-01264

ASSIGNED STAFF REVIEWER: HCM
APPEAL ISSUE: CASE INFO./RECORDS
DUE DATE: 07/13/2006

Inmate BAIR, this acts as a notice to you that your appeal has been sent to the above staff
for FIRST level response. If you have any questions, contact the above staff member. If
dissatisfied, you have 15 days from the receipt of the response to forward your appeal for
SECOND level review.


Richard Russell/Christel Isler
Appeals Coordinator
Deuel Vocational Institution

STATE OF CALIFORNIA

**INMATE/PAROLEE
APPEAL FORM**
CDC 602 (12/87)

DEPARTMENT OF CORRECTIONS

Location: Institution/Parole Region
1. _____DVI_____
2. _____

Log No.
1. _06 - 0126 4_
2. _____

Category
0
MF. HCM

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|------|--------|-----------|------------------|
| CLIFFORD BALB | C95079 | P.I.A. WAREHOUSE | 43  346 |

A. Describe Problem: On June 1st 2005 I was written a 128-A Counseling Chrono here at DVI. I recieved this chrono on July 5th 2005. On July 5th 2005 I wrote a note to Mrs Diehl and Mrs Rhodes, to my Counselor and my wife, explaining the entire situation to them. On 4/23/06 I sent an inmate request to medical records to obtain a copy of my doctors visit on July 3rd to prove my medical condition on June the 1st 2005. I have been advised to 602 this entire matter.

If you need more space, attach one additional sheet.

B. Action Requested: I want a copy of my medical records as of July 1st through July 5th 2005 that will prove that I was seen by Doctor Fox and that he wrote me a prescription for my medical condition in my groin area. I want this 128-A removed from my records.

Inmate/Parolee Signature: Clifford Bair          Date Submitted: 5/10/06

C. INFORMAL LEVEL (Date Received: 5-17-06 )

Staff Response: Partially granted. Appropriate medical staff have been notified and the requested copies will be forwarded to you at the earliest convenience. Medical staff do not have the authority to remove documents from your file.

RECEIVED
1JUN 02 2006
MEDICAL APPEALS ANALYST
DVI

Staff Signature: Ruul Lodin guz          Date Returned to Inmate: 5.18.06

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response. 3 PAGES

Sir, I am respectfully submitting a copy of my doctors appointment with Dr. Fox on June 6th 2005 and the copy of the prescription that he ordered for my condition in my groin in my groin area. With this evidence I am asking that this 128-A be removed from my file.

Signature: Clifford Bair          Date Submitted: 5/25/06

Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim

RECEIVED
MAY 17 2006

CDC Appeal Number:

51

CDC FORM 695
Screening For:
CDC 602 Inmate/Parolee Appeals
CDC 1824 Reasonable Modification or Accommodation Request

State of California

RE: Screening at the SECOND Level

*July 24, 2006*

**BAIR, C95079**
*WLT300000000046U*

Log Number: DVI-X-06-01264
(Note: Log numbers are not assigned to screen out appeals, or informal level appeals)

The enclosed documents are being returned to you for the following reasons:

*There has been too great a TIME LAPSE between when the action or decision occurred and when you filed your appeal with no explanation of why you did not or could not file in a timely fashion. Time limits expired per CCR 3084.6(c). Therefore, if you would like to pursue this matter further, you must submit an explanation and supporting documentation explaining why you did not or could not file your appeal timely.*

*After reviewing this appeal again, it should not have been processed originally in May of 2006. The date of action or the date or the chrono is 06-01-05. Well beyond time constraints. Appeal Rejected.*

Richard Russell/Christel Isler
Appeals Coordinator
Deuel Vocational Institution

AT E. REVIEWERS ACTION - DATED 7/11/06 AND 7/13/06

PAUL HAYTER, OFFICE ASSISTANT MEDICAL RECORDS YOU WERE PROVIDED DESIRED COPIES OF YOUR MEDICAL FILE. THE MEDICAL APPEALS PROCESS DOES NOT ALLOW AUTHORIZATION OF REMOVAL OF DOCUMENTS FROM CENTRAL FILE. YOU NEED TO SUBMIT ANOTHER CDC 602 TO THE INSTITUTION APPEALS OFFICE ALONG WITH SUPPORTING DOCUMENTS WITH YOUR REQUEST

SAN #      07/11/06
ITEM #     07/13/06

I DID ON 7/19/06

**NOTE**

Failure to follow instruction(s) will be viewed as non-cooperation and your appeal will be automatically dismissed pursuant to CCR 3084.4(d). This screening decision may not be appealed. If you believe this screen out is in error, please return this form to the Appeals Coordinator with an explanation of why you believe it to be in error, and supporting documents. You have only 15 days to comply with the above directives.

**PERMANENT APPEAL ATTACHMENT – DO NOT REMOVE**

| DATE | TIME | PROBLEM # | |
|------|------|-----------|---|
| 6/10/03 | 03 | | S   Itch to groin region |
| | | | O  SPO₂   PU   Resp 20   Tmp 97⁶ |
| | | | A   Deferred |
| | | | P   Referred to MD   _____ Eloder |
| | | | Ⓢ  Inmate presents with redness, rash & itching to groin & scrotal area - Present since 5/28ᵗʰ to 5/29. Very tend to scrotal area. |
| | | | Ⓞ  Erythema to groin, scrotal area interterigious folds pat thigh. |
| | | | Ⓐ  Tinea cruris. vs dashidrosis |
| | | | Ⓟ  2% miconazole cream - Apply to groin and scrotal area BID - Re v/ in 2 wks if symptoms are unresolved. |
| | | | _Martin O. Drius_ |
| INSTITUTION   DVI | | | ROOM / WING |

CDC NUMBER, NAME (LAST, FIRST, MI)

BAIR, Cliff
C-95079

**OUTPATIENT  INTERDISCIPLINARY**
**PROGRESS NOTES**

CDC 7254 (8/89)

53

Page 2

NOTE: SEND COPY OF PHYSICIAN'S ORDER FOR MEDICATION
TO PHARMACY AFTER EACH ORDER IS SIGNED.

| Order Date | Time | Problem # | Physician's Order and Medication (Orders must be dated, timed, and signed.) |
|---|---|---|---|
| 6-10-05 | NOON | | |
| PRESCRIPTION | | | − 2% miconazole cream −<br>Sg Apply to affected area BID X 14 days |
| | | Sg | |
| | | | Nurse O. Dixon |
| WHAT PAGE 3 SAYS | | | AS RECORDED BY MA MALLATT / CIASC |
| 10/17/06 | | | NURSE PRACTIONER |
| | | S | ITCH TO GROIN REGION |
| | | O | BP 118/63 P 61 Res 20 Temp 97.6 |
| | | A | Infection |
| | | P | REFERRAL TO MD |
| SYMPTOMS | | S | INMATE PRESENTS SEVER REDNESS, BASH ITCHING TO GROIN AREA AND SCROTUAL AREA. PRESENT SINCE 5/28 5/29 VERY TENDER TO SCROTUAL AREA |
| EXAMINATION | | O | REDNESS TO GROIN + SCROTUAL AREA AND CROTCH AREA |
| ASSESSMENT | | A | FUNGAL INFECTION TO GROIN WITH BLISTERS AND DRY SKIN |
| TREATMENT | | P | CREAM TO SCROTUAL AREA / RECHECK IN 2 WEEKS IF SYMPTOMS RETURN |

ALLERGIES:

INSTITUTION
DVI

ROOM/WING

CDC NUMBER, NAME (LAST, FIRST, MI)

Bair, CuH L.
C 95079

Confidential
client information
See W & I Code, Sections 4514 and 5328

**PHYSICIAN'S ORDERS**

NOTE: SEND COPY OF PHYSICIAN'S ORDER FOR MEDICATION
TO PHARMACY AFTER EACH ORDER IS SIGNED.

| Order Date | Time | Problem # | Physician's Order and Medication (Orders must be dated, timed, and signed.) |
|---|---|---|---|
| 6-10-05 | NOON | | |
| | | | - 2% miconazole cream - Sig: Apply to affected area BID x 14 days |
| | | | Marilyn O. Dixon |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

ALLERGIES:

INSTITUTION  DVI

ROOM/WING

Confidential
client information
See W & I Code, Sections 4514 and
5328

CDC NUMBER, NAME (LAST, FIRST, MI)

Bair, Cliff L.
C 95079

**PHYSICIAN'S ORDERS**

CDC 7221 (2/00)

55

```
                          *** PATIENT PROFILE ***
                        Includes All Prescriptions
                    Discontinued Drugs Are Marked with *
************************************************************************
C-95079, BAIR, CLIFF                                 CURRENT UNIT: WL3-046U
ALLERGIES:                    DOB:   /  /    HT:  ft  in    WT:   0
======================================================================
START      Rx/Qty  DRUG                            PHYSICIAN        STOP
======================================================================
03/11/2005 975718  TERAZOSIN 5MG UD*              FOX, MICHAEL D. *04/07/2005
ES             56  TAKE 2 CAPS EVERY MORNING                      WC2-003U
----------------------------------------------------------------------
04/07/2005 983530  TERAZOSIN 5MG UD*              FOX, MICHAEL D. *05/04/2005
MP             56  TAKE 2 CAPS EVERY MORNING                      WL3-046U
----------------------------------------------------------------------
05/18/2005 996438  HYDROCODONE 5/ACETAMINOPH*      NEWMAN, HARRY  *05/19/2005
MP              2  TAKE 2 TABLETS NOW                             WL3-046U
----------------------------------------------------------------------
05/18/2005 996439  HYDROCODONE 5/ACETAMINOPH*      NEWMAN, HARRY  *05/25/2005
MP             28  TAKE 2 TABS 2 TIMES DAILY ====7AM====5PM==========WL3-046U
----------------------------------------------------------------------
05/23/2005 998202  TERAZOSIN 5MG UD*              FOX, MICHAEL D. *05/24/2005
MP             56  TAKE 2 CAPS EVERY MORNING                      WL3-046U
----------------------------------------------------------------------
05/24/2005 998222  TERAZOSIN 5MG UD*              FOX, MICHAEL D. *06/20/2005
MP             28  TAKE 1 CAPSULE DAILY IN THE MORNING 28 DAY SUPPLY WL3-046U
----------------------------------------------------------------------
06/10/2005 4335    MICONAZOLE 2% CREAM*           FOX, MICHAEL D. *06/24/2005
MP              1  APPLY LIGHTLY 2 TIMES A DAY                    WL3-046U
----------------------------------------------------------------------
06/20/2005 7229    TERAZOSIN 5MG UD*              FOX, MICHAEL D. *07/18/2005
MP             28  TAKE 1 CAPSULE DAILY IN THE MORNING 28 DAY SUPPLY WL3-046U
----------------------------------------------------------------------
07/18/2005 7229    TERAZOSIN 5MG UD*              FOX, MICHAEL D. *07/25/2005
ESA            28  TAKE 1 CAPSULE DAILY IN THE MORNING 28 DAY SUPPLY WL3-046U
----------------------------------------------------------------------
07/25/2005 18175   TERAZOSIN 5MG UD*              NEWMAN, HARRY  *08/10/2005
MP             56  TAKE 2 CAPS AT BEDTIME 28 DAY SUPPLY           WL3-046U
----------------------------------------------------------------------
08/05/2005 22695   ACETAMINOPHEN 325MG #50*       NEWMAN, HARRY  *08/10/2005
KVA            50  TAKE 2 TABS 3 TIMES DAILY RFX2                 WL3-046U
----------------------------------------------------------------------
08/25/2005 29349   TERAZOSIN 5MG UD*              NEWMAN, HARRY  *09/22/2005
ERS            56  TAKE 2 CAPS AT BEDTIME 28 DAY SUPPLY           WL3-046U
----------------------------------------------------------------------
09/09/2005 34140   IBUPROFEN 600MG  UD*           FOX, MICHAEL D. *09/22/2005
ERS            42  TAKE 1 TAB 3 TIMES DAILY REFILLX3              WL3-046U
----------------------------------------------------------------------
09/22/2005 34140   IBUPROFEN 600MG  UD*           FOX, MICHAEL D. *10/12/2005
KVA            42  TAKE 1 TAB 3 TIMES DAILY REFILLX2              WL3-046U
----------------------------------------------------------------------
09/29/2005 40694   TERAZOSIN 5MG UD*              FOX, MICHAEL D. *10/27/2005
ERS            56  TAKE 2 CAPS AT BEDTIME 28 DAY SUPPLY           WL3-046U
----------------------------------------------------------------------

======================================================================
PAGE 1                                        PRINTED: 02/03/2006
```

56

CDC FORM 695
State of California
Screening For:
CDC 602 Inmate/Parolee Appeals
CDC 1824 Reasonable Modification or Accommodation Request

RE: Screening at the INFORMAL Level

*July 24, 2006*

**BAIR, C95079**
*WLT300000000046U*

Log Number: DVI-X-
(Note: Log numbers are not assigned to screen out appeals, or informal level appeals)

The enclosed documents are being returned to you for the following reasons:

***You have submitted an appeal that duplicates a previous appeal upon which a decision has been rendered or is pending (CCR 3084.3(c)(2)).***

**Duplicate to 06-1264.**

Richard Russell/Christel Isler
Appeals Coordinator
Deuel Vocational Institution

*THIS IS THE 602 THAT I FILED AS TO E. REVIEWERS ACTION DATED 7/11/06 AND 7/03/06*

***NOTE***
Failure to follow instruction(s) will be viewed as non-cooperation and your appeal will be automatically dismissed pursuant to CCR 3084.4(d). This screening decision may not be appealed. If you believe this screen out is in error, please return this form to the Appeals Coordinator with an explanation of why you believe it to be in error, and supporting documents. You have only 15 days to comply with the above directives.

**PERMANENT APPEAL ATTACHMENT – DO NOT REMOVE**

57

STATE OF CALIFORNIA

**INMATE/PAROLEE APPEAL FORM**

CDC 602 (12/87)

DEPARTMENT OF CORRECTIONS

| | Location: Institution/Parole Region | Log No. | Category |
|---|---|---|---|
| | 1. _____ | 1. _____ | _____ |
| | 2. _____ | 2. _____ | |

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| CLIFFORD BAIR | 295679 | P.I.A. WAREHOUSE | C3 346 |

A. Describe Problem: As per Reviewers Actions at (E.) on 602 dated 7/11/06. I am Submitting Another 602 and Accompaning Documents that Prove I had a Sever Medical Condition in my Groin Area on June 1st 2005 when I was Is the Dental Chair here at DVI. These Documents are the letter I wrote to Ms Diehl - Ms Rhodes - Mrs Bair - Counselor C-File. The 602 5/10/06. The Medical Records from my Doctors Appointment with Doctor Fox that Prove my Medical Condition. the Notice from the Appeals Coordinator that my 602 was on File 6/31/06

If you need more space, attach one additional sheet. Copy of 128-A

B. Action Requested: Is That the 128-A I Recieved be Removed from my C-File and my Counselors Report for my Parole Board.

Inmate/Parolee Signature: _____  Date Submitted: 7/19/06

C. INFORMAL LEVEL (Date Received: _____ )

Staff Response: _____

_____

_____

_____

_____

Staff Signature: _____  Date Returned to Inmate: _____

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

_____

_____

_____

_____

Signature: _____  Date Submitted: _____

Note: Property/Funds appeals must be accompanied by a completed
Board of Control form BC-1E, Inmate Claim

CDC Appeal Number: _____

58

# DVI INMATE REQUEST

From: Clifford Bair    # C 25079    Housed: L3  346    Dated: 7/31/06

Assignment: P.I.A. Warehouse    To: MR C. Zuniga CC II

Briefly state your problem:    (See reverse side for mailing instructions)

I LOST MY BATTLE WITH THE 602 Process TO GET A 128-A REMOVED FROM MY C-FILE AND MY COUNSELORS BOARD REPORT. THE SECOND LEVEL DECISION WAS I WAITED TO LONG TO FILE MY 602. I HAVE BEEN IN PRISON FOR 22½ YEARS AND UNTIL THIS 602 I HAVE NEVER FILED ONE I WOULD LIKE TO TALK TO YOU AND SEE IF THERE IS ANYTHING ELSE I CAN DO TO TAKE CARE OF THIS MATTER.    I THANK YOU

Clifford Bair

Response from Staff:

NO RESPONSE AS OF 8/7/06

Signed:_____ Title:_____ Dated:_____

Cus#03.doc    Rev.12/03

59

**Life Prisoners in California have a Constitutionally Protected Substantive Due Process right to a Fair and Impartial Parole Suitability Hearing and Decision**

Though "there is no constitutional or inherent right of a convicted person to be conditionally released before the· expiration of a valid sentence"...the mandatory language of a state's statutory scheme "creates a presumption that parole release will be granted" unless certain enumerated findings are made, thereby giving rise to a constitutional liberty interest. Id. at 12; Board of Pardons v Allen, 482 U.S. 369,377-78. (1987). The California parole scheme is virtually identical to the Nebraska one in Greenholtz and the Montana one in Allen. In both of these cases the United States Supreme Court held the statutes created a protected liberty interest,

, the Parole Board, although vested with significant discretion, is instructed by statute and/or regulation that it "shall" set a parole date "unless" limited circumstances exist.

Longstanding and clearly established United States Supreme Court precedent governs the instant case. Greenholtz v Inmates of Nebraska Penal, 442 U.S. 1, 60 L.Ed.2d 668,99 S.Ct. 2100 (1979), and Board of Pardons v Allen, 482 U.S. 369,96 L.Ed.2d 303,107 S.Ct. 2415 (1987). Such a precedent has resulted in both federal and California state courts expressly recognizing that California life prisoners have a protected liberty interest in parole release pursuant to the Fourteenth Amendment's Due Process Clause. McQuillion v Duncan, 306 F.3d. 895,902 (9th Cir. 2002) ("Under the clearly established framework of Greenholtz and Allen we hold that California's parole scheme gives rise to a cognizable liberty interest in release on parole.")(internal quotations omitted);Biggs v Terhune, 334 F.3d.910,914-15 (9th Cir. 2003)(recognizing due process liberty interest in context of parole suitability decision); Caswell v Calderon, 363 F.3d. 832,838 (9th Cir. 2004)(recognizing due process liberty interest in context of challenge to parole suitability rescission decision see also In re Rosenkrantz, 29 Cal.4th 616,657 (Ca. 2002) (recognizing judicial review using a "some evidence" test required to prevent Board decisions that are "arbitrary and

60

capricious, thereby depriving the prisoner of due process of law.)[1]; In re Scott, 119 Cal. App.4th 871,(Ca. App. 2004) (granting habeas relief after concluding the Board failed to consider substantial evidence showing suitability for release) petition for review denied, 2004 Cal. LEXUS 9695, 2004 D.A.R. 12607 (Cal. Oct.13, 2004)(unpublished). This clause applies when government action deprives a person of liberty or property. Greenholtz, 442 at 7. A person must have, not only a unilateral expectation, but a publicly recognized claim of entitlement to, the right at issue. Board of Regents v Roth, 208 U.S. 564,570-71, (1972).

    In California, the initial parole suitability hearing is scheduled a year before the prisoner's minimum eligible parole release date.[2] Cal. Pen. Code 3041(a). The statute provides that the Board "shall normally set a parole release date" at the initial suitability hearing. Id. Penal Code Section 3041(b) provides the standard for setting parole release dates:

> The panel or board "shall" set a release date "unless" it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Emphasis added; see also 15 CCR 2280 et seq. and 2400 et seq. Thus, there can be no question that the California parole scheme creates a protected liberty interest for prisoners.[3]

---

1 The California Supreme Court Rosenkrantz decision was specifically based on the Due Process protections afforded by the state constitution. The scope of California's procedural Due Process protections are arguably broader than federal protections in that California has rejected the notion that a statute-created right must be sufficiently compelling to have created a "liberty interest." See People v Ramirez, 25 Cal.3d 260(Ca. 1979). As for substantive Due Process analysis, the federal constitution's Due Process guarantee is at least as protective as California's constitution. See e.g. Hubbard v Superior Court, 19 Ca.4th 1138 1151 n. 19.

61

State law requires that the Board "shall" find a prisoner
suitable for parole and set a release date "unless" the reliable
evidence in the record shows that his/her release would pose a
risk to public safety. As in Greenholtz, the California statutory
scheme creates a statutory expectation of parole "absent the
requisite finding that one of the justifications for deferral
exists". Greenholtz at 12-15. Therefore, some evidence is
required to show that the prisoner is a current danger to the
community.

## What Due Process Requires

The core issue here is petitioner's substantive Due Process
rights, including the right to have his parole suitability
determined based on rational and nonarbitrary reasons that are
supported by reliable evidence. Though Dannenberg held that an
individual inmates suitability for parole under Penal Code
3041(b) must precede any effort to set a parole release date
under the uniform provisions of 3041(a), the court confirmed that
an inmate MUST be found suitable for release unless the Board
properly finds that the inmate presents a public safety danger.
Dannenberg at 1079-80;1082-83. Such a finding by the Board must
be based on "some evidence", which must be beyond that which is
minimally necessary to convict a person of the offense for which
he is confined. Id. at pg. 1095. see also In re Rosenkrantz, 29
Cal.4th 616,683 (2002).

In Hill, the court applied a "some evidence" test to review
whether there were sufficient protections in the circumstance
of prison disciplinary action that resulted in the loss of good
time credits, so as not to violate Due Process. Holding that "

---

2 Much earlier, the Board is obligated to meet with the prisoner
to review his/her central file, to make recommendations,
and to document activities and conduct pertinent to granting or
witholding post-conviction credit. This meeting must take place
during the third of incarceration. Pen. Code 3041(a).
3 The California Supreme Court has repeatedly held that the state
parole scheme creates a protected liberty interest for prisoners.
See e.g. In re Prewitt, 8 Cal.3d 470 (Ca.1973) In re Strum, 11
Cal.3d 258 (Ca. 1974).

62

"good time credits constitute a protected liberty interest, ●
a decision to revoke such credits must be supported by some
evidence". Superintendent v Hill, 472 U.S. 445,447,86 L.Ed. 356,
357 (1985). The Court went on to state that only a modicum of
evidence is required to revoke credits and that the "relevant
question is whether there is any evidence in the record that
could support the conclusion..."Id at 455-56. Declining to adopt
a more stringent standard, the court recognized the unique
circumstance of disciplinary proceedings which "take place in a
highly charged atmosphere [with] prison administrators [acting]
swiftly on the basis of evidence that might be insufficient in
less exigent circumstances. Id. at 456. The Court went further
to distinguish the evidence required to support a prison
disciplinary proceeding and a criminal conviction, indicating the
amount of evidence necessary to support a criminal conviction or
anything greater than some evidence applies in the context of
prison disciplinary proceedings. Id. at 457. Therefore given that
the liberty interest in a parole release date is significantly
greater than lost good-time credits, the standard of "some
evidence" required in Hill is insufficient to ensure Due Process
protections for a life prisoner's release on parole.

    Because the "some evidence" test applied in Hill related to
the unique circumstance of prison discipline it cannot be said
to be appropriate or applicable in a parole setting. Id., see
Biggs, 334F.3d at 915; McQuillion, 306F.3d at 904; Jancsek v
Oregon Board of Parole, 833 F.2d 1389-90 (9th Cir. 1987)[4] Rather,
"consideration of what procedures Due Process may require under
any given set of circumstances must begin with a determination
of the precise nature of the government function involved as well
as of the private interest that has been affected by governmental
action". Cafeteria Workers v McElroy, 367 U.S. 886,895 (1961).
Therefore, Due Process requirements are flexible and depend upon

---

4 The Ninth Circuit's application of the Hill standard to parole
setting decisions can be traced back to Jancsek. The entire
discussion in Jancsek of the standard of evidence necessary for'
a parole decision is one paragraph with only a single sentence
as to why Hill would be applicable to parole matters; "Though the
liberty interest at stake there [in Hill] surrounded the

a balancing of private interests and governmental action. Id.

In the instant case, if petitioner is to be found "not suitable" for parole release, such a finding must be supported by sufficient evidence and rational, nonarbitrary reasoning. However the Supreme Court has never specifically addressed the issue of the quantum of evidence required by Due Process to justify parole denial. Therefore, the requirements of Due Process are flexible and depend on a balancing of the interests affected by the relevant government action. See,e.g.,Cafeteria Workers v McElroy, supra.

Here, in the context of setting a parole release date for a life prisoner, the Due Process requirements call for more than "some evidence" for a number of reasons. First, the prisoner's interest in parole release is significantly greater. The unique circumstance of Hill involved the loss of some days of good time credits. Importantly, the maximum days a California prisoner stands to lose for a serious disciplinary violation is 360 days 15 CCR 3323. In the parole setting context, on the other hand, the issue is whether a person will ever gain his liberty. A finding of parole unsuitability, not only indefinitely delays a person's release from prison, it specifically finds that the person is a danger to the community. Such a finding makes it less likely that he/she will be found suitable in the future. Additionally, a finding of unsuitability results in a denial of parole for a period of time from one to five years, thereby heightening the interest of the prisoner. Finally, because California prisoners are commonly denied parole based upon the

accumulation of good-time credits, rather than the parole decision which is at issue here, both directly affect the duration of the prisoner's term." 833 F.2d at 1390.
5 Petitioner has been denied parole at each of his 3 parole suitability hearings because of his commitment offense.
6 There is no question that Due Process requires good cause for the Board to find a prisoner unsuitable for parole. The Board's governing regulations define good cause as "a finding by the Board based upon a preponderance of the evidence that there is

unchanging factors of their commitment offense[5], a finding of
unsuitability based upon that factor can result in a justif-
ication of parole denial for years to come.

Additionally, the interest of the Board in proceeding with
a parole suitability hearing with fewer or diminished Due Process
protections is less than the interest of the prison in discipl-
inary proceedings. The Board has no need to act swiftly. The
atmosphere is not like the charged prison atmosphere in Hill
where there are institutional safety needs and exigent circum-
stances that justify swift action. In the context of a parole
hearing, the Board has no legitimate interest served by the
reduced evidence requirement applicable in a disciplinary hearing.
Rather, the Board has a heightened administrative burden for
parole hearings, justifying heightened Due Process requirements
for those hearings. In fact, under California law, the Board is
required to provide substantial administrative requirements as
mandated in Morrisey v Brewer, 408 U.S. 471 (1972).

Given the considerations of a prisoner's enhanced interest
and the Board's decreased interest, it is evident that the Due
Process analysis weighs in favor of a quantum of evidence above
the "some evidence" standard for prison disciplinary proceedings.
Since a life prisoner's liberty has already been stripped by
virtue of a judgment with the highest procedural protections,
including an evidentiary requirement of proof beyond a reasonable
doubt, and because the Board's determination of whether a parole
date should be set involves considerations regarding the
prisoner's potential danger to the community, a greater than some
evidence standard is required. Importantly, the petitioner does
not compel the court to apply a quantum of evidence as high as
"beyond a reasonable doubt". However, because there is no just-
ification for a standard as low as "some evidence", the standard
for parole, rescission or failure to grant a parole date should
be some amount more. Therefore, the proper standard for parole

---

a factual basis and good reason for the decision. 15 CCR 2000(b)
(50). Thus, the Board's own rules require more than the "some
evidence" standard of Hill.

denial should be at least substantial evidence, that is, evidence sufficient to convince a reasonable person[6]. Moreover, even under the "some evidence" standard, that evidence used to justify parole denial must bear "some indicia of reliability". Biggs, 334 F.3d at 915; McQuillion, 306 F.3d at 904.

Importantly, though respondent in Rosenkrantz argued that McQuillion is no longer good law, the court determined the review of McQuillion only addressed a portion of the relevant statute, namely, PC 3041(a) and not the entire parole statute... Further in Dannenberg, the California Supreme Court held that the Board need not engage in a "uniform analysis" under PC 3041(a) if they determine denial is warranted by public safety concerns under PC 3041(b). Dannenberg, 34 Cal.4th at 1092-94, 23 Cal.Rptr.3d 415,104 P.3d 783. In making this decision, the court did not determine there is no liberty interest in parole. Rather, they determined the Board, under some circumstances, is not required to compare one life prisoner's to another who has been convicted of similar crimes. Dannenberg, 23 Cal.4th at 1098 n. 18. Therefore, the holding in McQuillion, "that the mandatory language of PC 3041(b) creates a liberty interest in parole remains controlling precedent. Rosenkrantz II, 444 F.Supp. 2d at 1078.

Ultimately, this court may not need to determine the quantum of evidence necessary to find a life prisoner in California unsuitable for parole. Here, even under the very low "some evidence" standard, there is insufficient evidence to find petitioner unsuitable for parole. In fact, there is no evidence in the record that he poses any degree of threat to the community. In fact, the evidence in the record supports the opposite conclusion, that petitioner's violence potential is definitely extremely low, if not nil.

**Justifying Petitioner's Parole Denial because the District Attorney opposed release is an Improper application of the law and violated Petitioner's Substantive Due Process right to a fair and Impartial Suitability Hearing and Decision**

The regulations and/or statute governing parole in California do not include any mention of District Attorney support

required for a finding of suitability. The relevant section
states in part,

> ...the board shall send written notice [of the hearing] to
> each of the following persons: the judge of the superior
> court before whom the prisoner was tried and convicted. the
> attorney who represented the defendant at trial, the
> district attorney of the county in which the offense was
> committed...

PC 3042. Specifically, that section requires the Board to "review
and consider all information received from the judge or any other
person and shall consider adjusting the terms or conditions of
parole to reflect the comments or concerns raised by this
information, as appropriate. PC 3042(f)(3). This opposition
indicates nothing about petitioner's institutional behavior or
the commitment offense that was not previously addressed in the
record and ultimately holds him to a term of life in prison based
on the commitment offense.

Finally, just as the repeated denial of parole by the Board
based upon the unchanging factors of the commitment offense is
a violation of Due Process, such denial masked in terms of
District Attorney opposition based on the commitment offense is
a. violation as well. Ultimately, "both the District Attorney...
opposed parole based solely upon their view of the gravity of the
offense, so their oppositions are merely cumulative of the BPH's
own determination regarding the callousness of the crime."
Rosenkrantz II 444 F.Supp.2d at 1080 fn 14. Such cumulative
evidence, at some point, becomes irrelevant. Blanket opposition
towards a prisoner whenever he goes before the Board, or a
statement that does not take into account the individual factors
of the case, is irrelevant and should not be used by the Board
to justify a parole denial. Reliance on such opposition is
"arbitrary". The relevant factors set forth by regulation that
the Board is required to consider when making a determination of
parole suitability set forth in the CCR Title 15 2402. This
section of four subdivisions: Subdivisions (a) reiterates the
statutory public safety factor, stating that [r]egardless of the

67

length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison. 15 CCR 2402(a). Subdivision (b) provides that:

> [a]ll relevant reliable information...shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

15 CCR 2402(b).

The criteria set forth by the Board to determine current dangerousness is outlined in the regulations. 15 CCR 2280 et seq and 2400 et seq. These regulations list circumstances tending to show suitability and unsuitability.

The circumstances tending to show unsuitability, indicating that the prisoner poses a current danger to the community are:

1. **Commitment offense** was "especially heinous, atrocious and cruel," such that it involved multiple victims, was carried out in a dispassionate or calculated manner (such as an execution-style murder), the victim was abused, defiled, or mutilated, showed an "exceptional callous disregard for human suffering,"or involved an inexplicable or very trivial motive";
2. **Previous record of violence** showing that the prisoner has on previous occasions inflicted or attempted to inflict serious injury;
3. **Unstable social history** showing that the prisoner has a history of tumultuous relationships with others;
4. **Sadistic sexual offenses** have been committed by the
5. **Psychological factors** shows a lengthy history of severe mental problems related to the offense; and
6. **Institutional behavior** shows that the prisoner is engaged

in serious misconduct in prison.

15 CCR 2281(c), 2402(c).

The circumstances tending to show **suitability**, that the prisoner does not pose a current danger to the community are: (See Exhibits A,B,C,D,E,F,G,& H)

1. **No juvenile record** of assaulting others or commiting offenses with a potential of harm to the victim;
2. **Stable social history** showing reasonably stable relationships with others;
3. **Signs of remorse** showing that the prisoner is remorseful, such as attempting to repair damage or indicate understanding of the nature and magnitude of the offense.
4. **Motivation for the crime** was the result of significant stress, especially if the stress had built over a long period of time;
5. **Battered woman syndrome** indicating the offense was the result of this type of victimization;
6. **Lack of criminal history** showing that the prisoner lacks "any significant history of violent crime";
7. **Age** such that the prisoner's probability of recidivism is reduced;
8. **Plans for the future** that are realistic or depend on marketable skill; and
9. **Institutional activities** that show an enhanced ability to function within the law upon release.

CCR 2281(d), 2402(d).

**Petitioner's rights to Due Process of Law were and continue to be violated by the Board's decisions to find him Not suitable for Parole.**

**There is no evidence in the record of the 2007 hearing to support denial of parole and no reason cited by the Panel to deny parole, bears a rational nexus to the conclusion that petitioner poses an unreasonable risk of danger to the public if released.**

As is evident from the information provided above, petitioner does not pose a risk to the public if released from prison. Moreover, he is not the same person now as he was when he committed the life offense. To the contrary, all evidence in the record viewed by the Board shows that petitioner is currently and immediately suitable for parole and has been so for many years.

69

Petitioner submits to this honorable court that there was no evidence produced by the Commissioners at his March 30, 2007 Parole Board hearing to prove that he is a threat to public safety, or that he is a risk to society if released on parole.

Petitioner is providing this honorable court with the evidence to prove that he is suitable to be released on parole according to the CCR Title 15 2402(d).

1. Petitioner has no juvenile record

2. Petitioner has a stable social history
   He has been married since 8-10-02
   See Exhibit (A) for parole plans
   See Exhibit (C) for support letters

3. Signs of remorse ( Why did this crime happen Exhibit A)
   See Exhibit (G) for letters to victims and the D.A. 's letter
   See Exhibit (H) for remorse in mental health evaluations

4. Motivation for the crime
   See Exhibit (A) for why did Mrs Aikens die and why was Miss Fomasi traumatized.
   See Exhibit (H) for 10 years of marital stress
   See Exhibit (A) cause of the crime for 25 plus years of alcohol and drug abuse.
   See Exhibit (D) certificates and self-help chronos

5. Battered Woman Syndrome  N/A

6. Lack of criminal history  See Exhibit (F)
   Petitioner lacks any history of violent crime

7. Age
   Petitioners present age of 62 reduces the probability of recidivism.
   See Exhibit (H) for birth certificate

8. Understanding and plans for the future
   Petitioner has made realistic plans for release
   See Exhibit (A) for parole plans for 3 counties as requested by petitioner's 2003 Parole Board panel.
   See Exhibit (B) for job offers
   See Exhibit (C) for support letters
   See Exhibit (H) for all mental health evaluations

9. Institutional Behavior
   Institutional activities indicate an enhanced ability to function within the law upon release.
   See Exhibit (D) for certificates and self-help chronos
   See Exhibit (F) for disciplinary history
   See Exhibit (H) for mental health evaluations

70

Petitioner submits to this honorable court that he meets all of the CCR Title 15 2402(d) requirements to be found suitable for his parole release date.

Petitioner contends that none of the above information was taken seriously in considering petitioner for his release date. Petitioner submits to this honorable court that if all of the CCR Title 15 2402(d) #1 through #9, plus petitioners exhibits A through H would have been given any consideration, petitioner would have received his legal and just release date.

71

The Board's previous decisions, including the 2007 decision, to find petitioner poses an unreasonable risk of danger to the public are not based in any facts before the Board. Instead this "finding" simply masks the Board's determination that petitioner must remain in prison indefinitely. Such a "finding" resulting in additional years in prison is of great concern and violates state law, basic constitutional principles and should not currently be considered in determining petitioner's suitability. The Board has consistently used the commitment offense to justify petitioner's continued parole denial. Each of the Panels, essentially, determined that the commitment offense was "carried out in an especially cruel and callous manner. The offense was carried out in a dispassionate and calculated manner. This was a senseless crime. The offense was carried out in a manner that demonstrates a callous disregard for another human being. The motive for the crime was inexplicable.

In <u>Biggs</u>, the Court determined that they must consider the Board decision-making process with respect to a person in prison over time:

The Parole Board's decision is one of "equity" and requires a careful balancing and assessment of the factors considered. As in the present instance, the Parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should [the prisoner] continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in parole... A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.

<u>Biggs</u>, 334 F.3d at 916-17.

Such continued reliance on the unchanging factors of the commitment offense, coupled with a failure to give weight to factors favoring parole, results in a due process violation. See e.g. <u>Irons v Warden of Cal. State Prison-Solano</u>, 358 F.Supp.2d

936,947 (E.D. Cal. 2005)(appeal pending)(finding due process was violated when petitioner, who had served 16 years of a 15 to life sentence was found unsuitable though he had met the suitability criteria); Masoner v California, 2004 WL 1080176 (C.D. Cal. Mar. 4, 2004)(N.O. CV 03-1261-ER)(order of denial to Respondent's application for stay of district court order granting habeas relief that repeated denial of parole based solely on commitment offense, without any evidence that prisoner's release would pose a danger to the public safety, violates due process). Furthermore, repeated denials of parole based upon the nature of the commitment offense alone violates due process requirements "where no circumstances of the offense reasonably could be more aggravated or violent than the minimum necessary to sustain a conviction for that offense." Scott II 133 Cal.App.4th at 598 (citing Rosenkrantz, 29 Cal.4th at 683). Therefore, to be constitutional, a finding of unsuitability must be based on "some evidence that the particular circumstances of [the life prisoner's] crime-circumstances beyond the minimum elements of his conviction - indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety." Dannenberg, 34 Cal.4th at pg. 1098.

Finally, as recently held in Rosenkrantz, continuing to deny parole based upon the nature of petitioner's crime violates Due Process. The reasons for this decision were as follows:

First, continued reliance upon the unchanging facts of petitioner's crime makes a sham of California's parole system and amounts to an arbitrary denial of petitioner's liberty interest.
Second, in this case, the circumstances of petitioner's crime do not amount to some evidence supporting the conclusion that petitioner poses an unreasonable risk of danger if released. Rosenkrantz II, 444 F.Supp.2d at 1082-83. Moreover, the the court recognized that such "continued reliance on such unchanging circumstances, after         two decades of incarceration and half a dozen parole hearings violates due process

Because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the some evidence standard." Id. at 1084.

Here, the circumstances are akin to Rosenkrantz, in that

petitioner has maintained an exemplary prison record, has greatly
matured and the Board continues to deny him parole release. It
has now been almost 23 years since petitioner was placed in the
custody of the CDCR. Since that time, he has obtained vocation-
al training, including thousands of hours of work, partipated in
copious therapy and self-help programs and has realistically
planned for his release. Continuing to rely on petitioner's
commitment offense as a factor predicative of his future danger-
ousness in the community is not only irrational, but violates
Due Process of law.

### Unchanging fact of Commitment Offense

As discussed, the Board's decision is not supported by even
the modest amount of evidence required by Due Process. The Boards
decision was based on an unreasonable determination of the facts
in light of the evidence (28 U.S.C. 2254(d)(2). None of the
relevant factors considered by the Board support a finding of
unsuitability for petitioner. To the contrary, all the evidence
in the record supports a determination that petitioner is curr-
ently and immediately suitable for parole.

All the evidence in the record before the Board showed
petitioner posed no risk to the community, no more than the
average person in the community. Under California requirements
petitioner was entitled to release unless "he pose[d] an unreas-
onable risk of danger to society if released from prison." 15 CCR
2402(a). an "at worst" low risk is not an unreasonable one.

### There remains no evidence that petitioner could benefit from more therapy in any manner that would change the assessment of the danger he does not pose to the community if released

Petitioner already benefits from a "low" risk assessment
by prison psychologists. In fact, his danger to the community
was described in his psychosocial assessment as very low.
Recently, the Board found that petitioner could benefit from
continued self-help and therapy. To the contrary, he already has
a negligible level of dangerousness if released to the community
and has participated in numerous self-help and therapy programs. ·

74

Every piece of evidence considered by the Board shows that
petitioner has participated in extensive therapy and has achieved
the lowest possible predictor of future violence. Therefore,
there is no basis for a recommendation that he participate in
additional therapy.

### Denial based upon the language of 2402(c)(1)(A-E) is Impermissible as those terms are Unconstitutionally Vague

The Board has consistently determined that petitioner is
unsuitable for parole because of his commitment offense. The
Board describes the offense as "cruel" and "callous" with a
"trivial" motive evidencing petitioner shows a "callous disregard
for human suffering." Not only is there no evidence in the record
to support this finding, but the Board is simply using terms to
justify a decision that is improper. By stating a crime is
"cruel" or "callous" does not immediately make it so. Couching
the circumstances of a commitment offense in these terms to
justify an unwarranted and baseless decision is improper.

Though the Rosenkrantz court determined there was "some MAN),
evidence" to support parole denial, the court stated it could not
support parole denial on the basis that the murder involved
cruelty or callousness. the court noted, "all murders, by their Nature
involve a disregard for the life and suffering of another.
Rosenkrantz, 29 Cal.4th at 420. Similarly, there is nothing
special, extraordinary or different about the murder for which
petitioner was convicted that rises to the level of "cruel" or
"callous". Petitioner's conduct involved no more than necessary
to commit the crime of felony murder.

Current Board regulations state a factor of unsuitability
for a crime that is "especially heinous, atrocious, or cruel"
considering the following factors:

- A. Multiple victims were attacked, injured or killed in the same or separate incidents.
- B. The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
- C. The victim was abused, defiled or mutilated during or after the offense.
- D. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
- E. The motive for the crime was inexplicable or very trivial

in relation to the offense.

CCR 2402(c). Application of these standards can only withstand
a vagueness inquiry if the regulations are sufficiently precise
to guide the Board and prevent arbitrary and discriminatory
enforcement. United States v Doremus, 888 F.2d 630,634 (9th Cir.
1989). The aforementioned protection can only be achieved through
limiting instructions that are known to and applied by the
decision-maker. However, in order to be proper, such limiting
instructions must be applied through an individualized review and
inquiry of the defendant and the crime. Proffitt v Florida, 428
U.S. 242,251-52 (1976).

     Here, the subcategories listed above do provide minimal
limiting instructions to guide theBoard as they determine what
"heinous, atrocious, or cruel" mean. More importantly, applic-
ation is not individualized to the petitioner or his crime.
Rather, the Board masks a denial in terms supported by the above
referenced language in order to justify otherwise baseless
decisions. With respect to petitioner's crime, there is nothing
to make these sub-sections apply. First, there were multiple
victims in petitioner's crime. Mrs Aikens died of heart failure
and Ms Fomasi was not physically injured. The victims were not
abused, defiled or mutilated after the offense. Finally, there
is nothing exceptional about this case.

## MEMORANDUM OF POINTS AND AUTHORITIES

It is well established that "the Board of Prison Terms is authorized by statute to determine parole suitability, and to exercise its discretion in deciding whether to grant or deny parole". (Ca. Penal Code §3040, 5075 et seq.; In re Fain (1983) 145 Cal. App. 3d, 540,548, 193 Cal. Rptr. 483; In re Rosenkrantz (2000) 80 Cal. App. 4th.409, 95 Cal. Rptr. 2d 279,290). That discretion, although broad, is not absolute and the Board's decisions must be supported by "some evidence". (In re Powell (1988) 45 Cal. 3d 894, 902-904, 248 Cal. Rptr. 431; also see Terhune V. Superior Court (1998) 65 Cal.App.4th 864, 872-873, 76 Cal. Rptr.2d 841; In re Minnis (1972) 7 Cal. 3d 639, 646-647, 102 Cal. Rptr. 749; In re Rosenkrantz (2000) supra. at p. 290). [Although a prisoner serving an indeterminate sentence is "not entitled to have his term fixed at. less than the maximum or to receive parole, he is entitled to have his application for these benefits duly considered"].

> "The Board of Prison Terms is required to determine parole suitability according to the guidelines set out in section 2402, (California Code of Regulations, Title 15 Division 2), Subsection (a) of section 2402, provides that, [r]egardless of the length of time served, a life prisoner shall be found unsuitable for denied parole if in the judgement of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison". (In re Rosenkrantz, supra, at p.290)".

Pursuant to Penal Code §3041 (b) a release date is presumptively required unless the gravity of the offense is such that the public safety requires a longer period of incarceration.

In conducting this analysis, the Board is to review the circumstances of the life offense. In this regard, "a parole denial may ultimately be based entirely on the nature of the commitment offense, as long as all other administratively prescribed "relevant factors" have been considered" by the Board.

(§2402(b) [all "relevant, reliable information available to the panel shall be considered in determining suitability for parole"]; In re Seabock (1983) 140 Cal. App. 3d 29, 38-39, 189 Cal. Rptr. 310; In re Rosenkrantz, supra at p.292.

As required by law (P.C.3041) petitioner's minimum parole (MEPD) was set at years. 9/17/2000

The Board is obliged to hold a fair hearing at which unbiased commissioners actually read reports and other documents and they make a reasoned decision based on appropriate factors. In re Rosenkrantz (2000) 80 Cal. App. 4th 409, 427-428. Simply "going through the motions" so that the Board can recite a post hoc rationalization for a decision already made will result in a denial of procedural and perhaps substantive due process to the affected prisoner. In re Powell (1988) 45 Cal. 3d 894, 902; In re Johnson (1995) 35 Cal. App. 4th 160; In re Rosenkrantz, supra, at p.428.

California Penal Code section 3041(a) provides that the Board "shall normally" set a parole release date. Section 3041(b) mandates as follows:

The panel or Board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

In this case, as has been demonstrated herein above, the Board did not follow P.C. sec. 3041(b) nor CCR, Title 15, Div. 2 sec. 2402. There was no evidence to support its findings of unsuitability.

All acts of murder by their nature involve a disregard for the life and suffering of another human being. In re Rosenkrantz supra, at p.425. Given the circumstances of this offense, compared to all other 1st degree murders, there is no evidence that petitioner displayed "an exceptionally callous disregard for human suffering".

77

PETITIONER"S MEMORANDUM OF POINTS AND AUTHORITIES (continued)
"The Rule of Parole Hearings"

It has become necessary to "Identify the problem" where parole hearings, the decisions rendered and court reviews are concerned; clarifying the Spirit and Intent of the process: California Penal Code section 3041(b) states in part: "...board shall set a date Unless...comsideration for public safety..." The functioning or mandatory words in this section order or "create" a federally protected liberty interest under U.S.C. 14th amendment. Due Process. This is supported under U.S. Supreme Court rulings of Greenholtz and Allen and Ninth Circuit interpretations under McQuillion v Duncan and Biggs v Terhune. The Ninth Circuit has also ruled that Sandin v Conner does not apply to parole hearings, only day to day operations of prisons. This does not remove the mandatory language of PC 3041(a). Since Powell v Gomez (9th Cir. 1990's), the U.S. Supreme Court's Superintendent v Hill has been authorized for court review of the California governor's and Board of Parole Hearing decisions. This ruling is suspect for a couple of reasons concerning the use of "some evidence":

1. It was authorized for use in keeping a high profile inmate in prison: The Onion Field killer, Greg Powell. Like Sandin v Conner, Supt. v Hill involves day to day prison operations, this time the disciplinary process.

2. It allows for, provides for abuses in both the decision making and review processes. This was the reason for the Ninth Circuit and lower courts to rule:
(a) Biggs v Terhune: the some evidence used must be based on an "indicia of reliability" to support the use of the factor and that the continued use of the commitment offense and prior conduct without an "indicia of reliability that the factor used proves the person is a current unreasonable risk of danger to society if released from prison violates Due Process.
(b) Rosenkrantz v Marshall (U.S. District Court, Central District, Cal. 2006), stated that some evidence cannot mean "ANY" evidence and there must be "an indicia of reliability".

As a result of In re Rodriguez (a lengthy court case on parole hearings), the court ordered, to my understanding, the

80

old Adult Authority which bacame the Board of Parole Hearings,
to write rules to standardize, prevent abuses, and allow for
review of parole hearings. (This became the basis for the 1977
enactment of PC 3041). The purpose was really to end the "gut
feeling" decision making process of the Board. This was accom-
plished and submitted to the Office of Administrative Law (OAL)
for review. It was then placed in the CCR Title 15 division 2
manual. The appropriate sections of that text are summarized
below:

CCR 2000(b)(48): Good cause. A finding by the Board based upon
a preponderance of the evidence that there is a factual basis and
good reason for the decision made.

CCR 2400: "This article implements Penal Code section 3041..."

CCR 2402(a): summarized that the Board shall find you suitable
if they cannot prove you are an "unreasonable risk of danger to
to society if released from prison"

CCR 2402(b): "All relevant and reliable information available to
the Panel shall be considered in determining suitability for
parole".

CCR 2402(c): Factors tending to show suitability,and (d) factors
tending to show                 suitability. In addition to these
the Board shall consider the intent of the sentencing court;
such as a plea bargain, etc...

The above CCR requirements constitute Administrative Law and
their implementation are a matter of law with the same protect-
ions that a Penal Code statute, state or federal constitutional
amendment has; Due Process of law or Due Course of law. Any new
rule or modification of a rule must be processed through the OAL
for review and approval.

     The Board must find by a preponderance of evidence that
there is good cause/good reason factually supported by the record
that an inmate is a current unreasonable risk of danger to the
public if released on parole, or they must find for suitability.
Then they must proceed via CCR 2403 to set a term. At this point
it is necessary to point out that "time served" nor "not enough
time served" (referring to the minimum eligible parole date),
are to be considered when making the decision of suitability.

It is a given that you have served the "time for the crime".
Time wise, an inmate that has served 17 years and another inmate
that has served 27 years are equal in the suitability, decision-
making process. Particularly, if they have an indeterminate
Term to Life sentence. (The Board was not given some evidence
authority). Upon court review, starting with Powell v Gomez, the
court has been authorized to make a decision that the Board had
some evidence to support their decision. However, federal courts
have ruled that some evidence cannot mean "ANY" evidence and
there must be "some indicia of reliability".

    The vast majority of state courts have taken a position that
as long as the Board cites the proper words, that's all that is
necessary. This allows for serious abuses of discretion and
review, rendering the process to a "No Parole Policy". This
results in pandering to the governor's whims. Without a complete
comprehensive review of the record, how can the court determine
if a "consideration" was actually made. Was the Board simply
"mouthing" the required words? Because of these potential abuses
we are asking for (eventually) the Ninth Circuit to revisit the
Powell v Gomez analysis. That should be a complete review of the
record on how "some evidence" under Supt. v Hill is being used
today. Also, to determine if that standard of evidence is still
appropriate for parole use, or should it be confined to the day
to day operation of prisons. Also to require the courts to find
that there is good cause/good reason and a preponderance of
evidence to support the decision made. Otherwise, require the
state courts to ensure, (via evidentiary hearing), that the Board
was complying with Administrative Law and Penal Code. At all
times we must defer to the federal courts to determine if the
state courts, made an appropriate review. If there was some
evidence, (not just "ANY" evidence), with an "indicia of rel-
iability" that the petitioner poses an unreasonable and current
risk of danger to society if released on parole. If this evidence
is not present, then there has been a Due Process/Liberty
Interest violation. This is both unreasonable and contrary to

82

clearly established federal law. Including but not limited to:

    (a) U.S. Supreme Court decisions in <u>Greenholtz</u> and <u>Allen</u>

    (b) Ninth circuit court interpretations of the above in
       1) McQuillion v Duncan (2002)

       2) Biggs v Terhune (2003)

    (c) U.S. District Court interpretations of the above in;
       1) Robert Rosenkrantz v Marshall (CD of Cal. 2006)
       2) Eugilio Martin v Marshall (ND of Cal. 2006)

## Conclusion

Petitioner Submits to this Honorable Court this Writ and His Exhibits, Not For a Retrial. Petitioner Confessed To this Crime on the 3rd Day He was In the County Jail. Petitioner Has Always Taken Full Responsibility For this Crime That He Committed That Took the Life of Mrs Aiken's and For the Trauma He Put Miss Fomasi Through.

If Giving My Life Today Would Change the Events of this Crime I Committed Almost 23½ Years Ago, Petitioner Would Do So. There Isn't A Day That Goe's By That Petitioner Isn't Ashamed And Sadden and Extremely Sorry For Causing The Death of Mrs Aiken on January 25th 1984 And For The Trauma He Put Miss Fomasi Through.

. Petitioner Is Not Asking For A Retrial By Any Court. Petitioner Is Asking This Honorable Court To Examine The Record And See What The Board of Parole Hearings (BPH) Has Used At Petitioner's Last 3 Hearings To Denie Petitioner; His Parole Release Date For 3 Years In A Row, Of Which Equals 2 Years Of Parole Denials, Having Had No Evidence From Petitioner's Over 23 Years Of Incar- ceration To Prove Petitioner Is An Unreasonable Risk To Society Or That He Is A Threat To Public Safety.

Petitioner Submits His Exhibits A, B, C, D, E, F, G, H To Prove To This Honorable Court That The BPH Totally Ignored All Of Petitioner's Evidence That Prove's He Is Not A Threat To Society Nor Is He A Risk To Public Safety. Petitioner Contends That If The BPH Would Have Given Half Of The Considerations To Petit- ioner's Positive Programs As The BPH Did To Retrying Petitioner For The Crime He Confessed To, Petitioner Would Have Received His Legal And Just Release Date.

PC 3041 (a)(6) Creates A Due Process Liberty Interest In A Parole

CONCLUSION CONT'D.

RELEASE DATE. PETITIONER SUBMITS THAT WHEN VIEWING PC SUBSECTIONS 190 - 1170 - 2933 - 3001 - 3040 AND 3041, THERE IS CLEARLY A LEGISLATIVE INTENT TO CODIFY SEPARATE AND DISTINCT PROVISIONS FOR PROVIDING PUNISHMENTS FOR VARIOUS FORMS OF HOMICIDE.

BASED ON PETITIONER'S BELIEF IN THE 8TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE CALIFORNIA PAROLE STATUTES, LAWS, REGULATIONS AND THE TITLE 15 REQUIREMENTS THAT PRODUCE A LIBERTY INTEREST IN PAROLE, AS WELL AS STATE DUE PROCESS PROTECTIONS (IN RE MINNIS 7 CAL. 3d 639, 646 (1972), (IN RE ROSENKRANTZ 29. CAL 4TH 616, 655, (2002) PETITIONER'S CLAIMS ARE VALID.

PETITIONER IS BEING DENIED HIS RELEASE DATE AS A RESULT OF ARBITARY APPLICATION OF THE LAW, BOTH STATE AND FEDERAL. THERE HAS BEEN "NO" EVIDENCE PRODUCED AT ANY OF PETITIONER'S PAROLE BOARD HEARINGS (2000 2003 2007) THAT REMOTELY PROVES THAT PETITIONER IS A THREAT TO SOCIETY OR A RISK TO PUBLIC SAFETY. THE 9TH CIRCUIT COURT HAS STATED THAT THE DETERMINATION THAT PETITIONER IS UNSUITABLE FOR PAROLE "MUST" BE SUPPORTED BY THE EVIDENCE BEARING SOME INDICATION OF RELIABILITY (MCQUILLIAN V. DUNCAN 306 F. 3d 895, 902 (9TH CIR, 2002). BIGGS V. TERHUNE 334 F. 2d 910, 915 (9TH CIR, 2003). CONTINUED USE OF UNCHANGING FACTORS CREATES A CIRCUMSTANCE THAT PETITIONER WILL NEVER BE ABLE TO DO ANYTHING ABOUT.    RESPECTFULLY SUBMITTED

I CLIFFORD BAIR PETITIONER DECLARE UNDER PENALTY OF PERJURY THAT THE FORGOING IS TRUE AND CORRECT.

DATE: 5/8/07          SIGN: Clifford Bair

85

## PRAYER FOR RELIEF

Petitioner/Appellant respectfully requests the following relief:

1. That the BPH be found to be using crime based unsuitability criteria that is unlawful and constitutionally vague.

2. That the court will find that the crime based parole unsuitability criteria applied against the appellant are "outside of controlling legal principles" and/or in a manner that usurps legislative function.

3. That the court will find there is no evidence in the record to support the position that appellant poses an "unreasonable risk of danger to society if released".

4. That the court will find that appellant is suitable for parole and apply appropriate orders.

5. That the court will find that appellant has served far in excess of the applicable matrix of terms and order appellant's immediate release and discharge from custody.

## VERIFICATION

I, Clifford Bair, affirm that I am the petitioner/appellant in the above entitled petition and that all information and statements contained herein are true and correct to the best of my ability under penalty of perjury.

DATE: 5/31/2007

Clifford L. Bair

86

CLIFFORD BAIR C 95079
L3 346 P.O. BOX 20
TRACY, CA 95378 0600

PROOF OF SERVICE BY MAIL

I VALERIE BAIR NOT BEING A PARTY TO THIS ACTION DECLARE
THAT I AM A RESIDENT OF ROSEVILLE, CALIFORNIA. THAT I AM OVER
THE AGE OF 18 YEARS OF AGE.

ON THIS DATE _MARCH 4th_, 2008 I HAVE SERVED A COPY
OF THE FOLLOWING DOCUMENT: CLIFFORD BAIRS WRIT OF HABEAS CORPUS

BY PLACING THIS DOCUMENT IN A SEALED ENVELOPE WITH POSTAGE
PREPAID IN THE UNITED STATES MAIL IN A DEPOSIT BOX SO PROVIDED
HERE IN ROSEVILLE, CALIFORNIA. ADDRESSED AS FOLLOWS:

CLERK OF THE COURT
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT
450 GOLDEN GATE AVE
BOX 36060
SAN FRANCISCO, CA 94102

OFFICE OF THE ATTORNEY GENERAL
MS DENISE A. YATES Esq
455 GOLDEN GATE AVE SUITE 11000
SAN FRANCISCO, CA
94102 7004

I VALERIE BAIR DECLARE UNDER PENALTY OF PERJURY THAT THE
FORGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE. THAT
THERE IS DELIVERY SERVICE BY UNITED STATES MAIL AT THIS ADDRESS.

EXCUTED ON THIS DATE: _3-4-08_

SIGN: _Valerie Bair_

87

# EXHIBIT AA

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life     )     CDC Number:  C-95079
Term Parole Consideration     )
Hearing of:                   )
                              )
CLIFFORD BAIR          .      )     INMATE COPY
                              )
_____)

DEUEL VOCATIONAL INSTITUTION

TRACY, CALIFORNIA

MARCH 30, 2007

8:47 A.M.

PANEL PRESENT:

STAN KUBOCHI, Presiding Commissioner
DIANE LUSHBOUGH, Deputy Commissioner

OTHERS PRESENT:

CLIFFORD BAIR, Inmate
BEN DAVEY, Attorney for Inmate
PHILLIP ABRAMS, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____No     See Review of Hearing
_____Yes    Transcript Memorandum

Sandra Tillman, Capitol Electroɪ    Reporting

### I N D E X

                                                              Page

Proceedings........................................    3

Case Factors.......................................   18

Pre-Commitment Factors.............................   22

Post-Commitment Factors............................   25

Parole Plans.......................................   44

Closing Statements.................................   71

Recess.............................................   96

Decision...........................................   97

Adjournment........................................  105

Transcript Certification...........................  106

3

1          P R O C E E D I N G S

2      **DEPUTY COMMISSIONER LUSHBOUGH:**  We're on record

3      **PRESIDING COMMISSIONER KUBOCHI:**  It is 8:47, and

4  this is a Subsequent Parole Consideration Hearing for

5  Clifford Bair, B-A-I-R, CDC number C-95079.  Today's

6  date is March 30th, 2007.  And we are located at the

7  Deuel Vocational Institute [sic].

8      Mr. Bair, I'm going to state some background

9  information concerning your current life sentence.  And

10  I want you to know that as I provide the background

11  information, as will Commissioner Lushbough discuss

12  your post-commitment factors, is that if either one of

13  us states facts that you believe need correction, we're

14  going to allow you to do so.  But all I ask of you is

15  that you wait for the speaker to end a thought, phrase,

16  or sentence, because these proceedings are tape

17  recorded.  It's later going to be transcribed into a

18  written transcript of the proceedings.

19      **INMATE BAIR:**  Yes.

20      **PRESIDING COMMISSIONER KUBOCHI:**  You're going to

21  be given a copy.  But the transcriber, that is the

22  people that convert the voice into a written copy, can't

23  make an accurate record if two or more people speak at

24  the same time.  What they do is if they can't hear, they

25  put inaudible.  And since we want to make an accurate

1  record because this hearing is very important to you, I
2  want you to be assured that we're going to obtain
3  accurate information.

4        But, as I've indicated, the ground rules are just
5  please wait for the speak to finish. And I'm also
6  telling you this because I don't want you to feel that
7  if you hear inaccuracies, that you have to wait all the
8  way until the end and get all frustrated.

9        **INMATE BAIR:** I agree.

10       **PRESIDING COMMISSIONER KUBOCHI:** You can make an
11  immediate correction. Simply wait for a pause. Our
12  records in the Board report indicate that you were
13  received into the Department of Corrections from Sonoma
14  County. And Mr. Abrams, we're going to do voice
15  identification, but could you please note the docket
16  number as I read the basic facts and then provide me the
17  docket number at the end.

18       Your life term began on or about April 26th,
19  1985, and that you were -- the controlling offense was
20  murder conviction in violation of Penal Code Section
21  187. There were also additional counts, count two, a
22  conviction for 459 of the Penal Code, which is burglary.
23  Count Four, a violation of Penal Code Section 236, which
24  is false imprisonment of another. Count Eight, a
25  violation of Penal Code Section 487, grand theft. Count

*Capitol Electronic Reporting*

1   10, a violation of Section Penal Code 496, possession of

2   stolen property, and for that you received a life

3   sentence and that your minimum eligible parole date was

4   September 17th of 2000.

5          Do you have our docket number, Mr. Abrams?

6          **DEPUTY DISTRICT ATTORNEY ABRAMS:**  The docket

7   number for the Superior Court?

8          **PRESIDING COMMISSIONER KUBOCHI:**  Yes.

9          **DEPUTY DISTRICT ATTORNEY ABRAMS:**  The Sonoma

10  County Superior Court?  Yes, that docket number is

11  12451-C.

12         **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.  And

13  at this time, Mr. Bair, we're going to have voice

14  identification to assist the transcriber in making a

15  written transcript.  We're going to go around the table.

16  We're going to state our first name.  We're going to

17  state our last name, spell our last name.  And when it

18  comes to your turn, add your CDC number.  My name is

19  Stan Kubochi, K-U-B-O-C-H-I, Commissioner

20         **DEPUTY COMMISSIONER LUSHBOUGH:**  Diane Lushbough,

21  L-U-S-H-B-O-U-G-H, Deputy Commissioner.

22         **INMATE BAIR:**  My name is Clifford Bair, B-A-I-R,

23  C-95079.

24         **ATTORNEY DAVEY:**  Ben Davey, D-A-V-E-Y, appointed

25  Counsel for Mr. Clifford Bair.

1      **DEPUTY DISTRICT ATTORNEY ABRAMS:** Phillip Abrams,

2 A-B-R-A-M-S, Deputy District Attorney, from Sonoma

3 County.

4      **PRESIDING COMMISSIONER KUBOCHI:** Thank you.

5 There is an officer here for security purposes only and

6 is not a participant. Sir, before we start your

7 hearing, before the -proceedings, you were, you and your

8 correctional counselor reviewed a BPT 1073 form; is that

9 correct? And I showed you the form?

10      **INMATE BAIR:** Yes.

11      **PRESIDING COMMISSIONER KUBOCHI:** That's before

12 you now. And the purpose of that form, Mr. Bair, is

13 that this Panel, in conducting your parole suitability

14 hearing, must accommodate any physical disabilities.

15 And I note that you have two hearing aids. And, Mr.

16 Bair, do you believe that you can adequately hear people

17 discussing your case with the assistance of the hearing

18 aids?

19      **INMATE BAIR:** Yes, Sir, I do.

20      **PRESIDING COMMISSIONER KUBOCHI:** And you are

21 wearing glasses. And that the glasses allow you to read

22 documents, if necessary; is that correct?

23      **INMATE BAIR:** That's correct.

24      **PRESIDING COMMISSIONER KUBOCHI:** And you can see

25 me with the assistance of those glasses?

1          **INMATE BAIR:** Yes, sir.

2          **PRESIDING COMMISSIONER KUBOCHI:** And is there any

3    other physical disability that you have at this time?

4          **INMATE BAIR:** None.

5          **PRESIDING COMMISSIONER KUBOCHI:** Thank you. And

6    you're comfortable sitting there as best you can. You

7    are shackled because that is the rules of Deuel

8    Vocational Institute, but other than being shackled,

9    you're comfortable?

10         **INMATE BAIR:** Yes, Sir, thank you.

11         **PRESIDING COMMISSIONER KUBOCHI:** And have you

12   been on any medication in the last year, sir?

13         **INMATE BAIR:** Yes, Sir.

14         **PRESIDING COMMISSIONER KUBOCHI:** What symptoms

15   was the medication prescribed?

16         **INMATE BAIR:** I have a urination problem to where

17   I have to go -- where I go to the bathroom frequently.

18   And this medication that I'm on is to help to control

19   that.

20         **PRESIDING COMMISSIONER KUBOCHI:** And the record

21   will reflect that you're about 62 years old?

22         **INMATE BAIR:** Yes.

23         **PRESIDING COMMISSIONER KUBOCHI:** And that your

24   attorney brought that to my attention, and I want you to

25   know that if at any time during these proceedings, you

1  have to use the restroom facilities, you just let me

2  know.  Do you understand that?  We'll take a recess.

3       **INMATE BAIR:**  Thank you.

4       **PRESIDING COMMISSIONER KUBOCHI:**  And I don't want

5  you to wait too long.

6       **INMATE BAIR:**  Thank you.

7       **PRESIDING COMMISSIONER KUBOCHI:**  When you feel

8  you have to use the facility, you just let me know and

9  we'll just call a recess.

10      **INMATE BAIR:**  Thank you very much.

11      **PRESIDING COMMISSIONER KUBOCHI:**  In regard to the

12  medication you're taking, do you believe that the

13  medication affects your ability to think clearly?

14      **INMATE BAIR:**  No.

15      **PRESIDING COMMISSIONER KUBOCHI:**  And as you sit

16  here today, do you believe that you are thinking

17  clearly?

18      **INMATE BAIR:**  Yes, Sir.

19      **PRESIDING COMMISSIONER KUBOCHI:**  And is there any

20  reason why you -- is there any reason that you cannot

21  speak to us in an effective manner?

22      **INMATE BAIR:**  No.

23      **PRESIDING COMMISSIONER KUBOCHI:**  Thank you, sir.

24  Mr. --

25      **INMATE BAIR:**  You're welcome.

1    **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Davey, is

2    there any other issues other than the once I've

3    discussed pursuant to the ADA that you believe this

4    Panel should address?

5        **ATTORNEY DAVEY:**  No, Sir.

6        **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.  Mr.

7    Bair, what was the highest grade in school that you

8    completed either before or after your incarceration?

9        **INMATE BAIR:**  Twelfth.

10       **PRESIDING COMMISSIONER KUBOCHI:**  Twelfth grade,

11   so you can read and write English with no difficulties?

12       **INMATE BAIR:**  Yes.

13       **PRESIDING COMMISSIONER KUBOCHI:**  Thank you, sir.

14       **INMATE BAIR:**  You're welcome.

15       **PRESIDING COMMISSIONER KUBOCHI:**  The purpose of

16   today's hearing, as you know, sir, is to once again,

17   consider your suitability for parole.  In doing so, we

18   will consider several factors.  I will state for the

19   record the facts of the life crime.  I'll review your

20   prior record, if any, before your incarceration.  I will

21   review your personal and social history before your

22   incarceration, and I will also discuss your parole

23   plans.

24       Commissioner Lushbough will review your post-

25   conviction factors that include any evaluations of

1   mental health evaluators, correctional counselors, and

2   other factors that we call programming.  That is your

3   job, your self-study, self-help groups, if any, as well

4   as any other issues related to your post-commitment.

5        Sir, before we recess for deliberations, the

6   District Attorney's office, that is the representative

7   from Sonoma County, may choose to ask you questions.

8   Your attorney may choose to ask you questions.  The

9   Panel may ask you questions.  And before recessing for

10  deliberations, the District Attorney's representative

11  will be allowed to provide a closing statement.  Mr.

12  Davey will provide a closing statement on your behalf,

13  and then you will be given an opportunity to tell this

14  Panel why you believe you are suitable for parole today.

15       In addition, we will note for the record any

16  letters of opposition or support.  We will then declare

17  a recess.  We will deliberate, and we'll reach a

18  decision.  We will reconvene and tell you the decision

19  that we make.  You'll be given a written copy, and we

20  will tell you the reasons for our decision.  If you are

21  found suitable for parole, the length of your

22  confinement will be explained to you.

23       As I've indicated, sir, you and your attorney in

24  addition to your statement of reasons why you believe

25  you are suitable, may provide any documents that you

*Capitol Electronic Reporting*

1   believe support a finding of suitability. In regard to

2   parole plans, it's very important that you tell us what

3   those plans are as of today. If those plans have

4   changed from any other written correctional counselor

5   reports, those changes will not be held against you

6   because we are aware that factors change on the outside

7   of prison.

8       Sir, the California Code of Regulations states

9   that regardless of time served, a life inmate shall be

10  found unsuitable for and denied parole if, in the

11  judgment of the Panel, the inmate would pose an

12  unreasonable risk of danger to society if released from

13  prison. In regard to this hearing, you have several

14  rights, sir. You have the right to have timely notice.

15  Did you receive timely notice of this hearing?

16      **INMATE BAIR:** Yes.

17      **PRESIDING COMMISSIONER KUBOCHI:** You also have

18  the right to review your Central File. Were you given a

19  chance to look at the Central File?

20      **INMATE BAIR:** Yes, Sir, I was.

21      **PRESIDING COMMISSIONER KUBOCHI:** And you also

22  have the right, as I've indicated, to present documents

23  and your attorney is permitted to present documents on

24  your behalf that you believe support a finding of

25  suitability. In addition, sir, you have the right to

| | |
|---|---|
| 1 | have your case heard today by an impartial Panel.  Are |
| 2 | you prepared to proceed today with this Panel? |
| 3 | **INMATE BAIR:**  Yes, Sir, I am. |
| 4 | **PRESIDING COMMISSIONER KUBOCHI:**  Sir, as I've |
| 5 | indicated, you will receive a written copy of our |
| 6 | decision.  And that decision will become final within |
| 7 | 120 days.  And you will also receive a copy of the |
| 8 | transcript of today's proceedings.  As to any appeal |
| 9 | rights, I'm going to ask you to direct those questions |
| 10 | to your attorney.  Mr. Davey does an excellent job and |
| 11 | he's very knowledgeable about your rights. |
| 12 | Sir, you are not required to admit or discuss |
| 13 | your offense.  However, this Panel does accept as true |
| 14 | the findings of the court from Sonoma County, do you |
| 15 | understand that? |
| 16 | **INMATE BAIR:**  Yes. |
| 17 | **PRESIDING COMMISSIONER KUBOCHI:**  We're not here |
| 18 | to re-try your case.  We're not here to re-litigate any |
| 19 | of the issues that were resolved in the Superior Court |
| 20 | of Sonoma County, and that includes facts in the |
| 21 | probation report.  You certainly can tell us about any |
| 22 | inaccuracies or any matters that you believe require |
| 23 | correction.  In regard to today's hearing, will you be |
| 24 | talking about your -- talking about the life crime? |
| 25 | **INMATE BAIR:**  Yes, Sir, I will. |

1          **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Now to

2    the extent that you can, please raise your right hand.

3    That's good enough.  You don't have to raise it too

4    high.  I don't want you to hurt your shoulder now.  Do

5    you solemnly swear or affirm the testimony that you give

6    at this hearing will be the truth, the whole truth, and

7    nothing but the truth?

8          **INMATE BAIR:**  Yes, Sir, I do.

9          **PRESIDING COMMISSIONER KUBOCHI:**  Thank you very

10    much.

11          **INMATE BAIR:**  You're welcome.

12          **PRESIDING COMMISSIONER KUBOCHI:**  Commissioner

13    Lushbough, is there any confidential material that will

14    be used by this Panel today?

15          **DEPUTY COMMISSIONER LUSHBOUGH:**  No, none will be

16    used.

17          **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.  And,

18    Mr. Davey, you've reviewed the checklist and you have

19    the same documents as this Panel?

20          **ATTORNEY DAVEY:**  Yes, Sir, I believe so.  And

21    I've passed the checklist to the District Attorney.

22          **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.

23          **ATTORNEY DAVEY:**  I have additional documents to

24    submit --

25          **PRESIDING COMMISSIONER KUBOCHI:**  Yes, sir.

1    **ATTORNEY DAVEY:** -- which consist of a completion

2    certification for Victim Awareness, Units One through

3    Six, March '07, on behalf of my client which is not in

4    the C-File.

5    **PRESIDING COMMISSIONER KUBOCHI:** Yes, sir.

6    **ATTORNEY DAVEY:** Additionally, letters from

7    Veterans Affairs relating to what services they could

8    provide for Mr. Bair on the event that he is paroled.

9    At the appropriate time, I do have a set of documents

10   for the Board to use during deliberation. My client is

11   going to be reading a short opening statement, and he'll

12   hand the packet to the Board.

13   **PRESIDING COMMISSIONER KUBOCHI:** Sure.

14   **ATTORNEY DAVEY:** Other than that, I have nothing

15   else to add.

16   **PRESIDING COMMISSIONER KUBOCHI:** And, Mr. Bair, I

17   want you to know that a couple of things. On anything

18   that isn't in our board packet right now, we're going to

19   give it back to you or your attorney because the Panel

20   members are not allowed to put anything in your Central

21   File. There's a specific process within the Department

22   of Corrections and primarily your correctional counselor

23   has the authority or other administrative staff at this

24   facility have the authority to put things in your

25   Central File. We can't do that this morning.

| | |
|---|---|
| 1 | And the fact that we give back the documents that |
| 2 | you're presenting does not mean we didn't look at them |
| 3 | during deliberations. I want to make that clear to you |
| 4 | because from your end of the table, if they're given |
| 5 | back at the end of this hearing, you -- regardless of |
| 6 | our decision, you're going to say well, these people |
| 7 | didn't even look at·it. That's why they're giving it |
| 8 | back. I'm explaining why we're giving it back. Do you |
| 9 | understand that, sir? |
| 10 | **INMATE BAIR:** Thank you. Yes, Sir, thank you |
| 11 | very much. |
| 12 | **ATTORNEY DAVEY:** Commissioner, one other minor |
| 13 | item. |
| 14 | **PRESIDING COMMISSIONER KUBOCHI:** Sure. |
| 15 | **ATTORNEY DAVEY:** I was provided this morning at |
| 16 | the table a support letter from Michael Ogness and |
| 17 | Martha Ogness dated, actually this one is dated May |
| 18 | 23rd. I think there's one more recent in the file. And |
| 19 | two chronos dated 3/7/07 on behalf of Bottle Stoppers |
| 20 | and also an NA chrono dated February 22nd, '07, which |
| 21 | probably are not in the C-File either but I did receive |
| 22 | copies for me. |
| 23 | **PRESIDING COMMISSIONER KUBOCHI:** Okay. We have |
| 24 | them too. |
| 25 | **ATTORNEY DAVEY:** Yeah. |

1     **PRESIDING COMMISSIONER KUBOCHI:** So there's no

2 need to pass those over.

3     **ATTORNEY DAVEY:** And I've shared those with my

4 client.

5     **PRESIDING COMMISSIONER KUBOCHI:** Yes, and thank

6 you for noting that on the record. Ogness for the

7 transcriber is spelled O-G-N-E-S-S.

8     **ATTORNEY DAVEY:** Thank you.

9     **PRESIDING COMMISSIONER KUBOCHI:** All right. Mr.

10 Davey, do you have any other matters that you wish to

11 bring to our attention at this time?

12     **ATTORNEY DAVEY:** One moment. My client has a

13 short opening statement he'd like to read.

14     **PRESIDING COMMISSIONER KUBOCHI:** Sure. Take your

15 time, sir, and the fact that you're reading is not held

16 against you. We don't expect polished professional

17 speakers. I want you to get comfortable with the

18 knowledge that we will listen to your statement

19 regardless of whether you are reading it or not. Take

20 your time. Get composed. Why don't you take a couple

21 of deep breaths before you start.

22     **INMATE BAIR:** Good morning. I confessed to my

23 crime on the third day I was in the county jail. I have

24 always taken full responsibility for the crime that I

25 had committed that caused the death of Mrs. Aikens [sic]

1   and for the trauma that I put Mrs. Fomasi through. My

2   remorse today is the same today as it has been since the

3   day I found out Mrs. Aikens had died. If there was

4   anything I could do to turn back the clock and give Mrs.

5   Aikens her life back today, I would.

6        If giving my life today would take back this

7   crime that I committed against Mrs. Aikens and Mrs.

8   Fomasi, I would give my life today for that. If giving

9   my life today would take the shame and sadness away from

10  my parents, my mother and father, my brothers and

11  sisters and their children, I would do that today. If I

12  could make amends to my two daughters, my six

13  grandchildren, if there was any way I could turn back

14  the clock and change these events, I would do that.

15       I wasn't going to talk about my crime today, but

16  I really don't have anything to hide. I want to discuss

17  anything with you and the Commissioners and the District

18  Attorney that you want to discuss with me. And that's

19  all I've got to say for right now. Thank you very much.

20       **PRESIDING COMMISSIONER KUBOCHI:**  Thank you, Mr.

21  Bair. Any other matters, Mr. Davey?

22       **ATTORNEY DAVEY:**  No, Sir, I believe we're ready

23  to proceed. My client would just object for the record

24  to being restrained. I know it's the policy of the

25  facility and I just want to object for the record.

1       **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  It's
2  absolutely agreeable in regard to placing your objection
3  on the record.  I would note that the Panel does not
4  have any authority over the security rules of this
5  institution.  We don't have the discretion because we do
6  not have any authority.  We don't have the discretion to
7  make any other accommodations in regard to security.
8  That is the manner in which this institution conducts
9  hearings.  But your objection is noted for the record.
10      **ATTORNEY DAVEY:**  Thank you, Sir.
11      **PRESIDING COMMISSIONER KUBOCHI:**  For the
12  transcriber, the second victim, the name is Fomasi, and
13  it is spelled F-O-M-A-S-I.  Aiken, the decedent, is
14  spelled A-I-K-E-N.
15      Sir, at this time, I'm going to read a brief
16  Statement of Facts into the record.  It is a summary.
17  At some point in time, there might be additional
18  information to the summary as I have tried to pick a
19  rendition of the facts that is as concise as possible,
20  but that doesn't mean that the summary I'm going to give
21  has every fact related to the determination that was
22  made in Sonoma County.  And I'm looking at the Board
23  report of July 2006.
24      That states on or about January 20th, 1984, your
25  ex-wife, Linda Bair, left her home in Visalia to visit

*Capitol Electronic Reporting*


19

1  with family members in Bodega Bay.  She had left you
2  back at her home in Visalia without any transportation.
3  Later that night, Inmate Bair stole a pickup truck and
4  followed his ex-wife to Bodega Bay.  You checked into
5  the Harbor View Motel around noontime on January 24th
6  under a false name.

7          You had been·seen at the motel on January 25th,
8  however, the pickup truck was missing.  On January 26th,
9  you checked out of the Harbor View Motel and the stolen
10 pickup truck was discovered about a mile and a half from
11 Bodega Bay down a ravine totally burned up.  The pickup
12 truck was stripped of its license plates when found.  On
13 January 26th, you purchased a six-pack of beer, a
14 sandwich, a package of peanuts, and some potato chips at
15 the Dry Dock Café.  The Dry Dock Café is approximately
16 75 yards away from Mrs. Teresa Aiken's house and forms a
17 triangle with the Harbor View Motel.

18         Apparently you had been a resident of Bodega Bay
19 a few years earlier and had done some yard work for the
20 victim, Teresa Aiken, during that time.  During the
21 afternoon of January 26th, you went to Mrs. Aiken's
22 house, overpowered her, took her eyeglasses, rendering
23 her almost blind, tied her up, and gagged her.  You then
24 placed her underneath her bedding and mattresses on the
25 floor of her bedroom.

1        At approximately 4:00 to 4:15 p.m., Ms. Rose

2   Fomasi came to deliver Ms. Aiken's mail.  After Ms.

3   Fomasi entered the house, you pulled a gun and ordered

4   her to lay down on the floor in the bedroom and not to

5   look at your face.  You then tied up Ms. Fomasi with the

6   electrical wire from Ms. Aiken's iron.  You then left

7   the residence taking Mrs. Aiken's eyeglasses, keys, and

8   her car.

9        Later that night, you abandoned Mrs. Aiken's car

10  after getting stuck on the shoulder of the Lakeville

11  Highway across from Gilardi's resort.  Gilardi is

12  spelled G-I-L-A-R-D-I.  You then stole an ocean going

13  sailboat from the Lakeville Marina which is part of

14  Gilardi's resort.

15       On January 27th at approximately 7:30 a.m., the

16  owner of the sailboat noticed the sailboat was missing

17  from its berth.  The owner subsequently found his

18  sailboat a short distance away stuck on the mud bank of

19  the Petaluma River.  As the owner approached the boat,

20  the owner observed you waving what appeared to be a

21  shotgun or a length of pipe ordering the owner to stay

22  away.  The owner then retreated back to the marina where

23  he watched his boat until Sonoma County Sheriff's

24  deputies arrived.

25       While watching the boat, the owner observed you

1   leave the boat and disappear into the surrounding area.
2   You were eventually found a short distance from the
3   Board hiding in a floodgate.  When you were arrested,
4   you were found to be wearing clothing taken from the
5   boat and had in your possession a flare gun, flares,
6   shotgun shells, and a 182 white tablets later determined
7   to be amphetamine.  ·

8       After your arrest, you were brought to the police
9   interview room.  While waiting to be interviewed, you
10  cut one of your wrists with a piece of plastic in an
11  apparent suicide gesture.  You were taken to the
12  community hospital for treatment.  The autopsy of Mrs.
13  Aiken revealed that her death was caused by chronic
14  pulmonary disease, chronic cardiac disease and multiple
15  traumatic injuries.  These injuries included bruising of
16  the mouth and lips, swollen hands from being tied behind
17  her back with multiple loops of ropes, petechial
18  hemorrhages noted on both hands mainly dorsally.  The
19  right hand was confluently purple in coloration and
20  massively swollen.  The pathologist found that the tying
21  of the victim's hands contributed very significantly to
22  her death.

23      And I am not reading into the record some of the
24  forensic matters such as fingerprints, et cetera, that
25  were taken from various items that tied you to the

1   sequence as noted such as, I believe, the mentioning of

2   the beer and the sandwich wrapper and the chip bags.  I

3   think some of those items had your fingerprints on it.

4        Briefly, sir, the probation report indicates that

5   you were born about September 14th, 1944, which would

6   have placed you about 40 years old at the time of the

7   crime.  And going back in time in October of 1969, it

8   looks like Riverside Sheriffs Office, reckless driving.

9   In May of 1974, possession of amphetamines in violation

10   of Section 11377 of the Health and Safety Code.  It

11   appears to have been related to also a driving while

12   under the influence of alcohol, stop or detention by

13   Riverside Sheriffs Office.

14        In Sacramento County on March of 1975, there was

15   a charge of and a conviction for 12020, possession of a

16   shotgun, and that appears to be related to a Fish and

17   Game detention that involved a loaded shotgun in a

18   vehicle.   You were placed on probation for that offense

19   for three years.  In 1980, specifically July, a driving

20   under the influence of alcohol for which you received

21   informal probation for the conviction in August of 1980.

22   In March of 1982, there was a conviction for petty theft

23   and vandalism.  Petty theft in violation of Section 484

24   of the Penal Code and vandalism Section 594 of the Penal

25   Code, for which you were placed on one year probation.

1  And you were ordered to do alcohol rehab in order to
2  make restitution.

3       The caption in the probation report indicates
4  that you in Santa Rosa, which is Sonoma County, you
5  vandalized, and I'm going to spell the name of the
6  store, Diekman, D-I-E-K-M-A-N, Diekman's Bay Store,
7  Bodega Bay.  Apparently you drove your pickup into the
8  building.  Your ex-wife worked at that grocery store.
9  The damage done was 3,355 dollars and 1982 dollar value.
10 And subsequently you were arrested for this offense.

11      The probation noted at the time of writing the
12 report for this sentencing, and I note the date of the
13 report being October 17th, 1984, or thereabouts, the
14 probation department noted in an outstanding warrant for
15 driving under the influence in violation of 2800.1 of
16 the Vehicle Code, evading a police officer.  There was
17 an outstanding warrant.

18      In regard to your personal history, sir, I'm
19 going to look for Counsel's edification on the July 2006
20 Board report.  You were born in Kentfield, California to
21 Ezra, spelled E-Z-R-A, and Blanche, with an E, Blanche
22 Bair.  You were the second to the youngest child with
23 one older sister and one older brother and one younger
24 brother, and one -- an older stepbrother and stepsister.
25 You graduated in 1962 from Esparto High School and

*Capitol Electronic Reporting*

1  attended one year of college at Riverside City College.

2       The Board report indicates that you enlisted in

3  the Navy in 1962.  You achieved the rank of E4 and that

4  you advised the correctional counselor that you were

5  honorably discharged in 1966 and through your verbal

6  narrative and historic information, you had been married

7  five times with your last relationship ending in divorce

8  in 1997 and that you had two daughters.  And that before

9  your incarceration, your primary occupation was driving

10  or operating heavy equipment in the construction

11  industry.

12       You started using drugs or alcohol in 1966 and

13  that your drug of choice was what is called today

14  methamphetamine, perhaps back in those days it was

15  simply called amphetamines.  That your drug use, which

16  began as I indicated in 1966, continued up until your

17  incarceration for this offense.

18       Sir, at this time, I'm going to ask Commissioner

19  Lushbough to discuss your post-commitment factors, and

20  then we're going to come back and talk about your parole

21  plans.

22       **ATTORNEY DAVEY:**  Sir, just to clarify the record,

23  I believe my client remarried in '01?

24       **INMATE BAIR:**  Yes.

25       **ATTORNEY DAVEY:**  To his current wife.  So that

```
 1  makes six --
 2            INMATE BAIR:   In '02.
 3            ATTORNEY DAVEY:   In '02.  I'm sorry.
 4            INMATE BAIR:   In August.  On August 10th.
 5            PRESIDING COMMISSIONER KUBOCHI:   Okay.  And then
 6   thank you for updating.  Thank you, Mr. Davey.  We want
 7   to have accurate information.  And, once again, before I
 8   turn this over, if you have to use the facilities, you
 9   let me or your attorney know.
10            INMATE BAIR:   I'm fine right now.  Thank you.
11            PRESIDING COMMISSIONER KUBOCHI:   Okay.  We want
12   you to be comfortable throughout these proceedings.
13            INMATE BAIR:   Thank you.
14            DEPUTY COMMISSIONER LUSHBOUGH:   Good morning, Mr.
15   Bair.
16            INMATE BAIR:   Morning.
17            DEPUTY COMMISSIONER LUSHBOUGH:   You were received
18   into CDC in November, November 2nd, 1984.  And as the
19   Commissioner mentioned, your life term began April 26th,
20   1985.  Your last hearing was July 25th, 2003.  That was
21   at Folsom at which time you were denied parole for three
22   years.
23            INMATE BAIR:   Yes.
24            DEPUTY COMMISSIONER LUSHBOUGH:   And the period
25   that I will be reviewing is from July 25th, 2003, to the
```

*Capitol Electronic Reporting*

1   present time.   That's the period of review.   I may go

2   back historically for some areas.   But I had a little

3   trouble getting back to your original classification

4   score.   As close as I could get was 1989 and you were at

5   99 points at that time.   Does that sound about right?

6           **INMATE BAIR:**   No.

7           **DEPUTY COMMISSIONER LUSHBOUGH:**   It doesn't.   What

8   does it sound like?

9           **INMATE BAIR:**   In, what was it?   What year was

10  it?

11          **DEPUTY COMMISSIONER LUSHBOUGH:**   In '89.

12          **INMATE BAIR:**   In 1989, that might have been 99 at

13  that time, yes.

14          **DEPUTY COMMISSIONER LUSHBOUGH:**   Okay.

15          **INMATE BAIR:**   I was still at Tehachapi level IV.

16          **DEPUTY COMMISSIONER LUSHBOUGH:**   Okay.

17          **INMATE BAIR:**   Yes.

18          **DEPUTY COMMISSIONER LUSHBOUGH:**   What did you come

19  in with?   What kind of classification score did you have

20  initially?

21          **INMATE BAIR:**   105.

22          **DEPUTY COMMISSIONER LUSHBOUGH:**   Okay.   Well, you

23  got that down to zero in 2001.

24          **INMATE BAIR:**   Yes.

25          **DEPUTY COMMISSIONER LUSHBOUGH:**   And then it was

```
 1   19, which was mandatory placement in 2005.  And

 2   currently you're carrying the 28 points.  Again,

 3   mandatory.  It still reflects that you have a zero;

 4   correct?

 5          INMATE BAIR:  Yes.

 6          DEPUTY COMMISSIONER LUSHBOUGH:  You have one 115.

 7   None in this period of review.  It was back in September

 8   of 1998, and that was smoking.  And that was

 9   administrative.

10          INMATE BAIR:  Yes.

11          DEPUTY COMMISSIONER LUSHBOUGH:  So you've been

12   free of those approximately nine years.  You have a

13   total of six 128(a)s, only one within this review period

14   and that was June 1st, 2005, disrespect towards staff.

15   You've been free of them about two years now.  Do you

16   recall that?  That was in the dental.

17          INMATE BAIR:  Yes.

18          DEPUTY COMMISSIONER LUSHBOUGH:  Any explanation

19   you want to give?

20          INMATE BAIR:  Yes, if you would like.  I wrote a

21   letter.  I had a medical problem at the time.  And

22   dentist Dr. Diehl was standing here next to me talking

23   and I was in -- I was very uncomfortable and in some

24   pain.  And when she stepped out of my line of sight and

25   walked behind me, I reached into my pants and I adjusted
```

1    myself.  I had blisters on the side of my legs and I had

2    a rash that I was very uncomfortable with.

3         And evidently, Ms. Rhodes, the dental technician,

4    observed me reaching inside my pants and adjusting

5    myself.  And she reported that to Dr. Diehl.  And Dr.

6    Diehl thought it was a sexual incident, and it wasn't.

7    I have the medical papers.  I think they're in my file

8    actually.  I gave them to my counselor, Mr. Larsen.

9    Yeah, here we go.  Thank you.

10        **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  Thank you.

11        **INMATE BAIR:**  You're welcome.

12        **DEPUTY COMMISSIONER LUSHBOUGH:**  And this was the

13   602 that you filed on the 128(a)?

14        **INMATE BAIR:**  Yes.

15        **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  Okay.

16        **INMATE BAIR:**  Those are the medical records that

17   I got from the medical department to show that I had a

18   medical problem.

19        **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  All right.

20   Thank you.

21        **INMATE BAIR:**  You're welcome.

22        **DEPUTY COMMISSIONER LUSHBOUGH:**  That's all right.

23   I'll get it to you.

24        **INMATE BAIR:**  Thank you.

25        **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay, well,

1   moving on.  You've already confirmed your high school

2   graduation in 1962.  The highest reading score I found

3   recently was 9.5.  Vocationally, it would appear to me

4   that most of your work skills and marketable skills have

5   been obtained through PIA.

6        **INMATE BAIR:**  Yes.

7        **DEPUTY COMMISSIONER LUSHBOUGH:**  But I also noted

8   that you prior to incarceration, you were a welder, a

9   journeyman plumber, a truck driver, an underground

10  natural gas worker.

11       **INMATE BAIR:**  Yes.

12       **DEPUTY COMMISSIONER LUSHBOUGH:**  Is that correct?

13       **INMATE BAIR:**  Yes.

14       **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  You do

15  have certificates of completion on forklift operator in

16  2006, warehouse worker laborer, you're certified with

17  1,512 hours.  It's a certificate of proficiency.  You

18  also have another certificate for forklift operator and

19  one for stock inventory in 2006.  Warehouseman in 2006,

20  and also material distribution in 2006.  From what I can

21  gather in going through your Central File, you had been

22  in metal shop PIA since March of '98, which means at

23  Folsom State Prison.

24       **INMATE BAIR:**  Yes.

25       **DEPUTY COMMISSIONER LUSHBOUGH:**  And you were

1    certified in grinding and also you were quality

2    inspector since July 2004 with above average grade

3    points.  You've been a fabricator.  You've been a tig

4    and mig welder.

5         **INMATE BAIR:**  Yes.

6         **DEPUTY COMMISSIONER LUSHBOUGH:**  As part of your

7    work history as well as your marketable skills.  Your

8    grades in PIA warehouse in 2005 and 2006 and into 2007

9    have been above average to exceptional, and currently

10   they're exceptional.

11        **INMATE BAIR:**  Yes.

12        **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  At one

13   point in 2005, you were the infirmary janitor, but I

14   didn't gather you were there very long.

15        **INMATE BAIR:**  A couple of months.

16        **DEPUTY COMMISSIONER LUSHBOUGH:**  Yeah.  And also a

17   janitor on L-III in 2005.  Again it doesn't appear you

18   were there too long.

19        **INMATE BAIR:**  Not very long.

20        **DEPUTY COMMISSIONER LUSHBOUGH:**  But you're

21   certainly characterized as an extremely good worker,

22   very reliable and dependable.  In terms of self-help,

23   all through this period, 2003 to the present, you have

24   been active in AA.  You also did an AA cell study.  You

25   have a certificate for that.  And P. Noble, N-O-B-L-E,

1   said that you were a current chairman and member of the

2   Board as of March 7th, 2007.

3           **INMATE BAIR:**  Yes.

4           **DEPUTY COMMISSIONER LUSHBOUGH:**  You're still --

5   So you are on the board and chairman now?

6           **INMATE BAIR:**  Yes.

7           **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.  You have a

8   certificate in effective communication in 2006, decision

9   making and problem solving.  You have a laudatory chrono

10  for completing Women's Perspectives in 2006.  You

11  completed a 22 session course called the Four

12  Agreements.  I'm not sure I know what that means, Four

13  Agreements?

14          **INMATE BAIR:**  It was a course study that they

15  offered at PIA during the morning for about an hour for

16  about three weeks.  It's the four agreements are to tell

17  the truth, always do the best we can, don't take it

18  personally, and don't make assumptions.  It's a

19  wonderful course.  Absolutely wonderful course.

20          **DEPUTY COMMISSIONER LUSHBOUGH:**  It sounds like

21  it.  It sound like --

22          **INMATE BAIR:**  It was a good course.

23          **DEPUTY COMMISSIONER LUSHBOUGH:**  -- it's pretty

24  solid information to be thinking about.

25          **INMATE BAIR:**  Yes.

1      **DEPUTY COMMISSIONER LUSHBOUGH:** Well, I saw a
2  reference in your reports that you had completed 158
3  correctional learning network courses. My understanding
4  is that those are sometimes all on video and sometimes
5  they are also people who are teaching; is that correct?
6      **INMATE BAIR:** For the most part they're on video.
7      **DEPUTY COMMISSIONER LUSHBOUGH:** Okay.
8      **INMATE BAIR:** And we do the courses by watching
9  the video and taking notes and, just to give you an
10  example of what we've got here, this is January of 2006.
11  And the first session starts out, it's an anger control
12  course. And we start out at the first of the month.
13  And they have these courses, say an hour on Monday and
14  an hour on Wednesday and an hour on Saturday. And
15  you'll watch these courses and take notes and at the end
16  of the month, you'll turn your booklets in and they'll
17  give you a certificate for doing these courses.
18      **DEPUTY COMMISSIONER LUSHBOUGH:** Okay. So do the
19  booklets come back to you graded or marked?
20      **INMATE BAIR:** Yes.
21      **DEPUTY COMMISSIONER LUSHBOUGH:** Okay. So you get
22  some feedback too?
23      **INMATE BAIR:** Just say for instance the gold
24  writing is the instructor's writing.
25      **DEPUTY COMMISSIONER LUSHBOUGH:** Okay. Good, so

1   you get feedback on what's going on.

2         **INMATE BAIR:**  Yes.

3         **DEPUTY COMMISSIONER LUSHBOUGH:**  All right.

4         **INMATE BAIR:**  Excellent courses.  Excellent

5   course.  I recommend them for everybody.

6         **DEPUTY COMMISSIONER LUSHBOUGH:**  Just looking at

7   this, I would say that you have put a lot of time and

8   effort into it also.  I'm going to read some of the

9   titles.  I'm sure there are more that we could talk

10  about, transitions, career, business basics, anger

11  control, training, career transitions, dispute

12  resolution, victim's awareness, let's save America, know

13  thyself, healthy family and kids, stress management,

14  anger management.

15        In the tech series, there were computers,

16  cultural diversity, communications, learn to earn job

17  success, and I think I got -- well, it goes on.  There's

18  a lot of certificates.  I counted about 50 self-help

19  certificates within this period of review.

20        **INMATE BAIR:**  Yes, Ma'am.

21        **DEPUTY COMMISSIONER LUSHBOUGH:**  Since 2003.  So

22  you've done a lot of work.

23        **INMATE BAIR:**  Yes.

24        **DEPUTY COMMISSIONER LUSHBOUGH:**  You had a

25  laudatory chrono December 19th, 2005, for your

1  contributions both time and money to the MAC children's

2  Christmas party.   In May 20th, 2006, the MAC Mother's

3  Day banquet.   March 28th, 2006, family relations

4  education enrichment.   And we spoke of women's

5  perspective.   And there were also two certificates for

6  FEMA topics.   The emergency preparedness topics.   I did

7  note your Counsel presented this today.   This

8  certificate is not yet in the C-File.   It's dated March

9  the 20th, 2007.   I'm sure it will be there soon.

10           **INMATE BAIR:**   Yes.

11           **DEPUTY COMMISSIONER LUSHBOUGH:**   But we'll give

12  this copy back to you.

13           **INMATE BAIR:**   Thank you.

14           **DEPUTY COMMISSIONER LUSHBOUGH:**   And that was the

15  victim's awareness one to six units.   Also the most

16  recent chronos which we received in late mail and we put

17  on your Counsel's table as well, and I trust you've seen

18  them now, March 7th, 2007, was a Bottle Stoppers, the

19  most recent one.   And that you attend all meetings,

20  share your experiences, strength and hope with other

21  members.   Current chairman and a member of the steering

22  committee.   And perform your duties of this office very

23  well by your examples to help ensure the group's

24  continual success.

25           Also P. Noble on February 27th, 2007, noted your

*Capitol Electronic Reporting*

1    participation during that particular quarter, which was

2    the first quarter of this year.  And that you continue

3    to accumulate knowledge of the NA way to recovery.  Is

4    there anything else that perhaps I failed to mention

5    that you've accomplished since our period of review

6    started on July 25th of 2003 that you would like to

7    bring to the Panel's attention at this time?

8         **INMATE BAIR:**  I think you've pretty well covered

9    it.  Thank you.  I think you've --

10        **DEPUTY COMMISSIONER LUSHBOUGH:**  Counsel, anything

11   that --

12        **INMATE BAIR:**  Other than listing every single

13   chrono that I've accomplished, I think you've done a

14   good job.  Thank you.

15        **DEPUTY COMMISSIONER LUSHBOUGH:**  All right.  Thank

16   you.

17        **ATTORNEY DAVEY:**  I think my client does do some

18   self-study as indicated, reads books and whatnot,

19   they're probably not documented line per line.  But he

20   tries to keep himself busy in a positive manner while

21   he's incarcerated.

22        **DEPUTY COMMISSIONER LUSHBOUGH:**  Not to pile more

23   work on you, please don't take it this way, but I'm gong

24   to suggest to you that if you don't get a date today and

25   if you're doing self-study and books, it wouldn't hurt

1  to start a list of those books, you know, title, author,
2  when you read it, and maybe just a short paragraph of
3  what affected you, what touched you, what helped you.
4  And then if you don't get a date today, by all means
5  bring that information in to the Panel so that they can
6  see that you have done these things as well.

7      **INMATE BAIR:** Actually I can do that for you
8  right now.

9      **DEPUTY COMMISSIONER LUSHBOUGH:** Okay. All right.
10     **ATTORNEY DAVEY:** It must have been four years in
11 the Navy that got him organized.

12     **DEPUTY COMMISSIONER LUSHBOUGH:** Very organized.
13 I have to tell you, Mr. Bair, this is the first time
14 this has ever happened when I've made that suggestion or
15 recommendation. Mr. Bair, for the record, has compiled
16 a number of composition books, two, three, four, five,
17 six of them so far, and are these books -- or seven of
18 them, that you have put your notes of your independent
19 study in?

20     **INMATE BAIR:** Yes.

21     **DEPUTY COMMISSIONER LUSHBOUGH:** Okay. All right.
22 What I'd like to ask you to do is this, if you would
23 just leave them on the table when we go into recess, the
24 Commissioner and I will go through them, take a look at
25 them, and see what you've been doing. Like I said, it's

*Capitol Electronic Reporting*

1  the first time I've ever suggested this and had someone

2  already have it done.

3  **INMATE BAIR:** Thank you very much.

4  **DEPUTY COMMISSIONER LUSHBOUGH:** Okay. If there

5  is -- that's fine. Thank you, sir. If there is nothing

6  else, what we'll do at this point is go into the most

7  recent psych evaluation prepared by Dr. Heather Mann,

8  first names H-E-A-T-H-E-R, last name M-A-N-N, Ph.D. And

9  the evaluation is dated November 3rd, 2006. And

10 beginning on page four, apparently the prior Board had

11 asked for an evaluation of jealousy as a factor in the

12 commitment offense. And Dr. Mann writes as follows:

13 "In response to the Board's question of

14 jealousy and his volatility in relationship based

15 on his life crime an extensive discussion was

16 conducted around the inmate's relationship

17 history and his ability to maintain a healthy

18 relationship with his current wife. There

19 appears to be a theme in his early marriages that

20 his expectations be followed by his partner.

21 When his expectations weren't maintained to his

22 satisfaction, the relationships ended.

23 "In discussion of the Inmate's marriages

24 that have occurred since incarceration, this

25 theme has gradually transitioned to a more mature

1          and cooperative stance in terms of relating to

2          his partners.  In his first marriage while he was

3          in prison, they had only known each other for six

4          months and had very few contacts.  When he was

5          unsatisfied with the issue of hygiene in the

6          relationship, he attempted to resolve this

7          through letter writing.  When he felt that she

8          was not able to have this conversation or modify

9          her behavior in any way, the marriage was ended.

10             "Looking at this marriage with Isabel, the

11          trend that begins to appear is that he slowly

12          gets to know the woman for a longer period of

13          time prior to the marriage."

14    You're currently married.  How long did you know

15    her before you got married?

16         **INMATE BAIR:**  I met Valerie when she was 12 years

17    old.

18         **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

19         **INMATE BAIR:**  And today she's 57.

20         **DEPUTY COMMISSIONER LUSHBOUGH:**  Okay.

21         **INMATE BAIR:**  And we got back together on April

22    19th of 2001.

23         **DEPUTY COMMISSIONER LUSHBOUGH:**  Did you go to

24    school together or were you in the neighborhood

25    together?

39

| | |
|---|---|
| 1 | **INMATE BAIR:** I was 17 years old, she was 12, and |
| 2 | I knew her parents. And her parents and my parents were |
| 3 | friends. And that's how I knew Valerie. That's how I'd |
| 4 | come to know who she is. |
| 5 | **DEPUTY COMMISSIONER LUSHBOUGH:** Okay. |
| 6 | **INMATE BAIR:** And in April of -- actually it was |
| 7 | March of 2001, I wrote a letter to her dad. I heard he |
| 8 | was, had cancer and emphysema and wasn't feeling very |
| 9 | well and I wrote him a letter. And she answered the |
| 10 | letter for him and we started corresponding to each |
| 11 | other. I sent her a visiting form. She started -- She |
| 12 | came to see me and we fell in love and we got married in |
| 13 | August, on August 10th, 2002. |
| 14 | **DEPUTY COMMISSIONER LUSHBOUGH:** Okay. Thank you. |
| 15 | **INMATE BAIR:** You're welcome. |
| 16 | **DEPUTY COMMISSIONER LUSHBOUGH:** With respect to |
| 17 | the diagnostic impression, Dr. Mann offers on Axis I, |
| 18 | Alcohol Dependence, In Institutional Remission; |
| 19 | Amphetamine Dependence, In Institutional Remission, with |
| 20 | no diagnosis on Axis II. And a Global Assessment of |
| 21 | Functioning of 90. |
| 22 | Then Dr. Mann goes on to the assessment of |
| 23 | dangerousness. I'm going to just summarize this, but as |
| 24 | stated in the parole plan section, this Inmate has given |
| 25 | significant priority to developing viable vocational |

1  plans, housing, and ways to maintain his sobriety in the
2  community.  He has developed reasonable accommodations
3  and vocational possibilities in three counties.  His
4  level of preparedness for parole is higher than that
5  noted of other inmates in his similar situation.  His
6  work skills are varied and he appears to be employable
7  in many different fields.

8      She does talk about insight.  Insight into his
9  life crime and demonstration of remorse are also two
10  factors associated with success on parole.  Inmate Bair
11  makes a statement in his account of the crime to attest
12  to his level of remorse regarding the offense.  And she
13  quotes you, "I have committed a crime to where there is
14  absolutely nothing I will be able to do to make amends
15  for what I've done.  Yes, I'm sorry and ashamed and
16  extremely sad that I murdered Ms. Atkins [sic] and
17  destroyed Ms. Fomasi's life."  End quote.

18      And she goes on then to talk about positive
19  protective factors.  And that has to do with your
20  disciplinary history, of course, in some great degree.
21  She states that your future risk for violence is below
22  average.  She doesn't say below average as compared to,
23  so I'm not sure what she's talking about.

24      She does mention your six chronos and states that
25  your assessment of dangerousness within a controlled

*Capitol Electronic Reporting*

1  setting of an institution is seen as below average in
2  comparison with other inmates.  Assessment of
3  dangerousness if released into the community is seen as
4  below average in comparison with other inmates.

5       She then under her observation states:

6            "Excluding previous criminal history for
7       nonviolent crimes, the only historical factor
8       that is associated with dangerousness in the
9       future are his problems that he had with alcohol
10      and drugs.  He appeared to have a considerable
11      substance abuse history with his alcohol problems
12      starting as early as age 10.  These problems in
13      combination with relationship factors led to his
14      crime.  Throughout his entire 22 years in prison,
15      he has demonstrated an ability to refrain from
16      alcohol and illegal drug use.  He has developed a
17      relapse prevention plan should any problems occur
18      in the future.

19           "It is also believed that the work he has
20      done to explore his commitment offense and the
21      potential cause of that has led him to a place in
22      his life where he is very motivated and has the
23      skills to maintain his sobriety.  In addition, he
24      has just rejoined NA and it would be beneficial
25      for him to continue with his participation in

1      this particular group.  His work ethic, ability

2      to adjust to institutional living, and his own

3      goals for self-improvement are likely to continue

4      during his period of incarceration and appear to

5      be sustainable upon parole.

6            "The final issue of concern by the Board

7      in July of 2003 was the issue of jealousy as it

8      relates to the commitment offense.  Previous

9      statements by the inmate described a jealous rage

10     as a contributing factor to the crime.  During

11     this interview, there was extensive discussion of

12     his relationship history as it relates to his six

13     marriages.

14           "From this discussion, it appears that the

15     inmate is aware that his three marriages prior to

16     incarceration were significantly impaired by his

17     own use of alcohol and drugs.  He also

18     understands that during these relationships, he

19     felt the need to control the relationship.  And

20     when his partners would not abide by his

21     expectations, he would leave the relationship.

22     This pattern continued during his fourth

23     marriage.  He knew the individual for a short

24     time of -- period of time, six months, prior to

25     the marriage.  He did not -- He did make an

1     attempt, which is a new behavior for him, to try

2     to resolve his concerns through letter writing

3     and open discussion.

4     "When this was not achieved to his

5     satisfaction, the marriage ended.  The last two

6     relationships, in parens, his last divorce and

7     his current marriage, close parens, are more

8     indicative of new relationship skills learned on

9     behalf of the inmate involving open

10    communication, honesty, and being able to make

11    mutual decisions.  Based on the above points, it

12    is important to note that jealousy has not been

13    researched as a significant factor in

14    contributing to dangerousness and future violence

15    of inmates who parole.

16    "However, in light of the Board's

17    concerns, the Inmate's self-help work over the

18    years and his current relationship are suggestive

19    of a level of maturation that is encouraging for

20    his future.  In conclusion, there appears to be

21    no factors that would preclude routine release

22    planning in this case."

23    With that, I will conclude the summary of the

24  psych evaluation.  Counsel, would you or your client

25  care to make any comments on the psych evaluation at

1    this time or would you prefer to defer to closing?

2        **ATTORNEY DAVEY:**  Commissioner, just a quick note.

3    You had indicated that the Board had postponed

4    previously to enable the psychology department to

5    prepare new information, and that has been done.  In

6    addition to that, my client has put together a short

7    synopsis of part of the additional things that the

8    doctor was talking about and maybe just kind of

9    encapsulates from pretty much birth to where he finds

10   himself today in three pages.  We'd like the

11   Commissioners to review that during deliberation as

12   well.

13       **DEPUTY COMMISSIONER LUSHBOUGH:**  All right, thank

14   you.  And we will.

15       **ATTORNEY DAVEY:**  Thank you.

16       **DEPUTY COMMISSIONER LUSHBOUGH:**  We'll do so.

17   Okay, Mr. Bair, I want to thank you for your attention.

18   I'm going to ask you now to direct your attention to the

19   Commissioner for the balance of the hearing, please.

20       **INMATE BAIR:**  Thank you.

21       **DEPUTY COMMISSIONER LUSHBOUGH:**  All right.

22       **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Bair, rather

23   than have me read something from a report, why don't you

24   tell me what your parole plans are.

25       **INMATE BAIR:**  My parole plans are if I'm to be, I

1    don't know whether I'm going to be picked up by a

2    probation officer or not.   But I'll parole to my wife in

3    Roseville, California.   Within a week of my parole, I

4    intend to sign up for or check into the Laborers and

5    Teamsters Unions of which I used to belong to.   And I

6    found out through communication with the unions that I

7    can be reinstated with the union halls.

8         I have a parole -- I have a job offer from Mr.

9    Michael Ogness at his driving school in Roseville.   I

10   have a job offer from the city of West Sacramento.   My

11   brother Duke Bair has offered to give me employment

12   driving truck.   My brother Lloyd Bair has offered to

13   help me find employment.   When I parole, I'm going to --

14   my wife works at the DMV.   She's going to help me get my

15   class one chauffeur's license so I could drive truck if

16   need be.

17        Let's see, I have parole plans for Sonoma County.

18   I have help from the AARP.   They've notified me that

19   they would be willing to help me to find secure

20   employment in Sonoma County and Tulare County.   I have

21   the Veterans Administration in Palo Alto that has

22   offered to help me find employment.   I have the veterans

23   group in Tulare County that's run by Dan Britton that's

24   going to help me find employment if I have to parole to

25   Tulare County.   Sonoma County is the county of my

1 | commitment.

2 |     Tulare County is the county of my last residence.

3 | I plan to -- I have the AA meeting places there in

4 | Roseville. I have an AA sponsor in Roseville. His name

5 | is Ralph Stevens. He lives in Citrus Heights. I have

6 | AA meeting places there in Santa Rosa. I have AA, all

7 | the AA meeting places there in Tulare County. I have 72

8 | hundred dollars in a savings account that if I'm having

9 | to parole to Sonoma or Tulare County, I will be able to

10 | rent an apartment and supply it with food and phone.

11 | Until I get my driver's license, I'll buy a bicycle and

12 | ride it back and forth to work.

13 |     I have my family. I have friends that have

14 | offered to help me readjust when I return to society.

15 | That's about it.

16 | **PRESIDING COMMISSIONER KUBOCHI:** Okay. It is

17 | 9:50 and with Counsel's permission and the correctional

18 | officer, we'll take a break now in view of your client's

19 | issues. And we can stretch our legs, because we're

20 | going to head into the question session.

21 | **INMATE BAIR:** Yes.

22 | **PRESIDING COMMISSIONER KUBOCHI:** And closing

23 | statement, and I want you to be real comfortable.

24 | **INMATE BAIR:** Thank you.

25 | **PRESIDING COMMISSTONER KUBOCHI:** Okay.

1    **ATTORNEY DAVEY:**   Thank you.

2                  (Thereupon, a recess was

3                    held off the record.)

4    **DEPUTY COMMISSIONER LUSHBOUGH:**   We're back on

5    record.

6    **PRESIDING COMMISSIONER KUBOCHI:**   It's 9:55 and

7    we're back on record.in the parole consideration hearing

8    of Clifford Bair.   Mr. Bair, we're heading toward that

9    portion of the proceedings in which questions are

10   permitted.   And before doing so, I'd like to state for

11   the record that the Board has sent out notices pursuant

12   to 30 --

13   **ATTORNEY DAVEY:**   Commissioner, I hate to

14   interrupt.   I waited for a pause.   Support letters.   I

15   don't believe you've covered the support letters, and

16   there are numerous support letters.

17   **PRESIDING COMMISSIONER KUBOCHI:**   I was going to

18   just read for the record that we're at that portion of

19   3042 notices were sent out.   And as a result of that --

20   you know, Mr. Davey, what amazes me is that I don't need

21   to follow any procedural ways because I find that

22   attorneys such as you who are excellent put me on auto

23   pilot.   And I can just sit here and make an attempt to

24   say anything and the next issue will be raised properly.

25   And I'm glad you do, because I don't want to leave

1  anything out on any hearing. Because it's the Inmate
2  here who has the expectations of having a fair hearing
3  and everything considered. So thank you, Mr. Davey.
4      And in regard to those 3042 notices, the District
5  Attorney's representative is here from Sonoma County.
6  And what I'm going to do, Mr. Davey, in this case
7  because I don't like.to -- I like to listen to what
8  everybody is saying. And that what I'm going to do is
9  at some point I'm going to simply list all the people in
10 the letters. And it may not be in the normal procedure
11 such as reading them all now, but I want to make sure
12 that we thoroughly go over everything with Mr. Bair.
13 But I guarantee you that this record will have a list of
14 everybody who sent in a support letter. Is that
15 agreeable?

16     **ATTORNEY DAVEY:** Thank you, Sir.

17     **PRESIDING COMMISSIONER KUBOCHI:** Okay. And like
18 I say, my comment was not made in what you'd call
19 scolding method.

20     **ATTORNEY DAVEY:** I understand.

21     **PRESIDING COMMISSIONER KUBOCHI:** It's simply an
22 observation from my side. And I really appreciate it
23 because I want to make sure that every issue on every
24 case is covered appropriately. So if I forget anything
25 else, you don't even need to apologize. You sav excuse

1  | me and just let her roll.

2  | So therefore, what I'm going to do because I did
3  | not want to divert my attention to what your client was
4  | saying because I know he's done so much is at some point
5  | what I do for concise purposes and accuracy is what I do
6  | is I list the person, the basic information in the
7  | letter, such as friend, letter of support, company, et
8  | cetera.  But I'm going to do that at some point in time
9  | because I want to listen to what your client says.

10  | **ATTORNEY DAVEY:**  Sure.  Absolutely.

11  | **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.  So
12  | right now, Mr. Bair, we're going to go into questions.
13  | And like I says, this is, this covers all the factors of
14  | suitability.  And I don't want you to think that we're
15  | re-trying your guilt or innocence, but out of necessity,
16  | some questions that may be asked go into a lot of stuff
17  | like before this, other relationships, et cetera.

18  | **INMATE BAIR:**  Yes.

19  | **PRESIDING COMMISSIONER KUBOCHI:**  Because they're
20  | all part of who you are today.

21  | **INMATE BAIR:**  Yes.

22  | **PRESIDING COMMISSIONER KUBOCHI:**  Okay?

23  | **INMATE BAIR:**  Yes.

24  | **PRESIDING COMMISSIONER KUBOCHI:**  But I don't want
25  | you to think it -- become defensive in that you might --

1  the questions are not indicative of any attitude of the

2  speaker or any preconceived ideas, but it's simply for

3  the purpose of obtaining information.

4      **INMATE BAIR:** Thank you.

5      **PRESIDING COMMISSIONER KUBOCHI:** Now, Mr. Bair,

6  I'm going to have some questions here in regard to this

7  crime that occurred in January of 1984. I'm going to

8  back up the time clock a little bit. Just back up the

9  chronological clock before January of '84. At that

10 time, let's call it December of 1983. Your wife was

11 Linda Bair; is that correct?

12     **INMATE BAIR:** Yes.

13     **PRESIDING COMMISSIONER KUBOCHI:** And by the way,

14 please excuse -- I like to ask the questions while

15 they're in my mind. And they might be out of sequence.

16 Because I find, if I don't ask them while they're in my

17 mind, I'm going to forget. In regard to your current

18 wife, what is her name?

19     **INMATE BAIR:** Valerie.

20     **PRESIDING COMMISSIONER KUBOCHI:** Your current

21 wife is Valerie and how did you meet her?

22     **INMATE BAIR:** I met her when she was 12 years old

23 and I was 17. I was going to high school. I knew her

24 mother and father. Her mother and father were friends

25 of my parents.

1    **PRESIDING COMMISSIONER KUBOCHI:**  Okay.   Well,

2    that's a little bit further back than I wanted to go.

3    How did you reconnect on the contact in regard to

4    leading to matrimony?

5    **INMATE BAIR:**  Her father was ill and I wrote him

6    a letter in March of 2001.  And he had her answer his

7    letter for him.  And Valerie and I started writing to

8    each other.  I mailed her a visiting form.  She got

9    approved to come and see me.  We started visiting, and

10   fell in love and got married in August 10th of 2002.

11   **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Now going

12   back now, you're very patient with me.  I don't --

13   Believe me, I'm not doing anything on purpose.  A

14   question hit my head and I've got to ask it, but it

15   might not be in time sequence with the other question I

16   might ask.

17   Going back to December of 1983, it is the month

18   before the homicide, Linda Bair was your wife; is that

19   correct?

20   **INMATE BAIR:**  Yes.

21   **PRESIDING COMMISSIONER KUBOCHI:**  And how long had

22   you been married to Linda Bair before December of '83?

23   **INMATE BAIR:**  Linda and I were together for 10

24   years.

25   **PRESIDING COMMISSIONER KUBOCHI:**  And Linda Bair

1  was what number marriage?

2  **INMATE BAIR:** Third.

3  **PRESIDING COMMISSIONER KUBOCHI:** And how did you

4  meet Linda?

5  **INMATE BAIR:** I went to high school with Linda.

6  **PRESIDING COMMISSIONER KUBOCHI:** And how old were

7  you when you married.Linda?

8  **INMATE BAIR:** Approximately 27 or 28.

9  **PRESIDING COMMISSIONER KUBOCHI:** And did you have

10  any arguments with Linda?

11  **INMATE BAIR:** Lots of argument.

12  **PRESIDING COMMISSIONER KUBOCHI:** Okay.  Within a

13  year of December of '83, what was the topic of the

14  arguments?

15  **INMATE BAIR:** Drugs and alcohol and adultery.

16  **PRESIDING COMMISSIONER KUBOCHI:** Okay.  And

17  looking back on that relationship now, clearly it ended

18  in divorce.  How much of the -- How much would you

19  assess to you as the source of the arguments?

20  **INMATE BAIR:** Eighty percent.

21  **PRESIDING COMMISSIONER KUBOCHI:** Eighty percent.

22  And back in January of '84, she left for Bodega Bay just

23  before the homicide here.  What was she going to Bodega

24  Bay for?

25  **INMATE BAIR:** Her parents owned Diekman's Bay

*Capitol Electronic Reporting*

1 | Store there in Bodega Bay and she would work for them

2 | during the summer months and on weekends. And she made

3 | a trek to Bodega Bay on average about three weekends a

4 | month.

5 | **PRESIDING COMMISSIONER KUBOCHI:** Now tell me

6 | about this incident involving, now that you mention

7 | Diekman's Bay Store related to Linda, tell me about this

8 | you driving your car, the vehicle into that store.

9 | **INMATE BAIR:** Yes.

10 | **PRESIDING COMMISSIONER KUBOCHI:** That was back in

11 | '82. What was that about?

12 | **INMATE BAIR:** That was about I felt that her

13 | parents had too much influence on her. And I actually

14 | felt that they were destroying our marriage. And the

15 | only way that I had to take it out on them was I backed

16 | my pickup into the front doors of the store and broke

17 | the glass doors.

18 | **PRESIDING COMMISSIONER KUBOCHI:** Okay. And going

19 | back to the time period shortly before January 20th,

20 | 1984, if this homicide happened around January 20th,

21 | 1984, how many days before did Linda go to Bodega Bay?

22 | **INMATE BAIR:** I'm not sure I understand your

23 | question.

24 | **PRESIDING COMMISSIONER KUBOCHI:** Yeah, if the

25 | homicide occurred at January 20th, 1984, how many days

1  before that did Linda leave Visalia to go up to Bodega

2  Bay?

3          INMATE BAIR:  Actually the homicide occurred on

4  January 25th.

5          PRESIDING COMMISSIONER KUBOCHI:  Okay.

6          INMATE BAIR:  And she left two days prior.

7          PRESIDING COMMISSIONER KUBOCHI:  Okay.  That's

8  what I ask questions because you have a good memory for

9  all this information.  So the homicide was January 25th;

10  right?

11          INMATE BAIR:  Yes.

12          PRESIDING COMMISSIONER KUBOCHI:  And she left on

13  the 20th?

14          INMATE BAIR:  Yes.

15          PRESIDING COMMISSIONER KUBOCHI:  Okay.  And she

16  took --

17          INMATE BAIR:  Left on the 20th, probably a

18  Friday, whatever Friday was.  Maybe the 22nd or 23rd.

19          PRESIDING COMMISSIONER KUBOCHI:  And she took the

20  only vehicle that you and she owned?

21          INMATE BAIR:  Yes.

22          PRESIDING COMMISSIONER KUBOCHI:  And for those

23  people who might look at this transcript and not know

24  the distance between Visalia and Bodega Bay, what was

25  the driving time if you went the speed limit between

1   Visalia And Bodega Bay?

2        **INMATE BAIR:** Four and a half to five hours.

3        **PRESIDING COMMISSIONER KUBOCHI:** Okay. And what

4   was your urgency in going to Bodega Bay after she left?

5        **INMATE BAIR:** My reason for going to Bodega Bay

6   was to see who she was having an affair with. I

7   actually knew who she was having an affair with, but I

8   just wanted to see it for myself.

9        **PRESIDING COMMISSIONER KUBOCHI:** Well, the issue

10  of infidelity had been raised before January of '84;

11  right?

12       **INMATE BAIR:** Yes.

13       **PRESIDING COMMISSIONER KUBOCHI:** Why steal a car

14  to follow her this time?

15       **INMATE BAIR:** I don't really have the -- I can't

16  give you really a good answer for that. It's just

17  having to be at the time that I did it, you know, the

18  time was at that time.

19       **PRESIDING COMMISSIONER KUBOCHI:** What was your

20  state of mind?

21       **INMATE BAIR:** I was under the influence heavily.

22       **PRESIDING COMMISSIONER KUBOCHI:** Were you kind of

23  emotionally upset?

24       **INMATE BAIR:** Yes.

25       **PRESIDING COMMISSIONER KUBOCHI:** What we would

*Capitol Electronic Reporting*

1   call ticked off?  Angry?

2        **INMATE BAIR:**  I would be angry.  Yes, I was

3   angry.  The problem that I had with her parents having

4   so much influence over Linda was that I didn't think

5   they were giving our marriage a chance and I was

6   resentful towards them and her.  Every time that we'd

7   have a disagreement,·she would get in the car and go to

8   Bodega Bay.  And it just came to the point where I'd had

9   enough of it and I went to Bodega Bay to see who she was

10  having an affair with.

11       **PRESIDING COMMISSIONER KUBOCHI:**  How old was

12  Linda at this time?

13       **INMATE BAIR:**  She was approximately 36, 37.

14       **PRESIDING COMMISSIONER KUBOCHI:**  What marriage

15  was it for her?

16       **INMATE BAIR:**  Third.

17       **PRESIDING COMMISSIONER KUBOCHI:**  At this point in

18  time, December 1983, January 1984, can you describe your

19  alcohol consumption on a daily basis?

20       **INMATE BAIR:**  Yes.  Daily.

21       **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  By the

22  way, I saw in the probation report your statements to

23  the probation department that you were -- that you were

24  drinking about a pint of whiskey a day?

25       **INMATE BAIR:**  Yes.

*Capitol Electronic Reporting*

1        **PRESIDING COMMISSIONER KUBOCHI:**  And that you

2   were taking as many as 15 amphetamine or Benzedrine

3   tablets?

4        **INMATE BAIR:**  Yes.

5        **PRESIDING COMMISSIONER KUBOCHI:**  And those

6   tablets would be considered uppers?

7        **INMATE BAIR:**  Yes.

8        **PRESIDING COMMISSIONER KUBOCHI:**  That is a --

9        **INMATE BAIR:**  Speed.

10       **PRESIDING COMMISSIONER KUBOCHI:**  Enhance your

11  nervous system?

12       **INMATE BAIR:**  Yes.

13       **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  And

14  there's a statement in the probation report that you

15  would take these tablets to level off the effect of

16  alcohol?

17       **INMATE BAIR:**  Yes.

18       **PRESIDING COMMISSIONER KUBOCHI:**  Which is known

19  as a depressant.

20       **INMATE BAIR:**  Yes.

21       **PRESIDING COMMISSIONER KUBOCHI:**  Is that correct?

22  Depressant on the central nervous system not your

23  emotions; is that correct?

24       **INMATE BAIR:**  I think alcohol has a lot to do

25  with your emotions also.

1              **PRESIDING COMMISSIONER KUBOCHI:** Okay.   And using
2    the timeframe between January 20th and January 25th, can
3    you tell me about your alcohol or drug consumption on
4    these days?
5              **INMATE BAIR:** I'm not sure what dates you quoted
6    but I --
7              **PRESIDING COMMISSIONER KUBOCHI:** January 20th,
8    '84.
9              **INMATE BAIR:** January 20th, '84, and January 25th
10   of '84?
11             **PRESIDING COMMISSIONER KUBOCHI:** Yeah.
12             **INMATE BAIR:** When I left Visalia to go to Bodega
13   Bay, I had been up for a couple of days.   Probably two
14   days.
15             **PRESIDING COMMISSIONER KUBOCHI:** And why is that?
16             **INMATE BAIR:** Without sleep.
17             **PRESIDING COMMISSIONER KUBOCHI:** But why is that?
18             **INMATE BAIR:** Just being stoned and loaded.
19             **PRESIDING COMMISSIONER KUBOCHI:** Okay.
20             **INMATE BAIR:** What was my alcohol consumption?
21             **PRESIDING COMMISSIONER KUBOCHI:** I'm just asking
22   a question.   I'm not accusing you of anything.
23             **INMATE BAIR:** No, I'm just trying to answer the
24   question you want me to answer.
25             **PRESIDING COMMISSIONER KUBOCHI:** Yeah.

1    **INMATE BAIR:**   It was steady.  I drank constantly.

2    **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  And as I

3    understand what you've told me so far, after Linda left.

4    **INMATE BAIR:**   Yes.

5    **PRESIDING COMMISSIONER KUBOCHI:**  Your purpose in

6    going up to Bodega Bay to see her in a -- to catch her

7    in a relationship with another male; is that correct?

8    **INMATE BAIR:**   Yes.

9    **PRESIDING COMMISSIONER KUBOCHI:**  We know that

10   Mrs. Aiken died.  We know that you went into her house.

11   When did you switch over from being concerned about

12   Linda Bair and then ending up in Linda -- I mean, Mrs.

13   Aiken's house?

14   **INMATE BAIR:**   If you don't mind, I'd like to read

15   you something if you don't mind.

16   **PRESIDING COMMISSIONER KUBOCHI:**  No, I want to --

17   I don't want something read.  I want you to tell me in

18   your own words.

19   **INMATE BAIR:**   Well, these are my words.

20   **PRESIDING COMMISSIONER KUBOCHI:**  No, I want you

21   to tell me without reading.

22   **INMATE BAIR:**   You want to know how did Mrs.

23   Aikens get confused with Linda?

24   **PRESIDING COMMISSIONER KUBOCHI:**  No.  When you

25   left Visalia.

1    INMATE BAIR:  Yes.

2    PRESIDING COMMISSIONER KUBOCHI:  I'm going to

3 call it a target -- the target of your concerns.  The

4 object of your concern was Linda.

5    INMATE BAIR:  Yes.

6    PRESIDING COMMISSIONER KUBOCHI:  Why did it

7 switch over to Ms. Aiken and her house?

8    INMATE BAIR:  The answer is right here if you'd

9 let me read it to you.

10    PRESIDING COMMISSIONER KUBOCHI:  No, you tell me

11 in your own words.  You're going to be given an

12 opportunity to address this Panel and you can read

13 anything you want at that time.

14    INMATE BAIR:  Okay.  Actually I was waiting for

15 Linda to come back from Lake Tahoe with her mother and

16 whoever she went to Lake Tahoe with.  And she never came

17 back.  And I decided I was going to leave Bodega Bay.

18 And I walked across the street and bought a hamburger

19 and French fries and a sandwich.  And I walked over --

20 and a six-pack of beer.

21    I walked over to Mrs. Aiken's yard and I sat down

22 in her yard and I was eating my lunch.  And Mrs. Aiken

23 was outside walking in her yard and I saw them drive by

24 with the pickup that I'd destroyed.  And I finished my

25 lunch and I walked over and I put my arm around Mrs.

1    Aiken and I walked her into the house. And I sat her

2    down in the chair and I says Mrs. Aikens, I need to

3    borrow your car. She said you can't have my car. And

4    that's when I ripped the phone out of the wall and

5    that's when I tied Mrs. Aikens up.

6            And then Mrs. Fomasi arrived. And I invited her

7    into the house and had her lay down on the floor in

8    between the bedroom and the living room and I tied Mrs.

9    Fomasi up. And Mrs. Aiken's car keys were in a little

10   bowl right there by the door. I walked out to the

11   garage and I started her car up and I turned around and

12   back in and Mrs. Fomasi was untied. So I tied Mrs.

13   Fomasi back up. And I got Mrs. Aiken's car, and I left.

14           **PRESIDING COMMISSIONER KUBOCHI:** At the

15   preliminary hearing of this case, Mrs. Fomasi testified

16   and for Counsel's edification, it's page six of the

17   probation report, the probation report noticed that in

18   looking at the records from Sonoma County that Mrs.

19   Fomasi testified at the preliminary hearing.

20           At page 11 of that transcript of the preliminary

21   hearing it said that, quote, you pulled a gun and told

22   her to lay down on the floor end quote. And that you

23   also testified that you said, quote, I'm going to burn

24   you guys up, unquote. She testified to that. Were you

25   contemplating burning the house with those people in it?

1        INMATE BAIR:  No.

2        PRESIDING COMMISSIONER KUBOCHI:  Why did you make

3    the statement?

4        INMATE BAIR:  You have to remember, Mrs. Fomasi

5    has an IQ of 57, and she testified about a lot of things

6    that wasn't true.

7        PRESIDING COMMISSIONER KUBOCHI:  Okay.  Thank

8    you.  I have no further questions.

9        INMATE BAIR:  You're welcome.

10        PRESIDING COMMISSIONER KUBOCHI:  And Commissioner

11    Lushbough, do you have any questions?

12        DEPUTY COMMISSIONER LUSHBOUGH:  No, thank you.

13        PRESIDING COMMISSIONER KUBOCHI:  Sir, at this

14    time, the District Attorney is going to be permitted to

15    ask questions of this Panel not directly at you.  Your

16    answers are to the Panel.

17        INMATE BAIR:  Okay.

18        PRESIDING COMMISSIONER KUBOCHI:  Not at the DA's

19    office.  Counsel, do you have any questions of this

20    Panel?

21        DEPUTY DISTRICT ATTORNEY ABRAMS:  I have a few

22    questions of the Inmate not of the Panel.

23        PRESIDING COMMISSIONER KUBOCHI:  No, the

24    questions are to the Panel.

25        DEPUTY DISTRICT ATTORNEY ABRAMS:  I see.  And

1   then they're addressed to the Inmate?

2           PRESIDING COMMISSIONER KUBOCHI:  Yes.

3           DEPUTY DISTRICT ATTORNEY ABRAMS:  All right.

4   Well, I think an important question was just touched on.

5   I would want to know whether Mr. Bair made any

6   statements while at the Aiken residence that he was

7   going to burn the place down or any words to that

8   effect.

9           PRESIDING COMMISSIONER KUBOCHI:  I've asked and

10  he's denied that.

11          DEPUTY DISTRICT ATTORNEY ABRAMS:  And he's denied

12  -- well, he's denied what she said about we're going to

13  burn you up.  But I don't know if he blanketly denied

14  any statements regarding burn the house down.

15          PRESIDING COMMISSIONER KUBOCHI:  That's a fair

16  question.  Did you make any statements about burning

17  anything?

18          INMATE BAIR:  No.

19          DEPUTY DISTRICT ATTORNEY ABRAMS:  I would want to

20  know from Mr. Bair, the pickup truck that he stole in

21  Visalia to drive to Bodega Bay, did he at some point

22  burn or set that truck ablaze, set it on fire?

23          PRESIDING COMMISSIONER KUBOCHI:  The vehicle you

24  took in Visalia, did you burn that vehicle?

25          INMATE BAIR:  Yes.

1    **DEPUTY DISTRICT ATTORNEY ABRAMS:**   And why did he

2  burn the vehicle?

3    **PRESIDING COMMISSIONER KUBOCHI:**   Why?

4    **INMATE BAIR:**   Why did I do it?

5    **PRESIDING COMMISSIONER KUBOCHI:**   Yes.

6    **INMATE BAIR:**   Just to destroy it.  To get rid of

7  my fingerprints.    .

8    **PRESIDING COMMISSIONER KUBOCHI:**   Why do that if

9  your purpose in leaving Visalia was to talk to your wife

10  about her affair?

11    **INMATE BAIR:**   Because I knew I wasn't going to be

12  able to drive a stolen pickup down the highway.  So the

13  only thing I knew to do was just to get rid of it.

14    **PRESIDING COMMISSIONER KUBOCHI:**   Okay.  Why did

15  you check into the hotel under false name?

16    **INMATE BAIR:**   Actually, I always do when I enter

17  a motel is just check in under an assumed name.  I

18  always have.  It's just kind of a joke.

19    **PRESIDING COMMISSIONER KUBOCHI:**   Okay.  Counsel

20  do you have any other questions?

21    **DEPUTY DISTRICT ATTORNEY ABRAMS:**   Just a couple.

22  The record indicates in the probation report that when

23  Mr. Bair checked out of the particular motel after

24  spending two nights there, paying for two nights, that

25  he took with him all of the trash liners, the garbage

1  bags and things of this nature in the motel.  I just

2  wonder why he did that?

3       **PRESIDING COMMISSIONER KUBOCHI:**  Why did you take

4  the trash liners out of the motel room that you stayed

5  in?

6       **INMATE BAIR:**  I just cleaned up the motel room

7  and I just took the garbage bags to the trash.  I just

8  threw them away.  I was just cleaning up the room.

9       **PRESIDING COMMISSIONER KUBOCHI:**  That's his

10  answer.

11      **DEPUTY DISTRICT ATTORNEY ABRAMS:**  When Mr. Bair

12  set out from Visalia to go to Sonoma County, Bodega Bay,

13  was he in possession of shotgun shells?

14      **PRESIDING COMMISSIONER KUBOCHI:**  That's a valid

15  question, sir.  Did you have shotgun shells on you when

16  you left your home in Visalia shortly after January

17  20th, 1984?

18      **INMATE BAIR:**  Yes.

19      **DEPUTY DISTRICT ATTORNEY ABRAMS:**  Why?

20      **PRESIDING COMMISSIONER KUBOCHI:**  Why did you have

21  shotgun shells?

22      **INMATE BAIR:**  I had a shotgun with me.

23      **DEPUTY DISTRICT ATTORNEY ABRAMS:**  What was Mr.

24  Bair intending to do with the shotgun?

25      **INMATE BAIR:**  I didn't have a clue.  I have no

*Capitol Electronic Reporting*

1  idea.

2         **DEPUTY DISTRICT ATTORNEY ABRAMS:**  Aside from

3  Linda Bair, who else was Mr. Bair angry with when he set

4  out for Sonoma County?

5         **PRESIDING COMMISSIONER KUBOCHI:**  If anybody.

6  Were you angry at anybody else besides Linda Bair, your

7  wife, when you left Visalia?

8         **INMATE BAIR:**  No.

9         **DEPUTY DISTRICT ATTORNEY ABRAMS:**  Is it true that

10 Mr. Bair had a, prior to the homicide and the related

11 crimes, Mr. Bair had a conviction of possessing a loaded

12 sawed-off shotgun; is that correct?

13        **PRESIDING COMMISSIONER KUBOCHI:**  When I read your

14 record, there was an arrest and conviction for

15 possession of a sawed-off --

16        **INMATE BAIR:**  In 1975.

17        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  And that

18 was true?

19        **INMATE BAIR:**  Yes.

20        **DEPUTY DISTRICT ATTORNEY ABRAMS:**  Was Mr. Bair

21 aware that Ms. Aiken, the homicide victim, was 86 years

22 of age at the time of his conduct towards her which led

23 to her death?

24        **PRESIDING COMMISSIONER KUBOCHI:**  Did it appear to

25 you that Ms. Aiken was an elderly woman?

1          **INMATE BAIR:**  Yes.

2          **DEPUTY DISTRICT ATTORNEY ABRAMS:**  At any time

3     during Mr. Bair's physical treatment, assault on Ms.

4     Aiken, did he question what he was doing?  Did he try to

5     stop himself from that?  Did he think he was harming or

6     killing an elderly woman?

7          **PRESIDING COMMISSIONER KUBOCHI:**  Did you

8     contemplate at any time stopping what you were doing?

9          **INMATE BAIR:**  No.

10         **PRESIDING COMMISSIONER KUBOCHI:**  Why not?

11         **INMATE BAIR:**  Attitude.

12         **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

13         **INMATE BAIR:**  I had a horrendous attitude.

14    Awful.

15         **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Thank you

16    for your answer.

17         **INMATE BAIR:**  You're welcome.

18         **DEPUTY DISTRICT ATTORNEY ABRAMS:**  Just a couple

19    more questions.  I'm just wondering what Mr. Bair was

20    intending to do at the time to Linda Bair if he had

21    found her in Bodega Bay?

22         **PRESIDING COMMISSIONER KUBOCHI:**  Did you have any

23    preconceived ideas in your head as to what would you do

24    or what would happen if you confronted your wife Linda

25    in Bodega Bay?

1      **INMATE BAIR:**  No, I didn't.

2      **DEPUTY DISTRICT ATTORNEY ABRAMS:**  The record

3 indicates that Mr. Bair has a number of prior criminal

4 convictions prior to the circumstances that led to the

5 commitment offenses.  I'm just wondering if Mr. Bair at

6 any time after the incident that he told us about where

7 he backed the vehicle into the apparently the parents of

8 Linda Bair's business, all the fighting that he had with

9 Ms. Bair, the prior two convictions, I believe, for

10 driving under the influence of alcohol, the possession

11 of a sawed-off shotgun, did he make any efforts to

12 change, to modify, improve his behavior?

13      **PRESIDING COMMISSIONER KUBOCHI:**  Basically during

14 the last two years of your marriage with Linda --

15      **INMATE BAIR:**  Yes.

16      **PRESIDING COMMISSIONER KUBOCHI:**  Did you enroll

17 in or receive the services of any therapy?

18      **INMATE BAIR:**  No.

19      **PRESIDING COMMISSIONER KUBOCHI:**  Or therapist?

20      **INMATE BAIR:**  I went to a 30-day alcoholic rehab.

21      **PRESIDING COMMISSIONER KUBOCHI:**  As part of the

22 conviction for DUI?

23      **INMATE BAIR:**  As part of the conviction of the

24 vandalism.

25      **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

1          **INMATE BAIR:**  The Bodega Bay store.

2          **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  The

3    Bodega Bay store that -- yes, the alcohol rehab, it's

4    right in your probation report.

5          **INMATE BAIR:**  Yes.

6          **PRESIDING COMMISSIONER KUBOCHI:**  You were ordered

7    to do that.          .

8          **INMATE BAIR:**  Yes.

9          **PRESIDING COMMISSIONER KUBOCHI:**  And you did.

10          **INMATE BAIR:**  Yes.

11          **DEPUTY DISTRICT ATTORNEY ABRAMS:**  Another

12    question for Mr. Bair.  In terms at any time during his

13    physical conduct toward Ms. Aiken that led to her death,

14    did Ms. Aiken, was she crying?  Did she beg him to stop,

15    to leave her alone?

16          **PRESIDING COMMISSIONER KUBOCHI:**  Did Ms. Aiken at

17    any time you were in her home after confronting her, did

18    you -- did she speak to you?

19          **INMATE BAIR:**  After she said that I couldn't

20    borrow her car?

21          **PRESIDING COMMISSIONER KUBOCHI:**  Yes.

22          **INMATE BAIR:**  Mrs. Aiken didn't speak to me.  She

23    did not say a word to me.

24          **PRESIDING COMMISSIONER KUBOCHI:**  Was she alive?

25          **INMATE BAIR:**  Yes.

1       **PRESIDING COMMISSIONER KUBOCHI:** Okay. How about

2 Ms. Fomasi? Did she say anything after you confronted

3 her and realized that Ms. Aiken has been tied up?

4       **INMATE BAIR:** She didn't say anything to me.

5       **PRESIDING COMMISSIONER KUBOCHI:** Okay.

6       **INMATE BAIR:** Mrs. Fomasi didn't.

7       **PRESIDING COMMISSIONER KUBOCHI:** Okay.

8       **DEPUTY DISTRICT ATTORNEY ABRAMS:** That's all I

9 have.

10       **PRESIDING COMMISSIONER KUBOCHI:** Thank you. Mr.

11 Davey, do you have any questions of your client?

12       **ATTORNEY DAVEY:** No, Sir, I have no further

13 questions of my client.

14       **PRESIDING COMMISSIONER KUBOCHI:** Now, Mr. Bair,

15 we're headed into that phase of the hearing in which the

16 District Attorney is allowed to make a statement

17 followed by Mr. Davey and then you. And so because you

18 have some health and medical issues, I just want you to

19 be ready and to just try to catch yourself. There have

20 been various times during this hearing that you've

21 become emotional.

22       I want you to be satisfied that you can tell us

23 why you believe you're suitable for parole when you are

24 given that chance, and I am going to allow you to say

25 anything either spontaneously or to read anything. Do

1   you understand that, sir?

2       **INMATE BAIR:**  Yes, Sir.  Thank you.

3       **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Counsel,

4   on behalf of the Sonoma County DA's office, your closing

5   statement.

6       **DEPUTY DISTRICT ATTORNEY ABRAMS:**  Yes.  Thank

7   you, Mr. Commissioner.  Just briefly.  I think the facts

8   surrounding the circumstances of the commitment offense

9   are well documented in the record.  I can say that I was

10  not the trial attorney in this case, but I had joined

11  the Sonoma County District Attorney's office at the time

12  and discussed the facts of the case with the trial

13  attorney, a Deputy District Attorney David Dunn.  And

14  other, I and other members of the office were

15  particularly disturbed by the factors of this case.

16      Among other reasons, the fact that Mr. Bair

17  focused on an 86-year-old woman who was completely

18  innocent of any wrongdoing.  She apparently was a very

19  well liked and respected figure in the community.  A

20  woman who had never provoked Mr. Bair in any fashion.

21      The circumstances that led to her death had to be

22  certainly considerable suffering and traumatic shock

23  which led to her death.  The other crimes are also a

24  real puzzle.  The stealing of the pickup truck to drive

25  to the town of Bodeo  Bay.  Why he did that.  Why he

*Capitol Electronic Reporting*

| | |
|---|---|
| 1 | then stole Ms. Aiken's car.  Why he stole the boat. |
| 2 | What did he intend to do with Ms. Linda Bair had he |
| 3 | encountered her in Bodega Bay.  Why he had possession of |
| 4 | shotgun shells having previously been convicted of |
| 5 | possessing a loaded and sawed-off shotgun.  Why he |
| 6 | needed to treat the victim in such a callous manner that |
| 7 | lacked any empathy towards another human being let alone |
| 8 | a woman of that age, causing her such a tormented and |
| 9 | violent death.  Why these crimes continued over a |
| 10 | several day period without Mr. Bair ever coming to grips |
| 11 | with himself and being able to stop rather than just, I |
| 12 | don't know if in his own mind he excuses his conduct |
| 13 | because he believes that he was under the influence of |
| 14 | alcohol and/or drugs. |
| 15 | The real problem I have, Mr. Bair certainly |
| 16 | states that he is remorseful for the crimes, really |
| 17 | regrets that.  But I'm sure the Board hears that in |
| 18 | every case.  But whether Mr. Bair truly feels remorse is |
| 19 | something only he knows for certain.  But the question |
| 20 | certainly that I have in reviewing all the records and |
| 21 | documents here and in listening and observing Mr. Bair |
| 22 | here today is whether he has a true understanding, a |
| 23 | real understanding as to why he committed these crimes. |
| 24 | Why he had the anger, the hostility that led to this |
| 25 | several day outburst. |

1       The question that was put to him about his

2 relationship with Ms. Bair and how that got transferred

3 to Ms. Aiken, and I think it's telling that Mr. Bair's

4 response was he simply wanted to read something into the

5 record rather than stating something that came from

6 inside him. What he really feels.

7       So I haven't really heard anything or read

8 anything that would help me or tell me, I think the

9 rational observer that Mr. Bair other than stating that

10 he has remorse for these crimes, whether he has a true

11 understanding of why he did that. And until that time,

12 I think that there's going to be a complete puzzle of

13 what was going on there. And I think without question

14 representing the Sonoma County District Attorney's

15 office, we would certainly oppose any release date for

16 Mr. Bair in that he, we truly believe that he represents

17 an unreasonable risk of harm to society. I'd submit it.

18      **PRESIDING COMMISSIONER KUBOCHI:** Thank you for

19 your comments. Mr. Davey.

20      **ATTORNEY DAVEY:** Yes, Sir, Commissioner, thank

21 you. I don't believe there's any question at least in

22 my mind that Mr. Bair is extremely remorseful for the

23 crime for which he committed against these two women,

24 specifically the traumatic death of Ms. Aiken and the

25 traumatic injuries and emotional injuries brought upon

*Capitol Electronic Reporting*

1 | Ms. Fomasi, and he will address those specifically in

2 | his closing. But he does take full responsibility for

3 | the crime.

4 | I believe he indicated, and I believe it's

5 | supported by the record, that he did confess to the

6 | crime and went forward with full participation in the

7 | case with the investigators and cleared the matter I

8 | believe without a trial. I think that's basically

9 | speaks some volumes about his situation at that point in

10 | time.

11 | Additionally, he fully admits he was an alcoholic

12 | and a drug abuser during those periods of time. He will

13 | address those more in detail in his closing. But it's

14 | my understanding, and I'm not an expert. I'm not a

15 | medical expert or psychology expert, but it's my

16 | understanding that mixing alcohol and amphetamines is

17 | probably one of the most dangerous combinations that

18 | there is.

19 | Because you have the upper effect of the

20 | amphetamine which will keep you active for days, weeks

21 | on end. You have the alcohol which is a depressant

22 | which, you know, basically smoothes out the ups and then

23 | between the two there's periods of time where people are

24 | basically totally out of control. And this may have

25 | happened during a period of time when Mr. Bair was out

1  of control. I believe his statements to the Board are
2  honest, correct.

3        In response to the District Attorney's why
4  questions, I believe that's one reason why. And
5  basically Mr. Bair will address that more eloquently in
6  his closing statement. That's what brought him here.
7  Additional factors that the Board has to address are
8  what type of background Mr. Bair had before he came into
9  custody. First off, he indicates that he did have a
10 good family life up to a point. He was a high school
11 graduate. He was working in the community on various
12 union jobs, Teamsters and I believe there's mention of
13 plumber, underground gas work. So he's got good work
14 experience. And that certainly is of concern to all
15 parties.

16       Should he be released on parole, he's more than
17 willing and physically able to work at some type of job.
18 He may not be able to be the heavy equipment operator he
19 was when he was in his 40s, but everybody has issues
20 that they can deal with.

21       Coming into the correctional system on the murder
22 of Ms. Aiken, he had amassed some criminal history. He
23 had no juvenile history, but he amassed some concerning
24 factors as prior arrests and/or convictions for not the
25 least of concern was the shotgun that the District

*Capitol Electronic Reporting*

| | |
|---|---|
| 1 | Attorney's office mentioned possession of a loaded |
| 2 | shotgun in a vehicle, I believe, and vehicle vandalism |
| 3 | which is concerning because that's basically a rage |
| 4 | issue.  I think he was -- he testified that he was |
| 5 | irritated and upset and mad at his in-laws for |
| 6 | attempting to affect the relationship that he and his |
| 7 | current wife Linda at that point in time.  That was one |
| 8 | of the reasons he was in Bodega Bay when this all |
| 9 | consummated in the untimely death of Ms. Aiken. |
| 10 | The post-conviction factors gone into this |
| 11 | morning I think are certainly reviewing the things that |
| 12 | have happened since the last hearing in '03 only touch |
| 13 | the surface.  I believe my client will at the |
| 14 | appropriate time present the Board with a full packet of |
| 15 | what he believes is important in his rehabilitation over |
| 16 | the last 23, 24 years.  He has done pretty much |
| 17 | everything that the Board has asked him to do.  He's |
| 18 | virtually remained disciplinary free.  I think only one |
| 19 | 115 in his history and that was an administrative 115 |
| 20 | for smoking.  He's certainly given up smoking since then |
| 21 | for various other reasons including the rules of no |
| 22 | tobacco behind the walls and for his medical reasons. |
| 23 | But, the 128 which was recited into the record by |
| 24 | the Commissioner this morning was discussed, and I |
| 25 | believe there's paperwork behind that to explain what |

*Capitol Electronic Reporting*

1   the situation was.  He doesn't seem to be the type of
2   person to me that would want to disrespect anyone.  He's
3   been very respectful to me.  To my knowledge, he's been
4   respectful to staff.  He's been respectful with the
5   District Attorney this morning and with the Panel.  And
6   he presents as an individual that is educated.  He is
7   trying to do what he. can to position his potential
8   parole.  He believes he is suitable for parole at this
9   point in time.

10      And I would cite several factors that are of
11  concern to the Board.  His vocations coming into prison
12  have been discussed.  Since he's been down, he has
13  established an extremely good work record.  He has
14  certificates in various trade groups, including a number
15  of year in PIA metal shop with the appropriate welding
16  certificates at Folsom State Prison prior to his
17  transfer to DVI, which I believe was a non -- it was a
18  transfer that he didn't really request, but because of
19  realignment of Folsom, they've transferred a lot of
20  their folks out.  But he has done what he can here.
21  He's in the warehouse.  He's getting good write-ups over
22  there.  He's earning certificates in the warehousing
23  inventory control, and all those important factors
24  relating to maintenance of supplies and whatnot that are
25  necessary in the facility.

1  aware that the Board can parole him to pretty much any
2  county in California, and his preference would be
3  certainly Placer County with his wife in Roseville.

4        He's got a job there.  He's got contacts with the
5  union.  He's got an AA sponsor in Roseville.  He's ready
6  to transition into that program once he's found suitable
7  for parole.  The support letters that I found in the
8  packet are very indicative of the work that he and his
9  wife have been doing setting him up in the community not
10  only the AA program but the job offer from the driving
11  school, signed by Mike Ogness.

12        Another support letter signed by Mike and his
13  wife relating to potential release.  A job offer or at
14  least a consideration for a job offer with Woodmart
15  Products in Sacramento.  Various letters from the
16  Veterans Administration with the programs that they can
17  provide for him in the community.  West Sacramento
18  employment potential, Sacramento works.  The list goes
19  on and on.  There's letters from his brothers in here
20  relating to housing, jobs, and certainly his wife's
21  letter is very telling as to what she can provide for
22  him.  So he's not going to be somebody that just walks
23  out in the community dry without a job.  Without family
24  support or without an ability to function in the free
25  community.

1        Lastly I'd like to address the psychological

2    report.  I'm not going to read it into the record in

3    detail, but I would note that there are some very

4    telling things in the psych report.  And one of the

5    issues the prior, I guess, the prior Board was concerned

6    about was what were the precipitating factors that

7    consummated in the life crime and Mr. Bair being

8    incarcerated for the last 24 years.  It is very clear

9    that he had as stated prior and the doctor goes into

10    great deal about his drug and alcohol problem.

11        As far as risk assessment as we speak and as the

12    doctor evaluated him not only in this one but Dr., I

13    believe, Rikers, in the prior evaluation that was done

14    in '06, about six months prior, indicates that it's

15    their belief that he would be a low risk of violence or

16    dangerousness as compared to other inmates whether

17    inside or outside the institution.  There's always the

18    proviso in the reports to paraphrase that if he remains

19    clean and sober and participates in the 12-step program

20    or something similar.

21        I believe the reports are indicative of my

22    client's ability to participate in the free community.

23    In the last line of Dr. Mann's report, it indicates over

24    the years and his current relationship vis-à-vis his

25    wife are suggest    of a level of maturation that is

1    encouraging for his future.  In conclusion, there
2    appears to be no factors that would preclude routine
3    release planning in this case.

4         So what we have is we've got Mr. Bair who had a
5    somewhat tumultuous maybe three or four years prior to
6    the life crime, I'm guessing there.  A lot of alcohol
7    abuse, a lot of drug abuse.  But as I understand it, he
8    was still able to function.  He was able to work.  He
9    was able to provide for himself or his family up until
10   the point where the familial relationship broke down and
11   he took off in a stolen vehicle to chase his wife to
12   find out what the heck was going on up there in Sonoma
13   County or Bodega Bay, Sonoma County.

14        He had a prior relationship, as I understand it,
15   with the victim.  He had done some work for her.  What
16   type of work it was is sort of unclear, but he did have
17   a passing relationship with this elderly lady.  And my
18   guess is he thought he could probably talk her out of
19   borrowing her car and just driving down the road and
20   none of this would ever happen.  He was in a situation
21   where he'd been, I believe he indicated he'd been up for
22   two or three days on amphetamines, again, amped up with
23   certain criteria to any normal person is pretty much not
24   easily understood.  I'm speaking of the normal person
25   using amphetamines and alcohol back to back.

| | |
|---|---|
| 1 | My client has matured. He has learned his |
| 2 | lesson. He has rehabilitated. He is in a position as |
| 3 | we speak to be paroled into the community and that is |
| 4 | his request and my request. Thank you. |
| 5 | **PRESIDING COMMISSIONER KUBOCHI:** Thank you. |
| 6 | **DEPUTY DISTRICT ATTORNEY ABRAMS:** Pardon me. I |
| 7 | just had one very minor correction and perhaps I |
| 8 | misunderstood Counsel. I believe he said there was |
| 9 | admissions and confession, there was no trial. There |
| 10 | was a trial, a jury trial. Excuse me. |
| 11 | **ATTORNEY DAVEY:** There was a confession but |
| 12 | later. |
| 13 | **DEPUTY DISTRICT ATTORNEY ABRAMS:** Right. A minor |
| 14 | thing. |
| 15 | **PRESIDING COMMISSIONER KUBOCHI:** Well, we're not |
| 16 | re-trying -- |
| 17 | **DEPUTY DISTRICT ATTORNEY ABRAMS:** Right. |
| 18 | Exactly. I just want to be clear. |
| 19 | **PRESIDING COMMISSIONER KUBOCHI:** -- whatever |
| 20 | Counsel says. We have a record of what happened. Thank |
| 21 | you. |
| 22 | **ATTORNEY DAVEY:** I stand corrected. |
| 23 | **PRESIDING COMMISSIONER KUBOCHI:** It's minor. We |
| 24 | understand. No problem. Okay, your turn. |
| 25 | **INMATE BAIR:** Thank you, Sir, very much. I'd |

 1  like to ask the District Attorney if he received the

 2  letter that I wrote to the DA in Sonoma County.

 3      **PRESIDING COMMISSIONER KUBOCHI:**  You can say what

 4  you said.  I don't want him participating any more.  He

 5  has a limited role here.  I don't want this to break

 6  down into anything that appears to be adversarial.

 7      **INMATE BAIR:** ˙Thank you, Sir.  This is a letter

 8  that I wrote to the District Attorney of Sonoma County.

 9  I am writing you today, and this is 11/20/2005.

10          "I am writing you today to apologize to

11      you.  I want you to know how sorry I am for the

12      crime that I committed that caused the death of

13      Mrs. Aikens and for the trauma I put Mrs. Fomasi

14      through.  I'm sorry for the pain and the sadness

15      that I've caused the city of Bodega Bay.  I'm

16      sorry for the pain and sadness I have caused my

17      ex-wives, and my two daughters, and my six

18      grandchildren.  I'm sorry and ashamed that I

19      caused my three brothers and their wives and

20      their children.

21          "I can't take back the pain that I've

22      caused these people.  I can't take back the pain

23      that I caused my deceased mother who loved me and

24      stood by me until the end of her life.  May God

25      bless her soul.  A . yet I couldn't take the

*Capitol Electronic Reporting*

1     heartache and pain that I caused her away from

2     her.  I couldn't take it away from my mother.

3     Even at the age of 87, I know my father loves me

4     and yet in his eyes I can see the pain and

5     sadness and the disappointment that I've caused

6     him.

7          "Over these past almost 23 years, I have

8     said how sorry I am to all the people that love

9     me and cared about me.  This is what makes my

10    saying I'm sorry to you today so empty.  There's

11    nothing in the world I can do to make up for what

12    I have done or to change what I did 23 years ago.

13    Yet, I'm here today writing to you asking you to

14    hear me when I say I'm sorry for putting you

15    through all the trauma that I have.

16         "I'm asking you to see that I'm not the

17    same man today I was on January 25th, 1984.  I

18    have been told by several that I love who love me

19    that my writing this letter to you is a total

20    waste of time.  Whether it is or not -- Whether

21    it is or not is really not that important.  The

22    most important thing about this letter to you,

23    I'm doing what I have been wanting to do for many

24    years now.  I'm proving to myself that I'm not

25    the  n today that I was almost 23 years ago.

1    Today I'm sober and free of drugs and I have been

2    since January 27th, 1984.

3        "I'm just sorry and ashamed beyond words

4    that it took this crime and conviction to sober

5    me up and to get me off drugs so that I could

6    find myself and see that I really am a decent man

7    and a decent human being.  I didn't you all the

8    certificates or chronos that I have earned or

9    received over the years, but I am sending you

10   what I do have to give you an idea what I've been

11   doing since I've been incarcerated --"

12   **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Bair, I

13   don't mean to interrupt.

14   **INMATE BAIR:**  Yes.

15   **PRESIDING COMMISSIONER KUBOCHI:**  But your

16   statement to us is why you believe you are suitable for

17   parole.  I'd like the record to reflect that you have a

18   total of about six inches of documents that you brought

19   into this hearing room.

20   **INMATE BAIR:**  Yes.

21   **PRESIDING COMMISSIONER KUBOCHI:**  And you have

22   told us the content of this letter, but that's a single

23   spaced, handwritten document that was addressed to the

24   District Attorney.

25   **INMATE BAIR:**  Yes.

1       **PRESIDING COMMISSIONER KUBOCHI:** And we want your

2 statement as to why you believe you are suitable for

3 parole today. We understand that you wrote the letter

4 to the DA. And with that --

5       **INMATE BAIR:** I wanted to make sure he

6 understands it. That he --

7       **PRESIDING COMMISSIONER KUBOCHI:** He's not a

8 participant here, sir.

9       **INMATE BAIR:** Okay. Thank you. You want to know

10 why I deserve to be paroled today?

11       **PRESIDING COMMISSIONER KUBOCHI:** That's correct.

12 That's what your statement is about.

13       **INMATE BAIR:** Why I deserved to be paroled today

14 is because I know why Mrs. Aikens died and I know why

15 the trauma Mrs. Fomasi went through. It's about

16 attitude. It's about self-esteem. It's about personal

17 pride of which I had none.

18       This crime started when I was two and a half or

19 three years old. It started at the age when I first

20 realized my father was beating my mother with his fists.

21 When she was knocked to the ground, he would kick her in

22 the face and kick her in the stomach until he got tired

23 of my crying and screaming at him to stop. To this very

24 day, I can still see my mother's bloody face at my

25 bedroom window crying saying, "Clif . let me in. Don't

1   tell Daddy I'm home."  I'd open the window for her and
2   she'd crawl into my urine soaked bed.  I would open the
3   window and she would crawl in.  Needless to say my
4   parents were drunks and this nightmare went on at least
5   twice a month until I was abandoned at the age of 14
6   years old.

7          We didn't have any plumbing in our home until
8   approximately 1958 or '59, so there was no where I could
9   bathe in order to get rid of the urine smell.  I carried
10  it to school with me.  Needless to say, I didn't have
11  any friends or self-esteem.  I felt extremely inferior
12  and with the attitude I had, I hated myself.  My father
13  and two of his friends stole a truckload of wine when I
14  was 10 or 11 year old.  My father stored his share of
15  the wine in our attic of our house.  And that's when I
16  started drinking.  When I was caught stealing my
17  father's wine, he would beat me.

18         I remember being beaten so bad a couple of times
19  that my mother refused to let me go to school.  I'll
20  never forget the day that my father came home and he was
21  drunk as usual.  I was 14 years old.  We were living in
22  a trailer house in Capay, California, Yolo County.  He
23  says, "We're moving to Los Angeles.  Is there anybody
24  going with me?"  And I looked at him and I said I'm not
25  going.  I'm 14 years  d and I'm not going.

1        When I got into high school, I was able to shower
2   in gym class so I didn't smell so bad. Once I was on my
3   own, I stopped wetting the bed. As happy was I was to
4   be on my own, the next three years of living, 90 percent
5   of the time I had no lights, no hot water. I would work
6   after school at White's General Store.

7        During some months in the barley harvest I would
8   (indiscernible) for Bill Richards. I can remember lots
9   of times during those three years that I was on my own
10  being so hungry that I just cried.

11       After I finished high school, 10 days after my
12  18th birthday, I joined the Navy. I continued drinking
13  alcohol through my four years in the Navy. Once out of
14  the service, I started taking speed in pill form. Once
15  I added speed to the alcohol, I was out of control.

16       What does any of this have to do with the death
17  of Mrs. Aikens and the trouble Mrs. Fomasi went through?
18  It has to do with my mental illness. My mental illness
19  being that I would not stop drinking or using drugs when
20  I knew it was destroying my life and everybody's life I
21  came into contact with. I never grew out of the
22  terrible attitude that was forced upon me as a child.
23  Even though I graduated from high school, I was
24  uneducated.

25       took the California Highway Patrol examination

1    four times.  I couldn't pass it. I took the deputy

2    sheriff's examination twice in San Bernardino and

3    Riverside.  I couldn't pass it.  My first marriage ended

4    because I wouldn't stop drinking and doing drugs.  My

5    second marriage ended for the same reason.  I loved

6    Linda and I wanted our marriage to work.  She asked me

7    to sober up and get off drugs, and I said no.  I asked

8    her to stop having affairs and she said she would, but

9    she didn't.  I blamed her for the demise of our marriage

10   and yet I wouldn't stop drinking or doing drugs long

11   enough to give our lives together a chance.  This went

12   on for 10 years.

13        Mrs. Aikens death and the trauma of Mrs. Fomasi

14   is a sad and horrible result of a childhood filled with

15   physical and emotional abuse also an adulthood of being

16   out of control on alcohol and drugs.  Yes, I'm extremely

17   sad and sorry and ashamed that I caused the death of

18   Mrs. Aikens and for the trauma I put Mrs. Fomasi

19   through.  Like I said, if I could turn back the clock,

20   my God, I would.  But you just can't do it.  All I can

21   do is what I've been doing for the last 23 years,

22   staying sober, staying off of drugs, paying attention to

23   my AA program, doing my self-help work, loving my wife,

24   and doing the very best I possibly can.  Like in the

25   four agreements, tell the truth, do the best we .  ㄱ,

1  don't take it personal, and don't make assumptions.

2        With the help of AA and NA and my wife and

3  family, I'm going to stay sober and free of drugs until

4  the day I die.

5        I'd like to go over my parole plans again if you

6  don't mind from Sacramento and Placer County.  Today I'm

7  not an unreasonable risk to the public safety nor am I

8  threat to society.  Why is this true?  It's true because

9  I'm sober and free of drugs and alcohol and I have been

10  since January 27th, 1984.  It's true because, and this

11  is sad, because of the horrible crime that I committed,

12  I was given a chance in this life to find the man and

13  human being I was born to be.

14        I was given the chance to get off of drugs and

15  alcohol and find that I had a choice of being the man

16  and human being that I wanted to be.  I found that the

17  hell that I suffered as a child and the hell I put

18  myself through as an adult did not define who I am

19  today.  I have found that my self-worth is not found in

20  drugs or alcohol.  Today my self-worth is found in the

21  man and human being that I am today.

22        It's true today because I am a proud husband, a

23  proud grandfather, my work reports through the past 23

24  years have proved that I take pride in my work.  I take

25  pride in the support of my family   friends.  I take

1   pride in the fact that my wife and I are ready for our
2   freedom.  I take pride in the fact that I have the
3   courage to tell the Aryan Brotherhood in 1984 and 1985
4   when they threatened my life that I wouldn't get metal
5   for them to make weapons with.  I said no.  I said my
6   life had been threatened dozens of times over the years
7   simply because I wouldn't cave in to do what other
8   people wanted me to do for them that was illegal and
9   that would end up getting other people hurt.

10          My proof you find me suitable for parole is in my
11  parole plans.  My parole plans for Sacramento County and
12  Placerville, I will parole wherever the Parole Board
13  tells me to, of course.  But I also have parole plans
14  for Roseville and Placer County.  I have the home with
15  my wife in Roseville at 345 Shadow Ridge, Number Four.
16  Our phone number is (916) 773-5296.  I have
17  transportation to and from work.  I have a firm job
18  offer from my brother Gerald Bair driving truck.  I have
19  a firm job offer from Mr. Mike Ogness at his driving
20  school.  I have an offer to help me find employment from
21  my brother Lloyd Bair.  I have a job offer from the
22  City of West Sacramento.  I have a job offer from
23  Woodmart of Rancho Cordova.  I have a list of five
24  welding companies who have said they will interview me
25  for a job.  I'm in touch with the Department of

1  Corrections Employment Services Division who will assist
2  me in finding employment.

3       I have had my wife call the Labors Local which is
4  185 out of Sacramento and the Teamsters Union, which is
5  Local 228 out of Sacramento, and they have assured her
6  that I can be reinstated in the Teamsters and Labors
7  Union.  I will also check in with the state unemployment
8  office.  I have contacted the Veterans of California in
9  Sacramento through Jeff Peters and they will help me.  I
10  have written to Sacramento County to the stripping
11  company here in Sacramento.  I have a letter from Mr.
12  David H. Craig of Inmate Employability Program, who has
13  given me a letter of recommendation for use in finding
14  employment.

15       I have the resource guide for Placer and
16  Sacramento Counties that have the addresses of alcohol
17  and drug treatments, the AA offices, AA meeting places,
18  NA meeting places.  I have emergency assistance
19  addresses.  I have the transportation addresses.  I have
20  Veterans Administration addresses.  I have the
21  Sacramento and Placer County sober living addresses if I
22  need it.  I have parole plans for Sacramento and Placer
23  County.  I wrote to the New Choice program of Sacramento
24  who has turned me down with any help because of my
25  cri... but I've written to them anyway.

```
1          I have a letter from the Department of

2   Corrections and Parole Community Services of which

3   offers programs that include employment assistance,

4   learning centers, and residential facilities.  Substance

5   abuse and treatment programs.  I have the information

6   from Charles A. Jones Skills and Business Center of

7   which I have filled out the forms to be ready and turn

8   in.  I have information about employers being bonded by

9   the federal government to give ex-convicts employment.

10  I have permission for them, if they need it.  I have --

11          PRESIDING COMMISSIONER KUBOCHI:  Sir, I hate to

12  interrupt.

13          INMATE BAIR:  Yes.

14          PRESIDING COMMISSIONER KUBOCHI:  But I'd like the

15  record to reflect that your statements are all being

16  read into the record from something you've prepared.

17  They appear to be going on and on, and we have your

18  parole plans, sir.

19          INMATE BAIR:  Yes, okay.  Thank you.

20          PRESIDING COMMISSIONER KUBOCHI:  Okay.

21          INMATE BAIR:  That will be all for me.  Thanks.

22          PRESIDING COMMISSIONER KUBOCHI:  Okay.  Thank

23  you.  Before we go into recess, I'd like the record to

24  reflect that there's four letters from Michael Ogness,

25  O-G-E-N-E-S-S [sic].  And one of the letter includes
```

1   signature of his wife Martha.  There's a Janet LeClaire,

2   Woodmart Products, job.  Joe Rosenthal, Ph.D., letter

3   and support.  Mr. Rosenthal is in charge of

4   institutional clinical services here.  Barbara Usrey,

5   U-S-R-E-Y, employment, West Sacramento.  Donna Butler,

6   employment, Sacramento County, common spelling.  Bud

7   Inzer, I-N-Z-E-R, Veterans Training and Jobs.  There's a

8   letter from your cellmate.  There's a letter from D. A

9   Schaffer, S-C-H-A-F-F-E-R, who appears to be another,

10  there's an H number.  It looks like a CDC number, but

11  he's a letter in support.  Paul Hyde, Inmate Peer

12  Tutoring, H-Y-D-E.  Initials J. M. Meyer, M-E-Y-E-R,

13  friend.  Shelly Ellis, common spelling, daughter.  Doug

14  and Brett McKoon, M-C, capital K-O-O-N, stepsons.  Ralph

15  Stevens, inmate, now on parole, letter of support.

16  Valerie Bair, two letters from your wife.  Lloyd Bair,

17  letter of support, brother.  Your sister, I believe it's

18  sister in law Ana Bair, A-N-A, that's her first name?

19          **INMATE BAIR:**  That's Diane

20          **PRESIDING COMMISSIONER KUBOCHI:**  Diane.  I

21  couldn't read her writing.  I knew you would clarify it

22  if I just let you know it was your daughter-in-law.

23  Duke Bair, brother.  Dan Britton, B-R-I-T-T-O-N, Veteran

24  Services Officer.  R. C. Dunn, father-in-law.  Ezra,

25  E-Z-R-A, goes by the name of ‑ 'll Bair, your father.

1  Butch Barker, Senior Work Force.  Bud Inzer, again, two

2  letters from him from the Veterans Group.  Kyle Terzian,

3  T-E-R-Z-I-A-N, drug abuse.  Royal Stewart, common

4  spelling, AARP.  There's a letter from Suzanne AARP.  S.

5  Singleton, common spelling AARP.  And those are in

6  regard to jobs for people over 55.  T. O'Sullivan,

7  friend, inmate.  And a letter documenting parole

8  programs available for those in release in the

9  community.  It's 9:05.  We're going to be in recess for

10 deliberations, sir.  Thank you very much.

11         **INMATE BAIR:**  Thank you very much.

12                         --o0o--

1 **CALIFORNIA BOARD OF PAROLE HEARINGS**

2 **D E C I S I O N**

3 **DEPUTY COMMISSIONER LUSHBOUGH:** We're on record.

4 **PRESIDING COMMISSIONER KUBOCHI:** All right, the

5 time is 11:28, and we're back on the record for Clifford

6 Bair, C-95079, and his Subsequent Parole Consideration

7 Hearing.

8 Sir, this Panel has reviewed all information

9 received from the public and relied upon the following

10 circumstances in concluding that you are not suitable

11 for parole and would pose an unreasonable risk of danger

12 to society or a threat to public safety if released from

13 prison. And looking at the crime, we find that the

14 offense was carried out in an especially cruel or

15 callous manner. There were multiple victims in this

16 case. In this, especially in the case of Ms. Aiken.

17 She was 84 years old and we find that she was

18 particularly vulnerable. The second victim, Ms. Fomasi,

19 was also particularly vulnerable in that she dropped --

20 she happened to drop by at the victim's residence when

21 you had taken control of Ms. Aiken.

22 And although we don't know whether you had bound

23 Ms. Aiken, that Ms. Fomasi in accidentally dropping by

24 to drop off the mail for Ms. Aiken was confronted by you

CLIFFORD BAIR    C-95079    DECISION PAGE 1    3/    '07

1   and also bound. We find that the surprise on her and

2   the age and circumstances of your initial contact and

3   assault upon Ms. Aiken indicates a particular cruelty

4   and disregard for the safety of others and a disregard

5   for the human suffering. In fact, Mrs. Aiken died of

6   heart failure while bound by you. We find that these

7   are particularly aggravated and we also find that the

8   victims were psychologically abused by you in that you

9   clearly had an opportunity to cease. You, throughout

10  the record of your conviction, you went to Bodega Bay

11  from Visalia, which is quite a distance away, because of

12  your, I'm going to call it your obsession with what your

13  wife was doing in clearly a failing relationship.

14         We also make a finding that your social history

15  before this crime was very unstable in that you had had

16  many failed marriages and few stable relationships with

17  others. There is a little bit of an irony in that the

18  very people that you wish to seek support from, such as

19  your father and your immediate family members, were

20  there in your life at the time and seemed to have had no

21  influence on your behavior. You basically, as

22  demonstrated by your statements at this hearing, did

23  what you wanted to do. And what you did ultimately was

24  in the total disregard for the rights of others.

25  CLIFFORD BAIR   C-95079    DECISION   `E 2      3/30/07

1          You stole other people's cars.  You burned them.

2   All in your attempt to get up to Bodega Bay.  You were

3   left without transportation in Visalia.  You checked

4   into the hotel under a different name and when asked why

5   you did that, you simply said that you did this every

6   time out and what appeared to this Panel as just a

7   cavalier fashion.  It creates a lot of concerns because

8   your answers were given to us today.

9          The facts of the crime and all the aggravated

10  factors surrounding the crime are what you call static.

11  They're in the past and will never change.  But in

12  talking about the offense and some of your motivations

13  and thinking at the time, we're asking what you were

14  thinking today about these factors and your responses

15  and your body language are a source of concern.

16         On the one hand, when people talk about -- and

17  before I go into this, we also find that your motivation

18  for this crime was just really inexplicable.  What

19  started out in your journey from Visalia, the object of

20  your concern and your passion was your wife and your

21  fears that she was involved in an extramarital affair.

22  And we had some exploration as to why, what I would call

23  metaphorically the target of your concerns as you left

24  Visalia switched over to Ms. Aiken, and frankly you

25  CLIFFORD BAIR   C-950'.    DECISION PAGE 3      3/30/07

*Capitol Electronic Reporting*

1   didn't have a real good explanation.  It appears that
2   whoever crossed your path was going to be in for a
3   problem physically.  From their physical safety purposes
4   and the rage and your inability to control your emotions
5   made you a danger to anybody who happened to have met
6   you if you at the time perceived that they crossed
7   either some line that you have, some line of behavior,
8   whatever.  But there was no reason when you left Visalia
9   for you to target Ms. Aiken as the object of anything,
10  whether it's death, physical harm, or whatever.

11          And clearly as I've indicated earlier, when Ms.
12  Fomasi came over there, she didn't have to be bound up
13  either.  You had plenty of time to cease your conduct.
14  And the fact that you didn't and your continued on and
15  you continued to be involved with the violations of the
16  rights of others is a big concern to us.  And as of
17  today, the dynamic factors, your answers in regard to
18  why you continued to do what you did remain a real
19  concern to us.

20          And so as I was about to say that people can come
21  in here and say that they're a changed man or a changed
22  person.  Well, you've been locked up for a while and
23  it's only natural that there's a passage of time and all
24  of us change.  But we're not satisfied with your
25  CLIFFO: 3AIR   C-95079   DECISION PAGE 4   3/30/07

1 insights as to the underlying causes and sources of your
2 involvement. The alcohol and drugs can be viewed as a
3 contributing factor, but they weren't the sole reasons
4 of why you did the acts against Ms. Aiken and Ms.
5 Fomasi. And your explanations as to what you did
6 separate and apart from your alcohol and drug
7 consumption are not reasonable.

8       And that leads me to make a finding that you're
9 -- we find that your abstention or your abstaining from
10 alcohol and drug consumption while incarcerated in a
11 controlled setting is really only part of the issue of
12 who you are. We also find that although you remain
13 discipline free and you do real work here in prison,
14 it's in a controlled structure. It's in a controlled
15 environment. And perhaps that's the best place for you.
16 And that's all part of why we're finding you not
17 suitable for parole. You operate better in a controlled
18 environment where other people are in control of what
19 you have to be doing and what you're responsible for
20 doing.

21       Before this crime was committed, you had a record
22 that involved carrying a sawed-off shotgun that was
23 loaded. On this case here, you brought a shotgun with
24 you from Visalia to Bodega Bay. You stole a pickup
25 **CLIFFORD BAIR   C-95079   DECISION PAGE 5     3/30/07**

*Capitol Electronic Reporting*

1  truck.  You drove it up.  Clearly, you did not have an
2  innocent intent.  Shotguns involving human behavior and
3  not related to fishing or hunting can only have one
4  deadly ending.

5       Another disturbing factor is that in 1982, you
6  drove your vehicle into the store that was owned by your
7  in-laws.  And under the circumstances and the totality,
8  that's a crime of violence.  You didn't like what you
9  perceived their interference into your relationship with
10 Linda Bair and you drove your car into their store
11 causing, by 1982 dollars, 3500 dollars in damage as you
12 backed it right up into the doorway.  That was in
13 disregard for others.  There could have been a customer
14 there just standing behind the door.  That's why I call
15 it a crime of violence.

16      So the homicide that was committed isn't your
17 only acts that indicates a disregard for the safety of
18 others or issues about your behavior and your mindset
19 that are a cause of concern for this Panel.  We've heard
20 from the opposition of the Sonoma County District
21 Attorney's office, and we also make a finding that, a
22 separate finding that you have been convicted of a very
23 aggravated murder involving multiple victims and it is
24 not reasonable that -- and that it is not reasonable to
25 CLIFFORD BAIR   C-95079    DECI    ON PAGE 6    3/30/07

1  expect that parole would be granted at a hearing during
2  the next three years, sir. You still have issues to
3  work on.

4         In this case there were multiple victims attacked
5  who were particularly vulnerable. You had an
6  opportunity to cease. And it appears from the stealing
7  of the car to the burning of that pickup that everything
8  you did on that trip was premeditated and deliberated
9  and planned and calculated. You checked into a motel in
10  Bodega Bay under a false name. We find that both
11  victims in this case were psychologically abused and
12  were exposed to extreme harm caused by you. In fact,
13  the one victim had a heart attack while bound up by you.
14  And we also find that your motive to harm Mrs. Aiken and
15  Ms. Fomasi was just totally unacceptable.

16         We believe that you continue to need therapy to
17  face, understand, and cope with stress in a
18  nondestructive manner as well as to come to terms with
19  other issues. In looking at your life, sir, most of
20  your problems you have in addition to your alcohol and
21  drugs involve women as a target of all your negative
22  emotion and ideations. Although you've never physically
23  abused women within the meaning of 273.5, that is in
24  regard to the person you were living with, your

25  CLIFFORD BAIR    05079    DECISION PAGE 7    3/30/07

1  descriptions of your relationships with your other wives

2  indicate that there was many, many arguments. That all

3  of your relationships with women involve arguing and

4  ultimately deteriorated in the form of a divorce.

5      And to that extent, sir, you continue to need

6  more therapy and more insight and more work in regard to

7  establishing that you're not a threat to anybody else.

8  Perhaps to all males, they won't be harmed by you. But,

9  like I said, in looking at everything in your personal

10  life, whether it's record for convictions or just your

11  personal history, you have problems with women. You're

12  married now, but we find that your contact with your

13  current wife, Valerie, that you met while you were

14  incarcerated is not a source of stability as the most

15  recent psychologist says because you never had a

16  relationship with her as husband and wife outside this

17  facility. So it's in error to say that, yeah, that

18  marriage is a source of stability to you. And through

19  that relationship, you've proven that you've worked out

20  a lot of your issues with women.

21      And with that, Commissioner, do you have any

22  further comments?

23      **DEPUTY COMMISSIONER LUSHBOUGH:** No. No comments.

24  Thank you.

25  **CLIFFORD BAIR    C-95079    DECISION PAGE 8    3/30/07**

*Capitol Electronic Reporting*

1          **PRESIDING COMMISSIONER KUBOCHI:** Thank you. It is

2     now 11:42, and this hearing is concluded, sir.

3                              --o0o--

21     PAROLE DENIED THREE YEARS

22     THIS DECISION WILL BE FINAL ON:     JUN 2 8 2007

23     YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

24     DATE, THE DECISION IS MODIFIED.

25     CLIFFORD BAIR   C-95079   DECISION PAGE          3/30/07

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, SANDRA TILLMAN, as the Official Transcriber,

hereby certify that the attached proceedings:

In the matter of the Life  )      CDC Number:  C-95079
Term Parole Consideration  )
Hearing of:                )
                           )
CLIFFORD BAIR              )
_____)

DEUEL VOCATIONAL INSTITUTION

TRACY, CALIFORNIA

MARCH 30, 2007

8:47 A.M.

were held as herein appears.  Further, this transcript

is a true, complete, and accurate record, to the best of

my ability, of the recorded material provided for

transcription.

_____
Sandra Tillman
May 14, 2007
Capitol Electronic Reporting

# EXHIBIT BB

67

1      **CALIFORNIA BOARD OF PRISON TERMS**

2                **D E C I S I O N**

3           **PRESIDING COMMISSIONER MOORE:** All right,

4      let the record show that all interested parties

5      have returned to the room, Clifford Bair, CDC

6      number C as in Charlie 95079.  The Panel has

7      reviewed all information received from the public

8      and relied on the following circumstances in

9      concluding that the prisoner is not suitable for

10     parole and would pose an unreasonable risk of

11     danger to society or a threat to public safety if

12     released from prison at this time.  The paramount

13     reason would be the timing and the gravity of the

14     committing offense.  Mr. Bair, the offense was

15     carried out in an especially callous manner.

16    ·There were multiple victims attacked, injured, or

17     killed in the same incident in that Theresa Blanch

18     Aikens, she was 86 years of age, lost her life in

19     this incident, as well as Rosie Formosie was

20     accosted and tied up.  And you had a loaded

21     weapon, by the grace of God, more people weren't

22     hurt.· You were going after your wife, you had

23     some marital discord.  You followed her.  You

24     stole a pickup truck and yet today, when we

25     questioned you about, why, you really couldn't

26     answer why other than you just lost it and -- The

27     **CLIFFORD BAIR  C-95079  DECISION PAGE 1  7/25/03**

68

1    offense itself was carried out in a manner which
2    demonstrates, let's see, an especially insensitive
3    disregard for human sufferings.  This 86-year-old
4    woman, she deserved to live out the rest of he
5    life in peace.  She was a well-respected member of
6    the community -- of her community, loved by all,
7    and the motive for this crime was inexplicable and
8    very trivial in relationship to the offense
9    because of marital discord and distrust.  These
10   conclusions are drawn from the Statement of Facts
11   wherein the prisoner embarked on -- the prisoner
12   embarked on a crime spree of sorts and all because
13   of marital disputes with his wife or spouse
14   intending to follow the -- his wife, spy on her.
15   You accosted Theresa Aikens, bound her, took her
16   glasses.  Another innocent bystander came to
17   deliver mail and you forced her on the floor and
18   bound her.  And then you not only left there, went
19   off, took her vehicle from there, then you got
20   into a boat, took a boat.  Nevertheless, these
21   conclusions are drawn from the Statement of Facts
22   where the victim -- one of the victims lost her
23   life.  She was left bound and gagged under some
24   bedding and a mattress.  She died as a result of
25   your actions.  Previous record, the prisoner has
26   an escalating pattern of criminal conduct, a
27   CLIFFORD BAIR  C-95079  DECISION PAGE 2  7/2ɔ/03

69

1    history of unstable tumultuous relationships with
2    others, coming from a dysfunctional family·
3    setting, an abusive father. The prisoner also has
4    a problem with marriages, he's been in five
5    different marriages. He's failed to profit from
6    society's previous attempts to correct his
7    criminality, such attempts included probation,
8    county jail time, fines, restitution for fines.
9    The prisoner has an unstable social history or
10   prior criminality which includes as I mentioned
11   earlier about the use and abuse of substances,
12   illegal substances such as alcohol and drugs and
13   possession of a -- arrest for possession of a
14   sawed-off shotgun. Institutional behavior, the
15   prisoner has programmed in a limited manner while
16   incarcerated. He's not sufficiently participated
17   in beneficial self-help and therapy programming at
18   this time. Parole plans, the prisoner lacks
19   realistic parole plans in the last county of legal
20   residence or the county of commitment, he does not
21   have acceptable employment plans at this time.
22   3042 Notices indicate opposition to a finding of
23   suitability, specifically -- oh, in terms of
24   plans, I mean to mention as well, he does have
25   some alternate plans in an alternate county.
26   However, the county of commitment or the county of
27   **CLIFFORD BAIR  C-95079  DECISION PAGE 3  7/25/03**

1  last residency, he has none.  3042 Notices, the
2  Hearing Panel notes responses to 3042 Notices
3  indicate an opposition to a finding of
4  suitability, specifically the District Attorney's
5  Office of Sonoma County were representative here
6  and present and they're in opposition to a finding
7  suitability here today.  Other information bearing
8  on his suitability would be that the prisoner's
9  counselor, a CC-I D.W. Nelson wrote in the current
10  Board report of the prisoner that he would pose a
11  moderate degree of threat if released to the
12  public at this time, today.  Remarks, the Panel
13  makes the following findings:  That the prisoner
14  still needs therapy in order to face, discuss,
15  understand, and cope with stress in a
16  nondestructive manner so that he can better
17  understand the causative factors of why he did
18  what he did, why he chased his wife half way
19  across the state, stealing a vehicle, stealing
20  several vehicles, and a vessel, and then
21  accosting, causing the disruption of life for one
22  of our senior citizens.  And until progress is
23  made, the prisoner continues to be unpredictable
24  and a threat to others.  The prisoner's gains are
25  recent, and he must demonstrate the ability to
26  maintain these gains over an extended period of
27  CLIFFORD BAIR    15079  DECISION PAGE 4  7/25/03

71

1   time.  Nevertheless, he should be commended for
2   positive work reports, he's been a continuous --
3   positive reports in the PIA metal fab, got a
4   forklift operator's license, participated in 2002
5   in the Conflict Resolution, as well as Phases Life
6   Skills in 2002 as well.  However, these positive
7   aspects of his behavior don't outweigh the factors
8   of unsuitability at this time.  This is another
9   three-year denial, Mr. Bair, and in a separate
10  decision, the Hearing Panel finds that the
11  prisoner has been convicted of murder and it is
12  not reasonable to expect that parole would be
13  granted at a hearing during the next three years.
14  The specific reasons for our findings are as
15  follows:  That the prisoner committed the offense
16  in an especially callous manner.  As I mentioned,
17  there were multiple victims attacked, injured, or
18  killed in the same incident, and the offense was
19  carried out in a dispassionate manner.  This was
20  the murder of Theresa Aikens, she was 86 years of
21  age.  She did not deserve to lose her life in such
22  a fashion.  The prisoner was embarked upon a crime
23  spree after some type of marital discord or
24  dispute with his spouse with the intent to spy or
25  to -- on his wife.  He stole a vehicle or truck,
26  traveled some four and a half-hours or more trying
27  CLIFFORD BAIR  C-95079  DECISION PAGE 5  7/25/03

72

1    to track her down, ascertain her location which
2    never took place by the grace of God.
3    Unfortunately, Ms. Aikens ran into his path and
4    Ms. Formosie as well ran into the prisoner's path
5    and unfortunately Ms. Aikens lost her life.  She
6    was found bound and gagged under some bedding and
7    mattress and subsequently died as a result of the
8    prisoner's actions.  This was -- the motive was --
9    the crime was inexplicable or very trivial in
10.  relationship to the offense as mentioned, a
11   marital discord.  The prisoner has a history of
12   criminality and misconduct and we talked about
13   that in regards to problems with substance abuse,
14   of alcohol, drugs, amphetamines were used,
15   possession of a sawed-off shotgun.  As well, the
16   prisoner has a history of unstable, tumultuous
17   relationships with others coming from a
18   dysfunctional family setting, an abusive father,
19   having multiple marriages and multiple divorces.
20   Therefore, a longer period of observation or
21   evaluation of the prisoner is called for before
22   the Board should find that he is suitable for
23   parole.  Recommendations to you, Mr. Bair, are to
24   continue to remain disciplinary free, to continue
25   to participate in beneficial self-help and therapy
26   programming to better help you to understand the
27   **CLIFFORD BAIR  C-95079  DECISION PAGE 6   '25/03**

73

1    causative factors of what caused you to be before

2    us here today, what caused Ms. Aikens to lose her

3    life.  This will conclude the reading of our

4    decision today.  Commissioner, any comments to the

5    prisoner?

6        DEPUTY COMMISSIONER HARMON:  Nothing further

7    at this time.  Continue on the same path you're on

8    sir.  Good luck to you.

9        INMATE BAIR:  Thank you.

10        PRESIDING COMMISSIONER MOORE:  Good luck to

11    you, Mr. Bair.

12        INMATE BAIR:  Thank you.

13        PRESIDING COMMISSIONER MOORE:  That will

14    conclude the hearing, the time is 1015 -- yes,

15    that's his -- 1015 hours.

16        ATTORNEY CHLADEK:  Can he have that file now

17    or --

18        DEPUTY COMMISSIONER HARMON:  This needs to

19    come out.

20        ATTORNEY CHLADEK:  Okay.

21        DEPUTY COMMISSIONER HARMON:  Just take it

22    out.

23        PRESIDING COMMISSIONER MOORE:  Just take the

24    Acco fastener off and he can have that.

25    PAROLE DENIED THREE YEARS

26    FINAL DATE OF DECISION_____        $\mathit{OCT\ 23}$ 

27    CLIFFORD BAIR  C-95079  DECISION PAGE 7  7/25/03

2000

# EXHIBIT CC

34

1          CALIFORNIA BOARD OF PRISON TERMS

2                   D E C I S I O N

3          PRESIDING COMMISSIONER MUNOZ:  The hearing for

4     Inmate Bair has resumed.  And, Mr. Bair, this Panel

5     has reviewed all information received from the public

6     and relied on the following circumstances in

7     concluding that you're not suitable for parole, and

8     that you would pose an unreasonable risk of danger to

9     society and a threat to public safety if released from

10    prison at this time.  Many factors were considered.

11    First and foremost was the commitment offenses and

12    their nature.  The offenses were carried out in an

13    especially cruel manner, a manner that demonstrates a

14    callous disregard for human suffering.  Multiple

15    victims were confronted and one was killed, Ms. Aiken

16    was killed, and the other suffered -- I don't know if

17    she suffered any physical injury, but I'm sure she

18    suffered emotional type injuries, after they were both

19    left behind bound and gagged, and Ms. Aiken was under

20    some mattresses.  Also, the motive for the crime was

21    inexplicable or very trivial in relation to the

22    offense.  I suppose I'm speculating when I say that

23    your intention was merely to take the vehicle to

24    follow your spouse.  I'm not sure.  But at any rate,

25    you probably could have done that without causing any

26    harm to either the victim who died or t' other person

27    CLIFFORD BAIR    C-95079    DECISION PAGE 1    4/12/00

35

1     that you left tied up.  After all, the victim was 86
2     years old and she was -- you took her glasses.  She
3     couldn't see.  I'm not sure.  I can't think of any
4     good reason why she was left tied up and under the
5     bedding and the mattress.  These conclusions are drawn
6     from the Statement of Facts, wherein the prisoner
7     embarked on a crime spree after some kind of a marital
8     dispute with his spouse and intended to spy on the
9     victim (sic).  I suppose, as I just stated, he
10    intended to take the victim's car.  He left her bound
11    and gagged under some bedding, a mattress, and she
12    died as a result of those actions by the prisoner.
13    This inmate has failed to profit from society's
14    previous attempts to correct his criminality.  Such
15    attempts include adult probation, county jail time, as
16    well as fines and restitution that he was ordered to
17    pay by the courts as a result of previous arrests.
18    And he also has an unstable social history and prior
19    criminality, which includes the use and abuse of
20    substances, such as alcohol and amphetamines.
21    Regarding your institutional behavior, you have
22    received 12 (sic) 128's and two (sic) 115's.  The 115
23    was for smoking, smoking at the work cite.  I will
24    note that one of the 128's was also for the same type
25    of violation.  The inmate's parole plans include
26    strong support from his family and some job offers,
27    CLIFFORD BAIR    C-95079    DECISION PAGE 2    4/12/00

36

1    but this Panel feels that that job offer or those job

2    offers need to be firmed up and that you should --

3    this Panel also wants you to explore the continuing

4    with the AA type programming, as I talked about

5    earlier in this hearing. This Panel makes the

6    following findings: That the prisoner needs to

7    continue in self-help programming and therapy, in

8    order to face, discuss, understand, and cope with

9    stress in a nondestructive manner, until progress is

10   made, and the prisoner continues to be unpredictable

11   and a threat to others. This Panel appreciates the

12   inmate's gains and they are somewhat recent, but we

13   want you to demonstrate an ability to maintain those

14   gains over an extended period of time. And he should

15   be commended for some of the things he has

16   accomplished. You have taken part in a number of

17   self-help programming, including the Sitta program,

18   which is a yoga type of a self-help program, and

19   you've also taken part in a number of other programs

20   here in the institution. They include substance

21   abuse, the Alternatives to Violence, the anger

22   management program. They're all very important

23   programs and this Panel appreciates you doing that.

24   You should also be commended for completing the

25   plumbing vocational program and for your current work

26   in welding And this Panel also acknowledges that you

27   CLIFFORD BAIR    C-95079    DECISION PAGE 3    4/12/00

37

1    are now presently involved with the AA program here at

2    the institution.  However, these positive aspects of

3    your behavior do not outweigh the factors of

4    unsuitability.  In a separate decision, this Hearing

5    Panel finds that the prisoner has been convicted of

6    murder and it is not reasonable to expect that parole

7    would be granted at a hearing during the next three

8    years.  The specific reasons for this finding are as

9    follows:  The prisoner committed the offense in an

10   especially cruel manner.  After being -- while

11   involved in a marital dispute with his spouse, he

12   broke into a residence, supposedly to steal a car.  He

13   tied up the victim, an elderly victim, 86 years old,

14   tied her up, gagged her, left her under some bedding

15   and a mattress, and also did that to a second woman

16   that came to the residence, left her tied up.  Left in

17   a stolen car.  Ms. Aiken died as a result of the

18   actions undertaken by the inmate.  And this -- in this

19   crime spree that the inmate took part in or

20   perpetrated, both of the victims were injured.  As I

21   said, one was killed and one was emotionally scarred.

22   The offenses were carried out in a dispassionate and

23   calculated manner, and a manner which demonstrates a

24   callous disregard for human suffering.  The motive for

25   the crime was inexplicable in relation to the offense.

26   I don't think we'll ever figure out why the inmate

27   CLIFFORD BAIR    C-95079    DECISION PAGE 4    4/12/00

38

1    just couldn't have taken the car and walked away.  He

2    was dealing with a 86 year old female.  And perhaps,

3    if he had just taken the car, she wouldn't have died

4    the way she did.  Also, I have to note that the

5    prisoner has a history of criminality, which includes

6    arrests for -- or drug related arrests, driving under

7    the influence, and possession of a shotgun, and also

8    was arrested for malicious mischief.  He was found

9    guilty or pled guilty to all of the charges that he

10   was arrested for.  And he has history of abuse of

11   alcohol and amphetamines.  The recommendations from

12   this Panel, Mr. Bair, that you become and remain

13   disciplinary-free, and also if available to continue

14   your participation in any and all self-help programs

15   that become available, and also continue with the

16   welding that you're involved in now.

17          INMATE BAIR:  Thank you.

18          PRESIDING COMMISSIONER MUNOZ:  All right, sir.

19   And I want to wish you good luck in your endeavors.

20   'And, Mr. Smith, do you have anything further for the

21   inmate?

22          DEPUTY COMMISSIONER SMITH:  Good luck, sir.

23          INMATE BAIR:  Thank you very much, I appreciate

24   it.

25          PRESIDING COMMISSIONER MUNOZ:  This concludes

26   the hearing for Inmate Bair.  It's r  14 minutes to

27   CLIFFORD BAIR    C-95079    DECISION PAGE 5    4/12/00

39

1     one p.m.   Thank you for being here, sir.

2          INMATE BAIR:   Thank you, Gentlemen, very much,

3     I appreciate it.

4          DEPUTY COMMISSIONER SMITH:   You got it, thank

5     you.

6          PRESIDING COMMISSIONER MUNOZ:   Thank you.

7          INMATE BAIR:   Thanks.

8                         --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED THREE YEARS

26   EFFECTIVE DATE OF THI:" ECISION_____ MAY 0 2 2000 _____

27   CLIFFORD BAIR     C-95079     DECISION PAGE 6     4/12/00

# EXHIBIT DD

As revealed earlier, as it had three times earlier, the Board found Lawrence's record exhibited all the positive factors listed in the regulations as favoring release on parole, except for the one applicable only to battered spouses. As to the commitment offense itself, the Board found it had been committed while under the stress of an emotional love triangle. It also found none of the other negative factors were present. Lawrence had no criminal record whatsoever, to say nothing of a history of violent crimes or assaultive behavior. Nor was there any suggestion of sadistic sexual acts or an unstable social history. Psychological examinations for the last 15 years uniformly report Lawrence to be sound psychologically and with no severe mental problems. Finally, Lawrence's performance during more than two decades of incarceration has been exemplary, to say nothing of being free of "serious misconduct."

[6] Despite the Board's action and its repeated overwhelmingly positive findings—on four occasions spread over more than a decade—the Governor's reversal of its recommendation must be upheld if there is "some evidence" to support his contrary conclusion the parole should be denied. But as explained earlier in discussing the standard of review, it is not just "some evidence" to support the Governor's findings, but "some evidence" sufficient to satisfy the statute's ultimate test, that is, "some evidence" the release of Lawrence would subject society to an "unreasonable risk" of danger to public safety.[64]

[7] As a result, a finding a given murder was committed in an "atrocious" manner, for example, only supports a denial of

parole to an otherwise suitable inmate when the atrociousness of the murder was of such a nature it logically leads to the conclusion release of the inmate *at the present time* would create an "unreasonable risk" of danger to public safety. "The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record *rationally indicate* that the offender will present an unreasonable public safety risk if released from prison."[65]

The fact Lawrence was not a career criminal or a serial or mass murderer or sex offender, nor one who murdered for financial gain, but whose only crime was the murder she committed during a period of emotional stress while still a young woman, combined with the fact she is now entering her sixties, greatly reduces the risk she will be a danger to the public safety if released on parole. But the issue remains whether it can be said there is "*some* evidence" to support the Governor's contrary conclusion within the state and federal standards of review.

### B. Cases Interpreting the State "Some Evidence" Standard.

In recent years, several California appellate courts have applied the state constitution's due process "some evidence" standard as declared by the California Supreme Court in *Rosenkrantz* and found a commitment murder insufficient to sustain a denial of parole many years or decades later. Meanwhile, several federal district courts have invoked the federal due process "some evidence" standard set forth in *Biggs v. Terhune* to reverse parole denials, again when based on old commitment offenses. The California Supreme Court ex-

---

64. "The test is not whether some evidence supports the *reasons* the Governor cites for denying parole, but whether some evidence indicates a parolee's release *unreasonably endangers public safety*." (*In re Lee* (2006) 143

Cal.App.4th 1400, 1408, 49 Cal.Rptr.3d 931, italics added.)

65. *In re Scott* (2005) 133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905, italics added.

court rejected this characterization. "[T]he record contains no evidence Scott committed his offense 'in an especially heinous, atrocious or cruel manner,' or that the nature of his crime indicates he poses a continuing threat to the public safety if released.... *All* of the many psychological evaluations of Scott emphasized that he committed his crime while he was experiencing an unusual amount of stress arising from unusual circumstances not likely to recur, and for that reason (as well as his prior crime-free life) there was a low risk he would commit another violent act if released." [75]

The same could be said about Lawrence based on the record in her case. Indeed there are close parallels between the two cases. Lawrence's paramour told her he was leaving his wife then called to say he couldn't do it, because the wife threatened loss of his children. Just like Scott, Lawrence drove over in a rage to confront and eventually kill the person who was keeping her from her lover. Moreover, in both cases, the Governor based his reversal of the parole board's recommended release on the nature of the commitment crime—characterizing Scott's as "especially atrocious" and "particularly heinous" while Lawrence's as "a shockingly vicious use of lethality and an exceptionally callous disregard for human suffering."

In *In re Lee*,[76] a man had sold his restaurant, but the buyer was behind in his payments. In 1987, the seller brought a gun and box of bullets when he came to the restaurant to collect an overdue payment, purportedly intending to kill the buyer and then himself. When the buyer refused to pay, the seller drew the gun and fired five rounds, wounding the buyer but

killing the buyer's wife. In 1989, the seller pled guilty to second degree murder and premeditated attempted murder. He was sentenced to 17 years to life for the second degree murder and life with the possibility of parole for the attempted murder. Sixteen years later, in 2005, Lee had his first parole hearing and the Board approved an immediate release, but the Governor reversed the recommendation.[77]

The Court of Appeal reversed the Governor's reversal, summarizing its reasons in the following words. "We must ... view the Governor's two reasons within the context of the other factors he must consider to see if some evidence shows Lee continues to pose an unreasonable risk to public safety. [Citation omitted.] Applying that test, we find no evidence that Lee is likely to commit another crime or that his release would unreasonably endanger the public. Like the Governor, we do not minimize the seriousness of Lee's offenses [now] 19 years ago, for which society has legitimately punished him. No reasonable possibility exists, however, that Lee will re-offend. Other than his offenses here, he has led a crime-free life. The dispute over the restaurant debt that motivated the shootings occurred almost 20 years ago. Weakened by the march of time trod by all mortals, Lee is now 82 years old and in poor health, leaving him to hobble from room to room. The two reasons the Governor cites—the nature of Lee's crimes and recent acceptance of responsibility—do not change those facts. We conclude the Governor's reversal of the Board's decision is therefore not supported by some evidence." [78]

75. *In re Scott, supra,* 133 Cal.App.4th at pages 600–601, 34 Cal.Rptr.3d 905.

76. *In re Lee, supra,* 143 Cal.App.4th at page 1404, 49 Cal.Rptr.3d 931.

77. *In re Lee, supra,* 143 Cal.App.4th at pages 1404–1405, 49 Cal.Rptr.3d 931.

78. *In re Lee, supra,* 143 Cal.App.4th at page 1409, 49 Cal.Rptr.3d 931.



eration in the suitability determination is whether the inmate is *currently* a threat to public safety." [85]

Also decided in late 2006, *In re Elkins*[86] ordered the forthwith release of a prisoner who had been convicted of first degree murder in 1980 receiving a sentence of 25 years to life and whose recommended parole in 2005 had been reversed by the Governor. As is true in Lawrence's case, the primary grounds for the Governor's rejection of the Board's recommendation was the "heinous, atrocious or cruel" nature of the commitment offense.[87]

The victim of Elkins's crime was a friend to whom Elkins, at the time a 19-year old drug user, owed money for prior drug purchases.[88] Elkins committed the murder in the course of a robbery by beating the sleeping victim repeatedly with a baseball bat. He then stole money and property from the victim's bedroom, placed the body in a car trunk, drove to an isolated area near Donner Pass and dumped it. He went home and slept for several hours before stealing more of the victim's property from a storage locker and the house of the victim's girl friend. Elkins then fled the state and remained on the run for several months before being captured and returned to California for prosecution. He pled not guilty, but was convicted by a jury of first degree murder and robbery. The judge sentenced him to 25 years to life for the first degree murder

and a concurrent sentence on the robbery.[89] Elkins finally revealed the location of the victim's body some 10 months after the murder.[90] By the time it was found, and the victim's relatives received some closure, the body was partially eaten by animals.

In contrast to Lawrence, Elkins did not have a discipline-free prison record—although it had been for a long time before the parole hearing.[91] He had two serious violations in the first three years of his commitment, one of which put him in "Max B," an increased custody level, for seven months. There also were claims by other prisoners caught in drug-dealing to the effect Elkins was a "major dealer" within the prison as recently as 1990, but nothing evidently came of those confidential reports. Like Lawrence, Elkins also had a number of minor incidents, primarily being late to assignments, resulting in counseling.

In other respects, Elkins had a very good record of progress while in prison—but not nearly as outstanding as Lawrence.[92] While Lawrence earned an AA, BA, and an MBA, in a comparable period of time Elkins only received a GED and was working on his AA. But Elkins had, like Lawrence, participated in a wide array of behavior modification programs including several designed to address the serious drug addiction he suffered during the period he committed the robbery-murder that

85. *In re Weider, supra,* 145 Cal.App.4th at page 589, 52 Cal.Rptr.3d 147, italics added.

86. *In re Elkins* (2006) 144 Cal.App.4th 475, 479–480, 50 Cal.Rptr.3d 503.

87. *In re Elkins, supra,* 144 Cal.App.4th at pages 486, 493, 50 Cal.Rptr.3d 503.

88. *In re Elkins, supra,* 144 Cal.App.4th at pages 480–481, 50 Cal.Rptr.3d 503.

89. *In re Elkins, supra,* 144 Cal.App.4th at page 479, 50 Cal.Rptr.3d 503.

90. *In re Elkins, supra,* 144 Cal.App.4th at page 481, 50 Cal.Rptr.3d 503.

91. *In re Elkins, supra,* 144 Cal.App.4th at pages 483, 484 and footnote 2, 493, footnote 5, 50 Cal.Rptr.3d 503.

92. *In re Elkins, supra,* 144 Cal.App.4th at pages 483–484, 493, footnote 5, 50 Cal. Rptr.3d 503.

district court decisions discussed below,[100] and concluded "[t]he facts of the offense here are older than in any of those ... cases and less or only equally aggravating.... The Governor's decision reversing the Board's grant of parole on the basis of the facts of the offense lacks 'some evidence' that granting parole posed 'an unreasonable risk of danger to society.' " [101]

The Court of Appeal in the *Elkins* case took the unusual step of issuing its writ forthwith, ordering the prisoner's immediate release.[102] The California Supreme Court then not only denied review, but also denied supersedeas and a depublication request.[103] If the result and rationale in *Elkins* are correct, *a fortiori*, the Governor's reversal of Lawrence's parole release cannot be sustained. Beating a man to death in order to take his property and savings, then hiding the body and fleeing the state is certainly more indicative of a predisposition to reoffend than is a shooting and stabbing during a fit of rage over the loss of a lover. To the extent fleeing the jurisdiction rather than seeking to evade prosecution and conviction in other ways is a negative, continuing to flee until captured as Elkins did is far worse than eventually returning to California and voluntarily turning oneself in to the authorities, as Lawrence did. Furthermore, as to positive factors cited as favoring release, Lawrence is more than a decade older than Elkins and has a discipline-free record in contrast to Elkins's serious misbe-

havior during the early years of his imprisonment.

As mentioned earlier, the dissent rejects the "some evidence" test applied in the above cases—that the commitment offense must supply "some evidence" supporting a finding the prisoner's release at the present time would represent an "unreasonable risk" of danger to the public safety. Instead, the dissent argues, "some evidence" of one of the factors listed in the regulations as militating against release suffices to justify a Governor's reversal of a recommended release on parole. But as discussed further below, assuming as we do these other appellate courts employed the correct test, the nature of the commitment offenses and other circumstances in those cases provide strong precedent for concluding Lawrence's commitment offense fails to satisfy the California "some evidence" test and thus the Governor's reversal should be reversed.

### C. Cases Interpreting the Federal "Some Evidence" Standard.

We turn now to the federal cases interpreting the federal "some evidence" standard framed in *Biggs v. Terhune*, and find they focus more directly on the age of rather than the nature of the commitment offense.

Our suspicion there *may* be a difference between the state Constitution's "some evidence" standard and the federal Constitution's "some evidence" standard finds its

---

page 500, 50 Cal.Rptr.3d 503.

100. See pages 46–48, below.

101. *In re Elkins, supra,* 144 Cal.App.4th at page 502, 50 Cal.Rptr.3d 503.

102. "The Governor's decision reversing the Board decision granting Elkins parole is vacated. Elkins's petition for habeas corpus is granted. The Board is ordered to release Elkins forthwith pursuant to the conditions

set forth in its decision of March 4, 2005. Considering that release by the Board would have been final on June 30, 2005, over a year ago, and in the interests of justice, this opinion shall be final as to this court immediately." (*In re Elkins, supra,* 144 Cal.App.4th at p. 503, 50 Cal.Rptr.3d 503.)

103. *In re Elkins, supra,* 144 Cal.App.4th 475, 50 Cal.Rptr.3d 503, review denied and depublication request denied February 7, 2007.

twenty years-to-life into life imprisonment without the possibility of parole." [110] The judge then used that rationale to question the Governor's reversal of a parole recommendation in this case.

"This case presents a stronger case for release than *Biggs* for several reasons. First, petitioner's commitment offense was less serious than the petitioner's in *Biggs.* The *Biggs* petitioner was involved in a violent, manipulative, and premeditated murder, while petitioner here acted impulsively and, at least in part, in response to the circumstances. [Citation.] Second, the *Biggs* petitioner had not yet served the full terms of his sentence, while petitioner here has exceeded his sentence by approximately six years. Finally, unlike petitioner here, the petitioner in *Biggs* had not been granted parole by the original panel hearing his case. Petitioner here has 'demonstrate[d] exemplary behavior and evidence of rehabilitation,' as required by the *Biggs* court, for a significant period of time. Therefore, the sole reliance on petitioner's commitment offense in denying him parole impinges on petitioner's constitutional liberty interest in parole." [111]

> D. Because of the Nature and Age of Lawrence's Commitment Offense, It Does Not Supply "Some Evidence" She is a Present Threat to Public Safety.

We first focus on the report's discussion of factors other than the commitment offense, in which the report principally questions factors the Board cited as favoring release. Then we turn to the nature of

110. *Martin v. Marshall, supra,* 431 F.Supp.2d at page 1046.

111. *Martin v. Marshall, supra,* 431 F.Supp.2d at page 1047.

112. At the 2005 hearing, after discussing the commission of the crime and her flight from prosecution two months later, Lawrence was

Lawrence's commitment offense and whether it supplies 'some evidence" rationally establishing her release would pose an unreasonable risk of danger to public safety. And finally, we consider whether that commitment offense has lost whatever predictive value it might have initially possessed because of intervening time and events.

> 1. Discussion of factors unrelated to the commitment offense in the Governor's report do not contribute "some evidence" Lawrence's release would represent an unreasonable risk to public safety.

[8] Using selected quotes from Lawrence's 2002 and 2005 board hearings, at one point the report suggests Lawrence was not remorseful but was still justifying her murder of Mrs. Williams. Among these selective quotes from the record are the following. " 'I always viewed [Mrs. Williams] as the obstacle in my fantasy romance. That she was the one that was keeping me from having what I wanted. So in my mind, it was natural for me to confront her as though she would disappear....' Ms. Lawrence ... [also] said that she saw Mrs. Williams as her 'problem.' "

In context, however, it is apparent Lawrence was only explaining her state of mind at the time of the homicide, not justifying it. To the contrary, these and like statements were made in the course of condemning her own behavior on that occasion and expressing deep remorse for what she had done and why she had done it.[112] Furthermore, the 2005 statement I

asked if there was anything else she had to say about the crime itself. She responded: "I would like to let you know, you know, that I'm totally, totally aware of what I did. I take full responsibility for what I did.... And I made that first step back into reality to come and let you know that I do understand that I did something horrible, and I'm willing to suffer the consequences for what I did. And I



94102

0000

MAR 3

By:

Court

Court

thern District

olden Gate Ave

By 36060

San Francisco, CA

94102

at usps.com