Exhibits

EXHIBIT INFORMATION

## EXHIBIT A.

1. WHY DID MRS AIKENS DIE
2. WHY WAS ROSIE FOMASI TRAUMATIZED

3. OPENING STATEMENT
   A. PAROLE PLANS PLACER AND SACRAMENTO COUNTIES
   B. PAROLE PLANS SONOMA COUNTY OF COMMITMENT.
   C. PAROLE PLANS TULARE COUNTY OF LAST RESIDENCE

4. LIST OF CERTIFICATES AND CHRONO'S

5. LIST OF SUPPORT LETTERS

6. REMINDER THAT THERE IS STILL VIOLENCE IN PRISON

## EXHIBIT B.

1. JOB OFFERS AND BONDING INFORMATION
   A. MEFERRAL DRIVING SCHOOL
   B. WOODMACK PRODUCTS, INC
   C. SACRAMENTO WORKS
   D. MAAP NEW CHOICE PROGRAM
   E. SONOMA COUNTY JOB LINK
   F. CITY OF WEST SACRAMENTO
   G. AARP SANTA ROSA, CA
   H. INMATE EMPLOYABILITY PROGRAM
   I. NBRC SANTA ROSA, CA

EXHIBIT B CONTINUED
JOB OFFERS

J. TULARE COUNTY HEALTH + HUMAN SERVICES AGENCY
K. BROTHER LLOYD BAIR
L. BROTHER GERALD BAIR
M. EXPERIENCE WORKS PLACER + SACRAMENTO COUNTIES
N. AARP VISALIA, CA. TULARE COUNTY.
O. DEPARTMENT OF CORRECTIONS PAROLE DIVISION

EXHIBIT C

1. SUPPORT LETTERS (40)

EXHIBIT D

1. SOCIAL SECURITY INFORMATION
2. CERTIFICATES AND CHRONO'S (100)
   A. MARCH VICTIMS AWARENESS 2007 UNITS 1-6
      DECEMBER 2006 VICTIMS AWARENESS UNITS 1-4
      DECEMBER 2005 VICTIMS AWARENESS UNITS 6
      SEPTEMBER 2005 VICTIMS AWARENESS UNITS 6
   B. MARCH 2007 ANGER CONTROL UNITS 1-3
      DECEMBER 2006 ANGER CONTROL UNITS 1-6
      JANUARY 2006 ANGER CONTROL UNITS 6
      NOVEMBER 2005 ANGER MANAGEMENT UNITS 1-4
      JULY 2005 ANGER MANAGEMENT

A

EXHIBIT D.
   CERTIFICATES AND CHRONO'S CONTINUED
   C. JANUARY 2007 Dispute Resolutions Units 1-3
      DECEMBER 2006 Dispute Resolutions Units 1-3
      AUGUST 2005 Dispute Resolutions
      JUNE 2002 Conflict Resolutions

   D. AA AND NA
      MARCH 1998 THROUGH FEBRUARY 2007
      28 CERTIFICATES AND CHRONO'S

   E. JOB AND CAREER
      JUNE 1999 THROUGH FEBRUARY 2007
      35 CERTIFICATES AND CHRONO'S

   F. PARENTING AND LIFE SKILLS
      AUGUST 2002 THROUGH JANUARY 2007
      10 CERTIFICATES AND CHRONO'S

EXHIBIT E.
   1. DISCIPLINARY REPORT

EXHIBIT F.
   1. COUNSELORS REPORTS
   2. REQUEST TO SEE CONFIDENTIAL FILE
   3. VICTIMS LETTER
   4. D.A's. LETTER
   5. DOCTOR REKARTS LETTER

A

EXHIBIT G.
  1. MENTA HEALTH EVALUATIONS 1986 THROUGH NOVEMBER 2006

EXHIBIT H.
  1. BIRTH CERTIFICATE
  2. HIGH SCHOOL GRADUATE INFORMATION
  3. HONORABLE DISCHARGE U.S. NAVY.

A

CAL. CODE REGS. TITLE 15 § 2402 (d).
CIRCUMSTANCES TENDING TO INDICATE SUITABILITY
FOR PAROLE.

Circumstances tending to indicate suitability for parole include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to the victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for the Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome ...

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

Cal.Code Regs. tit. 15 § 2402(d).

A

Petitioner submits to this honorable court that there was no evidence produced by the Commissioners at his March 30, 2007 Parole Board hearing to prove that he is a threat to public safety, or that he is a risk to society if released on parole.

Petitioner is providing this honorable court with the evidence to prove that he is suitable to be released on parole according to the CCR Title 15 2402(d).

**1. Petitioner has no juvenile record**

**2. Petitioner has a stable social history**
He has been married since 8-10-02
See Exhibit (A) for parole plans
See Exhibit (C) for support letters

**3. Signs of remorse ( Why did this crime happen Exhibit A)**
See Exhibit (G) for letters to victims and the D.A. 's letter
See Exhibit (H) for remorse in mental health evaluations

**4. Motivation for the crime**
See Exhibit (A) for why did Mrs Aikens die and why was Miss Fomasi traumatized.
See Exhibit (H) for 10 years of marital stress
See Exhibit (A) cause of the crime for 25 plus years of alcohol and drug abuse.
~~See Exhibit (D) certificates and self-help chronos~~

**5. Battered Woman Syndrome  N/A**

**6. Lack of criminal history  See Exhibit (F)**
Petitioner lacks any history of violent crime

**7. Age**
Petitioners present age of 62 reduces the probability of recividism.
See Exhibit (H) for birth certificate

**8. Understanding and plans for the future**
Petitioner has made realistic plans for release
See Exhibit (A) for parole plans for 3 counties as requested by petitioner's 2003 Parole Board panel.
See Exhibit (B) for job offers
See Exhibit (C) for support letters
See Exhibit (H) for all mental health evaluations

**9. Institutional Behavior**
Institutional activities indicate an enhanced ability to function within the law upon release.
See Exhibit (D) for certificates and self-help chronos
See Exhibit (F) for disciplinary history
See Exhibit (H) for mental health evaluations

A

Petitioner submits to this honorable court that he meets all of the CCR Title 15 2402(d) requirements to be found suitable for his parole release date.

Petitioner contends that none of the above information was taken seriously in considering petitioner for his release date. Petitioner submits to this honorable court that if all of the CCR Title 15 2402(d) #1 through #9, plus petitioners exhibits A through H would have been given any consideration, petitioner would have received his legal and just release date.

2.

# EXHIBIT A

To the Commissioners of the Board of Parole Hearings

Subject: Why did Mrs Aikens die and
         Why was Rosie Fomasi traumatized?

It's about attitude, self-esteem, and personal pride of which I had none. This crime started when I was 2½ or 3 years old. It started at the age when I first realized that my father was beating my mother with his fists. When she was knocked to the ground he would kick her in the face and stomach until he got tired of my crying and screaming at him to stop. Then he would start to beat me.

To this very day I can still see my mother's bloody face at my bedroom window crying and saying, "Cliffie wake up and open the window and let Mommy in, don't tell Daddy I'm home". Her face would be a bloody mess and her hair would be matted and soaked in blood. I would open <ins>The window</ins> and she would crawl in and get into my urine soaked bed. Needless to say my parents were drunks and this nightmare went on at least twice a month until I was abandoned at the age of 14.

We didn't have any plumbing in our home until approximately 1958 or 1959, so there was nowhere I could bath in order to get rid of the urine smell that I carried with me to school. Needless to say I didn't have any friends or self esteem. I felt extremely inferior and with the attitude I had I hated myself. My father and two (2) of his friends stole a truckload of wine when I was 10 or 11 years old. My father stored his share of the wine in the attic of our home. This is when I started drinking. When I was caught stealing my father's wine I was beaten. Many times my mother would cry and beg him to stop beating me. I can remember being beaten so bad on a couple of occasions, that my mother wouldn't let me go to school. I was scared to death of my father. He could just look at me crazy and I would start crying.

I'll never forget one day when he came home when we were living in a trailer house in Capay. (Yolo County). I was living there with my mother, father, and my younger brother, Gerald. My father walked in the door drunk and said, "We are moving to L.A., Is there anyone going with me?". I can't remember anyone saying anything except me. I don't know where I got the courage to say,"I am not going" but I did and the next morning my parents and my baby brother were gone.

*A·A*

I was left all alone.

I was able to shower in high school gym class, so I didn't smell as bad. Once I was on my own I stopped wetting the bed. As happy as I was to be on my own, the next three years of living 90% of the time with no lights, no heat, and no hot water was difficult. I would work after school at Watt's General Store and during the summer months I worked harvesting barley for, Bill Hays. I also knocked almonds for Richard Bills, and drove a caterpillar for, Jonathan Durest. I can still remember lots of times during those 3 years I would be so hungry I would cry, and yet I spent all of my money on alcohol. In the 3 years I lived alone, I received one $10.00 dollar money order from my mother of which I used to buy a pair of Levi's and one or two cases of beer.

After I finished high school and 10 days after my 18 birthday, I joined the Navy. I continued drinking alcohol throughout my 4 years in the Navy. Once out of the service I started taking speed in pill form. Once I added speed to the alcohol I was out of control.

What does any of this have to do with the death of Mrs Aikens and the trauma Miss Fomasi went through? It has to do with my mental illness. (My mental illness being that I would not stop drinking and using drugs when I knew I was destroying my life and everyone's life I came into contact with) I never grew out of the terrible attitude that was forced upon me as a child. Even though I graduated from high school I was uneducated. I took the Highway Patrol examination 4 or 5 times and couldn't pass it. I tried to go to college and quit because I wouldn't stop drinking or using drugs. My attitude was I blamed everyone for my failures as a man, as a father, as a husband, and as a human being. I refused to grow up and take responsibility for my life and my family. From the time I started drinking alcohol I was on a mission of self-destruction. At the age of 22 I added drugs to the mix and this just made my attitude worse than it ever should of been. I had an attitude of being selfish. My drugs and alcohol came first and if anyone didn't like it, I did not care.

My first marriage ended because I wouldn't stop drinking and using drugs, also because she got pregnant when I asked her not to. My second marriage ended for the very same reasons, only sooner. Here is where my mental illness really showed through. I claimed

2.A

that I loved Linda, (my third wife), and that I wanted our marriage
to work. She asked me to sober up and get off drugs and I said no.
I asked her to stop having affairs and she said she would, but
never did. I blamed her for the demise of our marriage, yet I would
not stop drinking or using drugs long enough to give our lives
together a chance. This went on for 10 years or more.

Mrs Aiken's death and the trauma of Miss Fomasi, is the sad
and horrible results of a childhood filled with physical and emotional
abuse, also as adulthood of being out of control on alcohol and
drugs.

Yes, I am extremely sad, sorry and ashamed that I caused the
death of Mrs Aikens and for the trauma I put Miss Fomasi through.
If giving my life today would turn back the clock and erase the
death of Mrs Aikens, and the trauma of Miss Fomasi, I would give
my life to do this. Saying that I am extremely sad, sorry, and
ashamed today would be meaningless if I hadn't come to the point
in my life where I live by the 12 Steps of A.A. and N.A. Saying
I would give my life today would mean nothing if I didn't keep the
promise I made to myself on the day of my arrest, 27 Jan. 1984.
It breaks my heart today knowing that I put Miss Fomasi through
the trauma I did, and that Mrs Aikens died, before I could promise
myself that I would live sober and free of drugs everyday for the
rest of my life, No matter what happens to me from this point
forward with the help of God and A.A. N.A. I will keep my promise.
With the help of God, my wife, my family and my friends, I will
die sober and free of drugs. I will die the man and the human being
I was born to be.

Respectfully submitted,

Clifford L. Bair

Reasons Why I Should Be Given My Release Date.

Parole Board 2006  Opening Statement

This Is Not My Second Parole Board Hearing, Its My 3rd. Yes Sir, I Will Be Talking About My Crime Today. I Confessed To My Crime On The 3rd Day I Was In The County Jail. I Have Always Taken Full Responsibility For Causing The Death Of Mrs Aikens And For The Trauma I Put Miss Fomasi Through. My Remorse Is The Same Today, As It Has Been Since The Day I Found Out Mrs Aikens Had Died. If There Was Anything I Could Do To Turn Back The Clock And Take Back My Actions On January 25th 1984 → "Please Believe Me I Would". I Am More Than Sorry That I Was The Cause Of Death Of Mrs Aikens And For The Trauma I Put Mrs Fomasi Through. If Giving My Life Today Would Give Mrs Aikens Her Life Back And Erase The Trauma I Put Miss Fomasi Through → If It Would Make Amends To My Mother And Father → To My Brothers And Sisters → To My Wives And My Two Daughters → To My 6 Grandchildren. Today I Would Give My Life To Turn Back The Clock Yes, I Am Sorry And Ashamed That My Drug And Alcohol Addiction Had Me So Out Of Control At That Time In My Life → I Am Sincerely Sorry.

Today I Am Here To Fight For My Wife's And I's Freedom. Today, After 22 Years Of Incarceration I Am Here To Prove That I Am Not The Same Man I Was Almost 23 Years Ago, Who Caused The Death Of Mrs Aikens And Who Traumatised Miss Fomasi.

1 A

TODAY I AM NOT AN UNREASONABLE RISK TO PUBLIC
SAFETY, NOR AM I A THREAT TO SOCIETY. WHY IS THIS
TRUE? IT'S TRUE BECAUSE I AM SOBER AND
FREE OF DRUGS AND ALCOHOL, AND I HAVE BEEN SINCE
JANUARY 27TH 1984. IT'S TRUE BECAUSE, AND THIS IS
SAD → BECAUSE OF THIS HORRIBLE CRIME THAT I
COMMITTED → I WAS GIVEN A CHANCE IN THIS LIFE
TO FIND THE MAN AND HUMAN BEING I WAS BORN TO
BE. I WAS GIVEN THE CHANCE TO GET OFF OF DRUGS
AND ALCOHOL AND FIND THAT I HAD A CHOICE OF BEING THE
MAN AND HUMAN BEING THAT I WANTED TO BE. I
FOUND THAT THE HELL THAT I SUFFERED AS A CHILD AND
THE HELL I PUT MYSELF THROUGH AS AN ADULT → DID
NOT DEFINE WHO I AM. I HAVE FOUND THAT MY SELF WORTH
IS NOT FOUND IN DRUGS OR ALCOHOL. TODAY MY SELF
WORTH IS IN THE MAN AND HUMAN BEING I HAVE BE-
COME OVER THESE PAST ALMOST 23 YEARS.

     IT'S TRUE BECAUSE TODAY I AM A PROUD HUSBAND. I
AM A PROUD GRANDFATHER OF 6 GRANDCHILDREN. MY
WORK REPORTS PROVE I TAKE PRIDE IN MYSELF AND IN
MY JOB HERE AT DUI. I TAKE PRIDE IN THE SUPPORT
OF MY FAMILY AND FRIENDS. I TAKE PRIDE IN THE FACT
THAT MY WIFE AND I ARE READY FOR OUR FREEDOM. I
TAKE PRIDE IN THE FACT THAT I HAD THE COURAGE TO TELL
THE ARIAN BROTHERHOOD AT OLD FOLSOM IN 1985 WHEN I
WORKED THERE AS A PLUMBER THAT I WOULD NOT GET ANY
METAL FOR THEM TO MAKE WEAPONS. I TAKE PRIDE IN

2A

THE FACT THAT I SAID NO TO TRANSPORTING DRUGS FROM THE VISITING ROOM AT OLD FOLSOM → AT TEHACHAPI. 4A AND AS OF 2004 AT OLD FOLSOM. I TAKE PRIDE IN THE FACT THAT EVEN THOUGH I HAVE BEEN THREATEN OVER A DOZEN TIMES WITH PHYSICAL HARM → I HAVE NOT ALLOWED MYSELF TO GET INVOLVED IN ANY KIND OF VIOLENCE IN ALMOST 23 YEARS OF INCARCERATION. EVEN WITH ALL THE MINOR WRITE UPS I HAVE HAD → SOME TRUE AND NOT TRUE → I AM PROUD OF MY PRISON RECORD AND THE FACT THAT I AM STILL ALIVE.

NOTE:

I DO HAVE A HEARING PROBLEM. I HAVE FILED THE NECESSARY ADA FORM. MY HEARING HAS BEEN TESTED AND I HAVE BEEN FITTED WITH HEARING AIDS. I AM PROUD OF THE SUPPORT OF MY WIFE.

MORE PROOF TO FIND ME SUITABLE FOR PAROLE IS IN MY PAROLE PLANS.    PAROLE PLANS FOR PLACER AND SACRAMENTO COUNTIES. I WILL PAROLE WHERE EVER THE PAROLE BOARD TELLS ME TO. BUT I ALSO HAVE PAROLE PLANS FOR PLACER AND SACRAMENTO COUNTIES. I HAVE A HOME WITH MY WIFE IN ROSEVILLE, CA AT ~~345 SHARON AVE #~~ 916 773 5296 — I HAVE TRANSPORTATION TO AND FROM WORK. I HAVE A FIRM JOB OFFER FROM MY BROTHER GERALD DUKE BAIR, DRIVING TRUCK. I HAVE A FIRM JOB OFFER FROM MICHAEL OGNESS AT HIS DRIVING SCHOOL. I HAVE AN OFFER TO HELP ME FIND EMPLOYMENT FROM MY BROTHER LLOYD BAIR. I HAVE A JOB OFFER FROM THE CITY OF WEST SACRAMENTO. JOB OFFER FROM WOODMACK INC RANCHO CORDOVA CA.

3A

I HAVE A LIST OF 5 WELDING COMPANIES WHO HAVE SAID THEY WOULD INTERVIEW ME FOR A JOB. I AM IN TOUCH WITH THE DEPARTMENT OF CORRECTIONS EMPLOYMENT SERVICES DIVISION WHO WILL ASSIST ME IN FINDING EMPLOYMENT. I HAVE HAD MY WIFE CALL THE LABORERS LOCAL 1080 AND THE TEAMSTERS UNIONS IN SACRAMENTO AND THEY LOCAL 185 HAVE ASSURED HER THAT I CAN BE REINSTATED. I WILL ALSO CHECK IN WITH THE STATE UNEMPLOYMENT OFFICE. I HAVE CONTACTED THE VETERANS OF CALIFORNIA IN SACRAMENTO THROUGH JEFF PEALER AND THEY WILL HELP ME. I HAVE WRITTEN ~~TO THE CITY OF WEST SACRAMENTO~~ → TO SACRAMENTO COUNTY → TO THE CAMBELL SOUP COMPANY OF SACRAMENTO → TO A STRIPPING COMPANY. I HAVE A LETTER FROM MR DAVID H. CRAIG OF THE INMATE EMPLOY-ABILITY PROGRAM WHO HAS GIVEN ME A LETTER OF RECOMMENDATION FOR USE IN FINDING EMPLOYMENT.

I HAVE THE RESOURCE GUIDE FOR PLACER AND SACRAMENTO COUNTIES.

1. HEALTH INFORMATION  2. ALCOHOL AND DRUG TREATMENT INFO  3. ADDRESSES OF COUNTY OFFICES  4. EMPLOYMENT/JOB PLANNING  5. EMERGENCY ASSISTANCE  6. TRANSPORTATION  7. VETERANS INFORMATION  8. AA MEETING ADDRESSES
I HAVE SACRAMENTO AND PLACER COUNTY SOBER LIVING ADDRESSES
I HAVE THE RE-ENTRY BOOKET OF PLACER AND SACRAMENTO COUNTY
1. HOUSING  2. EMPLOYMENT  3. ADDICTION TREATMENT  4. EDUCATION  5. VOCATIONAL TRAINING PROGRAMS  6. AA AND NA MEETING ADDRESSES

4A

FUTURE PLANS

THESE ARE A FEW OF THE COMPANIES MY WIFE CALLED BEFORE
MY JULY 2003 PAROLE BOARD HEARING THAT AGREED TO INTERVIEW
ME FOR A JOB WHEN I AM RELEASED FROM PRISON.
SHE CALLED AGAIN IN JUNE OF 2006 AND THEY ARE STILL WILLING

SCHEETS WELDING
2521 GREENBACK LANE
FOLSOM, CALIFORNIA   PH# 988-0587

FORM + FUSION MANUFACTURING
11253 TRADE CENTER DRIVE
RANCHO CORDONA, CALIFORNIA PH# 638 8576

R + B FABRICATION (CERTIFIED)
11395 PYRITES WAY
RANCHO CORDOVA, CALIFORNIA PH# 638 1489

PRECISION FABRICATION WELDING
9477 GREENBACK LANE
FOLSOM, CALIFORNIA   PH# 987 8533

HOOPERS WELDING   (CERTIFIED MIG - TIG ALUMINUM & STAINLESS)
5729 MANZANITA AVE
CARMICHAEL, CALIFORNIA PH# 348 0667

GAYLE MANUFACTURING
ANDY STOLL EXT 137  PH# 530 662 0784
WOODLAND, CALIFORNIA
100 + WELDERS EMPLOYED

4A1

PAROLE PLANS FOR SONOMA COUNTY
   COUNTY OF COMMITMENT.
I WILL RENT AN APARTMENT, AND FURNISH IT WITH A PHONE & FOOD
ON THE DAY OF MY RELEASE I WILL CHECK IN WITH MY
PROBATION OFFICER. OR HE WILL PICK ME UP.
UNTIL I GET MY DRIVERS LICENSE AND I CAN AFFORD TO BUY
AN AUTOMOBILE & INSURANCE. I WILL RIDE MY BICYCLE
TO WORK. I WILL CHECK OUT TRUCK DRIVING SCHOOLS.

I HAVE WRITTEN TO THE SONOMA COUNTY PIC JOB TRAINING
SERVICES TO HELP ME FIND EMPLOYMENT.

I HAVE WRITTEN TO THE NORTH BAY RESOURCE CENTER
A DIVISION OF VIETNAM VETERANS OF CALIFORNIA INC
FOR ASSISTANCE IN FINDING HOUSING & EMPLOYMENT

I HAVE WRITTEN TO AARP OF SONOMA COUNTY FOR HELP
IN FINDING EMPLOYMENT.

I HAVE WRITTEN TO THE VETERANS ADMINISTRATION IN
MENLO PARK CALIFORNIA FOR ASSISTANCE IN HOUSING
DRUG & ALCOHOL TREATMENT AND FOR JOB ASSISTANCE

I HAVE WRITTEN TO EXPERIENCE WORKS - SENIOR WORKFORCE
SOLUTIONS FOR ASSISTENCE IN FINDING EMPLOYMENT

I HAVE THE SONOMA COUNTY HOMELESS RESOURCE
GUIDE OF 2005

5A

PAROLE PLANS — SANTA ROSA — SONOMA COUNTY

COUNTY OF COMMITMENT
SOBER LIVING ENVIRONMENT

DRUG ABUSE ALTERNATIVES CENTER
2227 CAPRICORN WAY SUITE 209
SANTA ROSA, CA 95407      707-571-2233

NEW FOUNDATIONS
4707 SUNSHINE AVE.
SANTA ROSA, CA 95409      707-538-4404

SOBER LIVING PLACES I COULD PAROLE TO IN
SANTA ROSA — SONOMA COUNTY

5A 1

SANTA ROSA

SOBER LIVING ENVIRONMENTS

Drug Abuse Alternatives Center
2227 Capricorn Way Suite 209
Santa Rosa, Ca. 95407
707 571-2233

Tulare Co. Alcoholism Council
120 West School St.
Visalia, Ca. 93291
559 625-2995

New Foundations
4707 Sunshine Ave.
Santa Rosa, Ca 95409
707 538-4404

Mens Sober Living Home
515 South Court St.
Visalia, Ca. 93277
559 ~~625-2995~~ 651-8090

Alcohol and Other Drug Services
2223 North Shirk Rd.
Visalia, CA 93277
559 651-8090

Western Pacific Truck School
8720 Fruitridge Rd
Sacramento, Ca 95826

Western Truck School
3990 Industrial Blvd
West Sacramento, Ca 95691

5A2

Parole Plans For Tulare County

Visalia, Calif was my last Residence

I will Parole To A Sober Living Address or,

I will Rent An Apartment And Furnish It With A Phone & Food

or I will Move Into

A Sober Living Environment Half Way House.

I will Check In with my Probation Officer on The Day of

my Release. Or He/She Will Pick Me up.

Until I Get my Drivers License And my Insurance

I will Have A Bicycle To Ride. I will Check out

Truck Driving Schools

I Have Written To

1. Tulare County Office of Job Training  3/15/06

I Received their Answer on 5/5/06

2. I Have Letters From The AARP Saying They Will Help me

With Employment

3. I will Contact The Laborers And Teamsters Unions

4. I Have Addresses of AA Meeting Places

5. I Have The Resource Guide For Tulare County

The Parole And Community Services Division

6. I Have Addresses of Half Way Houses In Tulare Co.

7. I Have The Addresses of Emergency Assistance

8. Employment Job Planning Addresses

9. Health And Dental Care Addresses

10. Emergency Homeless Assistance Addresses

11. Low Income Housing Information Addresses

12. Veterans Services Information Addresses

13. Letters out To Dan Britton For Employers

14.

6A

PAROLE PLANS - VISALIA - TULARE COUNTY

LAST RESIDENCE VISALIA.
SOBER LIVING ENVIRONMENT

TULARE CO. ALCOHOLISM COUNCIL
120 WEST SCHOOL ST.
VISALIA, CA  93291
          559 625-2985

MENS SOBER LIVING HOME
505 SOUTH COURT ST
VISALIA, CA  93277
        559 651 - 8090

ALCOHOL AND OTHER DRUG SERVICES
2223 NORTH SHIRK Rd
VISALIA, CA  93277
          559 651 8090

SOBER LIVING PLACES WHERE I COULD PAROLE TO IN
VISALIA - TULARE COUNTY

6 K 1

PAROLE BOARD 2006

I GRADUATED HIGH SCHOOL ON JUNE 12TH 1962.
I JOINED THE UNITED STATES NAVY ON SEPTEMBER 24TH 1962
   AND I RECIEVED MY HONORABLE DISCHARGE ON SEPTEMBER
   23rd 1966.

I HAVE NO CRIMINAL HISTORY AS A MINOR
MY ADULT ARREST RECORD CONSIST OF:
   1. POSSESSION OF A SAWED OFF SHOT GUN
   2. POSSESSION OF DRUGS
   3. HAVING A LOADED SHOT GUN IN VEHICLE
   4. VANDELISM
   5. DRIVING UNDER THE INFLUENCE

I WAS 62 YEARS OLD ON SEPTEMBER 14TH 2006

MY SELF HELP COURSE'S ARE NOT ALL RECORDED. I HAVE
ATTENDED N.A. AND A.A. MEETINGS AT TEHACHAPI 4-A IN
1988 AND 1989. I HAVE ATTENDED THESE MEETING IN SOLEDAD
IN 1992. I ATTENDED AN ANGER MANAGEMENT COURSE
IN R.J. DONAVON IN 1991 AND IN SOLANO IN 1997 THAT
WAS NOT RECORDED. IT WAS ONLY IN 1998 THAT I STARTED
MAKING SURE THAT MY SELF-HELP COURSE'S WERE
BEING RECORDED. EVEN WITH MY TRYING TO MAKE SURE
I CAN'T SAY THEY HAVE ALL BEEN RECORDED. HERE AT
DUI I HAVE HAD TO MAKE COPIES OF EVERYTHING I HAVE
DONE AND SEND THEM TO MY COUNSELOR.

7A

CERTIFICATES AND CHRONO'S SINCE I STARTED KEEPING RECORDS

1. AA Old Folsom March 1998
2. AA Old Folsom September 1998
3. MIG Welding Old Folsom June 1999
4. Substance Abuse March 1999
5. Anger Management July 1999
6. Siddha Yoga Project March 2000
7. AA Old Folsom December 1999
8. AA Old Folsom March 1999
9. AA Old Folsom June 2001
10. GTAW Certificate December 2001
11. AA Old Folsom January 2002
12. AA Old Folsom June 2002
13. Forklift March 2002 Old Folsom
14. Friends Outside June 2002 Old Folsom
15. P.H.A.S.E.S. Old Folsom August 2002
16. AA Old Folsom March 2002
17. AA Old Folsom December 2002
18. AA Old Folsom April 2003
19. AA Old Folsom July 2003
20. AA Old Folsom September 2004
21. AA Old Folsom December 2004
22. Welding Chrono Old Folsom 2005 February
23. AA Chrono DUI Tracy 2005 June
24. Chn Certificate DUI Tracy June 2005
    (4 Learning Programs)
25. Conflict Resolution Old Folsom June 2002

8A

PAROLE BOARD 2006
CERTIFICATES AND CHRONO'S CONTINUED

22. CLN CERTIFICATE   DUI TRACY  JULY 2005
    22 LEARNING PROGRAMS
23. CLN CERTIFICATE  DUI TRACY  JULY 2005
    8 HOUR CAREER TRANSITION COURSE COMPLETED
24. CLN CERTIFICATE DUI TRACY  JULY 2005
    ANGER MANAGEMENT SERIES NO# 1
25. CLN CERTIFICATE  DUI TRACY  AUGUST 2005
    DISPUTE RESOLUTIONS
26. CLN CERTIFICATE  DUI TRACY  AUGUST 2005
    BUSINESS BASICS
27. CLN CERTIFICATE  DUI TRACY  AUGUST 2005
    ( 28 CLN PROGRAMS )
28. CLN CERTIFICATE  DUI TRACY  SEPTEMBER 2005
    VICTIMS AWARENESS
29. CLN CERTIFICATE  DUI TRACY  SEPTEMBER 2005
    LETS SAVE AMERICA      ( 23 PROGRAMS )
30. CLN CERTIFICATE  DUI TRACY  OCTOBER 2005
    COMPUTERS TEC SERIES
31. CLN CERTIFICATE DUI TRACY  OCTOBER 2005
    CULTURAL DIVERSITY
32. CLN CERTIFICATE  DUI TRACY  OCTOBER 2005
    COMMUNICATIONS      ( 15 PROGRAMS )
33. CLN CERTIFICATE  DUI TRACY  NOVEMBER 2005
    ANGER MANAGEMENT SERIES # 2
34. CLN CERTIFICATE  DUI TRACY  NOVEMBER 2005
    STRESS MANAGEMENT    ( 10 PROGRAMS )   9A

PAROLE BOARD 2006
CERTIFICATES AND CHRONO'S CONTINUED

35. CLN CERTIFICATE DUI TRACY DECEMBER 2005
    VICTIMS AWARENESS
36. CLN CERTIFICATE DUI TRACY DECEMBER 2005
    KNOW THY SELF
37. CLN CERTIFICATE DUI TRACY DECEMBER 2005
    JOB SUCCESS.
38. CLN CERTIFICATE DUI TRACY DECEMBER 2005
    LEARN TO EARN
39. CLN CERTIFICATE DUI TRACY DECEMBER 2005
    PARENTING: HEALTHY FAMILY, HEALTHY KIDS
    (73 PROGRAMS)
40. CLN CERTIFICATE DUI TRACY DECEMBER 2005
    (43 PROGRAMS)
41. GENERAL CHRONO DUI TRACY DECEMBER 2005
    73 LEARNING NETWORK PROGRAMS JULY - SEPTEMBER
42. GENERAL CHRONO DUI TRACY DECEMBER 2005
    CHILDRENS CHRISTMAS PARTY
43. AA CHRONO DUI TRACY DECEMBER 2005
44. GENERAL CHRONO DUI TRACY JANUARY 2005
    (60 LEARNING NETWORK PROGRAMS) OCTOBER - DECEMBER
45. CLN CERTIFICATE DUI TRACY JANUARY 2006
    ANGER CONTROL TRAINING (6 PROGRAMS)
46. CLN CERTIFICATE DUI TRACY JANUARY 2006
    BUSINESS BASICS (6 PROGRAMS)
47. GENERAL CHRONO DUI TRACY MARCH 28TH 2006
    WOMEN'S PERSPECTIVE'S 9 WEEK COURSE

10A

# ADDITIONAL CERTIFICATES

FEMA — DECISION MAKING AND PROBLEM SOLVING JUNE 2006
FEMA — EFFECTIVE COMMUNICATION   JUNE 2006
THE FOUR AGREEMENTS    DECEMBER 2006
· CLN GOBS OF JOBS 1-4    DECEMBER 2006
· CLN ANGER CONTROL 1-6   DECEMBER 2006
· CLN DISPUTE RESOLUTIONS 1-3 DECEMBER 2006
· CLN COMMUNICATIONS 1-4 DECEMBER 2006
THE FOUR AGREEMENTS CHRONO DECEMBER 2006
· CLN DISPUTE RESOLUTIONS 1-3 JANUARY 2007
· CLN TRANSITIONS CAREER 1-4 JANUARY 2007
NA CHRONO   DECEMBER 2006
AA CHRONO   OCTOBER 2006
CERTIFICATE OF PROFICIENCY P.I.A. WAREHOUSE WORKER/LABOR
AA CHRONO MARCH 2003      JULY 2006 ↗
P.I.A. WAREHOUSEMAN JULY 2006
P.I.A. STOCK/INVENTORY JULY 2006
P.I.A. MATERIAL DISTRIBUTION JULY 2006
P.I.A. FORKLIFT OPERATOR JULY 2006
CULTURAL DIVERSITY 1-4 JANUARY 2007 ·· CLN
· TRANSITIONS EMPLOYMENT 1-4 JANUARY 2007 CLN
AA CHAIRMAN CHRONO FEBRUARY 28TH 2007
NA CHRONO FEBRUARY 2007
CLN VICTIMS AWARENESS 1-4 DECEMBER 2006
AA CHRONO MARCH 2000   AA CHRONO APRIL 2004
AA CHRONO JUNE 2001
AA CHRONO JUNE 2002

10A1

ADDITIONAL CERTIFICATES

CLN   ANGER CONTROL  1 - 3   FEBRUARY 2007
CLN   TRANSITIONS EMPLOYMENT  5 - 8  FEBRUARY 2007
CLN   TRANSITIONS CAREER   5 - 8  FEBRUARY 2007
CLN   PARENTING FROM THE INSIDE   FEBRUARY 2007

10 A 2

PAROLE BOARD 2006
CERTIFICATES AND CHRONO'S CONTINUED

48. 12 STEP COMPLETION CHRONO   DUI TRACY   April 26TH 2006
49. AA GENERAL CHRONO   DUI TRACY   APRIL 28TH 2006
50. FORGIVENESS 12 SESSION CLASS JULY 2006

SUPPORT LETTERS ←
FROM FAMILY AND FRIENDS

                          345 SHADOW RIDGE # 4
1. MY WIFE VALERIE BAIR   PHONE # 1 - 916 - 773 - 5296
   HOT GREEN POINT # 1   ROSEVILLE CALIFORNIA 95678 6633
   EMPLOYED BY THE CALIFORNIA DEPARTMENT OF MOTOR VEHICLES
   FOR 16 YEARS.        BROTHER ( PLACER + SACRAMENTO COUNTY )
2. GERALD DUKE BAIR   PHONE # 530 - 661 - 6048
   25 OLIVE WAY WOODLAND CALIFORNIA 95695
   BAIRS TRUCKING    FIRM JOB OFFER ( YOLO COUNTY )
3. LLOYD BAIR   BROTHER     530 - 787 - 3280
   25617 COUNTY ROAD 20 A   ESPARTO CALIFORNIA 95627
   WILL HELP WITH FINDING A JOB IF NEEDED
4. EZRA BAIR     DAD
   HIGHER CALL NURSING CENTER 40 N. MAIN MIAMI OK 74354
5. DIANE BAIR   SISTER - IN - LAW   530 - 787 - 3280
   25617 COUNTY ROAD 20 A ESPARTO CALIF 95627
6. RALPH STEVENS   AA SPONSOR   916 722 - 2378
   8934 MADISON AVE FAIR OAKS CALIF 95627
7. R. C. DUNN   FATHER - IN - LAW   209 - 668 - 9967
   865 LANDER AVE 324 TURLOCK, CALIF 95380
8. J. M. MEYER   FRIEND   4908 ORCHARD WAY SACRAMENTO,
   CALIF 95846   916 348 1824                    11 A

SUPPORT LETTERS FROM
FAMILY AND FRIENDS CONTINUED

9. KEVIN O'CONNOR    FRIEND AND ROOM-MATE
    E 19309    L3    346    P.O. BOX 600 TRACY, CALIF   95378

10. TERANCE O'SULLIVAN    FRIEND
    H 24516    L3    305    P.O. BOX 600 TRACY, CALIF   95378

11. DARRYL A. SCHLAPPI    CO-WORKER AND FRIEND
    E 54521    L3    335    P.O. Box 600 TRACY, CALIF   96378

12. PAUL E. HYDE    PEER TUTORING COORDINATOR  —  L3    334
    B 51538    P.O. BOX 600 TRACY, CALIF   95378

13. DOUG & BRETT MCKEON    STEP SON & DAUGHTER IN LAW
    13970 CEDAR DR  —  PINE GROVE, CALIF   95665

14. MICHAEL & MARTHA OGNESS    FRIENDS    916  987  0746
    142 WINDING CANYON LANE FOLSOM, CALIF   95630

15. SHELLEY ELLIS    DAUGHTER    660  395  9845
    1008 RUSTIC DR    MACON, MO   63552

16. O.L. LAMOTTA    CHIEF, PROGRAM SUPPORT UNIT
    PAROLE AND COMMUNITY SERVICES DIVISION

17. KYLE TERZIAN    PROGRAM MANAGER    795 WILLOW RD. BLDG 325B
    MENLO PARK, CALIF 94025    650  493-5000 X 22044

18. ROYAL STEWART    AARP/SCSEP    2055 W. STEELE LANE STE #E-2
    SANTA ROSA, CALIF 95403    707  525  9190

19. BUTCH BARKER    SENIOR WORKFORCE SOLUTIONS P.O. Box 494625
    REDDING, CALIF

20. BUD INZER    EMPLOYMENT + TRAINING SPECIALIST
    2455 BENNETT VALLEY RD #B117  SANTA ROSA CALIF 95404
    707  578  8387

12 A

21. DAN BRITTON  TULARE COUNTY VETERANS  205 N. L. STREET
TULARE, CALIF 93274    559 685 3300
22. SUZANNE SINGLETON  AARP FOUNDATION EMPLOYMENT PROGRAM
240 W. CALDWELL AVENUE  VISALIA CALIF 93277
559 625 8088

13 A

VIOLENCE IN PRISON.


VIOLENCE IN PRISON IS AROUND EVERY CORNER AND WILL COME AT YOU
EVERY SECOND OF EVERYDAY.  YOU HAVE TO CONSTANTLY BE ON GUARD
EVERY SECOND.
TODAYS DATE IS  9/21/2006 AND I AM AT WORK AND ITS 11 A.M. WE
HAVE BEEN TOLD THAT WE HAVE TO GO TO THE P.I.A. YARD TO EAT OUR
LUNCHES.  I HAVENT HAD TO EAT MY LUNCH OUT ON THE YARD FOR A
COUPLE OF MONTHES DUE TO THE WORK SCHEDULE.  TODAY ALL THE CREWS
ARE ON THE SAME SCHEDULE, SO TODAY I HAD TO GO OUT TO THE YARD
AND EAT MY LUNCH.  WHEN I ARRIVED OUT ON THE YARD THERE WAS NO
BODY SITTING ON THE BENCHES THAT WERE IN THE SHADE.  I SAT DOWN
ON THE END OF THIS ONE BENCH AND STARTED EATING MY LUNCH.
ABOUT 5 MINUTES WENT BY AND I WAS ABOUT READY TO EAT MY SECOND
SANDWHICH AND THIS INDIVIDUAL WALKS UP TO ME AND SAYS, WHAT THE
FUCK ARE YOU DOING SITTING IN MY SPOT .  ME BEING ME, I THOUGHT
HE WAS KIDDING AND SO I SAID WITH A SMILE ON MY FACE, I DIDNT
SEE YOUR NAME ANYWHERE SO I SAT DOWN.HE SAID, I WILL BEAT YOUR
FUCKING FACE IN IF YOU DONT MOVE. HE CONTINUED WITH, I'll TAKE YOU
IN THE BACK AND FUCK YOU UP. HE SAYS COME ON,  COME ON AND THEN
TAKES OFF WALKING SAYING I WILL TAKE YOU IN THE BACK AND KICK
YOUR GOD DAM BRAINS OUT. I SAT THERE AND CONTINUED TO EAT MY
SANDWHICH WHILE HE WALKED OFF.  BY THIS TIME THERE WERE 8 OR 10
GUYS SITTING AROUND SO THIS GUY HAD AN AUDIENCE TO SHOW EVERY
BODY HOW TUFF HE THINKS HE IS.

14 A.

*CLIFF BAICH C95079*

NEEDLESS TO SAY I DIDNT FOLLOW HIM, SO IN A COUPLE OF MINUTES
HE WAS BACK IN MY FACE TELLING ME IF I DIDNT MOVE HE WOULD
CAVE MY FUCKING FACE IN RIGHT THERE WERE I SAT.  I STOOD UP AND
ASK HIM IF HE WANTED SIT DOWN AND THEN I WALKED OVER TO ANOTHER
BENCH AND SAT DOWN AND FINISHED MY LUNCH.

THERE ARE INDIVIDUALS HERE AND IN EVERY PRISON WHO KNOW THAT
THEY ARE NEVER GOING HOME AND JUST THIS FACT ALONE MAKES THEM
ANGORY AND MENTALLY UNSTABLE.  THEY ARE OK FOR A COUPLE OF WEEKS
AND THEN THEIR SITUATION HITS THEM AND THEY BECOME ANG RY ALL
OVER AGAIN. WHEN THIS HAPPENS THEY LASH OUT AT THE WEAKEST IN-
DIVIDUAL THAT THEY CAN FIND.

JUST SO YOU WILL KNOW THAT EVERYDAY IN PRISON IS A VERY SERIOUS
CHALLENGE. EVERYDAY IN HERE, IN ONE WAY OR THE OTHER, WE ARE
FIGHTING FOR OUR LIVES.

16 A

JOB OFFERS

*B*

# EXHIBIT B

# DVI INMATE REQUEST

From: **Bair**     # **C95079**     Housed: **L3   346**     Dated: **7/27/06**

Assignment: **Warehouse**     To: **Parole Officer II Y Dorm**

Briefly state your problem:     (See reverse side for mailing instructions)

I AM LOOKING FOR INFORMATION THAT WILL EXPLAIN TO ME WHAT A CONVICTED FELON HAS TO DO TO GET BONDED. I THANK YOU

Response from Staff: — Mr. Bair, Attached is a contact you may want to pursue for your "bonding" issue.

Signed: **K. Rader**     Title: **PA II**     Dated: **8/9/06**

Cus#03.doc                                                            Rev.12/03

1 B

## Rader, E. Lynn

**From:** Macias-Price, Lori
**Sent:** Wednesday, August 09, 2006 10:05 AM
**To:** Rader, E. Lynn
**Subject:** Emailing: clearinghouse.htm

---

| WHO WE ARE | ▷ RESOURCES & ASSISTANCE | ISSUES & POLICY | PUBLICATIONS | EMPLOYER RESOURCES |

national **H·I·R·E** network      ►►    resource & assist

## ▷ CALIFORNIA

### I. California Department of Industrial Relations

Contact:
California Department of Industrial Relations
455 Golden Gate Ave., 10th Fl.
San Francisco, CA 94102
415-703-5070
Web Site: www.dir.ca.gov/          *out 8/10/06*

Information about State Department of Labor resources may be of interest to:
• potential employers looking for incentives to hire individuals with criminal histories;
• service providers and individuals with criminal histories who are looking for assistance in finding employment; and
• researchers and policy makers looking at current programs to ascertain what programs are effective and serve their intended purpose.

#### A. Federal Bonding Program
The Federal Bonding Program provides fidelity bonding insurance coverage to individuals with criminal histories and other high-risk job applicants who are qualified, but fail to get jobs because regular commercial bonding is denied due to their backgrounds.

Contact:
Phil Carr, Bonding Coordinator
Job Services Division
California Employment Development Department
750 Inn Street
Sacramento, CA 95814
916-654-6577

#### B. Tax Credits
The Work Opportunity Tax Credit (WOTC) is a federal tax credit to reduce the federal tax liability of private for profit employers to be used as an incentive for employers to hire individuals from eight different targeted groups: TANF recipients, veterans, ex-felons, high risk youth, summer youth, Food Stamp recipients, SSI recipients, and

**I. Department of Labor**

**II. Criminal Record Repository**

**III. State Attorney General**

**IV. State Department of Corrections**

**V. State Department of Parole/Probation**

**VI. Legal Assistance**

**VII. Local Service Providers**

2B



# **Referral Driving School** LLC

7516 Maple Ave Suite 3          Citrus Heights, CA  95610

DMV License E4096          916  729-4771  www.newdriver.com

January 17, 2007

Dear Cliff,

I was very happy that I had the opportunity to meet with you on Saturday. I was pleased with the outcome of our interview. I am confident that you will be able to fill the position without any problem. I was impressed by you and want you to know that the position awaits you.

If anyone has any questions regarding the position or the employment, please feel free to have them contact me at any time.

Sincerely,

Mike Ogness

Referral Driving School
7516 Maple Ave
Citrus Hgts, CA 95610

916  729-4771 office line
916  786-2505 cell phone

Clifford Bair
C-95079
L3-346
P.O. BOX 600
Tracy, CA
95378-0600

*3 B*



# Referral Driving School LLC

7516 Maple Ave Su 3   Citrus Hgts  Ca   95610
License #DS4096   (916) 729-4771

August 10, 2006

To Whom It May Concern;

This letter is to inform you that I have a job opening for Cliff Bair *C 95079* ready and waiting in our school office. The job requires telephone skills and filling. I am aware of Cliff's background and should you decide to parole Cliff, he can begin work immediately.

If you have any questions please feel free to contact me at any time.

Sincerely,

Mike Ogness
Senior Partner / Operator

Web Site    www.NewDriver.com/rds

4 B

**WPI**
**WOODMACK**
**PRODUCTS, INC.**

November 7, 2006

Mr. Clifford Bair C-95079
L3/346
P.O. Box 600
Tracy, Ca. 95378-0600

Dear Mr. Bair,

Thank you for expressing your desire for future employment at Woodmack
Products, Inc. As you may know, your parole status, either past or present, does
not have a negative impact in determining your hiring status.

Woodmack Products, Inc. is a light metal manufacturing company and most
commonly our employment opportunities are for "machine operator trainee." These
positions are full-time/40 hours per week, Monday thru Friday. Some overtime and some
Saturday work is required.

Although we cannot forecast future openings, we wish to encourage you to
contact this office again closer to your release date. At that time, we will further discuss
our interview and hiring process.

If we can be of further assistance, please do not hesitate to contact this office.
Once again, thank you for your interest.

Sincerely,

Janet LeClair
Administrative Assistant

Specializing In Gas Burners, Manifolds & Venturis
11430 White Rock Road • Rancho Cordova, CA 95742-6600 • (916) 853-6150 • Fax: 853-6473
e-mail: wpi@speedlink.com

5B

# CAREER CENTERS



**BROADWAY**
915 Broadway
Sacramento, CA 95818
(916) 324-6202

**CITRUS HEIGHTS**
7640 Greenback Lane
Citrus Heights, CA 95610
(916) 676-2540

**FRANKLIN**
7000 Franklin Blvd., Suite 540
Sacramento, CA 95823
(916) 262-3200

**GALT**
1000 C Street, Suite 100
Galt, CA 95632
(209) 744-7702

**GREATER SACRAMENTO
URBAN LEAGUE**
3725 Marysville Blvd.
Sacramento, CA 95838
(916) 286-8600

**HILLSDALE**
5655 Hillsdale Blvd., Suite 8
Sacramento, CA 95842
(916) 263-4100

**LA FAMILIA COUNSELING
CENTER**
5523 34th Street
Sacramento, CA 95820
(916) 452-3601

**LEMON HILL**
5451 Lemon Hill Avenue
Sacramento, CA 95824
(916) 433-2620

**MARK SANDERS
COMPLEX**
2901 50th Street
Sacramento, CA 95817
(916) 227-1395

**MATHER**
10638 Schirra Avenue
Mather, CA 95655
(916) 228-3127

**RANCHO CORDOVA**
10665 Coloma Rd., Suite 200
Rancho Cordova, CA 95670
(916) 852-3608

**SOUTH COUNTY**
8401 - A Gerber Road
Sacramento, CA 95828
(916) 689-3560

## Administrative Offices
## & Employer Services

925 Del Paso Blvd.
Sacramento, CA 95815
(916) 263-3800
Website: http://www.seta.net

---

Clifford Bair C95079
L3      346
P. Bo Box 600
Tracy, CA  95378-0600

**SACRAMENTO
WORKS**
*Your Workforce Resource*

October 12, 2006

Dear Mr. Bair:

This is in reference to your recent letter to our Career Center.

After reviewing your letter and concerns for future employment/placement opportunities after your release, I would like to suggest that you contact our South County Sacramento Works office. Their address is 8401 Gerber Road, Ste A, Sacramento, CA  95828. There is a case manager, Warren Murphy, who works with ex-offenders and will be glad to help you achieve your goals. His phone number is 916-525-4717 ext.2153. There is also another program in Sacramento called, **The New Choice Program** that works with and helps ex-offenders with employment, housing. and other problems. Their phone number is 916 341-0593. I suggest you call and set an appointment time with these referrals.

I hope this will meet your needs and expectations. I you have any further questions you can write me directly.

Sincerely,

Donna Butler
Neighborhood Services Coordinator

6 β



4241 Florin Road, Suite 110
Sacramento, CA 95823

916.394.2320 tele
916.394.2480 fax

# maap Inc.
The Road to a Better Life

November 30, 2006

**George de la Mora**
Executive Director

<u>**Board of Directors**</u>

**Gustavo Martinez, Esq., President**
Office of the City Attorney
Sacramento

**Ester Cabrera, Vice President**
State Board of Equalization
Accounting Section

**Carol Rameriz, Secretary**
Lilliput Children's Services

**Alex Amaya, Treasurer**
U.S. Bank

**Jose Campos**
State Board of Equalization
Accounting Section

**Jean Walker**
Department of Rehabilitation

**Jesus Rodriguez**
Community Member

Mr. Clifford Bair, C-95079
Duel Vocational Institution
P.O.Box 600
Tracy, Ca 95378

RE: New Choice Application

Dear Mr. Bair:

Thank you for your interest in The New Choice program. Enclosed you will find an application, please complete and mail back at your convince to the address below.

If you have additional questions please place them in writing to the following address.

New Choice Program
MAAP, Inc. Attn: Tressa Dorsey
4241 Florin Road, Suite 110
Sacramento, CA. 95823

Your questions need to be specific and you will need to provide an accurate address for return response. Thank You.

Sincerely,

Tressa Dorsey
Program Coordinator



# What is
# Sonoma County Job Link?

*Every day, hundreds of qualified North Bay residents are looking for jobs. And every day, there are hundreds of jobs waiting to be filled. We are the employment link.*

Sonoma County Job Link is a collaboration of over 30 employment and training providers that can help you to:

- Identify your career interests and skills
- Improve resumes, cover letters and job interview skills
- Discover the hidden job market
- Find out what employers expect
- Get technical training for a higher paying job
- Enter an apprenticeship program
- Finish your high school education
- Improve your English language skills

Job Link is your gateway to a vast array of employment related resources.



JOB LINK

---



*"...if you realize that no one is going to do it for you, and if you really do take charge of yourself, there are people who do care, who will help you. That's what I've found."*

David Floyd

# One-Stop Services
## for Job Seekers

- **Job search resource libraries**
- **Career information and planning**
- **On-line listing of local, state, national job openings**
- **On-line resume posting**
- **Access to computers, fax, and phone bank**
- **Skills assessment, job-search workshops, job placement assistance**
- **Skills training**
- **Internships**
- **Referral to other needed services**

Attend an orientation at Job Link today. Gain the skills and knowledge you need to build a sustainable career or create a new one.

8 B

# CITY OF WEST SACRAMENTO

**CITY HALL**
1110 West Capitol Avenue
West Sacramento, CA 95691

City Council
City Manager
City Clerk
Human Resources
(916) 617-4500
Fax (916) 372-8765

Building
(916) 617-4683
Fax (916) 371-0845

Community Development
Planning
Engineering
(916) 617-4645
Fax (916) 371-0845

Finance
(916) 617-4589
Fax (916) 373-9006

Fire Administration
(916) 617-4600
Fax (916) 371-5017

Housing & Community Investment
(916) 617-4555
Fax (916) 373-5848

Information Technology
(916) 617-4520
Fax (916) 372-8765

Parks & Recreation
(916) 617-4620
Fax (916) 373-5329

Redevelopment
Economic Development
(916) 617-4535
Fax (916) 373-5848

Refuse & Recycling
(916) 617-4590
Fax (916) 617-4589

Utility Billing
(916) 617-4589
Fax (916) 373-9006

**POLICE**
550 Jefferson Boulevard
West Sacramento, CA 95605

Administration
(916) 617-4900
Fax (916) 373-2377

Code Enforcement
(916) 617-4925
Fax (916) 617-4340

**PUBLIC WORKS**
1951 South River Road
West Sacramento, CA 95691

(916) 617-4850
Fax (916) 371-1516

www.cityofwestsacramento.org

September 14, 2006

Cliff Bair, C95079
L3 346
P.O. Box 600
Tracy, CA  95378-0600

Dear Cliff:

Thank you for your interest in employment with the City of West Sacramento.  However, we do not have any position entitled "Welder".  We do recruit for the position of Maintenance Worker as well as part time Laborer and you may apply for these positions when they are open.  Currently the Laborer position is open.  I am including a job description for you.  All applications are accepted and screened for minimum qualifications and requirements designated by the position.

For future reference, our job line (916-617-4525) and web page (http://www.cityofwestsacramento.org) are updated every Friday afternoon.  Please feel free to reference these for any position you may be qualified for.  Attached is a current listing of our openings.

Again, thank you for your interest in serving the City of West Sacramento.

Very truly yours,

Barbara A. Usrey
Administrative Aide / Human Resources Division

9β

The City of
West Sacramento
is recruiting for

# LABORER
(Temporary,
Extra Help)



$8.00 - $12.00
per hour

**Final Filing Date:**
Continuous until filled

Visit us at
www.cityofwestsacramento.org

City of West Sacramento
Human Resources Division
1110 West Capitol Avenue, 3rd Floor
West Sacramento, California  95691

10 B

# **AARP** Senior Community Service Employment Program

**FOUNDATION**

Clifford Bair    C95979
L3      346
P.O. Box 600
Tracy, CA., 95378-0600

September 21, 2005

Dear Mr. Bair,

AARP's Senior Community Service Employment Program (SCSEP) provides temporary work experience for people aged 55 and older whose incomes fall at or below the Federal Poverty Line.    Clients are given temporary positions in non-profit community organizations where they have an opportunity to sharpen and develop skills while searching for a permanent job.  SCSEP's goal  is for each of its clients to obtain employment outside of the program.

Eligible applicants are placed in non-profit or public service community agencies where they receive on-the-job training for 20 hours per week.  They are paid at least the minimum wage.  During their temporary employment, clients work with the Director of the local project to locate permanent employment either on a part time or full time basis. For the clients the benefits of the program include:

- Help in developing job search skills and in locating a permanent job.
- Paid work experience to improve job skills and develop new ones.
- Opportunity to establish a current work history
- Paid sick leave.
- Paid holidays.
- Workers compensation insurance.

You did not mention, in your letter, when you are to be released.  You may, if you choose, set up an appointment for intake into our program when you are released by calling the Project Office and setting up an appointment.  You will need a Social Security Card, a acceptable form of identification that will prove that you are 55 years of age, some proof of any money you have earned by going back 12 months and a resume or good idea of just what kind of work you are going to be looking for.

You may contact our office Monday – Friday 9 A.M. – 4 P.M.  We will look forward to hearing from you.

Royal Stewart, Employment Specialist
AARP/SCSEP
(707) 525-9190
scsantaros@aol.com

116

August 29, 2006

Mr. Clifford Bair, C-95079
Deuel Vocational Institution'
P O Box 600
Tracy, CA 95378

INMATE EMPLOYABILITY PROGRAM – JOB REFERRAL PROGRAM

Dear Mr. Bair:

At the current time you are not eligible for nomination to the Prison Industry Authority (PIA) newly established Job Referral Program because you do not meet the minimum criteria for inmate participation of being within 90-days of parole.

However, your Inmate Employability Program (IEP) records revealed numerous achievements, and your PIA supervisors have graded you above average in all performances and equipment skill, formal training and job skill areas at Deuel Vocational Institution. Your supervisors have written and/or stated that you would be an asset to any Warehouse or Inventory Control Program, as well as other California employers.

With this in mind, it was stated that upon parole you are a perfect candidate for nomination to the Job Referral Program. Once in the Program, IEP staff will be able to assist you in setting up interviews with employers who participate in our Program leading to employment within your county of parole.

It is because of your PIA work history, commitment, and supervisory recommendations that the Inmate Employability is providing you with a Letter of Reference with experience history (enclosed) for use in employment searches prior to Job Referral Program nomination. Thank you for your continued dedication to a high level of work standards. I wish you the best in your future endeavors. Please contact me as soon as you receive a parole date so that I may activate your nomination.

Sincerely,

DAVID H. CRAIG
Prison Industry Administrator

12 B

Bair
Page 2


Job Referral Program

# PIA JOB EXPERIENCE/TRAINING


**Current Assignment:** Mr. Bair is a highly effective Warehouse Worker works in various PIA Warehouses. He is responsible for the inventory of the warehouse and for all picking and pulling of Raw Goods. He is responsible for the receiving of materials into the warehouse as well. Prior to his transfer to DVI from Folsom, Mr. Bair was a Mig and Tig Welder with major experience in the Metal Shop at Folsom. He was also a quality control inspector of metal products. This has helped him in his review of the quality of goods he is asked to store at DVI in the various warehouses.

**Training :**

- He has received a Certificate of Proficiency in the occupational category of Warehouse Worker/Laborer, Stores, D.O.T. No. 922.687-058 with 1,512 + hours of experience.

- Certificates of Achievement indicating sufficient training in the safe use and operation of the following processes used in the Warehouses at DVI:

    - ➢ Forklift Operator
    - ➢ Stock/Inventory
    - ➢ Warehouseman
    - ➢ Material Distribution

13B



Cliff Bair C95079                                   May 31, 2006
L3 346
P.O. Box 600
Tracy, CA 95378-0600

Dear Mr. Bair:

Your request for housing and job information was referred to me from Patrick Jolly of the
Sonoma County Veterans Services Office.

Enclosed is a resource guide with housing information on page 11.

In terms of employment, we offer qualified veterans a free 30 hour job search workshop
entitled *Winning the Employment Game* based on the book of the same title. The
workshop helps veterans get clear about their direction and teaches them job search skills
including interviewing, resume preparation and networking preparation. This would
require that I meet with you and fill out about 40 minutes of paperwork.

I don't know what type of work you are qualified to do but if you have access to a
computer you might look at Caljobs, the CA state employment website.

Sincerely,

Bud Inzer

Employment & Training Specialist
Northbay Veterans Resource Center
*A division of Vietnam Veterans of CA*

148



December 5, 2005

Cliff Bair C95079
L3 346
P.O. Box 600
Tracy, CA 95378-0600

Dear Cliff:

You will find that I have enclosed a resource guide for you, which highlights most of the
resources in Sonoma County for housing, work/training, medical, emergency shelters and
food/meals.

Your probation officer will give you a listing of what is available as well. The Redwood
Gospel Mission might be a place to start. At least you can get a bed and a meal and if
you find employment immediately, they might let you stay for up to 30 days. In addition
please look at page 10 and 11 in the Homeless Resource Guide for additional housing.
We have a transitional house in Petaluma, California. Please note that this is not an
emergency shelter and would take time to apply for the program. You are certainly
welcome to apply if it seems appropriate. Please note that this is a clean and sober
facility.

We have an employment program which is free to qualifying veterans. The employment
program is centered around a very comprehensive and successful 30 hour workshop
entitled Winning the Employment Game. WEG runs Monday through Friday from 9 am
to noon for two weeks. Participants gain clarity about their career direction, learn how to
access the hidden job market, learn how to handle difficult interview questions, learn
proven job hunting techniques and focus their attention on good self-care during the
process.

Please feel free to contact us after you have been released.

Sincerely,

Bud Inzer
Employment & Training Specialist
Vietnam Veterans of California



**Tulare County**
**Health & Human Services Agency**
C. Brian Haddix, CAO
Kristin Bennett, Interim HHSA Director
John Davis, Director - Human Services Department

---

**Human Services Department** ▪ Danny Britton ▪ Veteran's Services Officer

May 5, 2006

Cliff Bair
L3 346
PO Box 600
Tracey, CA 95378-0600

Mr. Bair,

We participate in a program with the Parole Officers that will be part of your parole program. This program is a mandatory meeting normally within one month of release. At the meeting you will find several of the supportive service organizations in the enclosed list. Hopefully the list will help you in preparing for parole. Also enclosed is an application for a reduced fee California Identification Card. If you have this completed and give it to your parole officer at your first meeting, it can speed up the process.

If you need anything else or have more questions, please don't hesitate to contact me at the address listed below.

Respectfully,

Dan Britton
Tulare County Veterans Service Officer

16 B

May 10, 2006

To Whom it May Concern:

This letter is in support of my brother, Clifford Bath. I strongly feel he is very remorseful of his crime, & has served his sentence willingly & without behavior issues & in superior standing. Clifford has worked extremely hard to prove to his family & society that he is indeed a changed person. I feel with his determination & desire, he can be a mentor to many others that may be thinking of taking the wrong road down life's path. I also strongly feel he will spend the remainder of his life becoming a person we all, as family & society want to have amongst us and he very proud to have as a family member, friend or colleague. As his brother, I will be very willingly to help find a place of employment, provide transportation to and from and

17B

seeking employment. I can help provide a comfortable place to live in a very clean & healthy environment, and provide very strong family support for his transition.

Please consider a second chance to prove he is indeed a changed person.

Thank You
Very Much

Lloyd Bair
530 787 3280

LLOYD BAIR
25617 County Road 20 A
ESPARTO, CA 95627
530 787 3280

17 B 1

May 7, 2006
To Whom It May Concern:

I am sending this letter of support for Cliff Bair. I am Cliff's brother Duke Bair and I own my own trucking company. I am willing to give Cliff a job and a place to live at the time of his release. I feel Cliff has worked hard to change his life and will do very well back in society with the help of his family. If you have any questions please feel free to contact me.

Thank You,
Duke Bair

Duke Bair
25 Olive Way
Woodland, California
95695          530 661 6048


Gerald Duke Bair
608 Del Oro
Woodland, CA 95695
530 666 5116

18 B

# Experience Works
**Senior Workforce Solutions**

P.O. Box 494625
Redding, CA 96049
(530) 226-0651
(Fax) 226-0651

December 6, 2005

Clifford Bai**ⓡ** C**ⓦ**5079
L3    346
P.O. Box 600
Tracy, CA 95378-0600

Dear Clifford;

Thank you for your interest in the Senior Community Service Employment Program of Experience Works. We have been providing employment services to individuals 55 or older for over 40 years. Employers value the talents older workers bring to the workplace and are looking for people like you.

We work with individuals in Placer as well as Sacramento. We operate a grant from Department of Labor who has income criteria on those that we may serve. Currently the eligibility income goes back 12 months from date of application and the guidelines for a family of two (which would include you and your wife's income) would be a maximum of $16,037.50.

If you qualify, you'll be placed in a part-time community service training assignment to gain experience. You can serve your community at libraries, hospitals, senior centers and other organizations, while expanding your skills and earning an income while you continue with your job search. Our local SCSEP staff will help you secure the training you need and will assist you in making the transition to a job that's right for you.

Thank you again for your letter and looking forward to working with you.

Sincerely,

*Butch Barker*

Butch Barker
Operations Coordinator

*19 B*

# AARP Senior Community Service Employment Program

Linda Herrera, Project Director
AARP Foundation Senior Community Service Employment Program
240 W. Caldwell Avenue
Visalia, CA  93277
(559) 625-8088  phone
(559) 625-8089  fax
scvisalia@aol.com

September 1, 2005

Dear Mr. Bain,

Thank you for your interest in our program.

When you get home to Visalia, please give us a call at 625-8088 and we will set up an appointment to enroll you in the SCSEP program.  One requirement is that you be a resident of either Kings or Tulare county to apply.

Good luck to you, and looking forward to hearing from you next summer.

Sincerely,

Suzanne

𝒜𝑜𝐵

# *AARP* Senior Community Service
# Employment Program



*Linda Herrera, Project Director*
*AARP Foundation Senior Community Service Employment Program*
*240 W. Caldwell Avenue*
*Visalia, CA 93277*
*(559) 625-8088 phone*
*(559) 625-8089 fax*
*scvisalia@aol.com*

August 16, 2005

Dear Mr. Bai&.  *C 95079*

I am sorry this information comes to you so long after your request.

The AARP Senior Employment Program is for people 55 or over, not employed & with low or poverty level income.

I have enclosed some information for you to look over and get an idea of what this program is all about. We offer temporary training at the minimum wage of $6.75/Hr. for 20 hours a week. We try to match your interests with our available host agencies who will train you in their work place.

If you are interested you should call the EDD in your area and ask for a Title V program and if there is an AARP program in your county.

Here's wishing you the best in your new search.

S. Singleton

*21 B*

**DEPARTMENT OF CORRECTIONS**
**Parole and Community Services Division**
**P.O. Box 942883**
**Sacramento, CA 94283-0001**



MR CHIEF BAIR C95079
E3 346
P.O. Box 600
TRACY, CALLE 95378

This is in response to your recent letter requesting information concerning parole
programs that are available to you upon your release. I commend you for taking the
initiative to obtain this information.

The fact that you have no place to live or work does not have a bearing on your release
to parole. To assist parolees with their rehabilitation while on parole, the Parole and
Community Services Division (P&CSD) has developed and implemented numerous
community-based programs. These include employment assistance services,
computerized learning centers, residential facilities that provide multiple services to
homeless parolees, and substance abuse treatment programs.

Currently, The P&CSD administers three employment programs, which are located
throughout the State. One of these provides employment assistance services through
State Employment Development Department job specialists, who are located within
selected parole offices. Another program, the Offender Employment Continuum, helps
parolees become self-sustaining by providing them with referrals to educational
programs, vocational training and prospective employers. Additionally, the OEC works
closely with the Prison Industry Authority (PIA) to assist parolees who have participated
in PIA programs to find meaningful employment. The Parole Employment Program
provides employment services such as workshops and job placement assistance to
parolees through community providers.

In addition to the employment programs, there are the Computerized Literacy Learning
Centers (CLLC) where a parolee can advance from early education through 12th grade
and/or obtain a General Education Development Certificate. CLLCs are located within
selected parole units throughout the State.

P&CSD also provides services to homeless parolees through Residential
Multi-Service Centers (RMSC) which are located in Bakersfield, Fresno, Los Angeles,
and Stockton. This community-based program provides lodging, meals, individual and
group counseling, substance abuse counseling, parenting skills training, money
management, life skills training and medical referrals. Assistance is also provided in
obtaining Social Security cards and Department of Motor Vehicles identification. Other

24 β

Page 2

services include job search and job retention training, and assistance in finding and obtaining employment. During transition planning, staff provides program participants with assistance in locating permanent housing in the community.

For parolees who have a history of substance abuse, the P&CSD operates several substance abuse treatment programs. These are located throughout the State and include the Substance Abuse Treatment and Recovery Program and the Parolee Services Network.

Programs and services are free of charge to all parolees. However, to access them, parolees must coordinate their enrollment through their assigned parole agent. After you have been assigned a parole agent, I encourage you to contact him or her for assistance in locating specific resources that may be available to you in your community.

I am enclosing a copy of the Parolee Information Handbook. The handbook identifies, to a limited degree, local service agencies and qualifying factors. It also outlines typical benefits such as clothing, housing, financial assistance and bonding for employment, which some parolees may or may not be eligible for.

When completing your pre-parole plans, Release Program Study (CDC Form 611), with your assigned correctional counselor, you should discuss any parole issues you may have including changes in your county and out-of-state parole. I also recommend that you request, through your correctional counselor, participation in the institution's Pre-release Program.

I hope you find this information helpful.

Sincerely,

D. L. Lamotta

D. L. LAMOTTA
Chief, Program Support Unit
Parole and Community Services Division

Enclosure

cc: Correctional Counselor

22B1

SUPPORT LETTERS

C

# EXHIBIT C

DEPARTMENT OF VETERANS AFFAIRS
Palo Alto Health Care System
3801 Miranda Avenue
Palo Alto, CA 94304

In Reply ReferTo: 640/180D

March 21, 2007

Chairman
Board of Parole Hearings
1515 K Street, Rm 600
Sacramento, CA  95814 - 4053

Dear Chairman and Board Members:

I am writing this letter as a follow-up to my previous letter on behalf of Clifford Bair, C95079. As noted in that correspondence, I became familiar with Mr. Bair by way of our program's ongoing outreach efforts to incarcerated veterans, in this case to the Duele Vocational Institute facility. As we have continued our regular visits, this has allowed me to maintain contact with Mr. Bair. He continues to be very focused on creating a positive plan for himself upon release, and to remain very active in their veterans group during his continuing time in the facility.

In my continuing discussions with Mr. Bair, he has maintained the same overall plan for himself. Specifically, this includes his desire to return to his local community and establish a business for himself utilizing a Small Business Loan, taking advantage of local VA resources for ongoing support. His alternative plan remains consideration for one of our residential programs if needed to establish a positive re-entry into the community. He continues to appear very motivated to create a life for himself outside of the prison system that will promote continuing positive change and recovery.

Yours very truly,

Joel Rosenthal, Ph.D.
Coordinator of Clinical Services, Domciliary

1c

795 Willow Rd. Bldg. 323B
Menlo Park, CA 94025
650-493-5000 x22044
650-614-9821 – Fax

March 21, 2007

To: Executive Officer of the California State Prison Board

Re: Clifford Bair (C-95079)

This letter is being written to let you know of our Agency and to inform you of our contact with Mr. Bair. We are located in Menlo Park on the V.A. grounds; our Agency provides a number of services to Veterans who have an honorable discharge, which Mr. Bair does have. Our main function is to help Vets. Get their lives back on track through transitional housing and whatever treatment is necessary including vocational training, job placement, and support with substance abuse including transportation to 12-step meetings. What is unique about our Agency is that we are located on the same grounds the Veterans Administration Services are and do referrals on a daily basis.

The length of stay in our program is variable up to two years. After two years the person will be reevaluated to determine if a longer time frame is needed.

If and when Mr. Bair is released he will have housing through our Program along with the rest of the services we offer. It would be an honor for me to help a Veteran, who has been honorably discharged, return to becoming a productive member of society once again.

If there is any further information needed or any questions feel free to call me at (650) 493-5000 ex 24208

Sincerely,

Kyle Terzian

Kyle Terzian
Program Manager
Certified Addiction Treatment Specialist

## "Changing Lives One Vet At A Time"

2 C

trade that makes him employable. He has received many kudos from his supervisors for his work ethics.

He continues to attend all available programs for self improvement and has received many certificates recognizing his efforts. He will continue this journey upon his release.

Cliff is ready to meet the challenges that will be ahead of us. I ask that you allow my husband to move forward, to be a loving and supportive husband, father, friend, and an asset to society. I ask the board members to find my husband suitable for parole at this time.

Sincerely,

*Valerie Bair*

Valerie Bair
401 Green Point #2
Roseville, Ca 95678
916 773-5296

345 SHADOW RIDE #4
ROSEVILLE, CA 95678

**3C1**

Feb 11, 2005

To Whom it May Concern

My name is Valerie Bain. I am writing this letter on behalf of my husband Clifford Lee Bain C95079

Cliff and I have been married for 2½ years but have known each other all of our lives. I am an employee of the State of California and I have been for almost fifteen years. I would like the Attorney Generals office to know that I can offer Cliff, a home to live, a stable environment, transportation to and from work and most of all love.

Cliff is not the same man that entered the prison septem twenty one years ago. First of all he has acquired two trades. He is a certified welder and a journeyman plumber, both of which would make it much easier for him to secure gainful employment. I, with my employment with the state would be financially able to support Cliff until he could secure employment. He is at the top of his payscale in the P.I.A. and has received excellent reviews from his supervisors for the work he performs.

Cliff has been a model prisoner. He has received good Psych reports and the few write ups he has received in twenty one years have been very minor. Prior to his incarceration

4 C

Cliff had no violent record

Cliff has attended many self-help and self-improvement programs during this incarceration which include, AA, NA, Anger Management, Substance Abuse, Meditation, Yoga, and Personal Health and Self Enhancement, only to name a few.

Cliff has worked extremely hard to improve himself and to change old habits and he has succeeded. He has been alcohol and drug free for twenty one years only through his own desire, determination and the help of this A.A. meeting. When he is released he has an A.A. meeting place to attend and the support of a A.A. Sponsor.

Cliff has matured and recognizes the circumstances and conditions which led to his crime. My Husband is truly remorseful for the pain and suffering that he has caused so many people, including himself, but most of all the victims of his actions.

The circumstances of my Husbands crime will never change or go away and Cliff will have to live with that fact for the rest of his life. I personally know that it is a pain he lives with every day.

Not only does Cliff have my love and support but he has support from family and friends as well

My Husband has served twenty one years behind bars and he deserves another chance at life to be a productive citizen.

4C1

I am here to support my Husband in
whatever the may need to have a
successful parole.
They has continuously met the requests
of the parole board yet they still deny him.
When will it ever be enough?

Sincerely

Valerie Bair

4R2

Parole Board
Folsom State Prison
Represa, Ca 95671

Presiding Members
To Whom it May Concern

My name is Valerie Bair. I am writing
this letter on behalf of my husband Clifford
Lee Bair C95079
Cliff and I have been married for eight
months but have known each other all of
our lives. I am an employee of the State
of California and I have been for almost
thirteen years. I would like the presiding
members to know that I can offer Cliff a
stable environment, a home, and most of
all love.
Cliff is not the same man that entered
the prison system over nineteen years ago.
First of all he has acquired two trades. He
is a Certified Welder and a Journeyman
Plumber, both of which would make it much
easier for him to secure gainful employment.
I, with my employment with the State would
be able to financially support Cliff until he
could secure employment. He is at the top of
his payscale in the P.I.A. and has received
excellent reviews from his supervisors for
the work he performs.
Cliff has been a model prisoner. He has
received good Psych reports and the few write ups

5C

he has received in nineteen years have been very minor. Prior to his incarceration Cliff had no violent record.

Cliff has attended many self help and self improvement programs during his incarceration which include AA, NA, Anger Management, Substance Abuse, Meditation, yoga, and Personal Health and Self Enhancement Systems only to name a few. He was a tutor for two years for non-English speaking Hispanics. Cliff has worked extremely hard to improve himself and to change old habits and he has succeeded. He has been alcohol and drug free only through his own desire and determination. Cliff has matured and recognizes the circumstances and conditions which led to his crime. My husband is truly remorseful for the pain and suffering that he has caused so many people, including himself, but most of all the victims of his actions. The circumstances of my husband's crime will never change or go away and Cliff will have to live with that fact for the rest of his life. I personally know that it is a pain he lives with every day.

Not only does Cliff have my support but he also has support from family and friends. We have secured interviews for him upon his release and he is anxious to find employment.

My husband has served nineteen years behind bars and he deserves another chance

5 of 1

at life to be a productive citizen.
I am here to support my husband in
whatever he may need to have a successful
parole.

My prayer is for God to guide your
hearts and minds, so you may at this
time, find my husband suitable for parole

Sincerely,

Valerie Bair

522

05/22/06

Dear Board Members

I am writing this letter on behalf of my step-father Clifford Lee Bair C95079. I have never
personally met Cliff but I know he is not the same man who committed that terrible crime 22 years
ago. The reason I have never met Cliff in person is because I was in some trouble myself and
had to do some time and I am on parole. I will be off of parole in February 2007 at which time I
plan on becoming a regular visitor and establishing a relationship with my step-father.

Cliff and I have communicated through letters and talking on the phone. He has mentored me in
that he tells me the truth and guides me with his experience.
Cliff has discussed his crime with me and I know how sad and remorseful he is.

I am now married and with our first child due this summer, making Cliff a grandfather again. Our
hope is that Cliff will be able to join our family and become a productive citizen. My mother has
been married to him for almost 4 years and they deserve to
have a life together.

He has remained disciplinary free, has programmed and has always had a job. He has pride in
himself and it is well deserved. Cliff has worked hard to become the man he is today, someone I
am proud to call my step-father.


We will be here for Cliff and my mother to help them in whatever they may need to have a
successful parole. We hope that at this hearing you will be able to find Cliff suitable for parole.

Thank You

Doug McKeon
Brett McKeon
13970 Cedar Dr
Pine Grove, Ca 95665

6 C

To the Board of Parole,

I will make this brief as I know your time is valuable. My name is Shelley J. Ellis, daughter of Clifford L. Bair. I am writting to you on behalf of my Dad, praying for your consideration. I want you to know that I realize that my Dad has commit a serious crime I know he realizes it as well. However, I also want you to know that I believe in my heart that he is a Changed Man. I pray that you will consider this time served sufficient punishment for his past crime and give him a second chance. Please know that I and my family will back him, love him and support his future endeavors to the best of our abilities. We miss him and want a chance at a new life with him as a part of it.

My sincere thanks,

1008 Rustic Dr
Macon, Mo. 63552
(660) 395 9845

Shelley J. Ellis

7C

Dad,

11/15/06

We have all been incredibly busy. But, I wanted to get a note to you to let you know that we are always thinking about you and wishing the best for you. Have you had your hearing? and have you heard anything back? I know you were not expecting good news, therefore, I am almost afraid to ask...

I have been working everyday at the school as a substitute teacher. There aren't many people "qualified" to sub that don't already have full time jobs so I am in high demand. It is good money so I won't complain. The girls traveled to Mississippi last weekend (Oct. 26 - 30) to visit their father and meet their new "brother". Jeff has 5 children now and shows no signs of stopping.

Lauren's last home football game was last night. They have been receiving "Grand Champion" in about every band competition this year.

8C

11/15/06

Dear Grandpa,

I am, sord of mad at savannah! But
anyway I had had a bad weekend I got
almost a brook nose by a boy at the
skating rink it started to bleed ··· alot! And
today I was playing with savanth then she got
a phone call then she got off the phone
but then she told me she was going to play at
the park with her friend and her friends cosins.
Then I went with her Seuzy /her friends
name/ didn't want me there. Then she
/savannah/ forgot all about me /kicked me in the dirt
Now she is at Seuzy's house going to see
flushed away /MY FAVROITE MOIVE!!/
Oh ya that tooth that was hearting me fell out
I didn't get money for my tooth I want money.
I'm realy tird and it is only 6:15. Good night ZZZ
Oh I snore loud shh don't tell !ha ha! I hope to
see /write/ you soon.

                    yours truely,
                    Auburn Casady

9C

Dad,

Wanted to finally send you a note as well. The girls and I are doing well. Life has not been an easy one for me but I am well and we love each other and lack for nothing. The girls left to go to their Dad's in Mississippi so it is quiet here. My boyfriend, Chris Ristler, and I will have a few weeks to ourselves. but we will miss the girls. He is a good guy. He has three sons and he treats the girls and I very well.

Lauren will be 14 on July 1st. She will be a freshman in HS next fall. She is very smart, plays the flute, and is VERY active in her church group. She received high honors on her flute solos at contest, played for the President of the University of Missouri and received the President's scholar award at school, for academic excellence.

Savannah just turned 12 April 18. She is a social butterfly!! She made the cheer squad for her upcoming 7th

10 c

grade year. She is also a very good gymnast and competed on our local team.

Auburn Grace turned 10 in December. She will be in fourth grade next year. She is a hugger and a kisser! She's the athlete. She played on two basketball teams last year. She is also pretty smart as well.

I am doing much better health wise. I am not working but will probably go back to substitute teaching in the fall. Hope the letter will help, as it is sincere. Here are some pictures. Take Care ... more later.



Love you!

Love

Shelley

10 RC 1

Dear Grandpa',                           Monday Sept. 11, 2006'.

It's so nice to hear from you!' how have you been?'
I've been alright!' I just started highschool here
in Macon and it's been pretty crazy!' I'm in band
+ i play the flute'. so between practices and school
and friends i've been very busy'. our 1st football
game is this friday, + we play at half time'. im
pretty excited'. i'll have to send you a picture of me in
my band uniform'. today, i had a dentist app.
and I get my braces off next month (oct 9'.) so
today is the 5 year anniversary of 9/11' that's
pretty sad... i feel sorry for all those people that
lost their lives' and all their relatives'. I guess
im pretty fortunate, huh?' well yesterday was
my brother Carsten's Birthday'. He turned 2'
he's so cute'. he looks just like me!' my other
brother Dylan will be born October 10th'. they
both live in Mississippi though, w/ my dad +
step-mom (janna) so i don't get to see them that
much, except when I go visit them over the
summer'. that's always fun'. - Anyway, I just
turned 14 July 1st'. I can't wait until next
year when I get my permit'. Everyone
watch out!'. haha!' well anyway that's about
all there is to know about what's goin on
with me'. I try to attend church every
sunday and wednesday' I love my
God and my youth group'. And I hope

uc

Dear Grandpa,

How are you? I'm fine. I haven't been doing much latly. Guess what I'm in 4th grade ... if you did'nt know?! When I get older can I vist you? Mommy is making a wonderful super oh it's 4:58... I'me for super. Anything you have done latly? My tooth is lose and it hurts really bad. I am done with my homework! I have to cary the trash done hold on...... Never mind my sister Lauren did it. OW My tooth I will write to you when ever somthing exiting happens or I just want to talk or if you send me a letter. I like talking. How are you? Sorry I already asked that, My lips are chaped. I am going to the park later when I go I will write to you there. I am going with Laruen. What do you look like? Am I funny? I know I am pretty. By the way do you whant a picture of me? I act like I am 7 But I'm 9. I like being and acting like a child. Mommy has to read me your letter cause I don't know your hand-writeing. I am tierd. I love drawing. Do you? I have to go to bed in 3 mitaties. Well good night bye ya sweet dreams. See you in the futere. Oh at the park I rode my bike there and swung

12C

Dear Grandpa,

Hey hows it going? Fine here. I'm so glad that you wrote to me! I've just started 7th grade and I'm a Macon Middle school Cheerleader. My mom said we might come visit sometime but im not sure. How is it in California? Is the weather warm? In our state its cool most of the time here. On thursday we have a pep Rally and our first game I cant wait, but im also nervos. I wish you could be there to watch me and cheer me on. Well its 9:58. I better be getting to bed Well talk to you soon. Have a nice week!
     Ps: Write back!

                    Your Grandaughter

                    Savannah

13C

Make Yahoo! your home page                                    **Web Search**

MAIL    Welcome, **twobairsden**
[         ,          ]

| **University of Phoenix Online** | **BACHELOR'S DEGREES** | |
| --- | --- | --- |
| | Bachelor of Science in Business/Accounting | Bachelor of Science in Information Technology |
| **ASSOCIATES DEGREES** | Bachelor of Science in Business/Administration | Bachelor of Science in Management |
| Associate of Arts in General Studies | Bachelor of Science in Business/e-Business | RN to Bachelor of Science in Nursing |
| **MASTER'S DEGREES** | Bachelor of Science in Business/Management | |
| Master of Arts in Education | Bachelor of Science in Business/Marketing | |
| Master of Business Administration | Bachelor of Science in Criminal Justice Admin. | |

**Check Mail**    **Compose**                    **Search Mail**    **Search the Web**

Previous |    |

**Delete**    **Reply**    **Forward**    **Spam**    **Move...**

**Folders**    [   -   ]    This message is not flagged. [         -              ]

Date:    Fri, 26 May 2006 23:08:15 -0500 (Central Standard Time)

From:    "Shhelley Casady" <slcas@cvalley.net>

[    ]    To:    twobairsden@yahoo.com

[    ]    Subject:    Just checkin' to see if this is right????

**Search Shortcuts**

Hey Dad and Valerie....nice to hear from you today.  Told my boyfriend, Chris, about your proposition...His dad lives in CA too.   Anyway just wanted to see if I had your address correct. I'll write more later....

Love, Shelley

**FREE Emoticons for your email!    Click Here!**

**Delete**    **Reply**    **Forward**    **Spam**    **Move...**

Previous |    |

**Check Mail**    **Compose**                    **Search Mail**    **Search the Web**

Copyright © 1994-2006    Inc. All rights reserved.
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our

14 C

Make Yahoo! your home page

**Web Search**

MAIL

Welcome, **twobairsden**
[          ]

| **Check Mail** | **Compose** | | | **Search Mail** | **Search the Web** |

**Delete** | **Reply** | **Forward** | · **Spam** | **Move...**

**Folders**   [  -  ]

This message is not flagged. [          -          ]

| **Date:** | Sun, 28 May 2006 19:46:31 -0500 (Central Standard Time) |
| **From:** | "Shhelley Casady" <slcas@cvalley.net> |
[     ]
| **To:** | twobairsden@yahoo.com |
[     ]
| **Subject:** | · Emailing: lastscan picture of me and Chris. |

**Search Shortcuts**

Hey Dad and Valerie!!
Didn't send any pictures of me so thought I'd email you one. If you want, I can send you an invitation to see all of my pictures through my snapfish account...it doesn't cost anything to look and if you did want to order any pictures from there you can?? Just thought I'd offer that option...anyway let me know. Hope you are having a nice holiday weekend.

TTYL Shelley

**FREE Emoticons for your email!  Click Here!**

 

**Attachments**

15C

Dad and Valerie,

Thank You for the sweet letter and the picture. Dad you look really good, Valerie you are really pretty... so cute and perky! You both look happy and I'm glad. I got the letter the day I was leaving town to go on a business trip with Chris. This is the first chance I've had to sit down and write you back. By the way, while I'm thinking about it... I don't have a preference how we correspond... since Valerie will have to do it by email... ask her how she prefers to do it ☺.

Chris and I went up to Quincy Ill. There's not a whole lot up there to do... but the hotel had a pool, hot tub and a sauna so I just relaxed a bit. He works for US Cellular and he had to take a training course. Since the girls are with their father for the summer Chris and I are taking advantage of the quiet time together.

16 C

The girls come back on July 22nd and then it will be back to the usual chaos!

Lauren will start marching band practice, Savannah will start cheer practice and I'll be running them back and forth. Chris is taking all of us back to his hometown Middletown Ohio to meet his family. The trip is going to be a surprise to the girls ... they are going to be so excited when they find out.

My 20th High School reunion is this weekend and a bunch of my old friends are going to be in town. Can't wait to take Chris and show him off! Since it's also 4th of July weekend we are planning to go over to Mark Twain Lake and watch the fireworks display from the boat. Maybe take the tent and campout too ... if we can find a vacant campsite??

ENCLOSED:
Photo
VISITING APP

love you

16 R 1

May 7, 2006
To Whom It May Concern:

I am sending this letter of support for Cliff Bair. I am Cliff's brother Duke Bair and I own my own trucking company. I am willing to give Cliff a job and a place to live at the time of his release. I feel Cliff has worked hard to change his life and will do very well back in society with the help of his family. If you have any questions please feel free to contact me.

Thank You,
Duke Bair

Duke Bair
25 Olive Way
Woodland, California
95695            530 661 6048


Gerald Bair
608 Del Oro
Woodland, CA 95695
530 666 - 5116

17 C

Board of Prison Terms

May 1, 2006

To Whom It May Concern:

I am writing this letter on behalf of my son-in-law Clifford Lee Bair C95079.

I have known Cliff for most of his life and know him to be a good man. Cliff had a rough time growing up but was always a good kid.

I do not excuse him for the crime he committed but I do believe he has served his time and deserves to be released back into society and be a responsible citizen.

He and my daughter deserve to have a life together and I believe he has worked hard to change his life around. As I have said, he is a good man.

I'm getting on in years and my health is not good which makes it hard for me to visit Cliff very often, but I do believe he deserves another chance at life outside of prison walls.

I sincerely hope that you will be able to find Cliff suitable for parole at this time.

Thank you,

*R. C. Dunn*

R.C. Dunn
865 Lander Ave 324
Turlock, Ca 95380
209 669-9967

February 20, 2006

To whom it may concern,

My name is Ezra C Bair and I am the father of Clifford Lee Bair C95079. I am writing this letter in hopes that this is the last one I may have to write.

Clifford was and is a good boy. I wasn't much of a father to him ,sad to say , but I do love him and want him to come home.

My son has served his time for this crime and I am in hopes of seeing him free before I die. I am 87 years old and live in Oklahoma which makes it hard for me to see Clifford as much as I would like to. My health is poor which also makes it hard to travel.

I would like you to know that when my son is released, that I will hopefully be here for him to support him and his wife in what ever they need to have a good parole.

Thank You

*Bill Bair*

Ezra C. (Bill) Bair
56549 E Hwy 69
Miami, OK 74354

19C

May 23, 2006

California Board of Prison Terms
1515 K Street, Suite 600
Sacramento, CA 95814

RE: Clifford L. Bair C-95079

Dear Sirs;

We are Michael and Martha Ogness, a married couple and close friends of Valerie Bair, wife of Clifford Bair. Although we have never met Cliff, we have corresponded with him over the past two years. We are writing this letter to show our support for both Cliff and Valerie.

We have been impressed with Cliff's sincerity and the consideration he has shown for Valerie. Valerie can always depend on Cliff to call when he says he is going to call. He has yet to disappoint her. When weather has made traveling dangerous, Cliff has called Valerie and convinced her to stay home, even though he knew it meant he would have to wait for his visit, something they both look forward to every week. We have also been impressed with Cliff's continuing education. In an effort to improve himself, Cliff has taken many courses available to him through the prison facility. He has also read many self-help books.

We understand the severity of Cliff's crime and that he was convicted of first-degree murder. This crime was a terrible tragedy. Nothing can change what happened. Cliff has taken steps to rehabilitate himself and has accepted full responsibility for his actions. He is ready to rejoin society, to build a life with Valerie, and to become a productive citizen. We will be here to support Cliff and Valerie in whatever way we can to help Cliff to have successful parole.

It is our hope that the board will grant Cliff parole and release him from prison. We are aware there are prisoners who should never be released from prison, but we believe Cliff is not one of these prisoners. We know Cliff is truly remorseful for his crime. He deserves a second chance, to be released, so he can prove himself to society. We respectfully submit this request, on behalf of both Cliff and Valerie, that Cliff be released at this time.

Sincerely,

Michael G. Ogness and Martha Ogness
142 Winding Canyon Lane
Folsom, CA 95630
(916) 987-0746

May 10, 2006

To Whom it May Concern:

This letter is in support of my brother, Clifford Bath. I strongly feel he is very remorseful for his crime, & has served his sentence willingly & without behavior issues & in superior standing. Clifford has worked extremely hard to prove to his family & society that he is indeed a changed person. I feel with his determination & desire, he can be a mentor to many others that may be thinking of taking the wrong road down life's path. I also strongly feel he will spend the remainder of his life becoming a person we all, as family & society want to have amongst us and be very proud to have as a family member, friend or colleague.

As his brother, I will be very willingly to help find a place of employment, provide transportation to and from and

21C

seeking employment. I can help provide a comfortable place to live in a very clean & healthy environment, and provide very strong family support for his transition.

Please consider a second chance to prove he is indeed a changed person.

Thank You

Very Much

Lloyd Bair

25617 County Road 20 A

ESPARTO    CALIFORNIA

95627

530 787 3280

May 21, 2006

California Board of
Prison Terms

Re: BAIR, Clifford

Parole Board Members,

My name is Ralph W. Stevens, and I was recently parole fro Duell Vocational
Institute after serving a 16-to-Life sentence for a second degree murder.  I
have spent 24 years 4 months within the correctional system and have observed
many people during this time.  I feel that I have a unique perspective in
which to view inmates and their behavior.

I am writing to you in support of Clifford.  I have worked and lived near
Clifford for the past five years, and have had the opportunity to interact
with he and his Wife Valerie on numerous occations.  Several years ago
Clifford asked me if I would like to learn how to T.I.G. weld, and I said yes.
For the next two years he taught me the fine art of T.I.G. welding.  During
this time we were able to have many conversations concerning our beliefs and
our crimes.  Cliff has demonstrated to me time and time again how sorry he is
for his crime, and I believe his sincerity.

I believe that Clifford has changed his life.  I have seen him attend A.A. on
a regular basis, plus voice his opinion on alcohol abuse to inmates discussing
the desire to get loaded.  He has a wonderful and supportive Wife who is
waiting for his release back into society.

There are very few inmates who I would want living next to me or my family,
however, Cliiford and Valerie would be an asset to any community.  I strongly
urge you to consider and grant parole to Clifford.

Thank you for your time and consideration.          *tel* *   916 - 722 - 2378*

Ralph W. Stevens

8560 PERSHING AVE
FAIR OAKS, CALIF
95628

22 C

May 10, 2006

To Whom It May concern:

I am writing this letter in support of Clifford Bair.

I sincerely feel he is very remorseful for his crime, and has served his sentence with a very clean record. Clifford worked extremely hard to prove to family & society that he will become a changed person. His work record, attendance in Anger control & Alcoholism classes, attending religious sessions & his desire to be a better person is very admiral.

I feel his desire to stay a clean citizen & his desire to help others that maybe headed towards trouble will make him someone family members & society would want to call theirs.

I will help him with his transition by helping to provide family support, to

23C

help provide a place to live in a clean, healthy enviroment, & help provide transportation in seeking employment.

Please consider a parole for him, and help give him a second chance!

Thank-you Very Much

Dena Boir,
Sister - in - law
530 787 3280

93 C 1

**DEPARTMENT OF VETERANS AFFAIRS**
**Palo Alto Health Care System**
**3801 Miranda Avenue**
**Palo Alto, CA 94304**

In Reply ReferTo: 640/180D

September 18, 2006

Chairman
Board of Parole Hearings
1515 K Street, Rm 600
Sacramento, CA  95814 - 4053

Dear Chairman and Board Members:

I am writing this letter on behalf of Clifford Bair, C95079.  I have become familiar with Mr. Bair by way of our program's ongoing outreach efforts to incarcerated veterans, in this case to the Duele Vocational Institute facility.  We have been conducting outreach visits to DVI for the past year and Mr. Bair has been a regular participant in our meetings with the veterans.  It appears that he has been very active in their veterans group and has been a strong force in their efforts to assist all veterans in the facility.

In our discussions with Mr. Bair, he has emphasized his desire to return to his local community and establish a business for himself utilizing a Small Business Loan, utilizing VA resources in that area for ongoing support.  As an alternative to that plan, we have discussed with him our residential programs in the event that is needing a program like that to facilitate his return to the community.  With this, I have checked his VA eligibility status and provided information to him regarding benefits available to him.  Mr. Bair is eligible for all VA services.  It is my impression that Mr. Bair is very motivated to utilize these benefits to optimize a successful release and transition into the community if he is granted a parole date.

Yours very truly,

Joel Rosenthal, Ph.D.
Coordinator of Clinical Services, Domciliary

24C

May 23, 2006

Board of Parole Hearings
1515 K Street
Sacramento, CA 95814

RE: Clifford L. Bair

To: Members of the Board of Parole Hearings

This letter is in support of Clifford L. Bair who is scheduled to present himself before the Board of Parole Hearings in July, 2006.

I have known Mr. Bair and his wife, Valerie for several years. I am aware of Mr. Bair's crime, and the years he has served in prison.

I believe Mr. Bair has prepared himself to be found suitable for parole by the Board. Mr. Bair has taken classes, participated in various self-help groups, and has been awarded more than one Laudatory Chrono.

Mr. Bair has the full support of his wife, as well as his family and friends to help him have a successful transition upon release.

Please allow this letter to serve as not only support for Mr. Bair, but also a requested consideration to find him suitable for parole at this time.

Sincerely,

J. M. Meyer
4908 Orchid Way
Sacramento, CA 95841
916-348-1824

25C

State of California                                                      Department of Corrections and Rehabilitation

# Memorandum

Date    :        November 29, 2005


To      :        Inmate Cliff Bair
                 C-95079
                 Cell L-346

Subject:    **VETERANS' ADMINISTRATION**

This is in response to your correspondence dated 11-18-2005, sent to my office regarding the recent Veterans Group tour of Deuel Vocational Institution (DVI). I am glad you enjoyed the information the group has made available to you and other veterans at DVI. This is a new project for DVI and we look forward to enhancing its available benefits as much as possible.

With regard to Parole Agent Briseno, I too, have recognized her efforts in the area of attempting to assist inmates in making a positive change when released. She has been the one to lead this program in the right direction. Thank you for your positive comments and recognition of the hard work done by DVI staff.


S. R. MOORE
Warden (A)

26C



**795 Willow Rd. Bldg. 323B**
**Menlo Park, CA 94025**
**650-493-5000 x22044**
**650-614-9821 – Fax**

November 28, 2005

To: Executive Officer of the California State Prison Board

Re: Cliff Bair (C-95079)

This letter is being written to let you know of our Agency and to inform you of our contact with Mr. Bair. We are located in Menlo Park on the V.A. grounds; our Agency provides a number of services to Veterans who have an honorable discharge, which Mr. Blair does have. Our main function is to help Vets. get their lives back on track through transitional housing and whatever treatment is necessary including vocational training and job placement. What is unique about our Agency is that we are located on the same grounds the Veterans Administration Services are and do referrals on a daily basis.

If and when Mr. Bair is released he will have housing through our Program along with the rest of the services we offer. It would be an honor for me to help a Veteran, who has been honorably discharged, return to becoming a productive member of society once again.

If there is any further information needed or any questions feel free to call me at (650) 493-5000 ex 24208

Sincerely,

Kyle Terzian

Kyle Terzian
Program Manager
Certified Addiction Treatment Specialist

**"Changing Lives One Vet At A Time"**

27 C

# AARP Senior Community Service Employment Program

Linda Herrera, Project Director
AARP Foundation Senior Community Service Employment Program
240 W. Caldwell Avenue
Visalia, CA 93277
(559) 625-8088 phone
(559) 625-8089 fax
scvisalia@aol.com

September 1, 2005

Dear Mr. Baig,

Thank you for your interest in our program.

When you get home to Visalia, please give us a call at 625-8088 and we will set up an appointment to enroll you in the SCSEP program. One requirement is that you be a resident of either Kings or Tulare county to apply.

Good luck to you, and looking forward to hearing from you next summer.

Sincerely,

Suzanne

28 C

**AARP**

**FOUNDATION**

Clifford Bair    C95979                                          September 21, 2005
L3        346
P.O. Box 600
Tracy, CA., 95378-0600

Dear Mr. Bair,

AARP's Senior Community Service Employment Program (SCSEP) provides temporary work experience for people aged 55 and older whose incomes fall at or below the Federal Poverty Line.    Clients are given temporary positions in non-profit community organizations where they have an opportunity to sharpen and develop skills while searching for a permanent job.    SCSEP's goal is for each of its clients to obtain employment outside of the program.

Eligible applicants are placed in non-profit or public service community agencies where they receive on-the-job training for 20 hours per week.    They are paid at least the minimum wage.    During their temporary employment, clients work with the Director of the local project to locate permanent employment either on a part time or full time basis. For the clients the benefits of the program include:

- Help in developing job search skills and in locating a permanent job.
- Paid work experience to improve job skills and develop new ones.
- Opportunity to establish a current work history
- Paid sick leave.
- Paid holidays.
- Workers compensation insurance.

You did not mention, in your letter, when you are to be released.    You may, if you choose, set up an appointment for intake into our program when you are released by calling the Project Office and setting up an appointment.    You will need a Social Security Card, a acceptable form of identification that will prove that you are 55 years of age, some proof of any money you have earned by going back 12 months and a resume or good idea of just what kind of work you are going to be looking for.

You may contact our office Monday – Friday 9 A.M. – 4 P.M.    We will look forward to hearing from you.

Royal Stewart, Employment Specialist
AARP/SCSEP
(707) 525-9190
scsantaros@aol.com

# *AARP* Senior Community Service Employment Program

Linda Herrera, Project Director
AARP Foundation Senior Community Service Employment Program
240 W. Caldwell Avenue
Visalia, CA 93277
(559) 625-8088 phone
(559) 625-8089 fax
scvisalia@aol.com

August 16, 2005

Dear Mr. Baig.

I am sorry this information comes to you so long after your request.

The AARP Senior Employment Program is for people 55 or over, not employed & with low or poverty level income.

I have enclosed some information for you to look over and get an idea of what this program is all about. We offer temporary training at the minimum wage of $6.75/Hr. for 20 hours a week. We try to match your interests with our available host agencies who will train you in their work place.

If you are interested you should call the EDD in your area and ask for a Title V program and if there is an AARP program in your county.

Here's wishing you the best in your new search.

S. Singleton

30 C



A division of Vietnam Veterans of California, Inc.

December 5, 2005

Cliff Bair C95079
L3 346
P.O. Box 600
Tracy, CA 95378-0600

Dear Cliff: Bair

You will find that I have enclosed a resource guide for you, which highlights most of the resources in Sonoma County for housing, work/training, medical, emergency shelters and food/meals.

Your probation officer will give you a listing of what is available as well. The Redwood Gospel Mission might be a place to start. At least you can get a bed and a meal and if you find employment immediately, they might let you stay for up to 30 days. In addition please look at page 10 and 11 in the Homeless Resource Guide for additional housing. We have a transitional house in Petaluma, California. Please note that this is not an emergency shelter and would take time to apply for the program. You are certainly welcome to apply if it seems appropriate. Please note that this is a clean and sober facility.

We have an employment program which is free to qualifying veterans. The employment program is centered around a very comprehensive and successful 30 hour workshop entitled Winning the Employment Game. WEG runs Monday through Friday from 9 am to noon for two weeks. Participants gain clarity about their career direction, learn how to access the hidden job market, learn how to handle difficult interview questions, learn proven job hunting techniques and focus their attention on good self-care during the process.

Please feel free to contact us after you have been released.

Sincerely,

Bud Inzer
Employment & Training Specialist
Vietnam Veterans of California

3/ C



**Tulare County**
**Health & Human Services Agency**
C. Brian Haddix, CAO
Kristin Bennett, Interim HHSA Director
John Davis, Director - Human Services Department

---

**Human Services Department** ▪ Danny Britton ▪ Veteran's Services Officer

May 5, 2006

Cliff Bair
L3 346
PO Box 600
Tracey, CA 95378-0600

Mr. Bair,

We participate in a program with the Parole Officers that will be part of your parole program. This program is a mandatory meeting normally within one month of release. At the meeting you will find several of the supportive service organizations in the enclosed list. Hopefully the list will help you in preparing for parole. Also enclosed is an application for a reduced fee California Identification Card. If you have this completed and give it to your parole officer at your first meeting, it can speed up the process.

If you need anything else or have more questions, please don't hesitate to contact me at the address listed below.

Respectfully,

Dan Britton
Tulare County Veterans Service Officer

32 C

Commissioner;                              6-2-06

I am writing this letter on behalf of my friend, Clifford L. Bair.

I have known Mr Bair since March of 1998. Since that time we have worked closely together, as well as being housed in the same units. Throughout the years we have had many discussions about prison life, and about our plans in free society upon release. I have always known him to be very forthright and honest about himself, his past, and his future plans. We have attended self-help classes together, where in-depth discussions about ourselves were exercised. He has always expressed great remorse for his crime, and concern for the people affected by it. He makes no excuses for his behavior, but rather takes full responsibility for his actions. When you spend many years living and working around someone, often times you develop the ability to recognize sincerity from deception. This

93C

1.

ABILITY IS PARAMOUNT TO ESTABLISHING A TRUST RELATIONSHIP WHICH I BELIEVE WE HAVE.

IN THE WORKPLACE HE ALWAYS DEMONSTRATES A WILLINGNESS TO ASSIST INMATES AND STAFF IN COMPLETING THE JOB. HIS GREAT RESPECT RESPECT TOWARDS PEOPLE MAKES IT EASIER TO ESTABLISH UNITY AND COOPERATION WITHIN A GROUP.

MR BAIR SPEAKS FREQUENTLY ABOUT THE WONDERFUL RELATIONSHIP HE HAS WITH HIS WIFE AND FAMILY. HE EXPRESSES HOW HIS WIFE AIDS HIM IN BUILDING AND MAINTAINING A CONSTRUCTIVE CONTRIBUTION AND FUTURE PLAN. HE IS EAGER TO BE GIVEN THE OPPORTUNITY TO CONTINUE AND PROSPER HIS RELATIONSHIPS IN FREE SOCIETY. I BELIEVE HE HAS SERVED HIS TIME WELL, AND WOULD BE AN ASSET TO HIS FRIENDS, FAMILY AND SOCIETY IN GENERAL.

33 R 1

RESPECTFULLY  SUBMITTED,

DA Schlappi

DARRYL  A.  SCHLAPPI

P.O.  Bx  600

DVI    E84521    L-335

TRACY,  CA   95378 - 0600

33 ℂ 2

TO BPT Commissioners

I am writing this letter on behalf of CLIFFORD L. BAIR whom I've known since 1999, at both Folsom & DVI Prison. In those years I've got to know cliff and his wife. Are wives are both Inmate family Counsel members and good friends. I've had the opportunity to talk with cliff about are past mistakes and are future plans upon Release, I consider myself a good judge of character and I find cliff to be honest + forthright we've attended self help classes together and I find him to be very Remorsefull and sincere cliff Bair has helped me in organizing the children Kmas Party & the mothers Day Celebration and are wives have also worked well together in making these events a success. In my eyes I believe that cliff Bair has done his time well he's kept his nose clean as long as I've known him in prison and I believe he'll do the same If given the chance to Parole to society. I feel he would be an asset to the Community and his family, Cliff has helped me overcome problems I've had in accepting Responsibility for my crime. His help I believe has helped me become a better MAN he's taught me the meaning of Remorse humility and Empathy and I'll be forever gratefull for his help + understanding

Respectfully Submitted
T. O'Sullivan
H-24516   L-305

34 C

To Whom It May Concern, $\beta P H$

I am writing you this letter on behalf of Clifford Bair C-95079. I have worked with this individual over the course of the last year and found him to be hard working, responsible and some one that you can rely on to get the job done. In his capacity as warehouseman in PIA, we come in contact with each other on a daily basis.

With regard to other contacts, I am the coordinator of the Inmate peer tutoring program here in DVI and I have had occasion to work indirectly with Mr. Bair as he took full advantage of the programs that we offer here. He is always looking for the next class, and the next opportunity to do something better for himself. We worked together with the Children's Christmas Party and in preparation for the Mother's Day Celebration. Suffice it to say, if there is something constructive and beneficial going on Mr. Bair can likely be found participating.

In conversation with Mr. Bair it strikes me that he is a man bent on making himself someone better than he was, and paying his debt to society by becoming an asset to it instead. I am inspired by his example.

Sincerely Yours

Paul E. Hyde B-51538
Peer Tutoring Coordinator
Deuel Vocational Institution

June 1, 2006

35 C

Parole Board
Folsom State Prison
Represa, California

October 19, 2002

Presiding Members
To whom it may concern.

My name is Jessica Saathoff. I am writing on behalf of my friend, Clifford Lee Bair, C95079. I would like you all to know that I will be here for Clifford for support or whatever he may need to have a successful Parole.

Please get in touch with me if you have any questions regarding this letter.

Sincerly.

Jessica Saathoff

Ms. Jessica Saathoff
7630 Linden Avenue
Citrus Heights, Ca. 95610

Phone #  916-722-5293

36C

Date 10-14-2002

Parole Board
Folsom State Prison
Represa, California

Presiding Members
To Whom It May Concern,

My Name Is Lloyd Bair. I Am Writing
This Letter On Behalf Of My Brother, Clifford Lee
Bair C95079. I Would Like The Presiding Members
To Know That I Am Here For Clifford, In What Ever
He May Need, To Have A Successful Parole.
If There Are Any Questions Concerning This Letter,
Please Get In Touch With Me.

Mr. Lloyd Bair
25617 County Road 20 A
Esparto, California
95627
Lloyd Bair
Phone # 530/-787-3280

37C

DATE 1/13/03

PAROLE BOARD
FOLSOM STATE PRISON
REPRESA, CALIFORNIA
95671-5071

PRESIDING MEMBERS
TO WHOM IT MAY CONCERN,

MY NAME IS EZRA BAIR. I AM WRITING THIS
LETTER ON BEHALF OF MY SON CLIFFORD BAIR C95079.
I WOULD LIKE THE PRESIDING MEMBERS TO KNOW, THAT
I WILL BE HERE FOR CLIFFORD, IN WHAT EVER HE MAY
NEED, TO HAVE A SUCCESSFUL PAROLE.
IF THERE ARE ANY QUESTIONS CONCERNING THIS
LETTER, PLEASE GET IN TOUCH WITH ME.

MR EZRA BAIR
56498 E. HWY 69
MIAMI, OKLAHOMA
74354
PHONE 918 675 5259

Dear Sirs I will Help Clifford Bair any way
that I can, I am in hopes of having him
free as soon as possible. thank you
Ezra C Bair        38C

DATE: Oct, 14, 2002

PAROLE BOARD
FOLSOM STATE PRISON
REPRESA, CALIFORNIA


PRESIDING MEMBERS
TO WHOM IT MAY CONCERN,


MY NAME IS DIANE BAIR. I AM WRITING THIS LETTER ON BEHALF OF MY BROTHER-IN-LAW CLIFFORD LEE BAIR C95079. I WOULD LIKE THE PRESIDING MEMBERS TO KNOW THAT I AM HERE FOR CLIFFORD IN WHAT EVER HE MAY NEED TO HAVE A SUCCESSFUL PAROLE.

IF THERE ARE ANY QUESTIONS CONCERNING THIS LETTER, PLEASE GET IN TOUCH WITH ME.


MRS DIANE BAIR
25617 COUNTY ROAD 20 A
ESPARTO, CALIFORNIA
95627

PHONE #
530-787-3280

Diane Bair

39C

DATE 10-20-02

PAROLE BOARD
FOLSOM STATE PRISON
REPRESA, CALIFORNIA

PRESIDING MEMBERS
TO WHOM IT MAY CONCERN,

MY NAME IS R. C. DUNN. I AM WRITING THIS LETTER ON BEHALF OF MY SON-IN-LAW, CLIFFORD LEE BAIR C95079. I WOULD LIKE THE PRESIDING MEMBERS TO KNOW THAT I AM HERE FOR CLIFFORD IN WHAT EVER HE MAY NEED TO HAVE A SUCCESSFUL PAROLE.

IF THERE ARE ANY QUESTIONS CONCERNING THIS LETTER PLEASE GET IN TOUCH WITH ME.

MR R. C. DUNN
865 ~~LANDER~~ LANDER AVE #324
TURLOCK, CALIFORNIA
95381
PHONE # 209-669-9967

R. C. Dunn

40 C

3 Nov 2002

Parole Board
Folsom State Prison
Represa, California

Presiding Members
To whom it may concern;

My name is Gerald Bair. I am a servant of our Lord Jesus Christ — in whom I have placed all my trust. He leads me and guides me through this life. I am writing this letter on behalf of my brother, Clifford Lee Bair C-95079.

I would like the presiding members to know that I am here for Clifford in whatever he may need to have a successful parole. If there are any questions in regards to this letter please contact me. I will be happy to answer any questions.

Mr. Gerald Bair
25 Olive Way
Woodland, Cal. 95695
Phone 530-661-6048

Gerald W. Bair

41 C

# EXHIBIT E

89

## 602 INFORMATION

DISCIPLINARY REPORT
CDC 115

E.

# DISCIPLINARY REPORT
# FOR
# BAIR, CLIFFORD
# C95079

## CDC 115'S

DATE:           09-17-98
LOG #::         398-09-039
VIOLATION:      3041(D) SMOKING ON WORK SITE
DISPOSITION:    GUILTY REPRIMANDED AND COUNSELED

## CDC 128 A'S

06-01-05
05-28-03
11-02-94
07-26-94
11-23-89
05-12-86

$\mathcal{l} \mathcal{E}$

Case 3:08-cv-01289-JSW    Document 16    Filed 03/05/2008    Page 4 of 11

STATE OF CALIFORNIA    DATE: 9/18/98    INITIALS: 2    DEPARTMENT OF CORRECTIONS
**RULES VIOLATION REPORT**

| CDC NUMBER | INMATE'S NAME | | RELEASE/BOARD DATE | INST. | HOUSING NO. | LOG NO. |
|---|---|---|---|---|---|---|
| C-95079 | BAIR (W) | | MRPdg-17-2000 | FOLSOM | 3/A5-01 | 398-09-03 |
| VIOLATED RULE NO(S). | | SPECIFIC ACTS | | LOCATION | DATE | TIME |
| C.C.R. #3041(d) | | SMOKING ON WORK SITE | | INDUSTRIES | 09/17/98 | 0935 |

CIRCUMSTANCES

On Thursday, September 17, 1998, at approximately 0935 Hours, while performing my duties as Industries 4, Post 5577, I observed inmate BAIR, C-95079, MET-P.296, smoking a lit cigarette in the bathroom of Unit III Metal Fab., PIA. This is a direct violation of Title 15, § 3041(d), Failure to comply with all requirements for participation in the assigned activity, and the Memo dated 9-17-97, signed by Warden G.A. Mueller, which states in part, "Folsom State Prison is incorporating the following Smoking Policy to take effect on October 1, 1997. Inmates are not allowed to smoke at their work/training sites or during work/training hours. Smoke or smoking means the inhaling, exhaling, burning, or carrying of any lit cigarette, cigar, pipe, or smoking paraphernalia used for consuming the smoke of tobacco or any other burning product." Inmate BAIR is aware of the Smoking policy and that further violations will result in progressive disciplinary action (I.E. CDC-115 & 128-B1). The cigarette was confiscted pending adjudication of this report.

**INMATE BAIR IS AWARE OF THIS REPORT.**

| REPORTING EMPLOYEE (Typed Name and Signature) | | | DATE | ASSIGNMENT | | RDO'S |
|---|---|---|---|---|---|---|
| ▶ P. ARMSTRONG-LEDUC, C/O, BN 38144 | | | 9/18/98 | POST 5577 | | F/S/S |
| REVIEWING SUPERVISOR'S SIGNATURE | | DATE | □/INMATE SEGREGATED PENDING HEARING | | | |
| ▶ K.C. SCHMITT, C/SGT. | | 9-18-98 | DATE N/A | | LOC. N/A | |
| CLASSIFIED | OFFENSE DIVISION: | DATE | CLASSIFIED BY (Typed Name and Signature) | | HEARING REFERRED TO | |
| ☒ ADMINISTRATIVE | ADMIN | 9/18/98 | ▶ B.C. ADAMS, C/LT. | | ☒ CDC □ SHO □ SC □ F |
| □ SERIOUS | | | | | | |

COPIES GIVEN INMATE BEFORE HEARING

| □ CDC 115 | BY: (STAFF'S SIGNATURE) | | DATE | TIME | TITLE OF SUPPLEMENT | | |
|---|---|---|---|---|---|---|---|
| 398-09-039 | ▶ C/O J. Ostram | | 9/18/98 | 1000 | N/a | | |
| □ INCIDENT REPORT LOG NUMBER: | BY: (STAFF'S SIGNATURE) | | DATE | TIME | BY: (STAFF'S SIGNATURE) | DATE | TIME |
| N/A | ▶ N/A | | N/A | N/A | ▶ N/A | N/A | N/A |

HEARING

**Inmate BAIR (C-95079)** was properly identified. BAIR stated that he was in good health, acknowled receipt of all reports to be used in evidence, and was ready for this hearing. All time constraints HAVE been met and all reports WERE issued more than 24 hours prior to the hearing. **PLEA:** The charges were read to BAIR, and he pled **GUILTY**. He stated he was guilty.

**FINDINGS:** BAIR was found **GUILTY** of violating C.C.R. section 3041(d); SMOKING ON WORK SITE. The preponderance of the evidence submitted at the hearing DOES substantiate the charge. The evidenc includes:
  (1)  The Reporting Employee's Written Report which states: Officer Armstrong-Leduc observed inmate BAIR smoking a lit cigarette in the bathroom of Unit III Metal Fab.
  (2)  INMATE BAIR's VOLUNTARY ADMISSION OF GUILT.

**DISPOSITION: GUILTY; REPRIMANDED AND COUNSELED REGARDING FUTURE BEHAVIORAL EXPECTATIONS.**
INMATE BAIR WAS ADVISED THAT HE WOULD RECEIVE A COMPLETED COPY OF THE CDC-115 UPON FINAL AUDIT B THE DISCIPLINARY OFFICER.
INMATE BAIR WAS ADVISED OF HIS RIGHTS TO AND THE PROCEDURES FOR APPEAL IN THIS ACTION.

| REFERRED TO □ CLASSIFICATION □ BPT/NAEA | | | | | |
|---|---|---|---|---|---|
| ACTION BY: (TYPED NAME) | | SIGNATURE | | DATE | TIME |
| M. ADAIR, C/SGT. | | ▶ | | 09/21/98 | 172 |
| REVIEWED BY: (SIGNATURE) | | DATE | CHIEF DISCIPLINARY OFFICER'S SIGNATURE | DATE | |
| ▶ | | 9-23-98 | ▶ B.I. Jimenez | 9-24-98 | |
| □ COPY OF CDC 115 GIVEN INMATE AFTER HEARING | | BY: (STAFF'S SIGNATURE) | | DATE | TIME |
| | | ▶ | | 10/5/98 | 1130 |

CDC 115 (7/88)

2 E

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = Exceptional | 1 | A. Demonstrated Skill and Knowledge | 1 | F. Teamwork and Participation |
| 2 = Above Average | 1 | B. Attitude Toward Fellow Inmates and Workers | 1 | G. Learning Ability |
| 3 = Satisfactory | 1 | C. Attitude Towards Supervisors and Staff | 1 | H. Use of Tools and Equipment |
| 4 = Below Average | 1 | D. Interest in Assigned Work | 1 | I. Quality of Work |
| 5 = Unsatisfactory | 1 | E. Effort Displayed in Assigned Work | 1 | J. Quantity of Work |

| PAY STATUS: | From $ 0.00 | To $ 0.00 | | From Job No. ---------- | To Job No. ---------- |
|---|---|---|---|---|---|

| | | | LENGTH OF SUPERVISION |
|---|---|---|---|
| Total No. Hours Assigned  10 | | Total No. Hours Worked  40 | 18 MOS. |

| SUBJECT ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| P.I.A. WAREHOUSE #3 | 7/17/06 | PICKING ORDERS & DELIVERING GOODS | QUARTERLY |

| RECOMMENDED FOR: | ☐ REASSIGNMENT | ☒ RETAIN | ☐ PAY INCREASE | ☐ PAY DECREASE | INMATES INITIALS |
|---|---|---|---|---|---|

COMMENTS (IF MORE SPACE IS REQUIRED, USE REVERSE SIDE)

CONSISTENTLY RELIABLE TO CARRY OUT DUTIES WITH MINIMAL DIRECTION OR SUPERVISION

| SUPERVISOR | WORK DETAIL | ETHNICITY |
|---|---|---|
| DAVID AUSTIN | 0600 - 1530 | W |

| INMATES NAME | NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| BAIR, C. | C95079 | DVI | 1/1/2007 |

3 E

| GRADES | GRADE | | | GRADE | |
|---|---|---|---|---|---|
| 1 = Exceptional | I | A. Demonstrated Skill and Knowledge | | I | F. Teamwork and Participation |
| 2 = Above Average | I | B. Attitude Toward Fellow Inmates and Workers | | I | G. Learning Ability |
| 3 = Satisfactory | I | C. Attitude Towards Supervisors and Staff | | I | H. Use of Tools and Equipment |
| 4 = Below Average | I | D. Interest in Assigned Work | | I | I. Quality of Work |
| 5 = Unsatisfactory | I | E. Effort Displayed in Assigned Work | | I | J. Quantity of Work |

| PAY STATUS: | From $ 0.00 | To $ 0.00 | | From Job No.----------- | To Job No. ----------- |
|---|---|---|---|---|---|

| | | | | | LENGTH OF SUPERVISION |
|---|---|---|---|---|---|
| Total No. Hours Assigned  10 | | | Total No. Hours Worked  40 | | 18 MOS. |

| SUBJECT ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| P.I.A. WAREHOUSE #3 | 7/17/06 | PICKING ORDERS & DELIVERING GOODS | QUARTERLY |

| RECOMMENDED FOR: | ☐ REASSIGNMENT | ☒ RETAIN | ☐ PAY INCREASE | ☐ PAY DECREASE | INMATES INITIALS |
|---|---|---|---|---|---|

COMMENTS (IF MORE SPACE IS REQUIRED, USE REVERSE SIDE)

CONSISTENTLY RELIABLE TO CARRY OUT DUTIES WITH MINIMAL DIRECTION OR SUPERVISION

| SUPERVISOR | | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| DAVID AUSTIN | | 0600 - 1530 | W |
| INMATES NAME | NUMBER | INSTITUTION | DATE |
| BAIR, C. | C95079 | DVI | 1/1/2007 |

4 E

| GRADES | GRADE | | GRADE |
|---|---|---|---|
| 1 = Exceptional | _1_ | A. Demonstrated Skill and Knowledge | _1_ F. Teamwork and Participation |
| 2 = Above Average | _1_ | B. Attitude Toward Fellow Inmates and Workers | _1_ G. Learning Ability |
| 3 = Satisfactory | _1_ | C. Attitude Towards Supervisors and Staff | _1_ H. Use of Tools and Equipment |
| 4 = Below Average | _1_ | D. Interest in Assigned Work | _1_ I. Quality of Work |
| 5 = Unsatisfactory | _1_ | E. Effort Displayed in Assigned Work | _1_ J. Quantity of Work |

| PAY STATUS: | From $ 0.00 | To $ 0.00 | | From Job No. ----------- | | To Job No. ----------- |
|---|---|---|---|---|---|---|

| Total No. Hours Assigned  10 | | Total No. Hours Worked  40 | | LENGTH OF SUPERVISION 18 MOS. |
|---|---|---|---|---|

| SUBJECT ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| P.I.A. WAREHOUSE #3 | 7/17/06 | PICKING ORDERS & DELIVERING GOODS | QUARTERLY |

RECOMMENDED FOR: ☐ REASSIGNMENT  ☒ RETAIN  ☐ PAY INCREASE  ☐ PAY DECREASE

INMATES INITIALS

COMMENTS (IF MORE SPACE IS REQUIRED, USE REVERSE SIDE)

CONSISTENTLY RELIABLE TO CARRY OUT DUTIES WITH MINIMAL DIRECTION OR SUPERVISION

| SUPERVISOR | WORK DETAIL | ETHNICITY |
|---|---|---|
| DAVID AUSTIN | 0600 - 1530 | W |

| INMATES NAME | NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| BAIR, C. | C95079 | DVI | 1/1/2007 |

5 E

| STATE OF CALIFORNIA<br>CDC 101 (1/92) | | **WORK SUPERVISOR'S REPORT** | | DEPARTMENT OF CORRECTIONS |
|---|---|---|---|---|

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | ___ A. DEMONSTRATED SKILL AND KNOWLEDGE | | ___ F. TEAMWORK AND PARTICIPATION | |
| 2 = ABOVE AVERAGE | ___ B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | | ___ G. LEARNING ABILITY | |
| 3 = SATISFACTORY | ___ C. ATTITUDE TOWARD SUPERVISORS AND STAFF | | ___ H. USE OF TOOLS AND EQUIPMENT | |
| 4 = BELOW AVERAGE | ___ D. INTEREST IN ASSIGNED WORK | | ___ I. QUALITY OF WORK | |
| 5 = UNSATISFACTORY | ___ E. EFFORT DISPLAYED IN ASSIGNED WORK | | ___ J. QUANTITY OF WORK | |

| PAY STATUS: FROM: $ ᴼ 60 TO: $ 78 65 | FROM: JOB NO. | TO: JOB NO. |
|---|---|---|

| TOTAL # Hours Assigned: 16 | | TOTAL # Hours Worked: 16 | |
|---|---|---|---|

| INMATE ASSIGNED TO<br>WHSE #3 | DATE ASSIGNED<br>7.20- 05 | ACTUAL WORK CONSISTS OF<br>ASSTING WORKERS WITH ORDERS | PERIOD COVERED BY REPORT<br>1 ay NAME |
|---|---|---|---|

| RECOMMENDED FOR: | ☐ REASSIGNMENT | ☐ RETAIN | ☒ PAY INCREASE | ☐ PAY DECREASE | INMATE'S INITIALS |
|---|---|---|---|---|---|

| COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)<br>Reliable worker no problems | | CODE OF SAFE PRACTICES REVIEWED<br>SUPV'S INITIALS: | INMATE'S INITIALS: |
|---|---|---|---|

| SUPERVISOR<br>Daud Austin | LENGTH OF SUPERVISION<br>15 mo | WORK DETAIL<br>acw   110<br>110   1136 | ETHNICITY<br>WHT |
|---|---|---|---|

| INMATE'S NAME<br>Bair | CDC NUMBER<br>C95075 | INSTITUTION<br>D vt. | DATE<br>10-5-06 |
|---|---|---|---|

6E

STATE OF CALIFORNIA
CDC 101 (1/92)                    **WORK SUPERVISOR'S REPORT**                    DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | GRADE |
|---|---|---|
| 1 = EXCEPTIONAL | ✓ A. DEMONSTRATED SKILL AND KNOWLEDGE | ✓ F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | ✓ B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | G. LEARNING ABILITY |
| 3 = SATISFACTORY | ✓ C. ATTITUDE TOWARD SUPERVISORS AND STAFF | ✓ H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | ✓ D. INTEREST IN ASSIGNED WORK | ✓ I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | ✓ E. EFFORT DISPLAYED IN ASSIGNED WORK | ✓ J. QUANTITY OF WORK |

| PAY STATUS: FROM: $ | TO: $ | FROM: JOB NO. | TO: JOB NO. |
|---|---|---|---|

TOTAL # Hours Assigned:  ✓ o       TOTAL # Hours Worked:  ✓o

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| WHSE.  # 3 | 7-20-05 | AIDING WORKERS WITH ORDERS | Quarterly |

| RECOMMENDED FOR: | ☐ REASSIGNMENT | ☑ RETAIN | ☑ PAY INCREASE | ☐ PAY DECREASE | INMATE'S INITIALS |
|---|---|---|---|---|---|

| COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE) | CODE OF SAFE PRACTICES REVIEWED SUPV'S INITIALS: | INMATE'S INITIALS: |
|---|---|---|
| Always ready And Able for Any Task | | |

| SUPERVISOR | | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|---|
| David Austin | | 15 m ol. | 0600  1100  1130  1530 | WHT |

| INMATE'S NAME | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| Bair | C95079 | D.V.I. | 10-5-06 |

7E

| STATE OF CALIFORNIA<br>CDC 101 (1/92) | | **WORK SUPERVISOR'S REPORT** | | DEPARTMENT OF CORRECTIONS |

| **GRADES** | **GRADE** | | **GRADE** | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | ✓ | A. DEMONSTRATED SKILL AND KNOWLEDGE | ✓ | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | ✓ | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | ✓ | G. LEARNING ABILITY |
| 3 = SATISFACTORY | ✓ | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | ✓ | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | ✓ | D. INTEREST IN ASSIGNED WORK | ✓ | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | ✓ | E. EFFORT DISPLAYED IN ASSIGNED WORK | ✓ | J. QUANTITY OF WORK |

| PAY STATUS: FROM: $ • 60 TO: $ 70 65 | FROM: JOB NO. | TO: JOB NO. |
|---|---|---|

| TOTAL # Hours Assigned: 16 | | TOTAL # Hours Worked: 40 | |
|---|---|---|---|

| INMATE ASSIGNED TO<br>WHSE #3 | DATE ASSIGNED<br>7-30-05 | ACTUAL WORK CONSISTS OF<br>ASSTING WORKERS WITH ORDERS | PERIOD COVERED BY REPORT<br>1ay MAIN |

| RECOMMENDED FOR: ☐ REASSIGNMENT ☐ RETAIN ☑ PAY INCREASE ☐ PAY DECREASE | | INMATE'S INITIALS |

| COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)<br>RELIABLE WORKER — NO problems | CODE OF SAFE PRACTICES REVIEWED<br>SUPV'S INITIALS: | INMATE'S INITIALS: |

| SUPERVISIOR<br>DAVID Austin | LENGTH OF SUPERVISION<br>15 mo | WORK DETAIL<br>06 00    110<br>110    130 | ETHNICITY<br>WHT |

| INMATE'S NAME<br>BALL | CDC NUMBER<br>C95075 | INSTITUTION<br>D VI. | DATE<br>10-5-06 |

8E

| STATE OF CALIFORNIA<br>CDC 101 (1/92) | | **WORK SUPERVISOR'S REPORT** | | DEPARTMENT OF CORRECTIONS |
|---|---|---|---|---|

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | ✓ A. DEMONSTRATED SKILL AND KNOWLEDGE | | ✓ F. TEAMWORK AND PARTICIPATION | |
| 2 = ABOVE AVERAGE | ✓ B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | | G. LEARNING ABILITY | |
| 3 = SATISFACTORY | ✓ C. ATTITUDE TOWARD SUPERVISORS AND STAFF | | ✓ H. USE OF TOOLS AND EQUIPMENT | |
| 4 = BELOW AVERAGE | ✓ D. INTEREST IN ASSIGNED WORK | | ✓ I. QUALITY OF WORK | |
| 5 = UNSATISFACTORY | ✓ E. EFFORT DISPLAYED IN ASSIGNED WORK | | ✓ J. QUANTITY OF WORK | |

| PAY STATUS:  FROM: $ | TO: $ | FROM: JOB NO. | TO: JOB NO. |
|---|---|---|---|

| TOTAL # Hours Assigned: / o | | TOTAL # Hours Worked: 4o | |
|---|---|---|---|

| INMATE ASSIGNED TO<br>WHSE. #3 | DATE ASSIGNED<br>7.20.05 | ACTUAL WORK CONSISTS OF<br>Ariole workers with orders | PERIOD COVERED BY REPORT<br>Quarterly |
|---|---|---|---|

| RECOMMENDED FOR: | ☐ REASSIGNMENT | ☑ RETAIN | ☐ PAY INCREASE | ☐ PAY DECREASE | INMATE'S INITIALS: |
|---|---|---|---|---|---|

| COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)<br>Always ready and able for any task | | CODE OF SAFE PRACTICES REVIEWED<br>SUPV'S INITIALS: | INMATE'S INITIALS: |
|---|---|---|---|

| SUPERVISOR<br>David Aitin | LENGTH OF SUPERVISION<br>15 mo. | WORK DETAIL<br>0600  1100<br>1130  1530 | ETHNICITY<br>WHT |
|---|---|---|---|

| INMATE'S NAME<br>Bair | CDC NUMBER<br>C95079 | INSTITUTION<br>D.V.I. | DATE<br>10-5-06 |
|---|---|---|---|

9E

# EXHIBIT F

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JULY 2006 CALENDAR

I.   COMMITMENT FACTORS:

A.   LIFE CRIME: Count 1, 187 PC, First Degree Murder. Weapon: Unknown. Sonoma County Case Number 12451-C. Victim: Theresa Aiken, age 86. Received CDC on 11/2/84. Sentenced to 27 years to life, which includes a 2 year consecutive term for Count 4, PC 236. MEPD: 9/17/2000.

1.   Summary of Crime: On January 20, 1984, Bair's ex-wife, Linda Bair left her home in Visalia to visit with family members in Bodega Bay. She had left Bair back at her home in Visalia without any transportation. Later that night, Bair stole a pick-up truck and followed his ex-wife to Bodega Bay. Bair checked into the Harbor View Motel around noontime on January 24th, under a false name. Bair had been seen at the motel on January 25th, however, the pick-up truck was missing. On January 26th, Bair checked out of the Harbor View Motel and the stolen pick-up truck was discovered about a mile and half from Bodega Bay, down a ravine, totally burned-up. The pick-up truck was stripped of its license plates when found. On January 26th, Bair had purchased a six pack of beer, a sandwich, a package of peanuts and some potato chips at the Dry Dock Café. The Dry Dock Café is approximately 75 yards away from Mrs. Theresa Aiken's (victim) house and forms a triangle with the Harbor View Motel. Apparently, Bair had been a resident of Bodega Bay a few years earlier and had done some yard work for the victim during that time. During the afternoon of January 26th, Bair went to Mrs. Aiken's house, overpowered her, took her eyeglasses, rendering her almost blind, tied her up and gagged her. He then placed her underneath her bedding and mattresses on the floor of her bedroom. At approximately 4:00 to 4:15 p.m., a Ms. Rose Fomasi came to deliver Mrs. Aiken's mail. After Ms. Fomasi entered the house, Bair pulled a gun and ordered her to lay down on the floor in the bedroom and not to look at his face. The prisoner then tied up Ms. Fomasi with the electrical wire from Mrs. Aiken's iron. Bair then left the residence taking Mrs. Aiken's eyeglasses, keys and her car. Later that night Bair had abandoned the victim's car after getting it stuck on the shoulder of the Lakeville Highway across from the Gilardi's Resort. Bair then stole an ocean-going sailboat from the Lakeville Marina, which is part of the Gilardi's Resort. On January 27th, at approximately 7:30 a.m. the owner of the sailboat noticed the sailboat was missing from it's berth. He subsequently found the sailboat a short distance away, stuck on a mud-bank of the Petaluma River. As the owner approached the boat, he observed Bair waving what appeared to be a shotgun or a length of pipe ordering the owner to stay away. The owner then retreated back to the Marina where he watched his boat until Sonoma County Sheriff Deputies arrived. While watching the boat, the owner observed Bair leave the boat and disappear into the surrounding area. Bair was eventually found a short distance from the boat, hiding in a floodgate. When Bair was arrested, he was found to be wearing clothing taken from the boat and had in his possession a flare gun, flares, shotgun shells and 182 white tablets, later determined to be amphetamine. Bair was taken to the Sonoma County Sheriff's Office and

COPY CERTIFIED 5-20-065-9

placed in an interview room. While waiting to be interviewed, Bair cut one of his wrists with a piece of plastic in an apparent suicide gesture. He was then taken to Community Hospital for treatment. While at the hospital, Bair gave a brief statement to Detective Plass, in which he admitted spending the night on the boat, spending two days at the Harbor View Motel and to purchasing items from the Dry Dock Café. When questioned if he had visited an older lady the previous afternoon, Bair said he could not remember. Additionally, on January 27th, Mrs. Aiken and Ms Fomasi were found by a concerned friend who came to check in on the victim after finding the victim's car missing. The friend found Mrs. Aiken dead and Ms. Fomasi in the living room area after she crawled there during the night. The coroner's autopsy of the victim, Mrs. Aiken, revealed that her death was caused by chronic pulmonary disease, chronic cardiac disease and multiple traumatic injuries. These injuries included bruising of the mouth and lips, swollen hands from being tied behind her back with multiple loops of rope, petechial hemorrhages noted on both hands, mainly dorsally. The right hand was confluently purple in coloration and massively swollen and on sectioning reveals massive hemorrhage throughout, essentially in the entire extremity distal to the ligature. The tying of the victim's hands contributed very significantly to her death in that she would not have died at that moment without that insult.

The Probation Officer's Report pages 2,3,4,5 and 6 were utilized in this report.

2.   Prisoner's Version: The prisoner states that the above stated offense is accurate and readily accepts responsibility for the crime. The prisoner offers no new information to the above version, other than he was still in love with his then wife (Linda) and had followed her to Bodega Bay as he suspected she had a boyfriend there. In addition, Bair stated he had been under the influence of alcohol and methamphetamine and he hadn't slept in 5 days. Bair expressed remorse and sorrowfulness for his actions which led to the victim's death.

3.   Aggravating / Mitigating  Circumstances:

a.   Aggravating Circumstances:

   • The victim was particularly vulnerable due to age or physical condition.
   • Bair took advantage of a position of trust in committing the crime.
   • Bair has a criminal history and his prior convictions are of increasing seriousness.
   • Bair had an opportunity to cease but continued with the crime.
   • Bair has engaged in other reliably documented criminal conduct, which was an integral part of the crime, for which Bair is currently committed to prison.
   • The nature of the crime exhibited viciousness, cruelty or callousness.

b.   Mitigating Circumstances:

   • Bair's prior performance on probation was good.

- There is a likelihood that Bair was suffering from a combination of amphetamine and alcohol addiction at the time of the crime, which may have reduced his culpability for same.

B.  MULTIPLE CRIMES:

Count 4, PC 236, False Imprisonment. Weapon: gun. Sonoma County Case Number 12451-C. Victim: Rose Fomasi, age unknown. Received: CDC on 11/2/84. Sentence: 2 years state prison term consecutive to the life crime.

1. Summary of Crime: Same as the Life Crime.

2. Prisoner's Version: Bair accepts full responsibility for the crime. He stated he was under the influence of alcohol and methamphetamine and he had not slept in 5 days. He expressed remorse and sorrowfulness for the trauma he caused to Ms. Fomasi.

Count 8, PC 487(1), Grand Theft. Weapon: unknown. Sonoma County Case Number 12451-C. Victim: Lewis Riley, age unknown. Received CDC on 11/2/84. Sentence: Concurrent 2 year state prison term.

1. Summary of Crime: Same as the Life Crime.

2. Prisoner's Version: Bair stated he is unsure why he took the boat. He was under the influence of alcohol and methamphetamine and he had not slept in 5 days. He expressed remorse for taking the boat.

Count 10, PC 496, Receiving Stolen Property. Weapon: None. Sonoma County Case Number 12451-C. Victim: Rick Pasalakis, age unknown. Received CDC on 11/2/84. Sentenced: Concurrent 2 year state prison term.

1. Summary of Crime: Same as the Life Crime.

2. Prisoner's Version: Bair stated he was under the influence of alcohol and methamphetamine. He took the truck to follow his wife to Bodega Bay as he thought she was having an affair. He expressed remorse for taking the truck.

II.  PRECONVICTION FACTORS:

A.  Juvenile Record: None known.

B.  Adult Convictions And Arrests:

- 10/18/69, Riverside County Sheriff, reckless driving, convicted and fined.
- 5/23/74, Riverside County Sheriff, possession of amphetamine and DUI. Convicted of both charges, 3 years probation, fined, 30 days county jail suspended.
- 3/19/75, Sacramento County Sheriff, possession of sawed off shotgun and loaded shotgun in vehicle. Convicted of possession of sawed off shotgun, 3 years formal probation and fined.
- 8/7/76, Tulare County Sheriff, grand theft and possession of a controlled substance. Disposition is unknown.

- 3/15/82, Sonoma County Sheriff, petty theft, vandalism and driving on a suspended license. Convicted of petty theft and vandalism. Sentenced to 12 months probation, 30 days jail, restitution.
- 1/27/84, Sonoma County Sheriff, Murder, grand theft and burglary. Convicted of Murder First Degree, false imprisonment, grand theft and receiving stolen property. Sentenced to state prison (current commitment). Also convicted of 2 counts of burglary, false imprisonment, grand theft and destroying telephone line. Sentenced to 4 years and 8 months state prison, which was stayed.

C.    Personal Factors:

Clifford Bair was born on September 14, 1944, in Kentfield, California to Ezra and Blanche Bair. He is the second to the youngest child with one older sister, one older brother, one younger brother, an older step-brother and step-sister. Bair graduated in 1962 from Esparto High School and attended one year of college at Riverside City College. He enlisted in the U.S. Navy in 1962 and achieved the rank of E-4. He claims he was honorably discharged in 1966. Bair has been married five times with his last divorce ending in 1997. He has fathered two daughters. He has been employed in various capacities, most notably in the operation of heavy equipment and in the construction field. Bair started using drugs and alcohol in 1966, preferring methamphetamine as his drug of choice. The drug usage continued up until his incarceration, costing him numerous marriages and friendships.

III.    POSTCONVICTION FACTORS:

A.    Special Programming / Accommodations: None requested or required.

B.    Custody History:  Bair has remained on Medium A custody since the last hearing. While at FSP-II, Bair continued his assignment in the PIA Metal Shop where he earned exceptional and above average grades. On 2/10/05, he received a laudatory chrono from his work supervisor. On 3/10/05, Bair was transferred to DVI-II due to population realignment at FSP-II. On 3/19/05, Bair was assigned as an Infirmary Janitor. On 5/10/05, he was assigned as an L-3 Janitor. Since 7/20/05, Bair has been assigned as a PIA Warehouse Worker and he has earned exceptional, above average and satisfactory grades.

C.    Therapy & Self-Help Activities: While at FSP-II, Bair continued his active participation in the Alcoholics Anonymous Program. He received Certificates of Recognition. After transferring to DVI-II, Bair continued to participate in the Alcoholics Anonymous Program.  On 3/28/06, he received a laudatory chrono for completing a Woman's Perspectives course. On 4/26/06, Bair received a certificate for completing the 12 Step In-Cell Study Program.

Also at DVI, Bair participated in 158 Correctional Learning Network Programs. In addition, he earned certificates for completing special programming for the following:
- Business Basics, Anger Control Training, Career Transitions, Dispute Resolution, Victims Awareness, Let's Save America, Know Thyself, Healthy Family/Kids, Stress Management, Anger Management, Tech Series: Computers, Cultural Diversity, Communications, Learn to Earn, and Job Success.

D.  Disciplinary History: On 5/28/03, Bair received a CDC 128-A chrono for contraband (chewing tobacco). On 6/1/05, he received a CDC 128-A Chrono for behavior and respect towards staff.

E.  Other: On 7/25/03, Bair appeared before the BPT for a Subsequent Parole Consideration Hearing and parole was denied for 3 years. The BPT recommended that Bair: remain disciplinary free; and participate in available self-help are therapy programs, to better help Bair understand the causative factors of the commitment offenses.

## IV.  FUTURE PLANS:

A.  Residence:  Bair plans to reside with his wife, Valerie Bair, who resides at 401 Green Point, Apt. 2, Roseville, California 95678. Her telephone number is 916-773-5296. She is employed by the State Department of Motor Vehicle as an examiner. Bair anticipates receiving a letter of support soon.  Bair stated he has no relations or support system in Sonoma County (County of commitment) or in Tulare County (County of last residence). If he is required to parole to either of these two counties, then Bair would rent an apartment and purchase a bicycle by utilizing the approximate $10,000.00 in his wife's savings account. Bair would utilize the Parole and Community Services Division which offers housing resources, computerized learning centers and substance abuse treatment programs. He would also utilize community resource guides which offer various supportive services such as housing, emergency shelters, medical services and food resources.

B.  Employment: Bair plans to work for his brother, Gerald Bair, who owns Bair's Trucking in Woodland, CA. Bair said he would be hired as a truck driver. Gerald Bair can be contacted at his home address 25 Olive Way, Woodland, CA. 95695. His telephone number 530-661-6048. Bair stated he can also work for his brother, Lloyd Bair, who is a foreman for a farming company in Woodland, CA. Bair would be hired as a maintenance mechanic. Lloyd Bair can be contacted at his home address, 25617 County Road 20A, Esperto, CA. 95627. His telephone number is 530-787-3280. Bair anticipates receiving written employment offers from his brothers soon.

If granted paroles, Bair said his wife has arranged for job interviews with 6 welding companies in the Sacramento area. If he has to parole to Sonoma or Tulare Counties, Bair world utilize the Parole and Community Services Division, Employment Development Department, Community resource guides and the AARP Senior Community Service Employment Program in Santa Rosa. Bair said he could re-join the Labor and Teamsters Unions and could possibly work again as a pipe-layer or heavy equipment operator.

C.  Assessment: Bair has realistic parole plans. He plans to reside with his wife and work for one of his brothers. Bair needs to solidify his parole plans by receiving letters of support and written employment offers.

## V.  USINS STATUS: Not Applicable.

VI.     SUMMARY:

A.      Prior to release, Bair could benefit from: remaining disciplinary free; continuing his good work record; and by participating in available self-help and therapy programs.

B.      This report is based on an interview with Bair and a review of his central file.

C.      On 5/25/06, Bair examined his central file.

D.      No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for effective communication.

D. E. LARSON
Correctional Counselor I

J.E. ZUNIGA
Correctional Counselor II

FCLA)
B. K. LANDINGHAM
Facility Captain (A)

5/26/06
J.T. ROWE
Classification & Parole Representative

BOARD OF PRISON TERMS                                                                                          STATE OF CALIFOR

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

**X** PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF:    DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:    FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALI
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 3/17/03 to 3/16/04 | | | **PLACEMENT:** FSP-II. |
| | | | **CUSTODY:** Medium A. |
| | | | **VOCATIONAL TRAINING:** None. |
| | | | **ACADEMICS:** None. |
| | | | **WORK RECORD:** Bair continued his assignment in the PIA Metal Sh< and he earned exceptional and above average grades. |
| | | | **GROUP ACTIVITIES:** Bair continued his active membership in t Alcoholics Anonymous Program and he received a Certificate Recognition. |
| | | | **PSYCHIATRIC TREATMENT:** None. |
| | | | **PRISON BEHAVIOR:** On 5/28/03, he received a CDC 128-A chrono f Contraband (chewing tobacco). |
| | | | **OTHER:** None. |

CORRECTIONAL COUNSELOR SIGNATURE

DATE
5-25-06

NAME: BAIR        CDC #: C-95079        DVI        CALENDAR: JULY 2006 HEARING
Page 1 of 5

7F

BOARD OF PRISON TERMS                                                                                STATE OF CALIFOI

CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 3/17/04 to 3/16/05 | | | **PLACEMENT:** FSP-II. On 3/10/05, Bair was transferred to DVI-II. |
| | | | **CUSTODY:** MEDIUM A |
| | | | **VOCATIONAL TRAINING:** None |
| | | | **ACADEMICS:** None |
| | | | **WORK RECORD:** Bair continued his assignment in the PIA Metal Sh at FSP and he earned above average grades. On 2/10/05, he received laudatory chrono from his work supervisor. |
| | | | **GROUP ACTIVITIES:** Bair continued his active membership in 1 Alcoholics Anonymous Program at FSP. He received a Certificate Recognition. |
| | | | **PSYCHIATRIC TREATMENT:** None |
| | | | **PRISON BEHAVIOR:** Disciplinary free during this period of time. |
| | | | **OTHER:** On 7/28/04, he received a CDC 128-B chrono verifying his hi school graduation on 6/12/62. |

ORDER:

☐ BPT date advanced by _____ months.    ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.    ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress hearing on appropriate institutional calendar.

NAME: BAIR    CDC #: C-95079    DVI    CALENDAR:    JULY 2006    HEARING:

Page 2 of 5

8̸E

JMK,L.BOARD OF PRISON TERMS                                                    STATE OF CALIFOI
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

**X** PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF:    DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:    FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINAL
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 3/17/05 to 3/16/06 | | | **PLACEMENT:** DVI-II. |
| | | | **CUSTODY:** Medium A |
| | | | **VOCATIONAL TRAINING:** None. |
| | | | **ACADEMICS:** Bair participated in 158 Correctional Learning Netwo Programs. In addition, certificates were earned for completing spec programming for the following: Business Basics, Anger Control Trainii Career Transitions, Dispute Resolution, Victims Awareness, Let's Sa America, Know Thyself, Healthy Family/Kids, Stress Manageme Anger Management, Tech Series; Computers, Cultural Diversi Communications, Learn to Earn, Job Success. |
| | | | **WORK RECORD:** On 3/19/05, Bair was assigned as an Infirma Janitor. On 5/10/05, he was assigned as an L-3 Janitor. On 7/20/05, he w assigned as a PIA Warehouse Worker and he earned exceptional, abc average and satisfactory grades. |
| | | | **GROUP ACTIVITIES:** Bair participated in the Alcoholics Anonym( Program. |
| | | | **PSYCHIATRIC TREATMENT:** None. |
| | | | **PRISON BEHAVIOR:** On 6/1/05, he received a CDC 128-A chrono behavior and respect towards staff. |
| | | | **OTHER:** On 12/19/05, he received a laudatory chrono regarding contribution of time and money to the Annual MAC Childre Christmas Party. |

CORRECTIONAL COUNSELOR SIGNATURE                                DATE

JMK,L.BOARD OF PRISON TERMS                                                    STATE OF CALIFOR
**LIFE PRISONER: POSTCONVICTION PROGRESS REPORT**

☐ DOCUMENTATION HEARING

**X** PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF:    DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:    FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALI
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 3/17/06 to 5/23/06 (present) | | | PLACEMENT: DVI-II. <br><br> CUSTODY: Medium A. <br><br> VOCATIONAL TRAINING: None. <br><br> ACADEMICS: None in file. <br><br> WORK RECORD: Bair continued his assignment as a PIA Warehou Worker. He earned exceptional and above average grades. <br><br> GROUP ACTIVITIES: Bair continued to participate in the Alcoholi Anonymous Program. On 4/26/06, he received a certificate for completi: the 12 Step In-Cell Study Program. <br><br> PSYCHIATRIC TREATMENT: None. <br><br> PRISON BEHAVIOR: Disciplinary free during this period of time. <br><br> OTHER: On 3/28/06, Bair received a CDC 128-B laudatory chrono and certificate for completing a Women's Perspectives Course. |

COPY SENT TO INMATE 3-26-06

| CORRECTIONAL COUNSELOR SIGNATURE | | | DATE |
|---|---|---|---|

**NAME: BAIR    CDC #: C-95079**        DVI        **CALENDAR: JULY    2006  HEARING:**
Page 4 of 5

10 F

JMK,L.BOARD OF PRISON TERMS                                                                STATE OF CALIFORI
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

**X** PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

### INSTRUCTIONS
TO CDC STAFF:   DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:   FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALL
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | D. LARSON,       CCI |
| | | | J. E. ZUNIGA,     CCII    /CC-II (A) |
| | | | B. K. LANDINGHAM,      F. C. (A)     FC(A) |
| | | | J. T. ROWE,     C&PR     5/26/06   DR |
| | | | COPY SENT TO INMATE 5-26-06 |
| CORRECTIONAL COUNSELOR SIGNATURE | | | DATE |

NAME: BAIR       CDC #:  C-95079            DVI               CALENDAR: JULY    2006  HEARING:
                                        Page 5 of 5

LIFE PRISONER EVALUATION
SUBSEQUENT #1 PAROLE CONSIDERATION HEARING
APRIL 2003 CALENDAR

**BAIR**                                                              **C-95079**

## I.    COMMITMENT FACTORS:

### A.    LIFE CRIME:

Prisoner received CDC on 11/2/84.    Murder 1st, PC 187, case
number SON-124510-C and {1} count False Imprisonment, PC 236, case
number SON-12451-C, sentence 25 years to Life, plus a 2-year
enhancement.    Victim: Theresa Blanche Aiken, age 86 years.    MEPD:
9/17/2000.

#### 1.  Summary of Crime:

**Offense Summary:** Prior reports for the Board of Prison Terms {BPT}
and Probation Officer's Report {POR}, dated 10/17/1984, reviewed
and circumstances remain the same as stated in previous hearings.

#### 2.  Prisoner's Version:

Previous BPT reports and POR dated 10/17/1984, reviewed and
prisoner's version remains the same as stated in previous hearings. The
prisoner was interviewed for this report and stated version remains the
same.

#### 3.  Aggravating/Mitigating Circumstances:

##### a.  Aggravating Factors

- Victim was particularly vulnerable due to her age.
- Prisoner had opportunity to cease, but continued with crime.
- Circumstances of crime created potential for serious injury to others.

**BAIR**        **C-95079**        **FOLSOM**      **APR/03**      **DWN/jmf**

12 p

I.    **COMMITMENT FACTORS:** *{Continued}*

   3. **Aggravating/Mitigating Circumstances:** *{Continued}*

      a. **Aggravating Factors**

         ■ The murder was senseless and served no purpose in completing the crime.
         ■ Although the commitment offense involved one person, another person was victimized in the commitment offense.
         ■ Prisoner has a history of criminal behavior.
         ■ Nature of crime exhibited viciousness, cruelty or callousness.

      b. **Mitigating Factors**

         ■ None.

   B.    **MULTIPLE CRIME{S}:**

      None.

      1. **Summary of Crime:**

         None.

      2. **Prisoner's Version:**

         None.

II.    **PRECONVICTION FACTORS:**

   A.    **JUVENILE RECORD:**

      None.

| | | | | |
|---|---|---|---|---|
| **BAIR** | **C-95079** | **FOLSOM** | **APR/03** | **DWN/jmf** |

**II.    PRECONVICTION FACTORS:** *{Continued}*

**B.    ADULT CONVICTIONS AND ARRESTS:**

The prisoner has sustained arrests and convictions for reckless driving, possession of amphetamines, fish and game violations, possession of sawed off shotgun, loaded shotgun in vehicle and under the influence of alcohol/drugs and vandalism.

**C.    PERSONAL FACTORS:**

Prisoner is the second youngest of four children born 9/14/1944, in Kentfield, California to Ezra and Blanche Bair. The prisoner graduated from Esparto High School in 1962 and attended one-year of college at Riverside City College. The prisoner enlisted in the U.S. Navy in 1962, achieved the rank of E-4 and was discharged in 1966. The prisoner has been married five times with his last divorce ending in 1997. The prisoner has fathered two daughters and currently has no contact with them. The prisoner has been employed in various capacities, most notably in the operation of heavy equipment and in the construction field. Prisoner started using drugs and alcohol in 1996 and drug usage is noted to have cost him numerous marriages and friendships.

**III.    POSTCONVICTION FACTORS:**

**A.    SPECIAL PROGRAMMING.ACCOMMODATIONS:**

None.

**B.    CUSTODY HISTORY:**

The prisoner was received CDC on 11/29/1984 and assessed Close B custody. Following the required observation period, prisoner's custody was reduced to Medium A and, with the exception of transfers, custody has remained at Medium A.

**BAIR        C-95079        FOLSOM        APR/03        DWN/jmf**

*14F*

C.    **THERAPY AND SELF-HELP ACTIVITIES:**

The prisoner has participated in, and completed a substance abuse, Alternatives to Violence and Anger Management Program. The Central File also reveals prisoner's voluntary enrollment in "Friends Outside Creative Conflict Resolution Program". CDC 128-B's note prisoner's continued participation, in Narcotics Anonymous/Alcoholics Anonymous dating back to 6/8/2001.

III.    **POSTCONVICTION FACTORS:**

D.    **DISCIPLINARY HISTORY:**

During his incarceration, the prisoner has received four {4} 128-A's for failure to report to Close Custody Count, coverings over cell windows, smoking and refusing to perform job assignment. The prisoner's last CDC 128-A was dated 11/2/1994. The prisoner also received an Administrative CDC 115, 9/17/1998 for smoking on work site.

E.    **OTHER:**

The prisoner appeared before the BPT 4/12/2000 for his Initial Parole Consideration Hearing. The BPT recommended/requested the prisoner become/remain disciplinary free and participate in self-help. The prisoner appears to have satisfied these recommendations/requests.

During the period of time since the last hearing, the prisoner's behavior has improved in that he has received no CDC 115's, counseling or negative documentation of any type.

During the time period considered for this report, the prisoner remains assigned to Prison Industries Authority {PIA}, in the Metal Fabrication shop. Work supervisor's reports continue to rate prisoner above average and comments notes that prisoner works hard, stays very busy and is a good PIG welder.

**BAIR**    **C-95079**    **FOLSOM**    **APR/03**    **DWN/jmf**

15F

III.    **POSTCONVICTION FACTORS:** *(Continued)*

E.    **OTHER:**

During this period, CDC 128-B's note prisoner's continued participation in Narcotic Anonymous/Alcoholics Anonymous.  These chrono's note prisoner has shown the ability to relate with the group and to improve himself.

Additionally, CDC 128-B, dated 3/18/02, notes that the prisoner has successfully completed the required training and written test for Forklift Driving Safety and is qualified to operate a forklift for PIA.  CDC 128-B, dated 6/20/02, notes S's voluntary enrollment in "Friends Outside Creative Conflict Resolution Program".  This class consists of 3 eight-hour sessions and emphasizes values and strengths while learning and practicing appropriate Anger Management and Conflict Resolution skills.    The prisoner is noted to have attended all 3 classes in which he actively participated, asked pertinent questions relative to class material and maintained a positive and cooperative attitude during each session.

The prisoner appeared before the Board of Prison Terms on 4/12/02 for his Initial Parole Consideration Hearing and received a 3-year denial.  The panel recommended/requested that the prisoner remains disciplinary free and participate in self-help.

IV.    **FUTURE PLANS:**

A.    **RESIDENCE:** The prisoner was committed from Sonoma County, however, Probation Officer's Report {POR}, dated 10/19/1984, lists the prisoner's place of residence Visalia, California that is in Tulare County.  Prisoner, upon parole, would request to parole to Yolo County and reside with his wife, Valerie Bair, 802 Colby Court, Woodland, California 95695.  Telephone number is (530) 668-1794.

B.    **EMPLOYMENT:**  The prisoner's Central File reveals letters offering support and employment from family and friends and prisoner states that prior to his next Board Hearing he expects additional/current letters of support and employment.

C.    **ASSESSMENT:**  The prisoner understands problems he may face upon release and foresees no concerns.

| BAIR | C-95079 | FOLSOM | APR/03 | DWN/jmf |
| --- | --- | --- | --- | --- |

16F

**V.    USINS STATUS:** None.

**VI.    SUMMARY:**

A.    Considering the commitment offense, prior record, prisoner's adjustment and noting aggravating/mitigating circumstances, this writer believes the prisoner would probably pose a moderate degree of threat to the public at this time if released from prison.

B.    Prior to release, the prisoner could benefit from:  1.  Maintaining a disciplinary free record. 2. Continued participation in an assignment/skill, which affords job opportunities upon release from prison.  3. Continued participation in Narcotic Anonymous/Alcoholics Anonymous and any other self-help programs that become available.

C.    This Board Report is based upon an interview with the prisoner, lasting approximately 1 hour and a complete review of the Central File lasting 4 hours.

D.    The prisoner was afforded an opportunity to examine his Central File on 2/7/03.

E.    No accommodation was required per Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for Effective Communication.

**Prepared by:**                **Reviewed by:**                **Reviewed by:**

CC I                            CC II                           C&PR

**BAIR        C-95079          FOLSOM        APR/03        DWN/jmf**

$l7_F$

BOARD OF PRISON TERMS                                                        STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING
☐ PAROLE CONSIDERATION HEARING
☐ PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF:      DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF       FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS
                   ORIGINALLY ESTABLISHED. i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT 2290 - 2292, 2410 AND
                   2439.

| YEAR | POSTCONVICTION CREDIT | | REASONS |
|------|------|------|------|
| | BPT | PBR | |
| 3/15/00 TO 11/1/00 | | | PLACEMENT: FSP-II. CUSTODY: MED A. VOCATIONAL TRAINING: None. ACADEMICS: None. WORK RECORD: Assigned to PIA in Metal Fabrication, with above average work supervisors reports. GROUP ACTIVITIES: Participation in Narcotics Anonymous program at FSP-II. PSYCHIATRIC TREATMENT: None. PRISON BEHAVIOR: No CDC 115's or behavioral chrono's of any type. OTHER: None. |
| 11/2/00 TO 11/1/01 | | | PLACEMENT: FSP-II. CUSTODY: MED A. VOCATIONAL TRAINING: None. ACADEMICS: None. WORK RECORD: Assigned to PIA in Metal Fabrication, with above average work supervisors reports. GROUP ACTIVITIES: Participation in Alcoholics Anonymous program a FSP-II. PSYCHIATRIC TREATMENT: None. PRISON BEHAVIOR: No CDC 115's or behavioral chrono's of any type. OTHER: None. |

| CORRECTIONAL COUNSELOR SIGNATURE | | | | DATE |
|------|------|------|------|------|
| D. W. NELSON | | | | FEBRUARY 2003 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|------|------|------|------|------|
| BAIR | C-95079 | FOLSOM | APRIL 2003 | |

BPT 1004 (Rev 7/86)                               PAGE 1 OF 2

18 F

BOARD OF PRISON TERMS                                                          STATE OF CALIFORNIA
**CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT**

| POSTCONVICTION CREDIT | | |  |
|---|---|---|---|
| **11/2/01**<br><br><br><br>**TO**<br><br><br><br><br>**11/1/02** | | | **PLACEMENT:** FSP-II.<br>**CUSTODY:** MED A.<br>**VOCATIONAL TRAINING:** None.<br>**ACADEMICS:** None.<br>**WORK RECORD:** Assigned to PIA in Metal Fabrication, with above average work supervisors reports.<br>**GROUP ACTIVITIES:** Participation in Narcotics Anonymous program at FSP-II.<br>**PSYCHIATRIC TREATMENT:** None.<br>**PRISON BEHAVIOR:** No CDC 115's or behavioral chrono's of any type.<br>**OTHER:** None. |
| **11/2/02**<br><br><br><br>**TO**<br><br><br><br>**PRESENT** | | | **PLACEMENT:** FSP-II.<br>**CUSTODY:** MED A.<br>**VOCATIONAL TRAINING:** None.<br>**ACADEMICS:** None.<br>**WORK RECORD:** Assigned to PIA in Metal Fabrication, with above average work supervisors reports.<br>**GROUP ACTIVITIES:** None noted as of this date {10/29/02}.<br>**PSYCHIATRIC TREATMENT:** None.<br>**PRISON BEHAVIOR:** No CDC 115's or behavioral chrono's of any type.<br>**OTHER:** None. |

**ORDER:**
☐ BPT date advanced by _____ months.      ☐ BPT date affirmed without change.
☐ PBR date advanced by _____ months.      ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**
☐ Previously imposed conditions affirmed.
☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME<br>BAIR | CDC NUMBER<br>C-95079 | INSTITUTION<br>FOLSOM | CALENDAR<br>APRIL 2003 | HEARING DATE |
|---|---|---|---|---|

**Reviewed by:** _L.E. Oakley_          **Approved by:** _____ (A)          **Date:** 3/17/03
L. E. Oakley, Correctional Counselor II          Classification & Parole Representative

*18F*

**BOARD OF PRISON TERMS**                                        STATE OF CALIFORNIA
**NOTICE OF DATE, TIME AND PLACE OF HEARING**

Your life Parole Consideration Hearing
is scheduled for JANUARY 12, 2000 at 1:30 p.m.
at Folsom State Prison.

**·CERTIFICATE OF SERVICE**

On_____

I    (  ) gave         (  ) mailed this notice to the prisoner/parolee.

Signature of State Agent                                          Date

<u>Receipt Acknowledge (for Institution Use Only)</u>
Signature                              CDC Number          Date

NAME **BAIR, Clifford**               CDC NUMBER **C-95079**

BPT 1080(8/1/81)



## LIFE PRISONER EVALUATION
## INITIAL PAROLE CONSIDERATION HEARING #5
## AUGUST 1999 CALENDAR

**BAIR**

**C-95079**

### I.    COMMITMENT FACTORS:

A.    Life Crime:

Murder 1st, PC 187; Count 1; Case No.12451-C. Sentence: 25 years to
Life. MEPD: 9-17-00. Victim: Theresa Blanche Aiken, age 86 years.
Prisoner received a two year enhancement for False Imprisonment for a
total term of 25 years to Life plus 2 years.

*Offense Summary*

On January 20, 1984, the prisoner's ex-wife, Linda Bair left her home in
Visalia to visit with family members in Bodega Bay. She had left the
prisoner back at her home in Visalia without any transportation.
Subsequently, later that night the prisoner stole a pick-up truck and
followed his ex-wife to Bodega Bay. The prisoner checked into the
Harbor View Motel around noontime on January 24th, under a false name.
The prisoner had been seen at the motel on January 25th; however, the
pick-up truck was missing. On January 26th, the prisoner checked out of
the Harbor View Motel and the stolen pick-up truck was discovered about
a mile and a half from Bodega Bay, down a ravine, totally burned-up. The
pick-up truck was stripped of its license plates when found. On January
26th, the prisoner had purchased a six pack of beer, a sandwich, a package
of peanuts and some potato chips at the Dry Dock Cafe. The Dry Dock
Cafe is approximately 75 yards away from the Mrs. Theresa Akin's
(victim) house and forms a triangle with the Harbor View Motel.
Apparently, the prisoner had been a resident of Bodega Bay a few years
earlier and had done some yard work for the victim during that time.

During the afternoon of January 26th, the prisoner went to Mrs. Akin's house, overpowered her, took her eyeglasses, rendering her almost blind, tied her up and gagged her. He then placed her underneath her bedding and mattresses on the floor of her bedroom. At approximately 4:00 to 4:15 p.m., a Ms. Rosie Fomasi came to deliver Mrs. Akin's mail. Ms. Fomasi entered the house and the prisoner ordered her to lay down on the floor in the bedroom and not to look at his face. The prisoner then tied Ms.Fomasi up with the electrical wire from Mrs. Akin's iron. The prisoner then left the residence, taking Mrs. Akin's eyeglasses, keys and her car. Later that night, the prisoner had abandoned the victim's car after getting it stuck on the shoulder of the Lakeville Highway across from the Gilardi's Resort. The prisoner then stole an ocean-going sailboat from the Lakeville Marina, which is part of the Gilardi's Resort. On January 27, at approximately 7:30 a.m. the owner of the sailboat noticed that the sailboat was missing from its berth. He subsequently found the sailboat a short distance away, stuck on a mudbank of the Petaluma River. As the owner approached the boat, he observed the prisoner waving what appeared to be a shotgun or a length of pipe ordering the owner to stay away. The owner then retreated back to the Marina where he watched his boat until Sonoma County Sheriff Deputies arrived. While watching the boat, the owner observed the prisoner leave the boat and disappear into the surrounding area. The prisoner was eventually found a short distance from the boat, hiding in a floodgate. When the prisoner was arrested, he was found to be wearing clothing taken from the boat and had in his possession a flare gun, flares, shotgun shells and 182 white tablets, later to be determined to be amphetamine. The prisoner was taken to the Sonoma County Sheriff's Office and placed in an interview room. While waiting to be interviewed, the prisoner cut one of his wrists with a piece of plastic in an apparent suicide gesture. He was then taken to Community Hospital for treatment. While at the hospital, the prisoner gave a brief statement to Detective Plass, in which he admitted spending the night on the boat, spending two days at the Harbor View Motel and to purchasing items from the Dry Dock Cafe. When questioned if he had visited an older lady the previous afternoon, the prisoner said he could not remember. Additionally, on January 27th, Mrs. Akin and Ms. Fomasi were found by a concerned friend who came to check in on the victim after finding the victim's car

missing. The friend found Mrs. Akin dead and Ms. Fomasi in the living room area after she crawled there during the night. The coroner's autopsy of the victim revealed that her death was caused by "chronic pulmonary disease, chronic cardiac disease and multiple traumatic injuries". These injuries included bruising of the mouth and lips, swollen hands from being tied with multiple loops of rope, petechial hemorrhages noted on both hands, mainly dorsally. The right hand is confluently purple in coloration and massively swollen and on sectioning reveals massive hemorrhage throughout, essentially in the entire extremity distal to the ligature.

*The Probation Officer's Report pages 2, 3, 4, 5 and 6 were utilized in this report.*

B.    Prisoner's Version:

The prisoner states that the above stated offense is accurate and readily accepts responsibility for the crime. The prisoner offers no new information to the above version, other than he was still in love with his then wife (Linda) and had followed her to Bodega Bay as he suspected she had a boyfriend there.

C.    Aggravating Circumstances:

1. The crime involved a great degree of violence, great bodily injury, cruelty, viciousness and callousness.

2. The victim due to her age and physical limitations was extremely vulnerable.

3. The prisoner had a prior and increasingly serious criminal history.

D.    Mitigating Circumstances:

1. There appears to be no mitigating factors.

**BAIR**        **C-95079**        **FOLSOM**        **AUG99**    **PDB/fn**

23F

II.    **PRECONVICTION FACTORS:**

A.    Juvenile Record:

No record.

B.    Adult Convictions:

The prisoner has sustained arrests and convictions for reckless driving, possession of amphetamines, Fish and Game violations of possession of sawed-off shotgun, loaded shotgun in vehicle, under the influence of alcohol/drugs and vandalism.

C.    Personal Factors:

The prisoner was born on September 14, 1944 in Kentfield, California to Ezra and Blanche Bair. He is the second to the youngest child with one older sister, one older brother, one younger brother, an older step brother and step-sister. The prisoner graduated in 1962 from Esparto High School and attended one year of college at Riverside City College. He enlisted in the U.S. Navy in 1962 and achieved the rank of E-4. He discharged in 1966. The prisoner has been married five times with his last divorce ending in 1997. He has fathered two daughters and currently has no contact with them. He has been employed in various capacities, most notably in the operation of heavy equipment and in the construction field. The prisoner started using drugs and alcohol in 1966, preferring methamphetamine as his drug of choice. The drug usage continued up until his incarceration, costing him numerous marriages and friendships.

III.    **POSTCONVICTION FACTORS:**

The prisoner was received into CDC on November 2, 1984 and completed processing at California Medical Facility (CMF) Reception Center. He has served his sentence at Folsom State Prison IV, California Correctional Institution, California Training Facility, R.J. Donovan Correctional Facility, California State

Prison at Solano and Folsom State Prison Level-II. His incarceration can best be described as positive, as he has only received one Administrative disciplinary during this time. He has been predominately employed as a maintenance plumber, utility worker and in Prison Industry Authority (PIA) as a welder. He has received "above-average" to "excellent" work supervisors reports in all aspects of his assignments. The prisoner has also participated in and completed a Substance Abuse, Alternatives to Violence and Anger Management Program. The prisoner is currently void of any Holds, Warrants or Detainers. The reader is referred to the Post Conviction Progress report for timeline information.

## IV.    FUTURE PLANS:

Residence:

The prisoner states that he would self-parole to Santa Rosa, California.

Employment:

The prisoner has tentative plans to work as a mechanic for his brother Lloyd, who is a shop foreman at a trucking firm in Woodland, California. He would also utilize his skills in welding, plumbing and as a heavy equipment operator in securing employment. The prisoner also has aspirations of attending a truck driving school.

## V.    SUMMARY:

A.    Considering the commitment offense, prior record and prison adjustment, this writer believes the prisoner would probably pose a moderate degree of threat to the public at this time, if released from prison.

B.    Prior to release, the prisoner could benefit from:

1. Maintaining a disciplinary free record.

2. Maintaining good work habits and study skills.

3. Defining more established parole/long range goals.

| BAIR | C-95079 | FOLSOM | AUG99 | PDB/fn |
|------|---------|--------|-------|--------|

C.    This report is based upon (six hours):

    1. One and a half hour interview.

    2. One hour incidental contact in housing unit.

    3. Three and one half hours of central file review.

P. D. Bush, C.C.I
Unit III

Reviewed by:

L. E. Oakley
Correctional Counselor II

| BAIR | C-95079 | FOLSOM | AUG99 | PDB/fn |
| --- | --- | --- | --- | --- |

26 F

BOARD OF PRISON TERMS                                          STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING
☐ PAROLE CONSIDERATION HEARING
☐ PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF:    DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF    FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS
                ORIGINALLY ESTABLISHED. i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT 2290 - 2292, 2410
                AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| **3-11-97** <br><br><br> **TO** <br><br><br> **11-01-97** | | | **PLACEMENT:** CSP-SOL; transferred to FSP-II on 10-30-97. **CUSTODY:** MED A; CLO B upon arrival at FSP-II. **VOCATIONAL TRAINING:** None noted. **ACADEMICS:** None noted. **WORK RECORD:** CSP-SOL: assigned as plumber received "above average" to "exceptional" work supervisor reports. **GROUP ACTIVITIES:** None noted. **PSYCHIATRIC TREATMENT:** None noted. **PRISON BEHAVIOR:** Good; no disciplinaries to report. **OTHER:** 5-16-97 Laudatory chrono reflecting prisoner's positive attitude. |
| **11-02-97** <br><br> **TO** <br><br> **11-01-98** | | | **PLACEMENT:** FSP-II. **CUSTODY:** CLO B; reduced to MED A on 1-09-98 by FSP-ICC. **VOCATIONAL TRAINING:** None noted. **ACADEMICS:** None noted.  **WORK RECORD:** Assigned 11-13-97 as yard worker; reassigned 2-11-98 to PIA license plate.  Received "satisfactory" to "exceptional" work supervisor reports.  **GROUP ACTIVITIES:** None noted. **PSYCHIATRIC TREATMENT:** None noted. **PRISON BEHAVIOR:** Received an Administrative CDC 115 on 9-17-98 for Smoking on Work Site. **OTHER:** None noted. |

| YEAR | BPT | PBR | REASONS |
|---|---|---|---|
| CORRECTIONAL COUNSELOR SIGNATURE <br><br> P. D. Bush, C.C.I | | | DATE 7-07-99 <br> 7- 7-99 |
| **NAME** <br> **BAIR** | **CDC NUMBER** <br> **C-95079** | **INSTITUTION** <br> **Folsom State Prison** | **CALENDAR** <br> **AUGUST 1999**     HEARING DATE |

BPT 1004 (Rev 7/86)                              PAGE 1 OF 2

27ᴇ

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA
**CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT**

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| **11-02-98**<br><br>**TO**<br><br><br>**PRESENT** | | | **PLACEMENT:** FSP-II **CUSTODY:** MED A. **VOCATIONAL TRAINING:** None noted. **ACADEMICS:** None. **WORK RECORD:** Assigned to PIA Metal Fabrication as a welder. Received "above average" work supervisor reports. **GROUP ACTIVITIES:** Active participant in the Substance Abuse Program. **PSYCHIATRIC TREATMENT:** None noted. **PRISON BEHAVIOR:** Good; no disciplinaries to report. **OTHER:** None noted. |

**ORDER:**
- ☐ BPT date advanced by _____ months.      ☐ BPT date affirmed without change.
- ☐ PBR date advanced by _____ months.      ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**
- ☐ Previously imposed conditions affirmed.
- ☐ Add or modify _____
  _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME<br>**BAIR** | CDC NUMBER<br>**C-95079** | INSTITUTION<br>**Folsom State Prison** | CALENDAR<br>AUGUST 1999 | HEARING DATE |
|---|---|---|---|---|

Reviewed by: _____            Approved by: _____ (A) Date: 7/14/99
          L. E. Oakley, C/C.II              Classification & Parole Representative

BPT 1004 (Rev 7/86)                          PAGE 2 OF 2                          PERMANENT ADDENDA

INMATE COPY

NAME AND NUMBER _Bair, C_          _C-95079_          CDC 12

In preparation for my BPT hearing, I (request)/decline review of my Central File

_(signature)_                          _C-95079_        _6-4-99_
INMATE SIGNATURE                      NUMBER          DATE

_(signature)_                                          _6-4-99_
WITNESS SIGNATURE                                    DATE

Review of my Central File took place on _____

_____          _____          _____
INMATE SIGNATURE                      NUMBER          DATE

_____                              _____
WITNESS SIGNATURE                                    DATE

COPIED AT STATE EXPENSE

Department of Corrections                                    State of California
**RECORD INFORMATION RELEASE AUTHORIZATION**

Authorization must be obtained within 30 days of disclosure. Authorization must
be witnessed and signed by an employee.

I authorize the Department of Corrections to disclose designated information from my case records to:

Attorney

PERSON, AGENCY, ORGANIZATION

Central File

INFORMATION TO BE DISCLOSED

Life Parole Consideration Hearing

PURPOSE OF DISCLOSURE

_(signature)_ Bair C        _C 95079_        _6/4/99_
INMATE SIGNATURE            NUMBER            DATE
                           _C-95079_

_(signature)_      _CCI_       _FSP_       _6-4-99_
WITNESS SIGNATURE    TITLE     LOCATION      DATE
CDC 133 (6-79)

BOARD OF PRISON TERMS                                          STATE OF CALIFORNIA

## LIFE PRISONER: NOTICE OF HEARING RIGHTS

### 1. Purpose of Hearing:

The purpose of a parole consideration hearing is to determine whether you are suitable for parole (15 CCR Secs. 2281/2402). The purpose of a progress hearing is to determine whether a parole release date should be advanced (15 CCR Sec. 2269(a)). The purpose of a rescission hearing is to determine whether a parole date should be rescinded or postponed (15 CCR Sec. 2450).

### 2. Right to Hearing:

One year prior to your minimum eligible parole date a parole suitability hearing will be held (PC Sec. 3041(a)). You are entitled to a formal parole suitability hearing each year thereafter unless the hearing panel denies parole for more than one year (PC Secs. 3041(c), 3041.5(b)(2)).

### 3. Right to Be Present, Speak; Waiver; Consequence of Absence:

You have a right to attend the hearing, ask and answer questions, and speak on your own behalf (PC Sec. 3041.5(a)(2)). You may waive this right (see In re Sydney M. (1984) 162 CA3d 39,48 (juvenile hearing)). If you do not attend the hearing (unless you waive the hearing), a decision will be made in your absence (15 CCR Sec. 2248).

### 4. Attorney:

You are entitled to be represented by an attorney at the hearing (except progress hearings) (PC Sec. 3041.7). You may waive that right (15 CCR Sec. 2256(b)). If you are unable to afford counsel (i.e., have less than $1,500 in cash and/or accounts), an attorney will be provided at state expense (15 CCR Sec. 2256(c)).

### 5. Notice:

You will be notified of the week during which the hearing will be held at least one month before the hearing (15 CCR Sec. 2246). You will be given reasonable notice of the time, date, and place of the hearing.

### 6. Witnesses:

At a rescission hearing you are entitled to present and confront witnesses. At parole consideration and progress hearings you are not entitled to witnesses (see PC Secs. 3041.5(a)(5), 2932(c)).

### 7. Others Who May Attend the Hearing:

At parole consideration hearings the prosecutor (or representative) at the trial on the charges for which you are incarcerated will be invited to the hearing to represent the interests of the people (PC Sec. 3041.7). At parole consideration hearings notice of the hearing will also be given to the judge, prosecutor and your attorney at your trial (PC Sec. 3042(a)). The victim or next of kin or their attorney may also attend and address the hearing panel (PC Sec. 3043).

### 8. Review of File: Opportunity to Present Evidence:

You have the right to review nonconfidential documents in your Department of Corrections central file and you may appeal insufficient disclosure. You may enter a written response to any material in the file and may present relevant documents to the hearing panel (15 CCR Secs. 2247, 2249). At a rescission hearing you may call witnesses and may request that witnesses (including adverse witnesses) or documents be subpoenaed (15 CCR Sec. 2465(c)).

| NAME | CDC NUMBER | INST/REGION |
|---|---|---|
| Bair, C. | C-95079 | FSP |

BPT 1002 (Rev. 9/90)                                          Page 1 of 2 pages

30F

## LIFE PRISONER: NOTICE OF HEARING RIGHTS

Assistance in Preparing for the Hearing; Assistance in Communication:

You may receive reasonable assistance in preparing for the hearing. If you are unable to effectively communicate due to language difficulties or a physical or mental defect, appropriate assistance (e.g., an interpreter) will be arranged for you (15 CCR Sec. 2251).

10. **Postponements:**

A postponement is a delay of a hearing date requested and granted before the hearing actually starts. You may request a postponement by doing so in writing to department staff before the hearing or orally immediately prior to the hearing. Requests for postponements may be granted where good cause is found (see 15 CCR Sec. 2253). Where the hearing has already started, continuances may be granted where: (1) insufficient information is present to determine any necessary fact (15 CCR Sec. 2238), or (2) the panel determines that a decision regarding parole cannot be made because of pending new criminal or disciplinary charges (15 CCR Sec. 2272).

11. **Impartial Panel:**

You are entitled to a hearing by an impartial panel and may request the disqualification of one or more panel members where grounds for disqualification exist (15 CCR Sec. 2250).

12. **Record; Decision:**

You are entitled to a copy of the record of the hearing upon request (15 CCR Sec. 2254). You are entitled to a copy of the decision which includes the information considered and the reasons for the decision (15 CCR Sec. 2255).

Abbreviations:

PC = California Penal Code
CCR= California Code of Regulations, formerly California Administrative Code
CA = California Appellate Reports

I have read and understand the list of rights and procedures (items 1 through 12, above) and I have had an opportunity to ask questions about any rights or procedures that I did not understand.

| Signature | CDC Number | Date |
|---|---|---|
| | C-95079 | 6/4/99 |

I explained the foregoing rights to the prisoner, provided him/her with an opportunity to ask questions, and answered all questions he or she asked.

| Signature | Date |
|---|---|
| | 6-4-99 |

| Name | Title |
|---|---|
| P. BUSH | C C I |

| NAME | CDC NUMBER | INST/REGION |
|---|---|---|
| Bair, C | C-95079 | FSP |

BPT 1002 (Rev. 9/90)                                   Page 2 of 2 pages

31f

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | DATE |
|------|------------|-------------|----------|------|

Signature and Title of Witness (CDC) _____   Date

Signature of Attorney (if applicable) _____   Date

Signature of Prisoner _____   Date

PRISONER'S REASON(S) FOR REQUEST:
(for Example: Psychiatric Evaluation Inadequate, Programming Not Supportive, Cat H Incomplete, etc.)

[ ] One-year Denial       [ ] Two-year Denial       [ ] Three-year Denial

[ ] I waive my right to a parole consideration hearing and I waive the right to have an attorney represent me at a hearing in my absence. I find that I am unsuitable for parole based on my reasons given on this form and therefore request that you find me unsuitable.

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

**WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY**

The reasons for my request for a postponement are stated below.

[ ] I hereby request that the hearing indicated above be Postponed to _____ .

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

**POSTPONEMENT**

[ ] I cannot afford counsel and wish counsel appointed to represent me.

[ ] I will employ counsel to represent me at the hearing.

[ ] I do not personally wish to attend my hearing but I do wish to be represented by counsel at the hearing.

[ ] I do not wish to attend my Board hearing and do not wish to be represented at the hearing. The hearing will be held in my absence.

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

**WAIVER OF RIGHT TO ATTEND HEARING**

| HEARING TYPE (select one) | [ ] Parole Consideration | [ ] Progress | [ ] Rescission | Hearing Date |
|---|---|---|---|---|
| ACTION TYPE (select one) | [ ] Waiver of Appearance | [ ] Request for Postponement | [ ] Waiver of Parole Consideration Hearing-Stipulation of Unsuitability | |

**BOARD OF PRISON TERMS**
**LIFE PRISONER HEARING – EXTRAORDINARY ACTION AND DECISION**
STATE OF CALIFORNIA                                     BPT 1001A (Rev. 10/89)

32 f

LIFE PRISONER: REQUEST FOR ATTORNEY / WAIVER OF ATTORNEY OR WITHDRAWAL OF REQUEST

| Date of Hearing | Time of Hearing | Type of Hearing |
|---|---|---|

You will be notified 30 days prior to your hearing.

Please complete and return as instructed by staff as soon as possible but no later than 5 days after receipt.

## REQUEST FOR ATTORNEY

☒ I request the assistance of an attorney at my hearing.

1. ☐ I have or can retain my own attorney. The attorney is:

| Attorney's Name | Telephone |
|---|---|

Attorney's Address

| Signature of Prisoner | CDC Number | Date |
|---|---|---|

2. ☒ I wish to have the state provide an attorney to assist me. I declare under penalty of perjury that I am indigent (I have less than $1,500 in cash and/or accounts, Title 15 CCR §2256(c)) and cannot afford an attorney.

| Signature of Prisoner | CDC Number | Date |
|---|---|---|
| R. Clifford Bain | C-95079 | 6/9/99 |

## WAIVER OF ATTORNEY

☐ I waive my right to have an attorney.

On _____ (Date). I was informed that I have been scheduled to appear before the BOARD OF PRISON TERMS for a hearing. I was also informed of my right to be represented by an attorney at my Board hearing. I know that if I am indigent and cannot afford to retain an attorney the state will appoint an attorney to represent me at state expense. Knowing this, I have decided that I DO NOT wish the assistance of an attorney at my Board hearing.

| Signature of Prisoner | CDC Number | Date |
|---|---|---|

## WITHDRAWAL OF REQUEST FOR AN ATTORNEY

☐ I withdraw my request for an attorney.

I have reconsidered my request for an attorney at my Board hearing and have decided that I DO NOT wish to have the assistance of an attorney at my Board hearing. This decision to withdraw my request for an attorney is not being made as a result of any promises or duress. I know that if I withdraw my request for an attorney, I will not be able to later request an attorney again for this hearing.

| Signature of Prisoner | CDC Number | Date |
|---|---|---|

| NAME | CDC NUMBER | INSTITUTION |
|---|---|---|
| Bain, C | C-95079 | FSP |

BPT 1003 (Rev 9/90)

33f

BOARD OF PRISON TERMS    STATE OF CALIFORNIA

## REASONABLE ACCOMMODATION NOTICE AND REQUEST

In accordance with the provisions of the Americans with Disabilities Act (ADA), no qualified individual with a disability shall, on the basis of disability, be excluded from participation in, or be denied benefits of, the services, activities, or programs of a public entity, or be subjected to discrimination by any such entity.

■ I do not have a disability as defined under the ADA. (Sign & date form.)

☐ I do have a disability as defined under the ADA and request reasonable accommodation. (Complete # 1 through # 4 below, sign & date form.)

☐ I do have a disability as defined under the ADA, however, I do not need reasonable accommodation in order to effectively communicate at the BPT hearing. (Sign & date form.)

1. DESCRIBE YOUR DISABILITY: _____

_____

_____

2. WHAT VERIFICATION DO YOU HAVE OF YOUR DISABILITY? _____

_____

_____

3. DESCRIBE HOW YOUR DISABILITY WILL PREVENT YOU FROM EFFECTIVELY PARTICIPATING AT YOUR BOARD OF PRISON TERMS HEARING: _____

_____

_____

4. WHAT SPECIFIC ACCOMMODATION DO YOU REQUEST? _____

_____

PRISONER/PAROLEE SIGNATURE _____    DATE SIGNED  6/7/99

I have informed the prisoner/parolee of the above and ☑ note no overt indication he/she is not able to understand.
                                      ☐ do note an indication he/she is not able to understand.

CDC STAFF SIGNATURE _____    TITLE  CC I    DATE  6-4-99

NAME  Bain    CDC NUMBER  C-95079    TYPE OF HEARING  INIT    DATE OF HEARING _____    LOCATION  FSP

BPT 1073 (2/98)

34 F

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING
☐ PAROLE CONSIDERATION HEARING
☐ PROGRESS HEARING

**INSTRUCTIONS**
    TO CDC STAFF:      DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
    TO BPT STAFF       FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS
                       ORIGINALLY ESTABLISHED. i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT 2290 - 2292, 2410
                       AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| | | | "Addendum to report of 8/2/99.  All case factors and future plans remain the same." |
| **7/8/99** | | | **PLACEMENT:** FSP-II. **CUSTODY:** MED A. **VOCATIONAL TRAINING:** None noted. **ACADEMICS:** None noted. **WORK RECORD:** Assigned to PIA Metal Fabrication as a welder. Received "Above Average" to "Exceptional" work supervisor reports. **GROUP ACTIVITIES:** Active participation in the Anger Management Class. **PSYCHIATRIC TREATMENT:** None noted. **PRISON BEHAVIOR:** Good; no disciplinaries to report. **OTHER:** None noted. |
| **TO** | | | |
| **PRESENT** | | | |

| | BPT | PBR | REASONS | |
|---|---|---|---|---|
| CORRECTIONAL COUNSELOR SIGNATURE P. D. Bush, CC I | | | | DATE 3/15/00 |
| NAME BAIR | CDC NUMBER C-95079 | INSTITUTION Folsom State Prison | CALENDAR | HEARING DATE |

Reviewed by: _____        Approved by: _____  (A)    Date: 3/23/00
        L. E. Oakley, Correctional Counselor II          Classification & Parole Representative

BPT 1004 (Rev 7/86)                          PAGE 1 OF 1

35 F

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING
☐ PAROLE CONSIDERATION HEARING
☐ PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF:     DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF      FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS
                  ORIGINALLY ESTABLISHED. i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT 2290 - 2292, 2410
                  AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| 3-11-97<br><br><br>TO<br><br><br>11-01-97 | | | **PLACEMENT:** CSP-SOL; transferred to FSP-II on 10-30-97. **CUSTODY:** MED A; CLO B upon arrival at FSP-II. **VOCATIONAL TRAINING:** None noted. **ACADEMICS:** None noted. **WORK RECORD:** CSP-SOL: assigned as plumber received "above average" to "exceptional" work supervisor reports. **GROUP ACTIVITIES:** None noted. **PSYCHIATRIC TREATMENT:** None noted. **PRISON BEHAVIOR:** Good; no disciplinaries to report. **OTHER:** 5-16-97 Laudatory chrono reflecting prisoner's positive attitude. |
| 11-02-97<br><br><br>TO<br><br><br>11-01-98 | | | **PLACEMENT:** FSP-II. **CUSTODY:** CLO B; reduced to MED A on 1-09-98 by FSP-ICC. **VOCATIONAL TRAINING:** None noted. **ACADEMICS:** None noted. **WORK RECORD:** Assigned 11-13-97 as yard worker; reassigned 2-11-98 to PIA license plate. Received "satisfactory" to "exceptional" work supervisor reports. **GROUP ACTIVITIES:** None noted. **PSYCHIATRIC TREATMENT:** None noted. **PRISON BEHAVIOR:** Received an Administrative CDC 115 on 9-17-98 for Smoking on Work Site. **OTHER:** None noted. |

| YEAR | BPT | PBR | REASONS | |
|---|---|---|---|---|
| CORRECTIONAL COUNSELOR SIGNATURE | | | | DATE 7-07-99 |
| P. D. Bush, C.C.I | | | | 7- 7-99 |
| NAME<br>**BAIR** | CDC NUMBER<br>**C-95079** | INSTITUTION<br>**Folsom State Prison** | CALENDAR<br>**AUGUST 1999** | HEARING DATE |

BPT 1004 (Rev 7/86)                              PAGE 1 OF 2                              36 F

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

## CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| 11-02-98<br><br>TO<br><br>PRESENT | | | **PLACEMENT:** FSP-II **CUSTODY:** MED A. **VOCATIONAL TRAINING:** None noted.   **ACADEMICS:** None. **WORK RECORD:** Assigned to PIA Metal Fabrication as a welder. Received "above average" work supervisor reports. **GROUP ACTIVITIES:** Active participant in the Substance Abuse Program. **PSYCHIATRIC TREATMENT:** None noted. **PRISON BEHAVIOR:** Good; no disciplinaries to report. **OTHER:** None noted. |

**ORDER:**

☐ BPT date advanced by _____ months.    ☐ BPT date affirmed without change.
☐ PBR date advanced by _____ months.    ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.
☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME<br>**BAIR** | CDC NUMBER<br>C-95079 | INSTITUTION<br>Folsom State Prison | CALENDAR<br>AUGUST 1999 | HEARING DATE |
|---|---|---|---|---|

Reviewed by: _____    Approved by: _____    Date: 7/14/99
          L. E. Oakley, C.C.II          Classification & Parole Representative

BPT 1004 (Rev 7/86)                              PAGE 2 OF 2                    PERMANENT ADDENDA

37 F

BOARD OF PRISON TERMS                                                                                        STATE OF CALIFORNI

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☒ DOCUMENTATION HEARING

☐ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

## INSTRUCTIONS

TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.

TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALL
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 243S

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 05/05/94 to 11/01/94 | | | Remained at California Correctional Institution, Level II (CCI-II) at Medium A (Med. A) custody in general population (GP), assigned to Manpower #1 Yard Crew, receiving satisfactory to above average grades. Refer to Supervisor Reports (CDC 101's) dated 07/06/94 and 08/29/94 for details and comments. Received one Custodial Counseling (CDC 128A) dated 07/26/94 for smoking in work assignment. No laudatory or serious disciplinary reports during this period. |
| 11/02/94 to 11/01/95 | | | Remained at CCI-II, at Med. A custody, in GP assigned to Manpower #1 Yard Crew receiving satisfactory to above average grades. Refer to CDC 101's dated 11/29/94 and 02/28/95 for comments. Received one CDC 128A dated 11/02/94 for performance. No laudatory or serious disciplinary reports during this period. |
| 11/02/95 to present | | | Remained at CCI-II, at Med. A custody in GP assigned to Relief Crew Supply. No Work Supervisor Reports available. No laudatory or disciplinary reports during this period. Olsen Review on 02/05/97. This report covers the period up to 02/05/97. |

| CORRECTIONAL COUNSELOR SIGNATURE | | | | DATE 3-10-97 | |
|---|---|---|---|---|---|
| NAME | CDC NUMBER | INSTITUTION | CALENDAR | | HEARING |
| Bair, C. | C95079 | CCI-II | 05/97 | | 05/02/97 |

BPT 1004 (REV. 7/86)                          PAGE 1 of  1

COPY TO INMATE
VIA CC-1 3|24|97
38F

BOARD OF PRISON TERMS                                                                    STATE OF CALIFOR

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☒ DOCUMENTATION HEARING

☐ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

## INSTRUCTIONS

TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINA
                        ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 24:

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | Bair was received in CDC on 11-02-84 at NRC-CMF.  He wa: received from Sonoma Co. on Case #SON-12451-C for which he is serving a term of 25 - Life for Murder 1st, PC 18 on ct. 1 and a 2 year enhancement for False Imprisonmen PC 236, ct. 4 and non-controlling offenses on Case # SON-12451-C for Grand Theft, PC 487(1), ct. 8 and RSP, PC 496, ct. 10. |
| | | | Upon completion of initial processing at NRC-CMF, he wa CSR endorsed on 11-15-84 for transfer to Folsom for program placement. |
| 11-15-90 To 11-14-91 | | | Remained at RJD-III, Med. A custody, A/A-1 assigned as plumber.  On 4-18-91, he had his annual review and he w submitted to the CSR for override retention at RJD-III. Committee members, at his annual review, complimented Inmate Bair for remaining disciplinary-free and also nc his other positive programming during the year.  On 5-07-91, he had his post-board review.  At his Doc hear of 4-22-91, it was recommended that he participate in t PIA Voc. Laundry for 6 months as a trade which he comple at a later date.  It was noted that he had a GPL of 9. and suggested that he take academic courses in the futi This request has not been accomplished as of this date It was also noted that he attended AA and that he comp: a class for Alternatives To Violence.  He has not part: pated in neither AA or any other type of self-help gro through this date.  It was also noted that he has rema disciplinary-free and requested that he continue to do Bair has accomplished this goal to date.  Inmate Bair also complimented on his excellent work record which h has continued to date.  ON 5-14-91, he was CSR endorse to be retained at RJD-III.  On 10-16-91, he appeared before UCC for his annual review.  Committee member, a that time, acted to retain him in his present PIA laun assignment and requested the CSR to continue the overr |

CORRECTIONAL COUNSELOR SIGNATURE                                                   DATE

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARINC |
|---|---|---|---|---|
| Bair, Clifford | C-95079 | CCI-II | 4/94 | |

39F



BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

**CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT**

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 11-15-90<br>To<br>11-14-91 CONT'D | | | for RJD-III.  In addition, Committee members complimented Inmate Bair for his positive programming in his work assignment as well as remaining disciplinary-free.  On 10-29-91, the CSR elected to retain him at RJD-III. His work reports for this time period, while assigned as a plumber, went from average to above average.  On 5-22-91, he was assigned to PIA laundry as a mechanic's helper.  His work chronos during this time period denoted that his work was between above average and satisfactory.  In addition, these reports had comments that he worked well with staff and inmates and that he had made few mistakes in his work.  He did not receive any laudatory chronos during this time period nor did he receive any disciplinary chronos. |
| 11-15-91<br>To<br>11-14-92 | | | "S" remained at RJD-III, Med. A custody, A/A-1, assigned to PIA as a mechanic's helper.  On 11-03-92, he appeared before UCC for his annual review at which time Committee noted his positive programming in his work assignments and that he remained disciplinary-free during the past year.  Committee recommended that he be retained at RJD-III in his present program.  His work reports noted the he was an above average worker and had excellent comments, such as good attitude, conscientious steady worker and a team worker.  He did not receive any disciplinary or laudatory chronos during this time period. |
| 11-15-92<br>To<br>11-14-93 | | | "S" remained at RJD-III, Med. A custody, A/A-1, assigned to PIA as a mechanic's helper.  On 1-20-93, he appeared before UCC for the purpose of requesting the Committee for transfer consideration to be nearer to his family at CTF or SQ.  On 1-21-93, the CSR endorsed him for CTF-II.  Bair was received at CTF-C on 2-04-93 and during his initial classification on 2-08-93, Committee |

**ORDER:**

☐ BPT date advanced by _____ months.    ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.    ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING D, |
|---|---|---|---|---|
| Bair, Clifford | C-95079 | CCI-II | 4/94 | |

BOARD OF PRISON TERMS  STATE OF CALIFORNIA

**CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT**

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 11-15-92<br>To<br>11-14-93 CONT'D | | | acted to retain him in Med. A custody and placed him on the Support Services waiting list. On 4-08-93, he appeared before UCC at CTF-C for transfer consideration to either RJD or CRC as a hardship transfer based on his mother's health problems. Based on this request, he was submitted to the CSR for transfer consideration. During the interim, he was transferred to CTF-N and appeared before their UCC for initial processing on 4-22-93. Committee acted to retain him as Med. A custody, A/A-1 and placed him on Support Services waiting list for maintenance plumbing assignment. Committee also took into consideration his pending CSR endorsement for transfer. On 5-26-93, he was endorsed for CCI-II. He was received at CCI-II on 6-10-93 and appeared before UCC on 7-01-93. UCC elected to retain him as Med. A custody, A/A-1 and placed him on the Support Services waiting list. Inmate Bair's work reports for this time period are as follows; on 12-26-92, his PIA work assignments noted he was an above average worker and had laudatory comments, on 2-26-93 he was assigned to maintenance boiler room and received chronos denoting him as an average worker. On 4-29-93, he was assigned as a maintenance plumber at CTF-N and there are no work reports from that facility as "S" transferred to CCI-II. Work reports dated 7-22-93 and 9-01-93 from his PIA assignment at CCI-II denoted that he was an average worker. During this time period, he did not receive any disciplinary or laudatory chronos. |
| 11-15-93<br>To<br>Present | | | Remained at CCI-II, Med. A custody, A/A-1 assigned to PIA. His work chrono of 12-01-93 denoted that he was an average worker. He did not receive any disciplinary or laudatory chronos during this time period. Inmate Bair had the opportunity to review his C-file for an Olson Review. |

**ORDER:**

☐ BPT date advanced by _____ months.    ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.    ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

_____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DAT |
|---|---|---|---|---|
| Bair, Clifford | C-95079 | CCI-II | 4/94 | |

41E

BOARD OF PRISON TERMS                                                          STATE OF CALIFOR

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

[X]  DOCUMENTATION HEARING

[ ]  PAROLE CONSIDERATION HEARING

[ ]  PROGRESS HEARING

## INSTRUCTIONS

TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINA
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 241

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 11-2-88<br><br><br><br>to<br><br><br><br><br><br><br><br>11-2-89 | | | Subject remained at CCI-IV-A Close A Custody, General population.  Classification Score: 75, Work Group A1/Privilege Group A. Assigned as a Maintenance Plumber, received above average grades on Work Supervisor's Reports.  He received a Laudatory Chrono (CDC-128B) dated 1-7-88, stating that his work performance has been exceptional and his relationship with staff and other Inmates is outstanding.  On 10-20-89, UCC acted to reduce his custody from Close A to Close B. Classification Score: 37.  Subject has no adverse chronos or serious disciplinaries noted during this period. |
| 11-2-89<br><br><br><br>to<br><br><br><br><br><br><br><br><br>11-2-90 | | | Subject remained at CCI-IVA General Population, Med A Custody, Classification Score: 29, Work Group A1/Privilege Group A. He continued in his assignment as a Plumber. Work Supervisors Reports reflect above average and exceptional ratings.  He was subsequently referred to the CSR for Level III transfer.  On 1-30-89, subject received endorsement for CTF.  He was received at CTF-Central on 3-14-90 from CCI-IVA on a non-adverse transfer (Manpower/Plumber).  He continued assignment as a Plumber, receiving exceptional ratings on his Work Supervisor's Report.  Subject received no adverse chronos, nor were there any serious disciplinaries noted during this period. |

| CORRECTIONAL COUNSELOR SIGNATURE | DATE |
|---|---|
| | |

NAME  BAIR, Clifford     CDC NUMBER  C-95079   INSTITUTION  RJD     CALENDAR  4/91     HEARING

BPT 1004 (REV. 7/86)                          PAGE 1 of  2

Copy sent to inmate  4-15-91

71-F

BOARD OF PRISON TERMS                                                                STATE OF CALIFORN

## CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 11-2-90<br><br><br>to<br><br><br><br>Present | | | Subject remained at CTF-C, Med A custody, General Population. Classification Score: 29, Work Group A1/Privilege Group A. On 4-20-90, he was removed from his Plumbing assignment non-adverse and placed on the Support Services Waiting List. He was subsequently referred to the SR for transfer to RJD-III for hardship reasons. On 8-30-90, subject received endorsement for transfer to RJD-IIIdue to Family Hardship.<br><br>He was received at RJD-III on 9-18-90, from CTF-C; Custody Med A, Classification Score: 29, Work Group A1/Privilege Group A, General Population,non-adverse transfer. He is currently assigned as a Plumber. There are no Work Supervisor Reports for this period. Subject has no adverse chronos nor were there any serious disciplinaries noted during this period.<br><br>This report was reviewed with Inmate Bair prior to typing, and he was in agreement with its contents.<br><br><br>Prepared by:<br><br>D. Thomas<br>CC-I          M. Teichner<br>          CC-II     Reviewed by: |

## ORDER:

☐ BPT date advanced by _____ months.          ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.          ☐ PBR date affirmed without change.

## SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME BAIR, Clifford | CDC NUMBER C-95079 | INSTITUTION RJD | CALENDAR 4/91 | HEARING D |
|---|---|---|---|---|

4/3F
PERMANENT ADDE

BPT 1004 REV 7 86                                  PAGE  2  of  2

BOARD OF PRISON TERMS                                                                      STATE OF CALIFOR

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

[X] DOCUMENTATION HEARING

[ ] PAROLE CONSIDERATION HEARING

[ ] PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINA
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 241

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 11-2-88<br><br>to<br><br><br><br><br><br>11-2-89 | | | Subject remained at CCI-IV-A Close A Custody, General population. Classification Score: 75, Work Group A1/Privilege Group A. Assigned as a Maintenance Plumber, received above average grades on Work Supervisor's Reports. He received a Laudatory Chrono (CDC-128B) dated 1-7-88, stating that his work performance has been exceptional and his relationship with staff and other Inmates is outstanding. On 10-20-89, UCC acted to reduce his custody from Close A to Close B. Classification Score: 37. Subject has no adverse chronos or serious disciplinaries noted during this period. |
| 11-2-89<br><br><br><br><br>to<br><br><br><br><br><br><br>11-2-90 | | | Subject remained at CCI-IVA General Population, Med A Custody, Classification Score: 29, Work Group A1/Privilege Group A. He continued in his assignment as a Plumber. Work Supervisors Reports reflect above average and exceptional ratings. He was subsequently referred to the CSR for Level III transfer. On 1-30-89, subject received endorsement for CTF. He was received at CTF-Central on 3-14-90 from CCI-IVA on a non-adverse transfer (Manpower/Plumber). He continued assignment as a Plumber, receiving exceptional ratings on his Work Supervisor's Report. Subject received no adverse chronos, nor were there any serious disciplinaries noted during this period. |

CORRECTIONAL COUNSELOR SIGNATURE                                                    DATE

NAME **BAIR, Clifford**    CDC NUMBER **C-95079**    INSTITUTION **RJD**    CALENDAR **4/91**    HEARING

Copy sent to inmate 4/3/9

BOARD OF PRISON TERMS

STATE OF CALIFORN

## CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 11-2-90 to Present | | | Subject remained at CTF-C, Med A custody, General Population.  Classification Score: 29, Work Group A1/Privilege Group A.  On 4-20-90, he was removed from his Plumbing assignment non-adverse and placed on the Support Services Waiting List.  He was subsequently referred to the SR for transfer to RJD-III for hardship reasons.  On 8-30-90, subject received endorsement for transfer to RJD-IIIdue to Family Hardship.

He was received at RJD-III on 9-18-90, from CTF-C; Custody Med A, Classification Score: 29, Work Group A1/Privilege Group A, General Population, non-adverse transfer.  He is currently assigned as a Plumber.  There are no Work Supervisor Reports for this period.  Subject has no adverse chronos nor were there any serious disciplinaries noted during this period.

This report was reviewed with Inmate Bair prior to typing, and he was in agreement with its contents.

Prepared by:                 Reviewed by:

D.M. Thoma                   M. Teichner

D. Thomas                    M. Teichner
CC-I                         CC-II |

**ORDER:**

☐ BPT date advanced by _____ months.      ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.      ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING D |
|---|---|---|---|---|
| BAIR, Clifford | C-95079 | RJD | 4/91 | |

BOARD OF PRISON TERMS                                                                                      STATE OF CALIFORNIA

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☒ DOCUMENTATION HEARING

☐ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

## INSTRUCTIONS

TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.

TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY

ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 11-02-84<br><br>to<br><br>11-02-85 | | | Bair received at NRC-CMF for Initial Classification on 11-2-84, per AB 83/45. On 11-29-84, he was transferred to Folsom under PC 187 Murder First Degree, PC 236 False Imprisonment, PC 487(1) Grand Theft-8 counts, PC 496 Receiving Stolen Property-10 counts. He was sentenced to a term of 27 to Life. Custody is Close A general pop ulation. He was assigned as a maintenance plumber and received acceptable/above average work reports (CDC 101 work chrono dated 10-2-85). No disciplinary document- ation(s). No laudatory chrono(s). |
| 11-02-85<br><br>to<br><br>11-02-86 | | | Bair remained at Folsom under Close A custody in general population. He continued in his assignment as a mainten- ance plumber. 12-30-85, Transferred to California Cor- rectional Institution (CCI) at Tehachapi. Custody is Close A general population. He was assigned to main- tenance due to his skills as a plumber and construction worker. He received satisfactory/above average work report (CDC 101 dated 10-10-86). No disciplinary doc- umentation(s). No laudatory chrono(s). |
| 11-02-86<br><br>to<br><br>11-02-87 | | | Bair remained at California Correctional Institution (CCI) at Tehachapi under Close A custody general popula- tion. He continued in his assignment as a plumber re- ceiving above average/exceptional work reports (CDC 101 work chronos dated 4-9-87 and 7-9-87). No disciplinary documentation(s). He received two (2) laudatory chronos (CDC 128-B's dated 1-23-87 and 7-28-87). Supervisors of Maintenance Department commended Bair on his performance and relationship with Staff and other inmates. |
| 11-02-87<br>to<br>present | | | Bair remained at California Correctional Institution (CCI) at Tehachapi under Close A custody general popula- tion. He has continued in his assignment as a plumber. There are no work report(s) for this period. No |

| CORRECTIONAL COUNSELOR SIGNATURE | | | | | DATE |
|---|---|---|---|---|---|
| G. Hutch, CC-I  *Hutch, CC-I*  B. Holmes, CC-II | | | | | 2-19-88 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| BAIR, Clifford | C-95079 | CCI IV-A | 4/88 | |

BPT 1004 REV. 7 86                                    PAGE 1 of ___2___

COPY TO INMATE
VIA CC-1 *Hutch*
46F

BOARD OF PRISON TERMS                                                     STATE OF CALIFORNI

**CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT**

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 11-02-87<br><br>to<br><br>present | | | disciplinary documentation(s). He received one (1) laudatory chrono (CDC 128/B dated 1-7-88), stating that his performance has been excellent and his relationship is outstanding with Staff and other inmates.<br><br>This report was reviewed with Bair prior to typing. |

**ORDER:**

☐ BPT date advanced by _____ months.        ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.        ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed

☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DA |
|---|---|---|---|---|
| BAIR, Clifford | C-95079 | CCI IV-A | 4/88 | |

BPT 1004 (REV 7 86)                            PAGE __2__ of __2__                            PERMANENT ADDEN

# DVI INMATE REQUEST

From: C. Bair    # C85079    Housed: L3 346    Dated: 8/1/2005

Assignment: Int. Warehouse    To: MR Larson CC 1

Briefly state your problem:    (See reverse side for mailing instructions)

There is information in my file that is classified as confidential. I am requesting access to this information so that I can confront this information before my next parole board hearing.    I thank you

Response from Staff: You are not allowed to have access to confidential documents. That is why they have the "confidential" designation.

Signed: D. Larson    Title: CC1    Dated: 8/1/05

Cus#03.doc    Rev.12/03

## NO ENVELOPE NECESSARY

Mail Room: Please deliver to Staff member: MR Larson CC 1

Dated: 8/1/2005

Staff Response

Mail Room: Please Return to: Inmate C Bair    # C85079

Housed: L3 346    Dated: 8/1/2005

## FOLD HERE

48F

## CONFIDENTIAL CASE RECORDS

NAME: BAIR, CLIFFORD          CDC# C-95079          DATE 07-11-03

Central File Examnation Requested by

☐ Person Named          ☒ Attorney of Record          ☐ Court

In response to the above request, the below listed material has been deemed by the Department of Corrections to be of a confidential nature for the reasons given and will not be disclosed to the person named or to the person's attorney of record, except by order of an appropriate court.

| Date | Document | Reason |
|------|----------|--------|
| 08-25-97 | LETTER | Safety & Security of Institution |
| 08-29-97 | MEMO | " |
| 03-23-00 | CDC-810/CONFID LISTING | " |
| 03-28-03 | CDC-810/CONFID LISTING | " |
| 03-19-90/11-05-97 | CONFID FILE REVIEW LOG | " |

I have reviewed the file of the above named person and have authorized the withholding of the listed material from examination by the named person or the person's attorney of record named below.

_____          _____          _____
Signature of CDC Official          Date of Review          File Location

I acknowledge receipt of a copy of this listing of material withheld from my examination.

_____          _____
Signature          Date

filerevw.doc

49F

Dear Miss Fontaine,

I'm Sorry, I'm Sincerely Sorry,

I would not disrupt your life or intrude into your life again for anything in this world. But if I was able to mail you a letter, these are some of the things I would say to you. I'm Sincerely Sorry for the Horrible nightmare that I put You and Mrs Abins through on January the 25th 1984. Over these past years that I Have Been incarcerated there Hasn't Been a single day go By that I Haven't thought about You and Mrs Abins. The Death of Mrs Abins and the Horrible Trauma that I put You through, Miss Fontaine I'm Sorry, I'm Sincerely Sorry and Ashamed.

I Have also spent these past years searching my Heart and Soul for the answer as to why I committed this Crime against You and Mrs Abins. I wish I could tell You that I was a Drunk and a Drug addict and Being so at the time, I was out of my mind when I tied You up and Yelled all of those Horrible Obscenities at You. Yes It's true, Alcohol and drugs were a part of my life at the time when I committed this Crime. But neither Alcohol or drugs caused the mental illness that I was suffering at the time I tied You up and murdered Mrs Abins.

My mental illness started on the day I was Born and lasted until the day of my arrest. From the day I was Born until I was abandon at the age of 14 my life was pure Hell. The next 3½ Years I spent alone and starving Getting my High School Diploma, were no Better. My mental illness was my Horrible attitude that I grew up with.

But to say this Is a good enough reason for why I murdered Mrs Abins and for why I put You through the Hell that I did. Please Believe me there isn't a Unique reason good enough to make up for what I did to You. On January 25th 1984 I was an animal, and that's exactly How I treated You and Mrs Abins.

50F

there is no Human answer that I will ever Be able to give to you that will make up for what I did to you. Everyday I ask myself, what is it that I could do for you, to make up to you, for what I did to you. The answer to that Question is what really Breaks my Heart.

What I did to you and the fact that I Killed Mrs Alsim's Can not Be undone. Even if you could find it in your Heart to forgive me and I could Hear you say those words. As greatful as I would Be, I will never Be able to forgive myself.

I will Be sorry and sad and ashamed everyday for the rest of my life, Because I was a failure and a Coward. I was an animal that committed a Crime against you and Mrs Alsim that I should Have Been given the Death penalty and executed for. If it ends up that I spend everyday of the rest of my life in Prison, this is what I Deserve.

Miss Toniar, I'm sorry.
I'm Sincerely Sorry.

Clifford Bair

50F1

DISTRICT ATTORNEY
SONOMA COUNTY
MR DAVID DUNN Eq
DEPTY DISTRICT ATTORNEY
SANTA ROSA, CALIFORNIA

11/20/2005

DEAR MR DUNN,
CITY OF BODEGA BAY,
Ms ROSIE EOMASI,

I AM WRITING TO YOU TODAY TO APOLOGIZE TO YOU. I WANT
YOU TO KNOW HOW SORRY I AM FOR THE CRIME I COMMITTED THAT
CAUSED THE DEATH OF MRS AIKENS AND FOR THE TRAUMA THAT I PUT
MISS EOMASI THROUGH. IM SORRY FOR HEARTACHE AND PAIN THAT I
CAUSED MISS EOMASI. IM SORRY FOR THE PAIN AND SADNESS I HAVE
CAUSED THE CITY OF BODEGA BAY. IM SORRY FOR THE PAIN AND SAD
NESS I HAVE CAUSED MY EX-WIVES (5), MY TWO DAUGHTERS
AND MY 6 GRANDCHILDREN. IM SORRY FOR THE PAIN AND SHAME
I HAVE CAUSED MY 3 BROTHERS, THEIR WIVES AND THEIR CHILDREN
MY TWO SISTERS AND THEIR HUSBANDS AND THEIR CHILDREN. MY
DECEASED MOTHER WHO LOVED ME AND STOOD BY ME UNTIL THE
END OF HER LIFE, MAY GOD BLESS HER SOUL, AND YET I COULD
TAKE THE HEARTACHE AND PAIN THAT I HAD CAUSED HER AWAY
FROM HER. EVEN AT THE AGE OF 87 I KNOW MY FATHER
LOVES ME, AND YET IN HIS EYES I CAN SEE THE PAIN AND
SADNESS AND YES HIS DISAPPOINTMENT.



OVER THESE PAST ALMOST 24 YEARS I HAVE SAID HOW
SORRY I AM TO ALL THE PEOPLE THAT LOVED ME AND CARED ABOUT
ME. THIS IS WHAT MAKES MY SAYING I AM SORRY TO YOU SO
EMPTY. THERE IS NOTHING (NOTHING) IN THIS WORLD I CAN
DO TO MAKE UP FOR, OR TO CHANGE WHAT I DID ALMOST 24 YEARS
AGO. YET HERE I AM TODAY, WRITING TO YOU, ASKING YOU TO HEAR
ME WHEN I SAY I AM SORRY FOR PUTTING YOU THROUGH ALL THE
TRAUMA THAT I HAVE. IM ASKING YOU TO SEE THAT I AM NOT THE
SAME MAN TODAY I WAS ON JANUARY 25TH 1984.

I HAVE BEEN TOLD BY SEVERAL THAT I LOVE, WHO LOVE ME,
THAT MY WRITING THIS LETTER TO YOU IS A TOTAL WASTE OF TIME.
WHETHER IT IS OR NOT, IS REALLY NOT THAT IMPORTANT. THE MOST
IMPORTANT THING ABOUT THIS LETTER IS, I AM DOING WHAT I
HAVE BEEN WANTING TO DO FOR MANY YEARS NOW. I AM PROVING
TO MYSELF THAT I AM NOT THE MAN TODAY THAT I WAS ALMOST
24 YEARS AGO. TODAY I AM SOBER AND FREE OF DRUGS AND I HAVE
BEEN SINCE JANUARY 27TH 1984. IM JUST SORRY AND ASHAMED
BEYOND WORDS THAT IT TOOK THIS CRIME AND CONVICTION TO SOBER
ME UP AND TO GET ME OFF OF DRUGS SO THAT I COULD FIND MY
SELF AND SEE THAT I AM REALLY A DECENT MAN AND HUMAN
BEING.

I DON'T HAVE ALL OF THE CERTIFICATES OR CHRONO'S THAT I
HAVE EARNED OR RECIEVED OVER THE YEARS, THAT I HAVE BEEN
IN PRISON. BUT I AM SENDING YOU WHAT I DO HAVE TO GIVE
YOU AN IDEA OF WHAT I HAVE BEEN DOING SINCE I HAVE
BEEN INCARCERATED.

51 F 1

_3._

I AM NOT ASKING YOU OR ANYONE TO FORGIVE ME
FOR THIS CRIME THAT I COMMITTED. I HAVE COMMITTED
AN UNFORGIVEABLE CRIME OF WHICH I WILL NEVER FORGIVE
MYSELF FOR. BUT I DO WANT YOU AND EVERYONE I HAVE
HARMED TO KNOW HOW SORRY AND ASHAMED AND SAD I AM
FOR ALL THE HEARTACHE AND PAIN I HAVE CAUSED ALL OF
YOU. I AM SINCERELY SORRY.

Sincerely Yours

Clifford Bair

John Rekart Ph.D.
Staff Psychologist
DUI Tracy, CA

Chief Bair C95079
L3        346
P.I.A. Warehouse
Extension # 5816
        # 5825

Dear Doctor Rekart,

I have had my Parole Board Hearing cancelled. The Commissioners have said its because the questions from my 2003 Parole Board Hearing were not answered to their satisfaction.

These questions were concerning my mental health as to the issue of my violence potential.

The significance of alcohol and drugs as it relates to the commitment offense and my ability to refrain from the use/abuse of same when released.

The extent to which the prisoner has explored the commitment offense and come to terms with the under lying causes.

The need for further theraphy programs.

The prisoner is currently on his 6th marriage. Jealousy is a big part of his commitment offense. Does his future hold similar concerns on the outside.

I have written some of my thoughts to you on how I came to have the attitude I had and why I was jealous and why I am not jealous today. I am looking forward to our interview → hopefully soon. Sincerely

52
Cliff Bair F

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA

## SETTING A LIFE PRISONER TERM - PAROLE DENIED

### 11. NOTE TO CDC STAFF: RECOMMENDATIONS AND REQUESTS

☑ 3.  the panel's belief that the prisoner's current mental health is an important issue. In the new full evaluation, the panel requests that the clinician specifically address the following:

☑ a.  the prisoner's violence potential in the free community;

☑ b.  the significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from use/abuse of same when released;

☐ c.  the prisoner's psycho-sexual problems;

☑ d.  the extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes;

☑ e.  the need for further therapy programs while incarcerated.

☑ f.  other: *Prisoner is currently on his 6th marriage. Jealousy is a big part of commit. of offense. Does his future hold similar concerns on the outside?*

☐ 4.  the panel's belief that the prisoner has deteriorated psychologically and there appears to be a need for treatment. The panel bases this conclusion upon

_____

_____

_____

_____

☐ B.  (Other requests to CDC staff): _____

_____

_____

*53F*

THE AMERICAN CENTURY DICTIONARY,
DEFINITIONS.

JEALOUS
1. RESENTFUL OF RIVALRY IN LOVE.
2. ENVIOUS (OF A PERSON ETC).
3. FIERCELY PROTECTIVE, (OF RIGHTS ETC).
4. (OF INQUIRY, SUPERVISION ETC) VIGILANT — JEALOUSLY.

JEALOUSY
1. JEALOUS STATE OR FEELINGS

RAGE
1. FIERCE OR VIOLENT ANGER.
2. FIT OF THIS.
3. VIOLENT ACTION OF A NATURAL FORCE
4. TO BE FULL OF ANGER
5. SPEAK FURIOUSLY OR MADLY.
6. BE VIOLENT; HAVE FORCE
7. ALL THE RAGE VERY POPULAR; FASHIONABLE.

548

MY DEFINITION OF MY JEALOUSY IS AS FOLLOWS.

IT STARTED AT AN EARLY AGE. I WOULD SAY BETWEEN THE AGES OF 3, 4, 5 YEARS OLD. IT STARTED AT THE TIME I REALIZED MY FATHER WAS BEATING MY MOTHER AND I COULDN'T DO ANYTHING ABOUT IT. THEN HE STARTED BEATING ME WHEN I WOULD SCREAM AND YELL AT HIM TO STOP BEATING MY MOTHER. BOTH PARENTS WERE ALCOHOLIC'S. MY FATHER HAD NO PROBLEM BEATING MY MOTHER TO THE GROUND WITH HIS FIST AND THEN KICKING HER WITH HIS BOOTS. THESE BEATINGS TOOK PLACE FROM THE TIME I WAS BORN UNTIL I WAS ABANDON AT THE AGE OF 13 OR 14. I WET THE BED FROM THE TIME I WAS BORN UNTIL I WAS ABANDON. AS SOON AS I WAS ABANDON I QUIT WETTING THE BED. I STOLE MY PARENTS ALCOHOL AT THE AGE OF 10, 11, 12, 13. I STARTED SMOKING AT THE AGE OF 11 OR 12. ITS ABOUT MY ATTITUDE AT AN EARLY AGE

FROM THE 1ST GRADE THROUGH THE 8TH GRADE, WE LIVED IN A HOUSE WITH NO INSIDE PLUMBING. THERE WERE HUNDREDS OF DAYS I WOULD GO TO SCHOOL SMELLING LIKE URINE BECAUSE I COULDN'T TAKE A BATH OR SHOWER BEFORE I WENT TO SCHOOL. NEEDLESS TO SAY I DIDN'T HAVE A LOT OF FRIENDS. THESE YEARS OF MY LIFE WERE A NIGHTMARE AND CAUSED ME TO GROW UP WITH NO SELF-ESTEEM, NO SELF CONFIDENCE, AND NO SELF WORTH. MY FATHER SEEM TO HATE ME AND WHEN HE BEAT ME IT REALLY SHOWED. DURING THESE YEARS I FORMED AN AWFUL ATTITUDE AND I GREW UP AFRAID AND A COWARD. I DIDN'T GROW UP BEATING MY WIVES LIKE MY FATHER DID MY MOTHER. 55F BUT I DID GROW UP WITH A HORRIBLE ATTITUDE.

When I was in school and the other kids would call me Stinky and some of the guys would want to fight with me, I would run from them. When I was caught, I would curl up into a ball and protect myself as much as I could, I wouldn't fight back.

My teachers did the best they could, but they couldn't hardly stand to be around my smell either. My freshman year in high school I played sports and took gym so I was able to shower and this caused me to have a few more friends. After being abandoned I lived in this mobile home with no electricity until I graduated from high school. I remember having hot and cold running water. I believe I was abandoned the summer between my first and second year of high school. I can remember being so hungry at times I would cry. Especially at lunch time at school. There were times I would work at the grocery store after school as a box boy. I would also work on farms during the summer months but there were many days that I went hungry and I cried a lot. I did not get an education in grammer school and by the time I was in high school it was too late. I lived in Capay with a population of 50 at the most. I went to school 2 miles away in Esparto that had a population of 4 or 5 hundred. Everyone knew my situation, so I was passed through school in hopes that I would leave town when I graduated, of which I did when I joined the Navy. Every chance I had to drink alcohol I took it. Jealousy is fear - being afraid of losing. Something your not sure you can live with

I HAD ONE GIRLFRIEND IN HIGH SCHOOL (THIS IS MY FIRST EX-
PERIENCE) WHERE I REALLY FELT THE EMOTIONS OF BEING HELP-
LESS AND INSECURE. MY ATTITUDE WAS THAT I WANTED TO
CONTROL HER (TOTALLY). HER THOUGHTS, HER ACTIONS, I WANTED
TO CONTROL EVERYTHING ABOUT HER. BUT EVEN AT THAT TIME
AT THAT AGE (15) I KNEW HOW IMPOSSIBLE THAT WAS. THE
MORE I TRIED TO CONTROL HER THE FURTHER APART WE BE-
CAME. MY PARENTS REPUTATION AS THE TOWNS DRUNKS STAYED
WITH ME THROUGH ALL THE YEARS OF MY HIGH SCHOOL, SO I
TOO HAD A REPUTATION. ONE OF WHICH I TRIED TO LIVE UP
TOO. I COULD NOT WALK MY GIRLFRIEND HOME FROM SCHOOL.
WE COULDN'T GO TO THE SCHOOL DANCE'S TOGETHER — OR
TO ANY OF THE SCHOOLS SPORTS EVENTS. YES I KNEW I
WAS AN OUTCAST, BUT KNOWING I WAS, DIDN'T STOP THE PAIN.
SO I CONTINUED TO DRINK ALL THE ALCOHOL I COULD GET MY
HANDS ON. I HAD NO SELF-ESTEEM, AND I IN FACT DIDN'T
LIKE MYSELF. I TRIED TO PLAY FOOTBALL AND BASKETBALL,
BUT BEING I WAS STARVING HALF THE TIME, I WASN'T
PHYSICALLY FIT ENOUGH TO BE VERY GOOD. ALL THROUGH MY
HIGH SCHOOL YEARS I WAS LOOKED DOWN ON AND THIS MADE
ME FEEL INFEARIOR. WHEN MY GIRLFRIEND DECIDED WE WERE
GOING TO HAVE SEX, I CRIED. SHE WAS THE ONLY HUMAN BEING
IN MY LIFE AT THAT TIME I FELT THAT CARED ABOUT ME AND
SOMEHOW I KNEW WHEN WE HAD SEX, OUR LIVES TOGETHER
WOULD BE OVER, AND I WAS RIGHT. OUR LIVES TOGETHER WAS
OVER WITHOUT THE SEX, AT THAT TIME I JUST DIDN'T KNOW
IT. MY JEALOUSY STEMS FROM NO SELF-ESTEEM, NO
SELF CONFIDENCE, HAVING FEELINGS OF BEING INFEARIOR,

SEE

AND ALCOHOL AND DRUGS JUST MADE THESE FEELINGS 100 TIMES WORSE THAN THEY SHOULD HAVE BEEN. AGAIN, I GRADUATED FROM HIGH SCHOOL WITH NO EDUCATION AND WHEN I TURNED 18 IN SEPTEMBER OF 1962 I JOINED THE U.S. NAVY. AS UNEDUCATED AS I WAS, I COULD NEVER FIGURE OUT HOW I PASSED THOSE ENTRANCE TEST. BUT I DID, AND OTHER THAN FALLING ASLEEP ON WATCH (DRUNK) TRYING TO HELP OUT A SICK FRIEND, I SERVED MY COUNTRY WITH HONOR AND ALCOHOL. AFTER 2½ YEARS IN THE NAVY, I MET AND MARRIED SHARON SHATTO.

WHEN I MET SHARON I WAS SICK WITH LONELINESS, FROM BEING ALONE AND FROM NOT HAVING A FAMILY. HER PARENTS TOOK ME IN LIKE I WAS ONE OF THE FAMILY AND TREATED ME BETTER THAN I HAD EVER BEEN TREATED IN MY LIFE. LOOKING BACK, I WAS IN LOVE WITH SHARON'S FAMILY AND NOT HER.

APPROXIMATELY 6 MONTHS AFTER MY HONORABLE DISCHARGE FROM THE NAVY I STARTED USING METHAMPHETAMINES. THIS WAS IN 1967 AND IT WAS ALSO AROUND THIS TIME THAT I TOLD SHARON THAT I DIDN'T WANT HER TO GET PREGNANT. WITH MY ALCOHOL, AND NOW DRUG USE, I KNEW I WAS NOT READY TO BE A FATHER. IN OCTOBER OF 1967 SHARON GOT PREGNANT AND I WAS NOT AT ALL HAPPY. I CONTINUED MY DRUG AND ALCOHOL USE THROUGH SHELLEY LEES BIRTH 7/13/68, THROUGH 1969, 1970 1971, 1972 AND 1973. SHARON WAS NEVER UNFAITHFUL, BUT I ALWAYS WAS. I NEVER COULD FORGIVE HER FOR GETTING PREGNANT WHEN I ASK HER NOT TOO. IN 1973 I MET PATRICIA AND DIVORCED SHARON. I MARRIED PATRICIA AND TOLD HER NOT TO GET PREGNANT. SHE KNEW I WAS A DRUNK AND A DRUG ADDICT.

58 F

TO THIS VERY DAY I STILL CAN'T BELIEVE SHE MARRIED ME WITH ME BEING IN THE CONDITION I WAS IN. WE WERE MARRIED IN DEC 1973 AND SHE WAS PREGNANT IN JANUARY OF 1974 AND I LEFT HER SOMETIME IN EARLY 1975. I WAS JEALOUS OF PATRICIA BECAUSE I CARED A LOT FOR HER, BUT NOT ENOUGH TO STOP USING DRUGS AND DRINKING. I HAD A DIFFICULT TIME KEEPING A JOB AND SO WE HAD TO LIVE WITH HER MOTHER AND I WAS ASHAMED OF THAT. NOT BEING ABLE TO STAY EMPLOYED I BECAME VERY INSECURE AND MY FEELING OF BEING INFEARIOR CAME BACK WITH VENGEANCE. I LEFT PATRICIA BECAUSE SHE GOT PREGNANT WHEN I ASK HER NOT TOO. BUT I ALSO LEFT BECAUSE I KNEW MY JEALOUSY WAS OUT OF CONTROL, ALONG WITH MY ALCOHOL AND DRUG USE. I WAS NOT READY TO BE A FATHER, AND I KNEW IT AND I FELT BE- TRAYED BY SHARON AND PATRICIA. YES I WAS BEGINNING TO SEE THAT I HAD A SERIOUS PROBLEM WITH ALCOHOL AND DRUGS BUT NOT ENOUGH TO DO ANYTHING ABOUT MY PROBLEM. WHEN I LEFT PATRICIA I TOLD HER TO GET A DIVORCE BECAUSE I WAS NEVER COMING BACK. IN 2001 WHEN VALERIE CAME BACK INTO MY LIFE I FOUND OUT PATRICIA AND I WERE STILL LEGALLY MARRIED. SO I DIVORCED PATRICIA SO VALERIE AND I COULD GET MARRIED. MY LIFE WITH SHARON AND PATRICIA TOOK PLACE WHILE I WAS LIVING IN RIVERSIDE CALIFORNIA.

WHEN I LEFT PATRICIA I MOVED BACK TO ESPARTO CALIF WHERE MY BROTHER LLOYD BAIR STILL LIVES TODAY.

BEFORE I GET INTO MY MOVE TO ESPARTO I WANT TO MENTION THAT BEFORE PATRICIA AND I WERE MARRIED, SHE GOT PREGNANT AND WE HAD AN ABORTION. SHE KNEW WE HAD NO BUSINESS HAVING ANY CHILDREN, AND YET SHE GOT PREGNANT AGAIN. 59 F

I WOULD ALSO LIKE TO MENTION THAT DURING ALL THESE YEARS OF MY ALCOHOL AND DRUG ABUSE AND JEALOUSY THERE WAS NEVER ANY DOMESTIC VIOLENCE.

MY CRIMINAL HISTORY CONSISTS OF;

1. DRUNK DRIVING 5/23/74
2. POSSESSION OF SAWED OFF SHOTGUN 3/19/75
3. DRUNK DRIVING 7/5/80
4. PETTY THEFT AND VANDALISM 3/15/82

WHEN I ARRIVED IN ESPARTO I WAS IN REAL BAD SHAPE PHYSICALLY AND MENTALLY. DRUNK AND HIGH ON DRUGS PHYSICALLY, AND MENTALLY EXHAUSTED. MY BROTHER LLOYD TOOK ME IN AND FED ME AND GAVE ME A BED TO SLEEP IN. I WAS THERE A COUPLE OF DAYS WHEN HE GOT ME A JOB AND I RENTED AN APARTMENT FROM A COUSIN. WITHIN A MONTH OF BEING IN ESPARTO I MET LINDA AT A COUNTRY DANCE. I HAD DATED LINDA ONCE IN HIGH SCHOOL, SO AT THIS TIME WE HAD KNOWN EACH OTHER FOR 8 OR 10 YEARS. SHE HAD 3 BOYS BY TWO DIFFERENT MEN AND WAS IN THE PROCESS OF GETTING A DIVORCE. MY THINKING AT THAT TIME WAS TO GET AS FAR AWAY AS I COULD FROM THE DRUGS, AND TO SEE IF I COULD GET BACK TO WHERE I COULD TAKE CARE OF MY-SELF. ONCE LINDA AND I MET UP AGAIN, SHE HAD HER MIND MADE UP THAT WE WERE GOING TO BE TOGETHER. I WAS OUT OF DRUGS AT THIS TIME, BUT I WAS STILL DRINKING. IT WAS AROUND THIS TIME THAT I BOUGHT AN ANTIQUE SAWED OFF SHOTGUN, OR, AT LEAST I THOUGHT IT WAS AN ANTIQUE. I HUNG IT ON THE WALL IN MY APARTMENT.

LINDA AND I HAD BEEN SEEING EACH OTHER FOR ABOUT A MONTH. IN FACT HER AND THE 3 BOYS WERE AT MY APARTMENT MORE THAN SHE WAS AT HER HOME IN FAIR OAKS. LINDA WAS PUTTING A LOT OF PRESSURE ON ME TO MOVE IN WITH HER AND THE BOYS. I WAS STILL DRINKING AND I KNEW I WAS NOT READY TO TAKE ON A READY MADE FAMILY. LINDA WOULD NOT LEAVE ME ALONE. FINALLY IN MARCH OF 1975 I TOLD LINDA I WAS LEAVING ESPARTO AND I WAS MOVING BACK TO RIVERSIDE CALIFORNIA TO GO BACK TO WORK IN THE NATURAL GAS CONSTRUCTION TRADE. I WAS ALSO GOING BACK TO LOOK UP MY DRUG CONNECTION. HER AND THE BOYS HELP ME TO PACK MY CAR, AND THERE WERE A LOT OF TEARS FROM ALL OF US. I KNEW THAT THE SAWED OFF SHOT GUN WAS ILLEGAL, SO I PUT IT UNDER THE FRONT SEAT AND FORGOT ABOUT IT. LINDA AND THE BOYS LEFT AND NOT LONG AFTER I WAS ON THE ROAD.

I HAD JUST GOT ON HIGHWAY 99 IN SACRAMENTO AND I WAS HEADED SOUTH TOWARDS L.A. WHEN I WAS PULLED OVER BY THE CHP. THEY FOUND THE SAWED OFF SHOTGUN AND TOOK ME TO JAIL. THE NEXT MORNING I CALLED LINDA AND SHE CAME AND GOT ME OUT OF JAIL. I WAS GIVEN 3 YEARS FORMAL PROBATION AND SO I WAS FORCED TO MOVE IN WITH LINDA AND THE BOYS. LINDA'S MOTHER AND FAMILY KNEW WHO I WAS AND THEY DIDN'T LIKE ME AT ALL. LINDA AND THE BOYS WOULD SPENT THE WEEKENDS IN BODEGA BAY AND I WOULD STAY DRUNK IN FAIR OAKS. I KNEW A DRUG CONNECTION IN VISALIA AND SO AT LEAST ONCE A MONTH I WOULD DRIVE TO VISALIA AND BUY A MONTHS WORTH OF DRUGS.

61F

FOR THE FIRST YEAR AND A HALF, LINDA AND I's RELATIONSHIP AS FAR AS I WAS CONCERNED WAS BECAUSE I DIDN'T HAVE A CHOICE. BUT I STILL HAD THOSE FEELINGS OF WANTING TO HAVE A REAL FAMILY AND TO BELONG SOMEWHERE. I WAS DRINKING AND DOING DRUGS AND I WASN'T GOING TO STOP AND YET I ASK LINDA TO MARRY ME AND SHE SAID YES. AFTER 2½ YEARS OF BEING TOGETHER I THOUGHT IF WE GOT MARRIED MAYBE I WOULD BE INVITED ON SOME OF HER TRIP's TO BODEGA BAY. OF WHICH I WAS, AND YET I ALWAYS KNEW I REALLY WASN'T WELCOME. ALL MY LIFE UP TO THIS TIME I ALWAYS KNEW I WASN'T WELCOME AND I HAD AN ATTITUDE. AND YET I WASN'T GOING TO GIVE UP MY ONLY TWO FRIENDS (ALCOHOL AND DRUGS). IN 1979 I MADE UP MY MIND THAT I WAS GOING TO LEAVE LINDA AND MOVE TO VISALIA CALIFORNIA WHERE MY DRUG CONNECTION LIVED. I WENT TO VISALIA, FOUND A GOOD JOB IN THE NATURAL GAS CONSTRUCTION TRADE AND ALSO FOUND OUT I MISSED LINDA A LOT. I TALKED HER INTO SELLING HER HOME IN FAIR OAKS AND BUYING A HOME IN VISALIA. SHE BOUGHT A HOME IN VISALIA AND I MOVED HER AND THE BOYS DOWN THERE IN TIME FOR CHRISTMAS 1979. THE FIRST YEAR AND A HALF (EVEN THOUGH I WAS STILL DRINKING AND DOING DRUGS) I WAS HAPPIER THAN I HAD EVER BEEN (OR AT LEAST I THOUGHT I WAS). LINDA STOPPED GOING TO BODEGA BAY EVERY WEEKEND. HER TWIN BOYS FATHER LIVED IN SANTA ROSA AND FOR YEARS I FELT SHE WAS WITH HIM ON THE WEEKENDS. I REALLY FELT GOOD ABOUT HER NOT GOING TO BODEGA BAY. SHE DID THAT CHRISTMAS 62F ANYWAY. AND THAT WAS ANOTHER CHRISTMAS I WAS ALONE.

IT WAS THE BEGINNING OF THE SUMMER OF 1982 WHEN LINDA TOLD ME THAT HER MOTHER NEEDED HER AT THE STORE IN BODEGA BAY FOR THE SUMMER. SHE ASK ME IF I THOUGHT SHE SHOULD GO. I WANTED HER TO LOVE ME ENOUGH TO STAY IN VISALIA WITH ME. SO I TOLD HER TO MAKE UP HER OWN MIND. I DID TELL HER THAT I WANTED HER TO STAY HOME WITH ME. SHE WENT TO BODEGA BAY THAT SUMMER AND THE NEXT SUMMER AND EVERY WEEKEND IN BETWEEN AND I STAYED DRUNK AND HIGH ON DRUGS AND CHEATED ON HER AS MUCH AS I COULD. I BELIEVE IT WAS IN 1982 THAT WE DIVORCED AND HER MOTHER GAVE ME 5 THOUSAND DOLLARS TO GIVE UP MY SHARE OF OUR HOUSE, AND I AGREED. IT WAS AROUND SEPTEMBER OF 1983 THAT I LOST MY JOB IN VISALIA AND WENT TO RIVERSIDE TO WORK IN THE NATURAL GAS CONSTRUCTION TRADE. I WOULD WORK IN RIVERSIDE DURING THE WEEK AND SPEND MY WEEKENDS IN VISALIA (MOST OF THE TIME WITH ~~MYSELF~~). I WAS TRYING TO TALK LINDA INTO MAKING OUR LIVES TOGETHER WORK. BUT I WASN'T WILLING TO GIVE UP MY ALCOHOL OR DRUGS AND SHE WASN'T WILLING TO GIVE UP HER TRIPS TO BODEGA BAY. IT WAS CHRISTMAS 1983 AND I HAD JUST SPENT ANOTHER CHRISTMAS ALONE. THIS WOULD MAKE IT THE 18 TH OR 19TH CHRISTMAS I HAD SPENT ALONE AND I WAS EXTREMELY DE-PRESSED. I WAS 39 YEARS OLD WITH NO HOME, NO TRANS-PORTATION, NO JOB. JANUARY 1984 ARRIVED, AND I WAS DRAWING UNEMPLOYMENT TO SURVIVE. I WAS LIVING IN A 16 DOLLAR A NIGHT MOTEL DURING THE WEEK AND AT LINDAS DURING THE WEEKENDS. SOMETIMES SHE WOULD BE THERE AND SOMETIMES NOT.

63 F

It was the week of the 20th that I picked up my un-employment check. I bought 100 dollars worth of amphetamine pills (approximately 800), I believe this was a Thursday night. Linda would leave for Bodega Bay around 3 o'clock on Friday and so I would have the house for the weekend. She would pick the boys up from school and leave town. I arrived at Linda's at 3:30 or 4 PM on Friday afternoon. I had my pills and a bottle of whiskey so I was good to go. I cleaned up and decided I wanted something to eat. I walked down town and had dinner at a restaurant. I was depressed and feeling worthless as usual. When I left the restaurant I went to a service station to use the bathroom. When I came out of the bathroom there was a Chevy pick up there with the engine running. I got in the pick up and drove it to Linda's house. I stayed up all night packing all my belongings into this pickup, along with a shot gun and shells. This was also a sawed off shotgun.

How was I feeling at this time. I don't believe jealous rage is the right words to use for the way I was feeling at this time. Yes I thought I loved Linda and I thought I wanted our lives together to work out. But I wasn't willing to do what it took to make that happen. I was not going to give up my alcohol or drugs. I was depressed, I hated who I was, and I had no self-esteem and I didn't care anything about being alive. But I wasn't going to give up my alcohol and drugs.

64 F

THE ONLY PLAN I HAD WAS TO GO TO BODEGA BAY AND SEE WHO LINDA WAS WITH, OTHER THAN THAT I HAD NO PLANS. WHY THE SHOT GUN? I DID, HAVE THOUGHTS OF SUICIDE AND WHEN I WAS IN THE COUNTY JAIL I DID MAKE A VERY WEAK ATTEMPT AT CUTTING MY WRIST. BUT I HAD NO PLANS OF HURTING ANYONE OR KILLING ANYONE. AT THIS TIME IN MY LIFE I WAS PHYSICALLY AND MENTALLY EXHAUSTED. I HAD TRIED A 30 DAY DRUG AND ALCOHOL TREATMENT PROGRAM AFTER MY ARREST FOR PETTY THEFT AND VANDALISM ON 3/15 1982, BUT I WAS NOT MENTALLY READY TO GIVE UP DRUGS AND ALCOHOL.

THIS CRIME HAPPEN BECAUSE I NEVER GAVE MYSELF A CHANCE TO LIVE A LIFE SOBER AND FREE OF DRUGS. I NEVER GAVE MYSELF THE CHANCE TO BE THE MAN AND HUMAN BEING I WAS BORN TO BE. I NEVER GAVE MYSELF A CHANCE TO GET OVER MY ABUSE AS A CHILD OR THE PAIN AND SUFFERING I WENT THROUGH WHEN I WAS GOING TO HIGH SCHOOL. ALL MY ADULT LIFE I WAS ON A SUICIDE MISSION, AND UNTIL THE DAY OF MY ARREST FOR THIS CRIME, I WOULDN'T GET OFF OF DRUGS AND ALCOHOL LONG ENOUGH TO FIND OUT WHY.

THIS CRIME THAT I COMMITTED THAT CAUSED THE DEATH OF MRS AIKENS AND CAUSED THE TRAUMA I PUT MISS TOMASI THROUGH, IS AN UNFORGIVABLE CRIME, OF WHICH I WILL NEVER FORGIVE MYSELF FOR. YES ITS HORRIBLE AND SO VERY SAD THAT IT TOOK THE LIFE OF MRS AIKENS AND THE TRAUMA I PUT MISS TOMASI THROUGH TO SOBER ME UP AND GET ME OFF OF DRUGS. BUT I WAS AT THE POINT IN MY LIFE I COULDN'T DO IT ON MY OWN.

65F

13.

Its true, coming to prison saved my life and gave me the chance to find the man and human being I was born to be. I can't bring back Mrs. Aikens, I can't take back the trauma I put Miss Fomasi through. But I will live everyday of the rest of my life sober and free of drugs. I know what jealousy is. Its not having any trust or faith in myself. Its not knowing who I am as a man and human being. Its a feeling of being inferior, with no self confidence. Its being drunk and on drugs for 18 years, not caring about weather I lived or died. Today none of thats true.

Yes I have been married 6 times, and each time I have gotten married, my heart was wanting my marriage to work. 3 of my marriages failed because of my attitude and my alcohol and drug abuse. My 4th marriage failed because she lived out of state and she refused to move to California. And she was hygienecally unstable (no personal hygiene). My 5th wife and I divorced because we lost our family visits and I was forced to transfer from Tehachapi, level II where it was reasonable close for my wife to visit with me, I was forced to transfer to Solano which is almost 400 miles away from where she lived, which is Northridge California.

Today I am married to my beautiful wife Valerie who lives in Roseville California. We had our 4th wedding anniversary on August the 10th 2006 - I have known Valerie since she was 12 years old.

66 F

14.

I WROTE VALERIE'S FATHER A LETTER IN MARCH OF 2001. HE HAD VALERIE ANSWER HIS LETTER IN APRIL. I RECEIVED HER LETTER ON THE 19TH OF APRIL 2001 AND WE HAVE BEEN TOGETHER EVER SINCE.

REAL LOVE IS NOT JEALOUS OR CONTROLLING, ITS ALL ABOUT FREEDOM. ITS ABOUT TRUST AND COMMITMENT AND ALLOWING YOUR LOVE TO BE THE HUMAN BEING THEY ARE. ITS ABOUT LOVING THEM FOR WHO THEY ARE AND NOT TRYING TO MAKE THEM INTO SOMEONE THEY ARE NOT. ITS ABOUT BEING HONEST AND NOT CHEATING (ADULTRY). ITS ALL ABOUT COMMUNICATING OPENLY AND HONESTLY ALL THE TIME. ITS ABOUT KNOWING THAT WE ARE NOT PERFECT AND THAT MISTAKES WILL BE MADE. ITS ABOUT KNOWING HOW HONESTLY TO FORGIVE. I HAVE GIVEN MY LOVE TO VALERIE OPENLY AND HONESTLY WITH NO STRINGS ATTACHED, WITH COMPLETE TRUST AND COMMITMENT, AND I BELIEVE SHE HAS DONE THE SAME FOR ME. TODAY I AM ALCOHOL AND DRUG FREE AND I HAVE BEEN FOR ALMOST 23 YEARS. I WILL BE ALCOHOL AND DRUG FREE EVERYDAY FOR AS LONG AS I LIVE. I AM PHYSICALLY AND MENTALLY STRONGER TODAY THAN I HAVE EVER BEEN, AND I KNOW I WILL CON-TINUE TO BE WITH THE HELP OF MY WIFE → AA AND NA PROGRAMS.

TODAY I KNOW WHO I AM AS A MAN AND HUMAN BEING I KNOW WHAT I WANT, I KNOW WHERE I AM GOING AND I KNOW WHAT ITS GOING TO TAKE TO GET THERE. I HAVE THE CONFIDENCE TODAY TO KNOW THAT I CAN HAVE THE LIFE WITH MY WIFE THAT I WANT. I CAN GET OUT OF PRISON

167E

AND GO TO WORK UNTIL I AM 70 YEARS YOUNG AND LET VALERIE RETIRE WITH 30 YEARS WITH THE DMV ON JULY THE 1st 2010. I AM A WELDER AND A JOURNEY — MAN PLUMBER AND A TRUCK DRIVER AND HEAVY EQUIPMENT OPERATOR. I WILL HAVE A JOB WITHIN WEEKS OF MY RELEASE FROM PRISON. I AM ALSO A WAREHOUSEMAN.

YES, I AM 62 YEARS YOUNG. YES I AM HARD OF HEARIN YES I HAVE A PROSTATE PROBLEM TO WHERE I HAVE TO GO TO THE BATHROOM A LOT, AND I NEED DENTURES. BUT OTHER THAN THAT I AM PHYSICALLY FIT AND READY TO GO TO WORK IN THE FREE WORLD. I HAVE A FIRM FOUNDATION IN MY AA AND NA PROGRAMS, AND I WILL CONTINUE TO HAVE WHEN I GET HOME TO MY WIFE.

I HAVE A POSITIVE ATTITUDE TODAY BECAUSE OF WHO I AM AND WHAT I BELIEVE IN. I AM PHYSICALLY AND MENT— ALLY STRONGER TODAY BECAUSE I AM SOBER AND FREE FROM DRUGS. I WILL MAKE A LIFE FOR VALERIE AND I BECAUSE I WILL STAY SOBER AND FREE FROM DRUGS AND I WILL DO SO WITH THE HELP OF MY WIFE, MY FAMILY AND MY DAUGHTE AND MY GRANDCHILDREN, WITH THE HELP OF NA AND AA. I HAVE A SUPPORT SYSTEM TODAY THAT I HAVE NEVER HAD BE FORE IN MY LIFE. I CAN COUNT ON THESE PEOPLE AND THEY CAN COUNT ON ME. JEALOUSY IS NOT AN ISSUE IN MY LIFE TODAY AND NEVER WILL BE AGAIN.

RESPECTFULLY SUBMITTED

Clifford Bain
10/22/2006

68E

10.

IN MY OWN WORDS THE HISTORY OF MY CRIME.

I AM SUBMITTING MY 1999 PSYCHOLOGICAL EVALUATION TO YOU BECAUSE I FEEL THE SAME ABOUT MY CRIME TODAY, AS I HAVE FOR ALMOST 23 YEARS.    I HAVE MENTIONED THAT FOR EVERYONE CONCERN TO REALLY RECEIVE JUSTICE FOR WHAT I HAVE DONE, I SHOULD SPEND EVERY DAY OF THE REST OF MY LIFE IN PRISON. I DIDN'T GIVE MRS AIKENS A SECOND CHANCE AND UP UNTIL THE DAY OF MY ARREST FOR THE MURDER OF MRS AIKENS, I NEVER GAVE ANYONE A SECOND CHANCE. FOR WHAT I HAVE DONE, I DON'T DESERVE A SECOND CHANCE EITHER.    BUT THIS ISN'T TO SAY THAT I DON'T WANT A SECOND CHANCE, BECAUSE I DO. TODAY I AM THE MAN AND HUMAN BEING I WAS BORN TO BE, AND I KNOW THAT I AM NOT A THREAT TO SOCIETY, NOR A RISK TO PUBLIC SAFETY. I SINCERELY BELIEVE THAT MY PRISON RECORD OVER THE PAST 23 YEARS CLEARLY SHOWS THAT I AM SOBER AND FREE OF DRUGS AND THAT I AM GOING STAY THAT WAY. I RESPECTFULLY SUBMIT THIS TO YOU IN THE HOPE YOU WILL SEE ME AS THE MAN I AM TODAY.

"I'm extremely sorry and ashamed, and very sad that my jealous rage caused me to Murder Mrs. Atkins, and for the trauma that I put Ms. Fomasi through. I committed this crime while I was in a jealous rage. My parents, my childhood, nor alcohol or drugs, made me commit this act of violence. Even though my Ex-Wife Linda and I divorced in April 1981, we were still living together in our home in Visalia. I loved Linda and our three sons and I wanted our life together to work out. We divorced because we were both liars and cheats. Even though the divorce had been started, we both wanted to give our lives together a real chance, and without her mother's knowledge, we did. Linda and I promised each other there would be no more lies or cheating till the summer of 1983. I truly believed our lives together was going good. That summer Linda took the three boys to Bodega Bay so she could work in her mother's husband's grocery store. She promised she would work during the week and come to Visalia and spend the weekends with me. By the end of the summer she was back in Visalia and the boys were back in high school in Visalia. Then the weekends in Bodega Bay started again, with her picking the boys up after school on Friday, and then coming back Sunday night. This continued until I decided to go to Bodega Bay that weekend in January, 1984, to find out who she was with. That evening, when I came in from work, I got a call from Linda saying she was sorry for not being there for me, and we had a yelling match over the phone. She stated she was going to Reno with her mother and would be back Sunday night. While I was yelling at her she hung up the phone. That night I had dinner and a half-dozen or so drinks. While walking to another bar I stopped in a Service Station to go to the restroom, and when I came out of the restroom there was a white chevy pick-up sitting there with the engine running. I got in the pickup and drove to my home, packed some clothes, and loaded them and my sawed-off shotgun with shells in the pickup and took off for



Bodega Bay. I was extremely upset and angry. Once I arrived in Bodega Bay, I drove to the Harbor View Motel and I rented a room for two days. From the motel room I had a clear view of Linda's mother's home and Linda's car which was parked out in the street. After watching the house for two days and not seeing Linda or the boys, I checked out of the motel and drove to Santa Rosa. In Santa Rosa I ate and had a few drinks. When I arrived back in Bodega Bay I checked to make sure Linda's care was still there, and it was. At that time it crossed my mind that I needed to get rid of the pickup, so I drove out of Bodega Bay and went up into the foothills and drove down this dirt road, and waited until after dark. After finally deciding to burn the pickup, I took a towel I had taken from the motel room and soaked it with gas, and laid it on the floor and set it on fire. Once I was sure the fire was not going to go out, I walked up the side of the hill and sat down between some tall bushes next to the road and watched the pickup burn. I was sad, depressed, very angry, and disappointed myself. After three failed marriages and two beautiful daughters who I walked out on, at the age of 39 years old, I had absolutely nothing to live for. I knew I would never kill myself because I was a coward. What was I going to do now - I had no idea. After sitting there awhile, I got up and walked down the hill to Bodega Bay. After hiding the gun, I went into a bar, ordered a hamburger, french fries, and a six-pack of Budweiser. I drank a beer while I was waiting. I paid for my order, picked up by gun, and walked to a secluded area in Mrs. Atkins yard. While eating I saw a tow-truck go by pulling the trailer with the burnt pickup on it. Then I saw Mrs. Atkins walking through her yard. I walked up to Mrs. Atkins, put my arm around her shoulders and led her into the house. Once inside the house, I had Mrs. Atkins sit down in a chair next to the window that was open, which was next to the front door that I had closed, I asked Mrs. Atkins for the keys to her car. The only words I remember her saying were "I'm not giving you the keys to my car." Looking around the living room I noticed a table next to the front door with a bowel on it that had some keys in it. I put the keys in my pocket. I then walked over and took Mrs. Atkins by the hand and helped her stand up and then led her into the bedroom. I ripped the phone cord out of the wall and either tied her hands behind her back or in front (I'm really not sure). I had her lay down on the floor next to the wall and her bed where I tied her feet up. Ten or twelve months before this date I had done some work for Mrs. Atkins around her home and so we knew each other well. After tying her up, I pulled the mattress half off the bed and covered her up with it. I really didn't care whether Mrs. Atkins knew me or not. I really didn't give a dam about anything. At this time, I heard Ms. Fomasi at the front door. I waited for a few minutes to see if she would leave, but she didn't. I opened the front door and told her to come in, and to my surprise, instead of running away, she came in. I can't remember Ms. Fomasi saying a single word, I really can't. I led Ms. Fomasi into the doorway of Mrs. Atkins' bedroom and told her to lie down on the floor and she did. I tied her hands and feet, but I'm not sure what I used. I then went out into the garage and started the car and opened the garage door. The first thing I noticed when I went back into the house was Ms. Fomasi had her hands untied. That really upset me and I started yelling how I was going to burn the house down. I am not sure what I said, but I believe I said I would kill them both. What

ever Ms. Fornasi said I said is true, and I probably said a lot more. After tying her hands again, I went into the kitchen and opened the refrigerator and took a bite out of a tomato an put it back, and then I left.

Leaving Bodega Bay I took the back road to the foothills where I had burnt the pickup and continued on into Sebastiapol. I stopped in a liquor store, bought a pint of whiskey and two Pepsi's, and then drove back to Bodega, and instead of driving back into Bodega Bay, I turned left and headed towards Petaluma. For some reason Mrs. Atkins car would all the sudden stop running every twenty or thirty miles or so. Every time it did I would pull off to the shoulder of the road and after sitting there for awhile, it would start up again. This happened four or five times, and the last time it did, I found myself parked across the road from Garadie's Resort just outside of Petaluma. When I pulled off the road this time, I got the car stuck, and I couldn't drive off. At that time I gave up on the car. I got the sawed-off shotgun and crossed the street. The only thing I knew about what time it was is that it was dark outside. From the very beginning I had no plans, and I still didn't have any - other than finding Linda and to see who she was with, and now I didn't give a dam about that. Walking down this gravel road, I noticed a bar on my left and a mobile home on my right. Further down the road I saw a cabin that was completely dark inside, so I walked up and tried to open the front door. It was locked so I kept walking and a few minutes later I was on a boat dock where there were two or three sailboats tied up. I went aboard the first sailboat I came to and found a padlock on the cabin hatch. I busted the fiberglass around the lock with the gun butt and went into the cabin. I started going through everything just to see what was there. I found food, clothes, money, beer, a flare pistol, and the keys to the ignition in the ignition. I tried to start the engine and it wouldn't start. I went back up on deck and untied the mooring line, and pushed away from the pier. The tide at the time looked like it was going out, so I tried to steer the sailboat out of the channel and let it go with the tide. What I succeeded in doing was drifting upon a sand bar and getting stuck before I got out of the channel. I jumped into the freezing cold water and pushed the boat off the sand bar. In the process, I turned the boat around to where it headed back where I came from. Once back on board, I let it drift wherever it wanted to go. It ended up about a mild from the pier, still inside the channel. I changed clothes, drank a beer, laid down and went to sleep. When I woke up it was daylight. I looked out the portal and I could see a houseboat coming in my direction. When the houseboat arrived close enough to where I could see and hear what the owner of the sailboat was saying, I told him not to come any closer. I had the sawed-off shotgun in my hands. The owner asked me what I was doing on his sailboat. I don't remember answering his question. Then he said he called the police and they were on their way. Then he left. I am not sure whether I ever said anything to the sailboat owner or not. Whatever he said I said is true.

At this time I knew I was in trouble, but I had no idea how serious it was. A few minutes later I went over the side of the boat and climbed over the embankment of the canal on the



other side. When I entered the water I had the sawed-off shotgun and the flare pistol with me. I stayed in the water and came to a pump house and a cement food gate. At this point I could have went straight, but I went to the right instead. I got about 20 ft. when I heard the helicopter. I was about three-quarters under water so I just leaned up against the bank until I couldn't hear the helicopter anymore. At this time I faced the fact that I was going to be caught, and I also knew that if I didn't get out of this freezing water I was going to die. Dying really wasn't an issue, I just didn't want to freeze to death. I also knew I wasn't going to be arrested with a sawed-off shotgun. I pushed the gun down in the water under my feet and buried it in the mud. I made my way back to the cement flood gate and crawled inside. Shortly thereafter I was under arrest and on my way to jail.

Jealous rage is just an excuse, just a sick, sorry, and sad excuse, when there are absolutely no reasons or excuses for my killing Mrs. Atkins, or for the hell I put Ms. Fomasi through. At this time in my life I was a scum bag and a coward, and totally and completely worthless as a man and human being. For what I did to Ms. Atkins, Ms. Fomasi, and for all the heartache and shame I have caused my parents, my children, my brothers and sisters and their children, I should have been given the death penalty and executed. At least Ms. Atkins would have gotten equal justice.

I have committed a crime to where there is absolutely nothing I will be able to do to make amends for what I have done. Yes, I'm sorry and ashamed and extremely sad that I murdered Ms. Atkins, and destroyed Ms. Fomasi's life. But being sorry, ashamed, and sad, does not do anything for anyone. I have mentioned that I should have been executed. Well being executed would have given me an easy way out. For everyone concerned to really receive justice for what I have done, I should spend every day of the rest of my life in prison. I didn't give Ms. Atkins a second chance, and I have never given anyone else in my life a second chance. For what I have done, I don't deserve a second chance either."

It is signed, Clifford Lee Bair,

# EXHIBIT G

# DEUEL VOCATIONAL INSTITUTION
## Life-Term Inmate Evaluation for the Board of Prison Terms
## Mental Health Evaluation
### (Revised 1998)
### January 2007, Lifer Calendar

## I.   IDENTIFYING INFORMATION:

| | |
|---|---|
| Name: | Bair, Clifford |
| CDC: | C-95079 |
| Age: | 62-years-old |
| DOB: | 09/14/44 |
| Marital Status: | Married |
| Ethnicity: | White |
| Gender: | Male |
| Religion: | Protestant |
| Nicknames: | "Cliff" |
| Tattoos: | None |

COPY SENT TO INMATE _11-30-06 SM_

This is approximately the fifth report to the Board of Prison Terms on this 62-year-old (DOB 09/14/44) married white male serving a 25-year-to-Life sentence for PC 187, Murder in the 1st Degree, and PC 236, False Imprisonment, with a two year enhancement. He entered the California Department of Corrections and Rehabilitation (CDCR) on 11/02/84 and has served approximately 22-years.

This report is based upon a review of the inmate's central file, medical and psychiatric record, and a two-hour assessment interview.

## II.   DEVELOPMENTAL HISTORY:

Prenatal/perinatal concerns include inmate's mother smoking and drinking during the pregnancy. He reports he was born in the car on the way to the hospital. No known birth defects or significant delays in developmental milestones such as speech, language or motor development. His habits and behavior as a child were within normal limits, however, peer interaction and social interactions suffered due to deficits in clothing and hygiene related to poverty and poor parental support. He stated that his clothes were often soiled. He would arrive to school smelling of urine due to a long history of enuresis that lasted until age 13. The enuresis ceased, when at the age of 14 his parents abandoned him. His mother, father, and younger brother moved to Los Angeles and left him in the mobile home. He reports his older brother and sister had already left the family home. So, inmate Bair was self supporting at the age of 14. Inmate Bair reports he experienced physical abuse at the hands of his father and significant emotional abuse. In addition, the inmate witnessed domestic violence committed by the father towards the mother, both in the home and in public situations. Also, he witnessed physical abuse by his father towards his siblings. He reports no history of sexual abuse.

| BAIR, Clifford | CDC# C-95079 |
|---|---|
| DVI | November 3, 2006 | Page 1 G |

INMATE COPY

## III.   EDUCATION:

Inmate Bair completed high school in 1962. At that time he entered the military. Following his Honorable Discharge from the Navy, he enrolled at Riverside City College, where he attended for one year. However, he did not receive any credits. He dropped out due to marital issues and a need to support his current family at the time. He denied any history of special education, academic or behavioral problems. He was able to complete high school while taking care of himself in the family home from age 14-18. His TABE score for reading is 9.5. Current educational pursuits involve his work interests. He is a certified welder, a journeyman plumber, a warehouse man, forklift operator, heavy equipment operator, history of truck driving certification license, and in addition, has certification as an underground natural gas worker.

## IV.   FAMILY HISTORY:

Inmate Bair was born in Kentfield, California, in 1944 to Blanche and Ezra Bair. He was born the third of four children. The inmate's parents divorced when the inmate was 29-years of age. Both remarried. He also has two stepsiblings whom he has little to no contact with, which are from the second marriage of his mother. Inmate's mother Blanche Marie Parker is deceased. She died in 1995 at the age of 73 due to emphysema. According to the inmate's reports, neither parent had a mental health history, though both drank heavily and smoked cigarettes. His mother was a high school dropout and her occupation was a housewife. She has no known legal or criminal history. His father, Ezra Clayton, is currently 88-years-old. He lives in a convalescent home in Oklahoma. He has no current or historical medical issues. He dropped out of school in the 10th grade. He is currently retired. By trade, he worked as a truck driver and a welder. His history of criminality includes a DUI and a possible assault, details unknown.

As mentioned previously, the inmate reports that he has little to no contact with his stepsiblings, Claudine and Carl. He reports that they both suffer from obesity. Their ages are 69 and 67 respectively. He reports no known mental health, substance abuse, or criminal problems for either of them. Both are high school graduates. Claudine works as a secretary and is also a housewife. Carl works as a janitor.

Inmate Bair has three full biological siblings, all of which he has monthly contact with either through letters, visits or communication through his current wife. He has letters of support and positive relationships with all of his siblings. Lloyd, his oldest brother, is 65-years of age. He has no known medical or mental health history, excluding a hearing problem that is genetic. He has a history of alcoholism, though has been clean and sober for approximately 15-20 years. He is a high school graduate. He has been married two times. He is still married to his second wife. His occupation is as a foreman for a farming company. He has no known legal or criminal history. His next sibling is Janice, who is 63-years of age; also his older sibling. She has no known mental health history. Medical history includes a diagnosis of epilepsy. She has no known substance abuse history. She dropped out of school in the 8th grade. At that time she married and had three kids from that marriage by the age of 20. She then divorced that husband and has been remarried since then. Her occupation is as a housewife. She has no known legal or criminal history. The inmate's only younger sibling, Gerald, is 56-years of age. He has no known mental health history. He suffers from a hearing problem that was diagnosed when he developed measles as a child. He has no other known medical problems. He additionally struggled with alcoholism early on in life, but has been clean and sober for 15-20 years. There is

| BAIR, Clifford | CDC# C-95079 |
| --- | --- |
| DVI | November 3, 2006 | Page 2 |

no known drug history for any of the siblings. Gerald graduated from high school. He has been married four times and is currently married. He works for a trucking company and he has no known legal or criminal history. Inmate reports that he gets along very well with all of his siblings. Letters of support in his file and statements made during the interview are all indicative of a long history of support for the inmate. All siblings are very involved in his parole plans.

## V. PSYCHOSEXUAL DEVELOPMENT/SEXUAL ORIENTATION:

The inmate reports that he reached the age of puberty at age 14. His first sexual relationship was at the age of 17 during a relationship that had a year and a half duration. His sexual orientation is heterosexual. He denies any disorders or dysfunctions of sexuality. He also reports the absence of any history of high-risk behavior, sexual aggression, or sexually aggressive fantasies.

## VI. MARITAL HISTORY:

Inmate Bair has been married six times, three marriages of which occurred preincarceration. His first marriage was in 1965 to Sharon Schatto. This marriage lasted six years, until they divorced in 1971. His first child, Shelly Lee, who is now 38-years-old is a product of this marriage. He has three grandchildren from this daughter. The inmate reports that he has a close relationship with his daughter and her three grandchildren. The inmate gives two primary reasons for the failure of this marriage. He takes responsibility for his own substance abuse, including the use of alcohol and amphetamines that created problems in his marriage. In addition, the primary reason he attributes to the divorce, was the birth of his first child. He said that he specifically told his wife that he did not want to have children, yet she became pregnant and subsequently he decided to leave the marriage.

Inmate Bair's second marriage occurred in 1973 to Patricia Skaggs. They separated after two years for the same reasons listed above in the first marriage; substance abuse and the birth of a child against the wishes of the inmate. His second daughter was born as a product of this marriage. She is 32-years of age currently and her name is Ginger Ann, last name unknown. He has not had any contact with his daughter nor Patricia Skaggs. Over the years he has made attempts to contact his daughter through the mother, who has not returned his letters. His daughter Ginger has two children, but the inmate has no contact with these grandchildren. He had initially thought that he was divorced in 1975 from Patricia Skaggs, but in time realized that the divorce never occurred. This marriage was eventually dissolved in 2001.

The inmate remarried in 1975 to Linda Evans. The two of them divorced in 1981. There were no children from this marriage, however, Linda had three of her own children of which the inmate cared for on and off during the marriage. In regards to the failure of this marriage, the inmate reports that he, in a manner of speaking, felt trapped into this relationship. He reports he had made the decision to leave. Prior to the marriage he left her, but was pulled over by an officer who found a sawed off shot gun in his car. Due to this charge, he was placed on probation. He felt as if he had no where else to go but to return to Linda and her children. Later they married and he states that she was unfaithful, having a relationship with her previous spouse. Eventually she made the decision to leave the inmate and return to assist her mother in Bodega Bay.

The inmate's fourth through sixth marriages occurred since he has been in prison. In 1988, he married a woman named Thelma. They met through an introduction from another inmate. They knew each other for a period of six months prior to the marriage. They were married for two years and saw each other in person a total of three times; the first being the marriage ceremony. Upon the third visit, the inmate stated that he became aware of hygiene issues on the part of his then wife. He reports he was unhappy with her lack of hygiene. He tried to discuss this issue or resolve it through letter writing, but when she was not open to having this discussion or modifying her behavior, he filed for divorce in 1990.

His fifth marriage occurred in 1995 when he married a woman named Isabel Larios. They had known each other for a year and a half, having had several visits beforehand. They met each other through writing letters. He reports that this relationship was satisfying for the both of them. He began developing skills of open communication and verbal expression of emotions. They were married for two years, after which time he was transferred from Tehachapi to Solano. Due to the distance of travel and the fact that her family lived in a different part of the state, they made a mutual decision to end the marriage. He has made attempts to contact her over the years through letters, but has received no letters in response.

His current marriage is to Valerie Maquin. They married in 2002. They had known each other since he was 12 through the introduction of Valerie's father. Valerie's father had been present at a difficult time in the inmate's life. He had actually witnessed a domestic violent situation between the inmate's parents and intervened to assist the family. In 2000, the inmate tried to reestablish contact with Valerie's father. When Valerie's father received the letter, he had Valerie respond. It was at this time that they began writing letters and shared visits for two years prior to their marriage. They have since been married for four years and the inmate reports that this relationship is very emotionally satisfying to both parties. She comes to visit the inmate on a weekly basis. She lives in Roseville, California. She works at the DMV.

In response to the Board's question of jealousy and his volatility in relationships based on his Life crime, an extensive discussion was conducted around the inmate's relationship history and his ability to maintain a healthy relationship with his current wife. There appears to be a theme in his early marriages that his expectations be followed by his partner. When his expectations weren't maintained to his satisfaction, the relationships ended. In discussion of the inmate's marriages that have occurred since incarceration, this theme has gradually transitioned to a more mature and cooperative stance in terms of relating to his partners. In his first marriage while he was in prison, they had only known each other for six months and had very few contacts. When he was unsatisfied with the issue of hygiene in the relationship he attempted to resolve this through letter writing. When he felt that she was not able to have this conversation or modify her behavior in any way the marriage was ended. Looking at his marriage with Isabel, the trend that begins to appear is that he slowly gets to know the woman for a longer period of time prior to the marriage. His first marriage in prison occurred after six months of knowing each other, the second one they had written letters and communicated for a year and a half prior to the marriage, and specifically in this marriage the decision to get a divorce was a mutual decision and not based in conflict. And finally in his current relationship he discusses priorities of honesty, open lines of communication, the understanding that he cannot control another person's behavior and vice versa. He seems to have made great strides in this area and is able to give scenarios and realistic plans of how to handle conflict or distressing situations that can inevitably occur in a marriage. It appears that through his sobriety, relationship experiences, and his work on self-help, that these factors may have contributed to a maturation that has led to a value of

relationships for not only what he receives from the other person, but mostly what he has to contribute as a person.

## VII.  MILITARY HISTORY:

Inmate served in the United States Navy as a Chief Torpedo Man and Sonar Man from 09/1962 to 09/1966. He was involved in combat while he was in the Tonkin Gulf on two occasions. He was stationed on the USS Gridley, which is a guided missile frigate. His Army Number was 6889270. He received an Honorable Discharge from the Navy and has full Veteran benefits. He had one incident of problem behavior while he was in the military. According to his reports he was on liberty and had been drinking. A friend, who was not feeling well, asked him to cover for a four-hour duty watch and he was Court Marshaled for thirty days and busted down to Seaman for falling asleep on duty and being intoxicated.

## VIII.  EMPLOYMENT/INCOME HISTORY:

By his own report, inmate Bair, demonstrates considerable skilled labor prior to incarceration. Beginning in 1966 he worked for Santa Fe Railroad as a telegrapher. In 1968, he left that job in order to seek an increase in pay in the field of construction. For the next two years he worked at Cedars Springs Dam as a heavy equipment operator. The job was temporary in nature and he left when the job was completed. In 1970 he worked at Parris Dam, for a two-year period as a heavy equipment operator, until that job had been completed. At the completion of that job the inmate transitioned to S&E Pipeline Company and began working as a truck driver which he did for two years. In 1974, he left this field for a better job working for J&J Boring Underground Water as a laborer and truck driver until 1979. From 1979 until his arrest in 1984 he worked for W. M. Lyles Underground Natural Gas Pipeline.

Inmate Bair has been certified and has worked in several skilled trades since he has been incarcerated. He began working as a plumber at Old Folsom. He also worked in plumbing at Soledad and Donovan for the duration of 1984 to 1991. In 1991, he transitioned into maintenance in PIA while at Donovan, working at this job for a period of two years. In 1993 after he had transferred to Tehachapi, he worked for four years as a hobby shop clerk. In 1997 he returned to plumbing while he was in prison at Solano. From 1998 to 2005 he worked in PIA at Old Folsom as a certified welder. From 2005 to present he has worked as a porter in the OHU and is currently working in PIA. As mentioned previously in the education section, the inmate has received several certifications while in prison and also preincarceration. He is certified as a forklift operator, a warehouseman, a journeyman plumber, an underground natural gas worker. He has utilized every possibility to gain employable work skills since he has been incarcerated. In addition, he has and continues throughout his entire period of incarceration to receive above average rating on his supervisor's work reports. In July 2006, during this reporting period, he received certificates of achievement. Specifically, since July 2006, he has received these achievement certificates in warehouse, fork lift, material distribution, and stock inventory. It is noted that he has a considerable amount of chronos and certificates dating back to the beginning of his incarceration for above average participation and work performance.

| BAIR, Clifford | CDC# C-95079 |
|---|---|
| DVI | November 3, 2006 | Page 5 |

## IX.    SUBSTANCE ABUSE HISTORY:

Inmate Bair reports that he began drinking alcohol at the age of 10, although documents in his file state his first use of alcohol occurred at age 12. He stated that he began taking alcohol from his father at that age and began drinking heavily while he was high school and living on his own. He reports this increased throughout his lifetime until he was incarcerated. It was in 1966 when he was 23-years-old that he began taking amphetamines in pill form. This habit increased over time until his point of incarceration where he was taking up to forty pills a day. The only treatment reported or documented prior to incarceration for substance abuse was a thirty-day drug treatment program which he reports was a failure in attempting to move him towards sobriety. He states that at the time of committing his Life crime, he was under the influence of alcohol and amphetamines. At the point when he was arrested and taken to county jail (01/27/84), he states he has been clean and sober. He reports that his commitment to sobriety occurred at the time of incarceration and that he began involvement in Alcoholics Anonymous (AA) in 1988, although this early participation was not documented in his file. His full time participation in AA began in 1998. He also estimates a total of three years past participation in Narcotics Anonymous (NA). He just restarted this program approximately one week ago.

Excluding his Life crime, Inmate Bair has two previous charges on his record for substance-related issues. One was for possession of amphetamine, which occurred in 1974. Another was in 1980 for being under the influence of substances. His first offense in 1969 was for reckless driving, although it is unknown whether he was under the influence of alcohol at that time. It appears by his report and his lack of disciplinaries for alcohol or illegal drugs while incarcerated, that he has maintained his sobriety throughout his entire period of incarceration. He remains committed to staying clean for the remainder of his life. He has extensive plans involving attending AA and NA meetings in all the counties that he could possibly parole to; Sacramento, Solano, and Tulare Counties. He also has a relapse prevention plan developed should the need arise. These plans include several identified sober living environments, attending AA and NA, and acquiring a sponsor.

## X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Bair denies any previous psychiatric history. There is no known history of psychiatric hospitalizations or psychotropic medication. He denies any history of serious head injuries or serious accidents that have caused medical problems. There are no reports of suicidal or homicidal ideation or attempts in the past. He does endorse one suicidal gesture while in county jail where he had cut his wrists. However, he reports he had no intent to kill himself and only did this out of distress related to his situation. He denies any instances of seizures or other neurological conditions. The inmate has no significant impairments or illnesses aside from hearing loss, which is reportedly due to an ear infection approximately eight and a half months ago. There is also a genetic predisposition in their family to developing hearing loss. Inmate Bair is currently taking two medications for urination problems related to prostate issues.

## XI.    PLANS IF GRANTED RELEASE:

Inmate Bair has several parole plans based in three different counties. His primary parole plans involve paroling to Roseville, California, and residing with his current wife. Previous Board

| BAIR, Clifford | | CDC# C-95079 |
|---|---|---|
| DVI | November 3, 2006 | Page 6 |

hearings have suggested that he also develop parole plans for Tulare and Solano Counties in case he is paroled to either one of these counties. His plans if paroled to Sacramento include living with his current wife, Valerie Blair, in Roseville, California, and registering with laborer and teamster's unions. He has details of membership fees, locations, and all of the skills that would render him qualified to re-join these unions. He also plans to apply for unemployment upon release. Inmate Bair is qualified for jobs in welding, plumbing, warehouse, forklift operation. In addition, he has just taken a hazardous materials test for which he is awaiting the results. He has several potential job offers located in the Sacramento area, including Sacramento Works and a job offer at a shop where his brother works. If he is able to get his truck driving license, he has been offered a job where his brother Gerald works. In addition, he has resources available to him for housing, job referrals, and other support services available through the Veteran's Administration. AARP is also a program that has offered to assist him in locating employment in these different locations. There are letters in his file that document to this fact. He also has documentation from six different welding companies that are willing to interview him upon release. In addition to employment opportunities, he has saved $9,000 to help with his transition into the community. He has researched extensive self-help resources in all the communities described above. He has looked into sober living environments as a back-up housing option and has the meeting times and locations for AA and NA for the above counties.

Specific to Sonoma County, he plans to perform all of the tasks above in terms of registering with the union, unemployment, self help, etc.; but he also has received a job offer with Job Link in Santa Rosa. If he resides in either Solano or Tulare County and does not have housing with his wife, he has sufficient finances to set up an apartment, utilities and food. As necessary he plans to purchase a bicycle until that time when he would have the finances to purchase a car for purposes of employment.

In regards to Tulare County, he has written several temp agencies; Labor Ready, Prime Labor and Staffing. Health and Human Services Division located in this county has written a letter to him regarding job placement and housing support if necessary. He has also taken the steps to retrieve information for his employers regarding the tax benefits that they would receive if they were to hire an ex-offender and has paperwork available to apply to the Federal Bonding Program. As is clear of the above parole plans, this inmate has followed recommendations to seek job offers, housing plans, and support in these different counties. He appears to have viable parole plans for each county. His organizational skills and his tenacity regarding these plans were quite clear during the interview. His prognosis for community living is good considering these factors. In addition, he is more than willing to comply with the conditions of parole.

## Clinical Assessment

## XII.   CURRENT MENTAL STATUS/TREATMENT NEEDS:

General Appearance: Inmate looks his apparent age. Activities of daily living are adequate. Posture is slumped. Locomotion is self. His attitude was amiable and cooperative.

Psychomotor Status: His activity level was within normal limits. Eye contact was excellent. There were no problems noted with abnormal facial, extremity, or trunk movements.

---

<u>Orientation and Memory:</u> He was alert and oriented to person, place, and time. His remote, recent past memory, immediate retention, recall, and delayed recall were all good.

<u>Speech and Language:</u> Concentration and attention are good. Language and speech were good. No abnormal speech patterns were noted.

<u>Information and Intelligence:</u> His general fund of knowledge was good. His judgment appeared critical.

<u>Thought Process and Content:</u> Thought process was good. There were no problems associated with delusions, hallucinations, odd thought content, or negative symptoms of Schizophrenia.

<u>Affective State:</u> His affect was bright. Mood was euthymic. Inmate denied suicidal and homicidal ideation. There was no evidence of appetite disturbance, psychomotor retardation, impulsivity, flight of ideas, sleep disturbance, hopelessness, decreased need for sleep, pressured speech, anhedonia, bereavement, grandiosity or racing thoughts.

As per DSM-IV, the following diagnostic impressions appear appropriate for this inmate:

| AXIS I | 303.90 | Alcohol Dependence, in institutional remission. |
| | 304.40 | Amphetamine Dependence, in institutional remission. |
| AXIS II | V71.09 | No diagnosis on Axis II. |
| AXIS III | | Hearing loss, prostate problems. |
| AXIS IV | | Incarceration for a Life sentence. |
| AXIS V | GAF = 90 | Global Assessment of Functioning (on a scale of 0-100). |

Inmate's current level of care is in the General Population. He is not currently in any treatment activities. He is not currently on any psychotropic medications. His prognosis for continued mental health is good.

## XIII. REVIEW OF LIFE CRIME:

Inmate states that the version of his offense as stated of record is correct. The following excerpt is taken from the presentencing report from the Superior Court of California, County of Sonoma.

"Clifford Bair was a resident of the Bodega Bay area for two to three years and at that time he did some yard work for Teresa Aiken, a long time resident of Bodega Bay, and commonly known as the "Mother of Bodega Bay."

Apparently, in more recent times the defendant and his ex-wife Linda Bair purchased a home in Visalia, California, which his ex-wife Linda was living in January of this year. During 1983, the defendant apparently was working in the Los Angeles area for a construction company, the name of which is in the district attorney's file if you need it.

On January 20th, Linda Bair left Visalia and came to Bodega Bay to visit with family members and left the defendant at her home in Visalia without any transportation. On Saturday night a very nice pick up truck was stolen in Visalia and turned up on January 24th in the Harbor View Motel in Bodega Bay in the possession of the defendant. Mr.

Bair checked into the Harbor View Motel at about noontime on the 24th and registered under a false name, address, and city. He prepaid for two nights at this motel. The motel was in view of Mrs. Aiken's home at approximately 50-70 yards distance.

On the morning of January 25th, the defendant was seen in his motel room and the pick up truck was gone. On the 26th, the pick up truck was discovered about a mile and a half from Bodega Bay down a ravine totally burned up. There were no license plates on the pickup. Found also on the 26th of January the defendant checked out of the Harbor View Motel and took with him all his trash, including trash liners from trash cans and all towels in the room. There was no known reason for this conduct.

Sometime in the afternoon of January 26th, the defendant apparently purchased a six-pack of beer, a Dragger sandwich, a package of Tom's peanuts, and some potato chips at the Dry Dock Cafe in Bodega Bay. The Dry Dock is within 75 yards of Mrs. Aiken's house and forms a triangle with Mrs. Aiken's home and the Harbor View Motel. Apparently, the defendant then went to Mrs. Aiken's home on foot where he somehow overpowered Mrs. Aiken, took her sunglasses from her, rendered her almost blind, and then tied her and gagged her. He placed her underneath her bedding and a mattress on the floor of her bedroom. He disconnected the telephones in the home. At about four in the afternoon or around four fifteen, Rosie Fomasi, arrived at Mrs. Aiken's home to deliver her mail. When she entered the home she was ordered by the defendant to lay down on the floor in the bedroom and not to look at his face. He then tied up Rosie Fomasi with the electrical wire cut from Mrs. Aiken's iron. The defendant then left with Mrs. Aiken's eyeglasses and almost all of her keys and her car, which was garaged in a separate detached garage. Unfortunate for the defendant, he left behind at Mrs. Aiken's two Budweiser beer cans, the wax paper from his sandwich and the paper from his potato chips, two paper napkins from the Dry Dock and the empty peanut sack. Rosie Fomasi and Mrs. Aikens were eventually found in the morning at approximately 8:30 when a friend of Mrs. Aikens became concerned with the fact that her car was gone from the garage and they could not get an answer on the telephone from the house. Mrs. Aiken was dead when found and Rosie Romasi was found in the living area of the house having crawled there during the night. Rosie Fomasi suffered from severe swelling of her hands and lungs which resulted from having been bound all night long.

Sometime during the night probably between 10:00 p.m. and midnight, Mrs. Aiken's car became stuck on the shoulder of Lakeville Highway across the roadway from Gilardi's Resort. This resort is located the south end of the City of Petaluma. The defendant, having gotten the car stuck on the shoulder, abandoned the car at that point and stole an ocean going sailboat from the Lakeville Marina which is part of Gilardi's resort. The defendant left in Mrs. Aiken's car, a Pepsi can with a thumbprint on it, a Budweiser beer can and other items which connect back to Mrs. Aiken's house. Also in the car were found all the keys taken from Mrs. Aikens and on the ground next to the car were Mrs. Aiken's eyeglasses.

At approximately 7:30 in the morning of January 27th the owner of the sailboat arrived at the Marina and discovered the sailboat gone from its berth. He eventually found the sailboat up the Petaluma River stuck in mud of the bank. As he approached his sailboat, the defendant was observed on the deck holding what appeared to be a shot gun or a length of pipe and ordered the owner of the boat not to come any closer.

| BAIR, Clifford | | CDC# C-95079 |
|---|---|---|
| DVI | November 3, 2006 | Page 9 |

The owner retreated to Lakeville Marina where he watched the boat through binoculars until the Sheriff's Department arrived. During that period of time he saw the defendant go over the side of the boat and disappear into the surrounding area. The defendant was eventually found a short distance from the boat hiding in a flood gate. When he was arrested he was wearing clothing stolen from the boat and had on his person a flare gun and flare gun shells also taken from the boat. On his person were also shot gun shells. The defendant was arrested and taken to the Sonoma County Sheriff's Office."

## XIV. ASSESSMENT OF DANGEROUSNESS:

The research that has been done on determining dangerousness for inmates who have been released on parole has demonstrated factors that can be identified as risk factors and those that can be identified as, what can be called, protective factors. These protective factors are related to a lower risk of recidivism or dangerousness, but it must be stated that the predictive value of these factors is based on correlational data. Therefore it must be recognized that there are limits to the opinions set forth in this evaluation as a result of these factors. Considering this, it is recommended that this clinical evaluation be only one aspect in the process of determining the suitability of parole. The inmate has three risk factors that may indicate a higher risk of future violence. However, these risk factors are historical in nature and are not indicative of the last twenty-two years he has spent in prison. These factors include his substance abuse history, that he was intoxicated during the offense, and a previous history of criminal behavior. It is important to note that the previous history of criminal behavior did not include violent crime. His crimes were more suggestive of an increasing difficulty with substance abuse, including reckless driving, possession of amphetamines, possession of a weapon, under the influence of illegal substances, and ending with vandalism prior to the current Life offense.

There are many more positive factors present in this case that suggest that this inmate may be a lesser future danger to society. He actually meets all of the protective factors that have been identified in the research as being related to a lower likelihood of future crime. The inmate has been married six times. Individuals who have been married tend to have a lower rate of recidivism or dangerousness in the community. It is also positive that he is 62-years of age. It has been noted that violence in men tends to attenuate over the age of 35. He has demonstrated prosocial involvement with his peers and has also been commended for his excellent attitude and work performance since he has been incarcerated. Research shows that individuals who participate in prosocial activities have a lesser likelihood of future violence. His participation in Alcoholics Anonymous throughout his period of incarceration and his three-year participation in Narcotics Anonymous is also another factor suggestive of prosocial involvement, as he is not only maintaining his own sobriety, but assisting others in recognizing and sustaining their own sobriety. He has numerous letters of support from family and friends. He has continued to receive family support throughout the years, attests to monthly contact with all siblings, his wife, and father when it is possible. As stated in the parole plans section, this inmate has given significant priority to developing viable vocational plans, housing, and ways to maintain his sobriety in the community. He has developed reasonable accommodations and vocational possibilities in three counties.

His level of preparedness for parole is higher than that noted of other inmates in his similar situation. His work skills are varied and he appears to be employable in many different fields.

Insight into his life crime and demonstration of remorse are also two factors associated with success on parole. Inmate Bair makes a statement in his account of the crime to attest to his level of remorse regarding the offense, "I have committed a crime to where there is absolutely nothing I will be able to do to make amends for what I have done. Yes I'm sorry and ashamed, and extremely sad that I murdered Mrs. Atkins, and destroyed Mrs. Fomasi's life." Since his arrival in prison he stands by his maintenance of sobriety. He makes the statement, "I sincerely believe that my prison record over the past 22-years clearly shows that I am sober and free of drugs and that I am going to stay that way. I respectfully submit this to you in the hope that you will see me as the man I am today."

And finally the last protective factor present in this case is the fact that this inmate has yet to receive a disciplinary for violent behavior in prison. This is an indicator that his future risk for violence is below average. He has received only one disciplinary for his entire time incarcerated, this was for possession of tobacco. In addition, there are six documented CDC-128(A) chronos, which in summary, are for not following instructions.

Assessment of dangerousness within the controlled setting of an institution is seen as below average in comparison with other inmates. Assessment of dangerousness if released into the community is seen as below average in comparison with other inmates.

## XV.    CLINICIAN'S OBSERVATIONS/ COMMENTS/ RECOMMENDATIONS:

Due to concerns that the last Board Report did not address psych issues raised in the July 2003 hearing, this conclusion is going to comment specifically on the recommendations and requests made by the Board. The first issue raised was of the prisoner's violence potential in the free community. As stated in the assessment of dangerousness, excluding the inmate's Life crime, there are no other incidents of violence in the inmate's history either preincarceration or since he has been incarcerated. Inmate Bair has been disciplinary free from violence throughout his entire time in CDC. He has participated in a considerable amount of self-help programs in excess of what many inmates in his situation have done. Therefore in regards to his violence potential the assessment of dangerousness and the likelihood to commit a violent act in the community is below average in comparison with other inmates.

Excluding previous criminal history for non-violent crimes, the only historical factor that is associated with dangerousness in the future are his problems that he had with alcohol and drugs. He appeared to have a considerable substance abuse history with his alcohol problem starting as early as age 10. These problems in combination with relationship factors led to his crime. Throughout his entire 22 years in prison, he has demonstrated an ability to refrain from alcohol and illegal drug use. He has developed relapse prevention plans should any problems occur in the future. He has also spent a significant amount of time researching sober living environments, and AA and NA groups in his potential parole communities. It is also believed that the work he has done to explore his commitment offense and the potential causes of that, has led him to a place in his life where he is very motivated and has the skills to maintain his sobriety.

Through psychological evaluations over the years and the inmate's letters that he has written about his Life crime, it is clear that he has explored the contributing factors to his crime. While he understands that alcohol and drugs significantly contributed to his actions on the day of the offense, he takes full responsibility for his actions. As far as further therapy recommended

action, it is highly recommended that he continue his participation in AA as he has done for the past several years. In addition, he has just rejoined NA and it would be beneficial for him to continue with his participation in this particular group. His work ethic, ability to adjust to institutional living, and his own goals for self-improvement are likely to continue during his period of incarceration and appear to be sustainable upon parole.

The final issue of concern by the Board in July of 2003 was the issue of jealousy as it related to the commitment offense. Previous statements by the inmate described a jealous rage as a contributing factor to the crime. During this interview there was extensive discussion of his relationship history as it relates to his six marriages. From this discussion it appears that the inmate is aware that his three marriages prior to incarceration were significantly impaired by his own use of alcohol and drugs. He also understands that during these relationships he felt the need to control the relationship and when his partners would not abide by his expectations, he would leave the relationship. This pattern continued during his fourth marriage. He knew the individual for a short period of time, six months prior to their marriage. He did make an attempt, which is a new behavior for him to try to resolve his concerns through letter writing and open discussion. When this was not achieved to his satisfaction that marriage ended. The last two relationships (his last divorce and his current marriage) are more indicative of new relationship skills learned on behalf of the inmate involving: open communication, honesty, and being able to make mutual decisions. Based on the above points, it is important to note that jealousy has not been researched as a significant factor in contributing to dangerousness and future violence of inmates who parole. However, in light of the Board's concerns the inmate's self-help work over the years and his current relationship are suggestive of a level of maturation that is encouraging for his future. In conclusion, there appears to be no factors that would preclude routine release planning in this case.

Noted by:


HEATHER MANN, Ph.D.
Staff Psychologist

JOHN RANISESKI, Ph.D.
Senior Psychologist Supervisor

HM/tav

Original: C-File
cc:       Medical File


COPY SENT TO INMATE  11-30-06 SM

ATTORNEY

# DEUEL VOCATIONAL INSTITUTION
## Life-Term Inmate Evaluation for the Board of Prison Terms
## Mental Health Evaluation
## (Revised 1998)
## July 2006, Lifer Calendar

Psychosocial Assessment

I. IDENTIFYING INFORMATION:

| | |
|---|---|
| Name: | Bair, Clifford |
| CDC: | C-95079 |
| Age: | 61-years-old |
| DOB: | 09/14/44 |
| Marital Status: | Married, two children |
| Ethnicity: | White |
| Gender: | Male |
| Religious Preference: | Protestant |
| Nicknames/Alias: | "Cliff" |
| Tattoos: | None |

This is approximately the fourth psychological report to the Board of Prison Terms on this 61-year-old (DOB 09/14/44), married white male serving a 25-years-to-Life sentence for PC 187, Murder in the 1st Degree, plus two year enhancement for False Imprisonment. He entered the California Department of Corrections on 11/02/84 and has served 21 years.

This report is based upon a review of the inmate's central file, medical and psychiatric record, and an hour and a half assessment interview. Inmate was informed of the nature and purpose of the interview, his right to refuse to be interviewed and the lack of confidentiality of statements made by him in the interview. The inmate agreed to voluntarily participate in the interview.

INMATE COPY

II. DEVELOPMENTAL HISTORY:

Prenatal/perinatal concerns, the inmate reports that his mother smoked and drank while pregnant with him, and that he was almost born in the car on the way to the hospital. Inmate denied any abnormalities of developmental milestones including speech, language, or motor development. The inmate stated his habits, peer interactions, and socialization skills were good. He denied any history of cruelty to animals, enuresis, or arson. The inmate has a significant childhood history in which he was abandoned at the age of 14. His parents moved away and left him in a mobile home by himself. Inmate reports that his father was physically abusive, noting, "He beat me." He states his father was an alcoholic. The inmate denied any history of sexual abuse as either the perpetrator or victim.

COPY SENT TO INMATE 6-12-06 su



13 G

III.    EDUCATION:

Inmate's claimed grade level is the twelfth grade. He earned his high school diploma in 1962. He states he attended one year of city college, but then dropped out. He denied any history of special education or academic/behavioral problems. Inmate is a certified welder, a journeyman plumber, and has certification as an underground natural gas worker.

IV.    FAMILY HISTORY:

The inmate was born in Kentfield, California in 1944 to Blanch and Ezra Bair. He was born third of three children. He also has two step-siblings. Inmate's mother, Blanch Marie Parker, is deceased. She died in 1995 at the age of 73 due to emphysema. She had no mental health history, though drank heavily and smoked cigarettes. She was a high school drop out and was a housewife. She had no legal or criminal problems. Inmate's father, Ezra Clayton is currently 88-years-old. He lives in a convalescent hospital in Oklahoma. He has no mental health or medical history, though was a heavy alcohol user and smoked cigarettes. He dropped out of school in the tenth grade. He is currently retired, though worked as a truck driver and welder. He has had a DUI and possible assault criminal charges, although the inmate is uncertain.

The inmate reports he is not too close with his step-siblings, Claudine and Carl. He reports that both Claudine and Carl are morbidly obese, ages 69 and 67 respectively. He reports no mental health or substance abuse problems for either of them. Both are high school graduates. Claudine works as a secretary/housewife and Carl works as a janitor. There are no legal or criminal problems for either. The inmate's full brother, Lloyd, is 64-years-old. He has no mental health history, although does have a severe hearing problem. He also reports his brother has an alcohol problem, though is currently sober. He is a high school graduate and a shop foreman and truck driver. He has no legal or criminal problems. The inmate's older sister, Janice, is 63-years-old. She has no mental health or substance abuse problems. She does have epilepsy. She dropped out of school in the eighth grade, got married at age 14, and is currently a housewife. She has no legal or criminal history.

Inmate states he gets along very well with Lloyd and Janice.

V.    PSYCHOSEXUAL DEVELOPMENT/SEXUAL ORIENTATION:

The inmate states he reached puberty at the age of 14. His first sexual relationship was at the age of 17. His sexual orientation is heterosexual. He denies any disorders or dysfunctions of sexuality. He also denies any history of high risk behavior, sexual aggression, or sexually aggressive fantasy.

## VI. MARITAL HISTORY:

Inmate has been married six times. His first marriage was in 1964, while he was in the Navy, to Sharon Chatto. They divorced in 1971. He states, "She was a liar." The inmate was a drunk and a drug addict at that time. His second marriage was in 1972 to Patricia Skaggs. They divorced in 2001. He thought he was divorced a long time ago, so he married Linda Evans in 1975. They divorced in 1981. He reports, "She was unfaithful and a liar." The inmate's fourth through sixth marriages occurred while he was in prison. 'In 1988, the inmate married a woman named Thelma. They divorced in 1990. He said he married her for family visits and divorced her due to "poor hygiene." In 1995, he married Isabel Larios. They divorced in 1997 due to the lack of family visits. In 2002 he married Valerie Maquin. He is currently married. He states he knew her for a long time through her father. It appears that the inmate has matured somewhat and values relationships for their own sake rather than what they bring him at this point.

The inmate has two children, Shelly Lee and Ginger Ann. His daughter, Shelly Lee, is 36-years-old and has three children. He notes they talk and are very closely. His other daughter, Ginger Ann, is 32-years-old and has two children. He has no communication with her. Shelly Lee's mother is Sharon Chatto. Ginger Ann's mother is Patricia Skaggs. He states he gets along with Shelly Lee and her children very well. He contacts them regularly, but has no contact with Ginger Ann.

## VII. MILITARY HISTORY:

Inmate served in the United States Navy as a Chief Torpedo Man and Sonar Man from September 1962 to September 1966. With regard to combat experience, he was in the Tonkin Gulf twice on the U.S.S. Gridley, a guided missile frigate. His Army Number was 6889270. He said he was in a military court marshal for thirty days. He later was restored and busted to seaman. He reports it was for falling asleep on duty due to being intoxicated. He only received thirty days restricted to the ship.

## VIII. EMPLOYMENT/INCOME HISTORY:

In 1966 prior to incarceration, the inmate worked for the Santa Fe Railroad as a telegrapher. In 1968, he quit to make more money in construction. From 1968 to 1970 he worked at Cedar Springs Dam as a heavy equipment operator. He quit there when the job was completed. In 1970 he worked at the Paris Dam until 1972 as a heavy equipment operator until the job was completed. In 1972, he worked for S&E Pipeline Company as a truck driver until 1974. In 1974 he got a better job. He worked for J&J Boring Underground Water, as a laborer and truck driver until 1979. From 1979 until his arrest in 1984, he worked for W.M. Lyles Underground Natural Gas Pipeline.

Once incarcerated, the inmate worked as a plumber at Old Folsom, Soledad, and Donovan from 1984 to 1991. From 1991 to 1993 he worked in maintenance in PIA at Donovan. From 1993 until 1997 he worked as a hobby shop clerk at Tehachapi. From 1997 to 1998 he worked as a plumber in Solano. From 1998 to 2005 he worked in PIA in Old Folsom as a certified welder. From 2005 to the present here at DVI, the inmate worked as a porter in the OHU for a couple of

months. He is currently working in PIA. The inmate continuously and routinely receives exceptional and above average ratings on his supervisor's work reports. The inmate recently signed up for the CNC Router class in PIA which is a computer class.

## IX. SUBSTANCE ABUSE HISTORY:

The inmate reports he had his first drink of alcohol at the age of 12. He then began drinking a lot. In 1966, at the age of 23, he started taking amphetamines. He reports he was intoxicated daily until his arrest. He does report attending a 30-day drug treatment program, however, this was a failure. He has been attending Alcoholics Anonymous (AA) continuously since 1998, noting that prior to this he had been attending it on and off.

## X. PSYCHIATRIC AND MEDICAL HISTORY:

The inmate denies any previous psychiatric history. With regard to his medical history, he has a heredity hearing loss. He states the hearing loss was also due to an ear infection two and a half months ago. He says he has been operated on twice for ulcers prior to incarceration in 1969 and 1971. He denies any history of serious accident or head injury. He denied any history of suicidal, homicidal, or assaultive behavior. He denied any instances of seizures or other neurological conditions. The inmate has total hearing loss in one ear. He is currently taking two medications for urination problems.

## XI. PLANS IF GRANTED RELEASE:

Inmate plans to live with his current wife, Valerie Bair, in Roseville, California. However, if he has to parole to Santa Rosa, he will get an apartment. Financial plans include him working with his brother, Gerald Bair, in a trucking company in Woodland, California. This inmate has quite detailed parole plans, with six different job interviews. He is more than willing and prepared to comply with the conditions of parole. He appears quite adamant about being successful. Prognosis for community living is good.

### Clinical Assessment

## XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

General Appearance: Inmate looks his apparent age. Posture is adequate. Locomotion is self. His attitude was amiable and cooperative.

| BAIR, Clifford | | CDC# C-95079 |
|---|---|---|
| DVI | May 18, 2006 | Page 4 |

Psychomotor Status: His activity level was within normal limits. Eye contact was excellent. Gait was steady. There were no problems associated with abnormal facial, extremity, or trunk movements.

Orientation and Memory: He was alert and oriented to person, place, and time. His remote, recent past memory, immediate retention, recall, and delayed recall were all good.

Speech and Language: Concentration and attention are good. Language, speech, spontaneity, and comprehension were good. Prosody and flow were good. No abnormal speech patterns were noted.

Information and Intelligence: His general fund of knowledge was good. His judgment appeared critical. His insight appeared true.

Thought Process and Content: Thought process was logical and coherent. There were no problems associated with delusions, hallucinations, delusional thought content, or negative symptoms of Schizophrenia.

Affective State: His affect was within normal limits. Mood was euthymic. Inmate denied suicidal and homicidal ideation. There was no evidence of appetite disturbance, psychomotor retardation, impulsivity, flight of ideas, sleep disturbance, hopelessness, decreased need for sleep, pressured speech, anhedonia, bereavement, grandiosity or racing thoughts.

As per DSM-IV, the following diagnostic impressions appear appropriate for this inmate:

| AXIS I | V71.09 | No diagnosis on Axis I. |
| AXIS II | V71.09 | No diagnosis on Axis II. |
| AXIS III | | Hearing loss. |
| AXIS IV | | Incarceration for a Life sentence. |
| AXIS V | GAF = 90 | Global Assessment of Functioning (on a scale of 0-100). |

Inmate's current level of care is in the General Population. Inmate is not currently in any treatment activities. He is not currently on any psychotropic medications. His prognosis for continued mental health is good.

## XIII. REVIEW OF LIFE CRIME:

Inmate states that the version of his offense as stated of record is correct. The following excerpt is taken from the presentencing report from the Superior Court of California, County of Sonoma.

17 G

"Clifford Bair was a resident of the Bodega Bay area for two to three years and at that time he did some yard work for Teresa Aiken, a long time resident of Bodega Bay, and commonly known as the "Mother of Bodega Bay."

Apparently, in more recent times the defendant and his ex-wife Linda Bair purchased a home in Visalia, California, which his ex-wife Linda was living in January of this year. During 1983, the defendant apparently was working in the Los Angeles area for a construction company, the name of which is in the district attorney's file if you need it.

On January 20th, Linda Bair left Visalia and came to Bodega Bay to visit with family members and left the defendant at her home in Visalia without any transportation. On Saturday night a very nice pick up truck was stolen in Visalia and turned up on January 24th in the Harbor View Motel in Bodega Bay in the possession of the defendant. Mr. Bair checked into the Harbor View Motel at about noontime on the 24th and registered under a false name, address, and city. He prepaid for two nights at this motel. The motel was in view of Mrs. Aiken's home at approximately 50-70 yards distance.

On the morning of January 25th, the defendant was seen in his motel room and the pick up truck was gone. On the 26th, the pick up truck was discovered about a mile and a half from Bodega Bay down a ravine totally burned up. There were no license plates on the pickup. Found also on the 26th of January the defendant checked out of the Harbor View Motel and took with him all his trash, including trash liners from trash cans and all towels in the room. There was no known reason for this conduct.

Sometime in the afternoon of January 26th, the defendant apparently purchased a six pack of beer, a Dragger sandwich, a package of Tom's peanuts, and some potato chips at the Dry Dock Cafe in Bodega Bay. The Dry Dock is within 75 yards of Mrs. Aiken's house and forms a triangle with Mrs. Aiken's home and the Harbor View Motel. Apparently, the defendant then went to Mrs. Aiken's home on foot where he somehow overpowered Mrs. Aiken, took her sunglasses from her, rendered her almost blind, and then tied her and gagged her. He placed her underneath her bedding and a mattress on the floor of her bedroom. He disconnected the telephones in the home. At about four in the afternoon or around four fifteen, Rosie Fomasi, arrived at Mrs. Aiken's home to deliver her mail. When she entered the home she was ordered by the defendant to lay down on the floor in the bedroom and not to look at his face. He then tied up Rosie Fomasi with the electrical wire cut from Mrs. Aiken's iron. The defendant then left with Mrs. Aiken's eyeglasses and almost all of her keys and her car, which was garaged in a separate detached garage. Unfortunate for the defendant, he left behind at Mrs. Aiken's two Budweiser beer cans, the wax paper from his sandwich and the paper from his potato chips, two paper napkins from the Dry Dock and the empty peanut sack. Rosie Fomasi and Mrs. Aikens were eventually found in the morning at approximately 8:30 when a friend of Mrs. Aikens became concerned with the fact that her car was gone from the garage and they could not get an answer on the telephone from the house. Mrs. Aiken was dead when found and Rosie Romasi was found in the living area of the house having crawled there during the night. Rosie Fomasi suffered from severe swelling of her hands and lungs which resulted from having been bound all night long.

Sometime during the night probably between 10:00 p.m. and midnight, Mrs. Aiken's car became stuck on the shoulder of Lakeville Highway across the roadway from Gilardi's Resort. This resort is located the south end of the City of Petaluma. The defendant, having gotten the car stuck on the shoulder, abandoned the car at that point and stole an ocean going sailboat from the Lakeville Marina which is part of Gilardi's resort. The defendant left in Mrs. Aiken's car, a Pepsi can with a thumbprint on it, a Budweiser beer can and other items which connect back to Mrs. Aiken's house. Also in the car were found all the keys taken from Mrs. Aikens and on the ground next to the car were Mrs. Aiken's eyeglasses.

At approximately 7:30 in the morning of January 27th the owner of the sailboat arrived at the Marina and discovered the sailboat gone from its berth. He eventually found the sailboat up the Petaluma River stuck in mud of the bank. As he approached his sailboat, the defendant was observed on the deck holding what appeared to be a shot gun or a length of pipe and ordered the owner of the boat not to come any closer.

The owner retreated to Lakeville Marina where he watched the boat through binoculars until the Sheriff's Department arrived. During that period of time he saw the defendant go over the side of the boat and disappear into the surrounding area. The defendant was eventually found a short distance from the boat hiding in a flood gate. When he was arrested he was wearing clothing stolen from the boat and had on his person a flare gun and flare gun shells also taken from the boat. On his person were also shot gun shells. The defendant was arrested and taken to the Sonoma County Sheriff's Office."

## XIV.  ASSESSMENT OF DANGEROUSNESS:

Research has been done on determining dangerousness when inmates have been released on parole. There are several factors that have been identified as risk factors and several factors that have been identified as factors that may reduce the risk of recidivism or dangerousness, but it must be stated on the outset that the reliability and validity of these is quite low and there are limits to the opinions expressed as a result of these factors and clinical interviewing. Given the low predictability of clinical evaluation, very little weight should be given to the opinion herein in determining suitability for parole.

The inmate has several risk factors that may indicate a higher risk of future violence. These include his substance abuse history and that he was intoxicated during the offense. However, inmate has had numerous years of involvement in AA and is working steadily on his drug and alcohol problem. The inmate has a sincere commitment to sobriety. The inmate also has a previous history of vandalism; however, he has been disciplinary free for eight years, with no disciplinaries for violence. It appears that the inmate has made a very good institutional adjustment.

There are many more positive factors that give greater weight to the possibility that the inmate may be a lesser future danger. Inmate has been married, albeit it several times, however, what is notable is that inmates who have never been married tend to have a higher possibility of dangerousness. Also, the inmate is over the age of 39. It has also been noted that violence

| BAIR, Clifford | | CDC# C-95079 |
|---|---|---|
| DVI | May 18, 2006 | Page 7 |

19 G

attenuates in men over the age of 35. Inmate has also been free of serious disciplinaries for eight years. He has also had prosocial involvement in AA. He has family support and letters of support. It has also been noted that inmate's with strong family support do better on parole than those that do not. Inmate has strong viable vocational plans and has the best well prepared release plans that I have seen to date. Inmate has varied and strong work skills. He demonstrates insight and remorse into his problems and the basis for his behavior that led to the life crime. Inmate has also had drug and alcohol treatment with no disciplinaries for violence.

Assessment of dangerousness within the controlled setting of an institution is seen as below average in comparison with other inmates. Assessment of dangerousness if released to the community is seen as below average in comparison with other inmates.

## XV.    CLINICIAN'S OBSERVATIONS/ COMMENTS/ RECOMMENDATIONS:

Here is an inmate who appeared to have a serious drug and alcohol problem and did some bizarre things that led to a horrible crime. Inmate has since worked hard, made a good institutional adjustment, and appears to be working on improving himself. There appears to be no factors that would preclude routine release planning in this case.

Noted by:

JOHN REKART, Ph.D.
Staff Psychologist

GURMEL DHALIWAL, Ph.D.
Senior Psychologist Supervisor

JR/tav

Original:  C-File
cc:        Medical File

COPY SENT TO INMATE  6-12-06su

| BAIR, Clifford | | CDC# C-95079 |
|---|---|---|
| DVI | May 18, 2006 | Page 8 |

2ᴏ G

### *FOLSOM STATE PRISON*
BOARD OF PRISON TERMS
LIFE-TERM MENTAL HEALTH EVALUATION (Revised 1998)

### *FOR THE CALENDAR MONTH OF AUGUST ,1999*
PSYCHOSOCIAL ASSESSMENT

**IDENTIFYING INFORMATION:** Mr. Clifford Bair is a 54-year-old (DOB 09/14/44) divorced, first term, Caucasian male that is serving a Twenty Seven Years to Life sentence from Sonoma County for the offense of P.C. 187 Murder First Degree with Imprisonment. Date of the offense is 01/26 84. MEPD is 09/17/2000.

**SOURCES OF INFORMATION:** The following report is based on a review of the inmate's Central File, Unit Health Record, and an 120-minute Clinical Assessment Interview conducted on 07/26 99.

**DEVELOPMENTAL HISTORY:** He stated that as his birth was normal without any complications. His health as a child was good. There is no history of arson, cruelty to animals as a child, but he stated he did have difficulty with wetting the bed until he was about 14, off and on. When questioned about whether he had been abused as a child, he denied any sexual abuse, but he stated he was abused physically and emotionally. He stated that his father was an alcoholic who was very physically and emotionally abusive to Inmate Bair, as well as to his mother and the younger children. He stated that this abuse continued throughout his life until he was 14 years of age when his parents left their home in Woodland and went to Los Angeles with the other children. He stayed behind to attend high school.

ESPARTO

**EDUCATION:** He stated that he graduated from ~~Woodland~~ High School with a diploma. His grades were average. He did well in school and was only suspended as a Senior for skipping school. He enjoyed his school experience. After high school he joined the U.S. Navy. His WRAT Scores dated 11/05/84 shows Reading 12.3, Math 5.7, with a Total Grade Placement Level of 9.5.

ESPARTO

**FAMILY HISTORY:** He was born in Kentfield California. He was raised in ~~the Woodland~~. His father lives in Oklahoma and is 86 years of age. He does visit on occasion, as well as keeping in touch with letters. His mother died in 1995 when she was 73 years of age. His parents were married for 28 years, divorcing when Inmate Bair was 26 years of age. He stated that both parents abused alcohol. There is no other family history of mental health problems, substance abuse problems, or criminal behavior.

**BAIR, CLIFFORD  C-95079**                    **07/26/99   MAC:cdh**
**BOARD OF PRISON TERMS EVALUATION**
Page 1

221G

He has two older step-siblings from his mother's earlier marriage, with whom he still keeps in contact. His step-sister Claudine Murray is 64, and his step-brother Carl Suza is 62, and they both live in Northern California. He has a biological brother, Boyd, age 58, that lives in Esparta, a 56-year-old sister, Janice, who is married, retired, and traveling around the U.S. with her husband. Harold Bair is 48 and lives in Woodland. He is the third of the four biological siblings. He states that he gets regular visits from his siblings also. He stated that he was raised by his own parents until he was 14. At that point his parents moved the family to Los Angeles, and he elected to stay behind and finish high school. He lived by himself in the family trailer that was on a friend's lot.

When asked to describe his home life he stated that it was very unpleasant over the years due to his father's alcoholism and abusive behavior. He never ran away as a child. He stated that whenever he did anything wrong he was severely beaten. He described his relationship with his siblings and father at this time as being very good.

**PSYCHOSOCIAL DEVELOPMENT & SEXUAL ORIENTATION:** When questioned in this area, he stated that his sexual orientation is heterosexual. There is no history of problems with sexual adjustment or behavior. He stated that his first sexual relationship with a girlfriend was at the age of 18. He stated he thinks he has had a total of 15 sexual partners in his lifetime.

**MARITAL HISTORY:** Mr. Bair has been married and divorced on five occasions. He married Sharon Shatto in 1965. There is one child from this relationship, Shelly, who is 31. Shelly lives with her mother in Missouri. They separated when the child was six years of age. He married his second wife, Patricia, in 1972, and they had one child, Ginger, who is now 25 years of age. They separated when the child was six months old, and subsequently divorced. He tried to keep in touch with Patricia and the child but was told they did not want to have any contact with him. He married Linda Evan in 1976. He was married to Linda at the time of the Commitment Offense, and he stated that their unhappy marital relationship was related to the feelings he acted out in the Commitment Offense. He has been married on two occasions since being in Prison. He married Thelma in October, 1988, and they divorced, and he married Isabella in 1995 and they divorced in 1997 when contact visits were canceled for Life Term inmates. He does not have any contact with any ex-wives at this point in time.

**MILITARY HISTORY:** Mr. Bair was in the U.S. Navy from 09/24/62 to 09/23/66, a period of four years. He was a Sonar Man on the U.S.S. Gridley. He was also an Ordinance Man in the Navy. He obtained an Honorable Discharge.

**BAIR, CLIFFORD  C-95079**                    **07/26/99  MAC:cdh**
**BOARD OF PRISON TERMS EVALUATION**
Page 2

**EMPLOYMENT/INCOME HISTORY:** He stated that he worked regularly prior to his incarceration. His longest job was installing a natural gas pipeline for five years, he worked in Southern California in construction building dams for four years; and he worked for another pipeline company for four years. He also worked steadily as a field worker in housing maintenance and repair for three and one-half years. He was working as a field worker when he was arrested on the commitment offense. He is an experienced heavy equipment operator as well as welder and truck driver. In the institution he has worked regularly for Correctional Industries as a plumber and as a welder. He is now working as a welder for P.I.A. Industries and he likes his current employment very much. When released to the community he plans on obtaining employment as a welder, and perhaps as a truck driver.

**SUBSTANCE ABUSE HISTORY:** Mr. Bair stated that he used alcohol initially at the age of ten and used it off and on for 25 years. He would drink about two times a week. He did not consider himself an alcoholic. He also used Methamphetamines beginning at the age of 23 and he used this off and on for about ten years. He used Methamphetamines once a month and he states he was not addicted. He stated that he told a prior psychologist in San Diego that he had used Alcohol and Methamphetamines extensively. He stated when questioned about this that he lied to that evaluator, describing extensive use of Methamphetamines and alcohol in an effort to justify his behavior in his criminal offense. He stated that there was no justification for his actions at the time and he does not blame alcohol or drug use for his behavior. He stated he had used alcohol moderately at the time but he knew exactly what he was doing and he stated he accepts full responsibility for it.

He has not attended Alcoholics Anonymous or NA over the years. He has visited these programs on a few occasions, but he stated that he was not happy with the disingenuous behavior that he saw in other inmates and as a result, he did not continue attendance.

**PSYCHIATRIC AND MEDICAL HISTORY:** When questioned about his current health, he stated that he is in good health. He does not have a history of head injuries or accidents. He has no psychiatric history. There was a minor suicide attempt briefly after he was arrested. He is not suicidal at this time. He does not have seizures. He does not have blackouts or problems with memory. He does have some problems with being hard of hearing.

There are several prior psychological evaluations in the file that were prepared for the BPT. These will be briefly summarized below:

On 05/02/86, he was seen at CCI Tehachapi by Charles Willis, M. D., Psychiatrist, who indicated Mental Status was within normal limits. Diagnostic Impression was Alcohol Dependence and Amphetamine Dependence with Antisocial Personality Disorder.

**BAIR, CLIFFORD  C-95079**               07/26/99    MAC:cdh
**BOARD OF PRISON TERMS EVALUATION**
Page 3

On 03/02/88, he was seen at CCI Tehachapi by F. A. Matychowiak, M. D., Psychiatrist, who indicated the diagnostic impression of Alcohol and Amphetamine Dependence with Antisocial Personality Disorder. Violence potential was seen as low unless he should start drinking or using drugs, and at that point he could become unpredictable.

On 03/15/91, he was seen at Richard J. Donovan Correctional Facility by W. J. White, Psy.D., who indicated a diagnostic impression of Amphetamine and Alcohol Dependence in Institutional Remission, and Personality Disorder with Antisocial and Borderline Features. GAF was listed as 70. Mental Status was described as being within normal limits.

**PLANS IF GRANTED RELEASE:** The county of commitment is Sonoma County, and he stated that he would like to return to Sonoma County. He has family support with siblings that live nearby, as well as job offers with family members. He has excellent skills as a well, as a truck driver, and as a plumber. This man is able to comply with all parole expectations. He has made a good institutional adjustment and it is expected that he would relate to parole supervision in a conforming and cooperative manner. He does not have mental problems that would require attendance at parole Outpatient Clinic. He does have excellent employment skills that he has continued to use in the institution and as a result, obtaining employment in the community will not be a problem. He also has family support in the community where he will be living. As a result, the prognosis for successful community living in very good in this case.

24 G

# CLINICAL ASSESSMENT

**CURRENT MENTAL STATUS/TREATMENT NEEDS:**   Mr. Bair related in an outgoing, serious, and cooperative manner. He does have a small hearing problem. Hygiene and grooming were appropriate. He was alert and well-oriented. His thinking was rational and logical. His speech was normal, fluent, and goal oriented. He is functioning in the high-average ranges intellectually. Affect was appropriate. There is no evidence of depression or anxiety. He is not at all suicidal. He related in the interview in an earnest, sincere, open, non-defensive manner. Eye contact was very good. He spoke at some length about how there is no excuse for his behavior in the commitment offense, and he appears to be very aware of the great seriousness of his criminal behavior. He impresses as being a very sincere individual with considerable feelings of remorse and sorrow about the commitment offense. There is no indication of any mental or emotional problems in the interview.

Considering the current diagnostic classification in this case, it is apparent that this man did have a problem in the past with alcohol and Methamphetamine use. Apparently that contributed to the break-up of his marriages, according to information in the record. Therefore, the diagnosis of Polysubstance Dependence, particularly Alcohol and Methamphetamines by history, would appear to be appropriate. It did appear that there was some alcohol abuse that probably contributed in some part to his bizarre behavior in the commitment offense. In addition, there is evidence of a personality disorder in this case. He has been described as having an Antisocial Personality Disorder in the past. However, this diagnosis is not appropriate in that he does not meet the criteria for this classification. This man is certainly not criminally oriented in any way. He has also been described as having borderline personality features in the past. This does not appear to be appropriate, although he does have a pattern of unstable interpersonal relationships, which is typically seen in individuals with borderline personality problems. However, these individuals usually continue to act out their emotional distress with repetitive self-destructive behavior, which we haven't seen throughout the last 15 years of observation. What does appear to be evident is a Passive-Aggressive Personality Disorder, in which he tends to repress frustration, disappointment, anger, and then lets it out in inappropriate, self-destructive, as well as overtly-destructive ways. This personality characteristic seems to be improving with the years and with his age. However, the behavior seen in the commitment offense seems to be typical Passive-Aggressive Personality or Character Disorder actions.

There is no evidence in the record or in the interview that this man has any problems with a severe mental disorder. At this point in time he has matured a great deal and has shown considerable growth and maturity. It does not appear that the prior personality disorder problems are really evident at this point in his life.

**BAIR, CLIFFORD   C-95079**                                    **07/26/99    MAC:cdh**
**BOARD OF PRISON TERMS EVALUATION**
Page 5

## DIAGNOSTIC IMPRESSIONS:

| | |
|---|---|
| Axis I: | 304.80 Polysubstance Abuse, by History. |
| Axis II: | 301.9, Personality Disorder, NOS, and Passive-Aggressive Personality Features, Improved. |
| Axis III: | No Disorder. |
| Axis IV: | Incarceration. |
| Axis V: | Current GAF = 90. |

**REVIEW OF LIFE CRIME:** Mr. Bair submitted a rather lengthy, very carefully written, explanation of his thoughts and feelings at the time of the commitment offense. I will include most of his statements in this section:

"I'm extremely sorry and ashamed, and very sad that my jealous rage caused me to Murder Mrs. Atkins, and for the trauma that I put Ms. Fomasi through. I committed this crime while I was in a jealous rage. My parents, my childhood, nor alcohol or drugs, made me commit this act of violence. Even though my Ex-Wife Linda and I divorced in April 1981, we were still living together in our home in Visalia. I loved Linda and our three sons and I wanted our life together to work out. We divorced because we were both liars and cheats. Even though the divorce had been started, we both wanted to give our lives together a real chance, and without her mother's knowledge, we did. Linda and I promised each other there would be no more lies or cheating till the summer of 1983. I truly believed our lives together was going good. That summer Linda took the three boys to Bodega Bay so she could work in her mother's husband's grocery store. She promised she would work during the week and come to Visalia and spend the weekends with me. By the end of the summer she was back in Visalia and the boys were back in high school in Visalia. Then the weekends in Bodega Bay started again, with her picking the boys up after school on Friday, and then coming back Sunday night. This continued until I decided to go to Bodega Bay that weekend in January, 1984, to find out who she was with. That evening, when I came in from work, I got a call from Linda saying she was sorry for not being there for me, and we had a yelling match over the phone. She stated she was going to Reno with her mother and would be back Sunday night. While I was yelling at her she hung up the phone. That night I had dinner and a half-dozen or so drinks. While walking to another bar I stopped in a Service Station to go to the restroom, and when I came out of the restroom there was a white chevy pick-up sitting there with the engine running. I got in the pickup and drove to my home, packed some clothes, and loaded them and my sawed-off shotgun with shells in the pickup and took off for

**BAIR, CLIFFORD  C-95079**                                      **07/26/99   MAC:cdh**
**BOARD OF PRISON TERMS EVALUATION**
Page 6

26 G

Bodega Bay. I was extremely upset and angry. Once I arrived in Bodega Bay, I drove to the Harbor View Motel and I rented a room for two days. From the motel room I had a clear view of Linda's mother's home and Linda's car which was parked out in the street. After watching the house for two days and not seeing Linda or the boys, I checked out of the motel and drove to Santa Rosa. In Santa Rosa I ate and had a few drinks. When I arrived back in Bodega Bay I checked to make sure Linda's care was still there, and it was. At that time it crossed my mind that I needed to get rid of the pickup, so I drove out of Bodega Bay and went up into the foothills and drove down this dirt road, and waited until after dark. After finally deciding to burn the pickup, I took a towel I had taken from the motel room and soaked it with gas, and laid it on the floor and set it on fire. Once I was sure the fire was not going to go out, I walked up the side of the hill and sat down between some tall bushes next to the road and watched the pickup burn. I was sad, depressed, very angry, and disappointed myself. After three failed marriages and two beautiful daughters who I walked out on, at the age of 39 years old, I had absolutely nothing to live for. I knew I would never kill myself because I was a coward. What was I going to do now - I had no idea. After sitting there awhile, I got up and walked down the hill to Bodega Bay. After hiding the gun, I went into a bar, ordered a hamburger, french fries, and a six-pack of Budweiser. I drank a beer while I was waiting. I paid for my order, picked up by gun, and walked to a secluded area in Mrs. Atkins yard. While eating I saw a tow-truck go by pulling the trailer with the burnt pickup on it. Then I saw Mrs. Atkins walking through her yard. I walked up to Mrs. Atkins, put my arm around her shoulders and led her into the house. Once inside the house, I had Mrs. Atkins sit down in a chair next to the window that was open, which was next to the front door that I had closed, I asked Mrs. Atkins for the keys to her car. The only words I remember her saying were "I'm not giving you the keys to my car." Looking around the living room I noticed a table next to the front door with a bowel on it that had some keys in it. I put the keys in my pocket. I then walked over and took Mrs. Atkins by the hand and helped her stand up and then led her into the bedroom. I ripped the phone cord out of the wall and either tied her hands behind her back or in front (I'm really not sure). I had her lay down on the floor next to the wall and her bed where I tied her feet up. Ten or twelve months before this date I had done some work for Mrs. Atkins around her home and so we knew each other well. After tying her up, I pulled the mattress half off the bed and covered her up with it. I really didn't care whether Mrs. Atkins knew me or not. I really didn't give a dam about anything. At this time, I heard Ms. Fomasi at the front door. I waited for a few minutes to see if she would leave, but she didn't. I opened the front door and told her to come in, and to my surprise, instead of running away, she came in. I can't remember Ms. Fomasi saying a single word, I really can't. I led Ms. Fomasi into the doorway of Mrs. Atkins' bedroom and told her to lie down on the floor and she did. I tied her hands and feet, but I'm not sure what I used. I then went out into the garage and started the car and opened the garage door. The first thing I noticed when I went back into the house was Ms. Fomasi had her hands untied. That really upset me and I started yelling how I was going to burn the house down. I am not sure what I said, but I believe I said I would kill them both. What

27G

ever Ms. Fomasi said I said is true, and I probably said a lot more. After tying her hands again, I went into the kitchen and opened the refrigerator and took a bite out of a tomato an put it back, and then I left.

Leaving Bodega Bay I took the back road to the foothills where I had burnt the pickup and continued on into Sebastiapol. I stopped in a liquor store, bought a pint of whiskey and two Pepsi's, and then drove back to Bodega, and instead of driving back into Bodega Bay, I turned left and headed towards Petaluma. For some reason Mrs. Atkins car would all the sudden stop running every twenty or thirty miles or so. Every time it did I would pull off to the shoulder of the road and after sitting there for awhile, it would start up again. This happened four or five times, and the last time it did, I found myself parked across the road from Garadie's Resort just outside of Petaluma. When I pulled off the road this time, I got the car stuck, and I couldn't drive off. At that time I gave up on the car. I got the sawed-off shotgun and crossed the street. The only thing I knew about what time it was is that it was dark outside. From the very beginning I had no plans, and I still didn't have any - other than finding Linda and to see who she was with, and now I didn't give a dam about that. Walking down this gravel road, I noticed a bar on my left and a mobile home on my right. Further down the road I saw a cabin that was completely dark inside, so I walked up and tried to open the front door. It was locked so I kept walking and a few minutes later I was on a boat dock where there were two or three sailboats tied up. I went aboard the first sailboat I came to and found a padlock on the cabin hatch. I busted the fiberglass around the lock with the gun butt and went into the cabin. I started going through everything just to see what was there. I found food, clothes, money, beer, a flare pistol, and the keys to the ignition in the ignition. I tried to start the engine and it wouldn't start. I went back up on deck and untied the mooring line, and pushed away from the pier. The tide at the time looked like it was going out, so I tried to steer the sailboat out of the channel and let it go with the tide. What I succeeded in doing was drifting upon a sand bar and getting stuck before I got out of the channel. I jumped into the freezing cold water and pushed the boat off the sand bar. In the process, I turned the boat around to where it headed back where I came from. Once back on board, I let it drift wherever it wanted to go. It ended up about a mild from the pier, still inside the channel. I changed clothes, drank a beer, laid down and went to sleep. When I woke up it was daylight. I looked out the portal and I could see a houseboat coming in my direction. When the houseboat arrived close enough to where I could see and hear what the owner of the sailboat was saying, I told him not to come any closer. I had the sawed-off shotgun in my hands. The owner asked me what I was doing on his sailboat. I don't remember answering his question. Then he said he called the police and they were on their way. Then he left. I am not sure whether I ever said anything to the sailboat owner or not. Whatever he said I said is true.

At this time I knew I was in trouble, but I had no idea how serious it was. A few minutes later I went over the side of the boat and climbed over the embankment of the canal on the

**BAIR, CLIFFORD  C-95079**                                    **07/26/99   MAC:cdh**
**BOARD OF PRISON TERMS EVALUATION**
Page 8

28 G

other side. When I entered the water I had the sawed-off shotgun and the flare pistol with me. I stayed in the water and came to a pump house and a cement food gate. At this point I could have went straight, but I went to the right instead. I got about 20 ft. when I heard the helicopter. I was about three-quarters under water so I just leaned up against the bank until I couldn't hear the helicopter anymore. At this time I faced the fact that I was going to be caught, and I also knew that if I didn't get out of this freezing water I was going to die. Dying really wasn't an issue, I just didn't want to freeze to death. I also knew I wasn't going to be arrested with a sawed-off shotgun. I pushed the gun down in the water under my feet and buried it in the mud. I made my way back to the cement flood gate and crawled inside. Shortly thereafter I was under arrest and on my way to jail.

Jealous rage is just an excuse, just a sick, sorry, and sad excuse, when there are absolutely no reasons or excuses for my killing Mrs. Atkins, or for the hell I put Ms. Fomasi through. At this time in my life I was a scum bag and a coward, and totally and completely worthless as a man and human being. For what I did to Ms. Atkins, Ms. Fomasi, and for all the heartache and shame I have caused my parents, my children, my brothers and sisters and their children, I should have been given the death penalty and executed. At least Ms. Atkins would have gotten equal justice.

I have committed a crime to where there is absolutely nothing I will be able to do to make amends for what I have done. Yes, I'm sorry and ashamed and extremely sad that I murdered Ms. Atkins, and destroyed Ms. Fomasi's life. But being sorry, ashamed, and sad, does not do anything for anyone. I have mentioned that I should have been executed. Well being executed would have given me an easy way out. For everyone concerned to really receive justice for what I have done, I should spend every day of the rest of my life in prison. I didn't give Ms. Atkins a second chance, and I have never given anyone else in my life a second chance. For what I have done, I don't deserve a second chance either."

It is signed, Clifford Lee Bair.

It is felt by this evaluator that this man's statements of remorse are quite sincere and genuine. It would appear, based on the circumstances of the offense, that he was acting out his anger and rage at the time with antisocial behavior. There is no indication that he attempted deliberately to murder the victim, but due to her age and frail condition, she apparently died of a heart attack from the stress of the offense.

**ASSESSMENT OF DANGEROUSNESS:** There has been research done where the results have indicated factors indicating both a high risk for recidivism as well as a low risk of recidivism. Factors in this case associated with a higher risk for recidivism are his history of substance abuse, a family history of a father who was a serious alcoholic, as well as the history of rather severe physical abuse as a child. Factors indicating a lower risk of re-

**BAIR, CLIFFORD  C-95079**                              **07/26/99    MAC:cdh**
**BOARD OF PRISON TERMS EVALUATION**
Page 9

offense are this man's good institutional adjustment over the years, his stable work history, before and after his incarceration, his lack of violence before the offense as well as since he has been incarcerated, and the obvious growth and maturity that has occurred since his initial incarceration.

The assessment of dangerousness within the controlled setting of the institution is seen as below average in comparison to other inmates. Assessment of dangerousness if released to the community is also below average in comparison to other inmates. Significant risk factors in this case would be any use of alcohol or drugs.

**CLINICIAN OBSERVATION/COMMENTS/RECOMMENDATIONS:** There is no evidence of mental or emotional problems that would preclude routine release planning in this case. There is no evidence of mental problems that would require further diagnosis or participation in psychotherapy. This man's reasons for not participating in Alcoholics Anonymous or Narcotics Anonymous appear to be legitimate. However, it is recommended that he participate in some kind of substance abuse program for educational reasons prior to his release. This man's statements of remorse appear to be quite sincere. The probability of his getting into serious trouble in the future is very very small. He is quite happy with his current program which keeps his welding skills current. There are no other psychological recommendations.


Melvin Macomber, Ph.D.
Licensed Psychologist
Folsom State Prison

PSYCHOLOGICAL EVALUATION FOR BOARD OF PRISON TERMS

April, 1991 Calendar
Richard J. Donovan Correctional Facility
March 11, 1991

This is the Documentation report to the Board of Prison
Terms (Board) on this inmate.  He is a 47 year old,
Caucasian, Male currently serving a Twenty-seven year to
LIFE CDC sentence for Murder (First-Degree), False
Imprisonment, Grand Theft and Receiving Stolen Property.

Inmate Bair was interviewed this date for the purpose of
preparing this Board Report.  The interview was
approximately an hour in length.  Bair's Central File was
also reviewed to aid in the preparation of this report.

Although this was a complex offense involving several
criminal and violent acts, the core of this man's
indeterminate LIFE conviction revolves around the homicide.
Bair broke into an aged woman's home when she was present.
He tied her hands and placed a mattress and bedding on top
of her leaving her helplessly bound resulting in her death.
The inmate reports he does not know the motive for his
behavior.  He blames his homicidal actions on "drugs and
alcohol."  Some years prior to this offense, Bair served a
period of adult probation for possession of a sawed-off
shotgun (an anti-personnel weapon).

Somewhere in the events surrounding the homicide, Bair
injured a woman and also brandished a shotgun at another of
his victims, a man who was trying to recover his stolen boat
from the inmate.

Bair admits to an extensive history of amphetamine
dependence -- "I would take fifty to a hundred Benzedrines a
day."  In addition, he also had a major alcohol dependence
-- "I used to drink two pints of whiskey or two and a half
to three six-packs of beer everyday."  Years ago he went
through a thirty day substance abuse treatment program that
was completely unsuccessful.  Although he was previously
advised to participate in a drug/alcohol program in CDC, to
this date Bair has failed to do so.

This inmate has no history of mental hospitalizations,
psychological or psychiatric treatment or mental observation
of any kind.  Immediately following the commission of the
instant offense, this inmate cut his wrist in a half-hearted
suicide attempt while in police custody.  There have been no
prior or subsequent suicide attempts.  He denies any current
suicide ideation or intent.

**BAIR, CLIFFORD      C-95079    RJDCF-SD   (sh) 3/15/91**

31 G

## Mental Status Examination:

This is a heavily, shaggily bearded Caucasian, Male who was alert and well-oriented. He sat stiffly in the chair and tended to give clipped, phrasic responses to interview questions. It was difficult to get him to be open and straight forward in the interview. His attention span was acceptable but his performance on Serial Sevens was suggestive of concentration and mental control problems. his performance was plodding and dotted with errors. His memory for recent and remote events was unimpaired. His mood was euthymic. His affective display demonstrated restricted range and belied his avowed remorse for his criminal acts. He denied experiencing hallucinations in any sensory modality. No delusional material was elicited. His cognitive processes reflected concrete orientation and lack of psychological-mindedness. Intellectually, he is functioning in the bright-normal range of mental disabilities with a previously determined IQ score of 109. Insight is nil. social judgement, as determined from his ability to interpret common proverbs, does not point to psychotic disorganization but is reflective of significant characterologic defects.

| Diagnosis: | Axis I: | 304.40 | Amphetamine Dependence, Severe (In Institutional Remission) |
| --- | --- | --- | --- |
| | | 303.90 | Alcohol Dependence, Severe (In Institutional Remission) |
| | Axis II: | | Personality Disorder, NOS, with Antisocial and Borderline Features |
| | Axis III: | None Known | |
| | Axis IV: | 4-Severe | |
| | Axis V: | | Global Assessment of Functioning (GAF) score = 70 (on a scale of 0-90) |

Explanation of Diagnosis: This inmate is not psychotic but displays a disorder of character structure or personality that renders him likely to engage in extralegal and high-risk activities, violence and he is prone to stormy, unpredictable emotions and interpersonal relationships. Antisocial trends ameliorate somewhat by middle age years. he had no known physiological disorder or disease that could negatively impact his mental/emotional stability. His stress level is about average for incarcerated offenders. His GAF score is indicative of good correctional adjustment.
**BAIR, CLIFFORD      C-95079    RJDCF-SD    (sh) 3/15/91**

33 G

He has a serious drug and alcohol addiction that is in only fragile abeiance. When presented with an unstructured environment and easy access to chemical substances, he is almost for sure going to lose his sobriety.

<u>Psychological Conclusions</u>. The diagnosis listed above and the criminal, homicidal behavior of this inmate are directly related.

During his institutional confinement he has shown no significant changes from a psychological point-of-view beyond the effects of aging.

If he were returned to the community at this time there is a strong liklihood of his re-offending. He has not engaged in any meaningful activities that could alter his violence potential.

<u>Suggested Actions</u>: This inmate should be a long-term participant in psychotherapy with the goal of cutting through the denial of responsibility and denial of a serious addiction problem.

Likewise, he should be an active participant in AA, NA and any other drug/alcohol treatment programs.

He needs long-term intervention such as provided at CMC or CMF.

<u>Parole and Release Considerations</u>:

This inmate's violence potential in the past is judged as extremely high, much higher than average. At present his violence potential has shown little change except in so far as age has "slowed him down."

Parole considerations should include mandatory drug and alcohol abstinence with frequent screens.

No further recommendations to Classification Committee are indicated beyond what is listed in "Suggested Actions" above.

W.J. WHITE, Psy.D.
Clinical Psychologist
CA License #: PSY-9969


BAIR, CLIFFORD     C-95079    RJDCF-SD    (sh) 3/15/91

33 G

PSYCHIATRIC CONSULTATION
CCI TEHACHAPI

Bair, C-95079, Psychiatric Evaluation for Unit IV-A, BPT,
2-26-88.

On 2-26-88 the file was reviewed and the inmate was inter-
viewed for preparation of this report only.  Previous psych-
iatric evaluation of 5-2-86 notes Anti-Social Personality as
well as Alcohol Dependence and Amphetamine Dependence.  On
present examination this 43-year-old man acknowledged he is
in over a first degree murder which he relates to alcohol and
drugs.  He was using speed, amphetamines and whiskey because
he was depressed with his life and very unhappy and dissatis-
fied.  He guesses he hated himself and his life and was rebel-
ling.  Since institutionalization, he indicates that he is
currently assigned as inmate plumber.  He also has become a
deacon in his church and is more active in religion.  On the
streets he worked in underground natural gas pipelines which
is not too different than his current work.  He indicates he
is a high school graduate with one semester of college.  He
started drinking at 14 like so many other young people, be-
cause he had a horrendous childhood and grew up with an in-
feriority complex.  When he got out of military service he
found drugs, refused to give them up, even if each of his
three wives didn't like it, he would get rid of them rather
than give up the alcohol or drugs.  He feels that his current
incarceration is the result of his 20 years of being high.  He
is thoughtful that he is not dead, that he didn't destroy him-
self despite the problems of being here.  He indicates he has
been sober and straight and it is better than where he was.
He still has periodic depressions but not as bad as before.
He currently is physically well and is not on medication.
He sleeps well and his appetite is good.  Generally he wants
to go into business for himself in the future.  Otherwise he
doesn't seem to have many practical needs.  This 43-year-old
man seems somewhat overreactive.  He started out as an over
jovial person but his mood could change.  There was no evidence
of psychosis, there was no evidence of organic impairment.
There appeared to be at least average intelligence.  His in-
sight was adequate verbally.  Whether he could apply it was
another matter.

Diagnostic impression PERSONALITY DISORDER ANTI-SOCIAL TYPE
with a long history of ALCOHOL and AMPHETAMINE DEPENDENCE.

Diagnose psychopathology as part of his present offense.
During observation in the institution, he has psychiatrically
improved mildly in that he has not used and seems to maintain
himself without substance.  Violence potential would be
estimated to be low unless he is drinking or using drugs and
then he becomes unpredictable.  His chances with success or
failure rests with his ability to abstain from alcohol or

34G

COPY TO INMATE

drugs.    Conditions of parole would need to include testing
for drugs, A.A. and other means of trying to control the
alcohol intake.    Recommendation if denied would be good if
he had access to A.A. and other self-help programs to help
strengthen his resolve to avoid substance abuse.

_F.A. Matychowiak_ (signature)
F.A. Matychowiak, M.D.
Psychiatric Consultant

Bair, C-95079        CCI Tehachapi   IV-A      3-2-88

356

PSYCHIATRIC CONSULTATION
CCI TEHACHAPI

Bair, Clifford, C-95079, Psychiatric Consultation, BPT-AD 82/8,
CCI-Tehachapi, 4/30/86

HISTORY:

The patient is a 41-year-old, white, divorced male who entered
prison in October, 1984. He was sentenced to 27 years to life
which is on appeal. He was convicted of Murder in the first
degree. He possibly could be released about 1997.

PAST HISTORY:

Date of birth 9/14/44 in California. His father, living, is
described as a horrendous alcoholic as also is his mother. He
stated he started to become self-supportive when he was 14 years
of age. He has two brothers and one sister. He completed high
school and one year of college. He has worked as a construction
laborer. He has a protestant background, but he does not attend.
States religion only became meaningful to him as of June, 1985.
He is depressed some of the time, but sleeps and eats good.
He has had suicidal thoughts in the past, but denies current
intention. He made an attempt by cutting his left wrist in
January, 1984, while in the Sonoma County Jail. He has been
married three times. His first wife was Sharon Shatto, whom he
was married to between 1964 and 1971. He states that they have
one daughter and their marriage split up because of his use of
drugs and alcohol. His second marriage was to Patricia Skaggs
in 1973, which only lasted six months. They also have a daughter.
The split-up was for the same reason as with the first wife.
He married again, Linda Evans, by whom he had no children in
1975 and has lasted to 1981. The reason for dissolution being
the same as with the first two wives. He has had a stomach ulcer
and also had surgery on his right leg for a vascular traumatic
problem. He has no other serious medical illness and denies VD
history. He only saw a psychiatrist once at CMF. His sexual
history is conventional with an initial coitus when he was 15
years of age. He has also been arrested for drunk driving,
possessing a sawed-off shotgun and vandalism. He served in the
United States Navy from 1962 to 1966, receiving an Honorable
Discharge. He uses alcohol some and he feels it is a problem,
that he is an alcoholic, that he has been to AA. He smoked for
over 20 years and quit a few months ago. He states for some 20
years he used amphetamines on a steady program.

MENTAL STATUS:

The patient is an assertive, energetic, white male who relates
easily. His attention span and stream of talk are satisfactory.
He seems quite jovial and is not depressed. He denies hallucina-
tions and no delusions are noted. He states sometimes he has

36 G

uncomfortable dreams of being in jail. His three wishes are
(1) Have my freedom  (2) Become stronger in the Lord (3) The
Earth could be rid of nuclear problems. He explained one
proverb I gave him, gave concrete answer to another, and could
not explain a third. His I.Q. level from the C-file shows 109,
and this would seem to be about correct. He was able to name
the last six presidents correctly in sequence. He did not think
he was mentally ill, but that his judgment had been poor. His
comprehension level was rated as good. He sees himself as,
"An individual who finally realizes what he has lost." The
question he asked me was, "What do you think of me?"

SUMMARY AND DISCUSSION:

We have here a man with a serious crime for which he has been
convicted, now on appeal. He has other anti-social actions
on his record. Diagnostically one could see him in several
ways. (1) ANTI-SOCIAL PERSONALITY 301.70 (2) ALCOHOL DEPENDENCE
303.9x and (3) AMPHETAMINE DEPENDENCE 304.4x. I would certainly
encourage him to go to AA and when he is finally released, AA
would be a recommended social group to point him in the direction
of for his own benefit as well as society's. Parole supervision
should probably focus  on amphetamine testing control as part
of his parole situation.

*Charles D. Willis M.D.*

CHARLES D. WILLIS, M.D.
Diplomate American Board of
Psychiatry and Neurology

Bair, Clifford, C-95079    CCI-Tehachapi    bs    5/2/86

# EXHIBIT  

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY OF MARIN

### SAN RAFAEL, CALIFORNIA



169
322-A

1. **FULL NAME OF CHILD** — Clifford Lee Bair   Harper

2. **PLACE OF BIRTH** (a) COUNTY — Marin
   (b) CITY OR TOWN — Kentfield
   (c) NAME OF HOSPITAL OR INSTITUTION — Ross General Hospital
   (d) LENGTH OF STAY — 75 min

3. **USUAL RESIDENCE OF MOTHER**
   (a) STATE — California   LENGTH OF RESIDENCE IN CALIFORNIA — 14
   (b) COUNTY — Marin   2
   (c) CITY OR TOWN — Marin City   2
   (d) STREET ADDRESS — Box 991, Marin City

4. **SEX** — Male
5. **TWIN** — Single
6. **NUMBER OF MONTHS OF PREGNANCY** — 9
7. **DATE OF BIRTH** — September 14, 1944

**FATHER OF CHILD**

8. FULL NAME — Ezra Clayton Bair
9. COLOR OR RACE — White
10. AGE AT TIME OF THIS BIRTH — 25
11. BIRTHPLACE — Clayton, New Mexico
12. USUAL OCCUPATION — Welder
13. INDUSTRY OR BUSINESS — Marineship

14. CHILDREN BORN TO THIS MOTHER — 4
    (b) HOW MANY OTHER CHILDREN ARE NOW LIVING — 0

**MOTHER OF CHILD**

15. FULL NAME — Blanche Marie Harper
16. COLOR OR RACE — White
17. AGE AT TIME OF THIS BIRTH — 22
18. BIRTHPLACE — Idaho
19. USUAL OCCUPATION — Housewife
20. INDUSTRY OR BUSINESS — Home

22. MOTHER'S MAILING ADDRESS FOR REGISTRATION NOTICE — Box 991, Marin City, California

23. I HEREBY CERTIFY THAT I ATTENDED THE BIRTH OF THIS CHILD WHO WAS BORN ALIVE AT THE HOUR OF — 6:32p

THE INFORMATION GIVEN WAS FURNISHED BY — Mrs. Bair   RELATED TO THIS CHILD AS — Mother

ATTENDANT (OR OTHER) SIGNATURE — Lloyd G. Tyler M.D.

24. DATE RECEIVED BY LOCAL REGISTRAR — Sep 20, 1944
25. REGISTRAR'S SIGNATURE — P.D. Burrows
26. BIRTH NAME ADDED —

M.D.   DATE SIGNED — 9-19-44   ADDRESS — San Rafael, Calif.

H1

**CERTIFIED COPY OF VITAL RECORDS**
STATE OF CALIFORNIA, COUNTY OF MARIN

This is a true and exact reproduction of the document officially registered and placed on file in the office of the Marin County Assessor-Recorder.



Joan C. Thayer
JOAN C. THAYER
MARIN COUNTY ASSESSOR-RECORDER

*000173902*

DATE ISSUED   MAY 1 0 2006   BY _____ , Deputy

This copy is not valid unless prepared on an engraved border, displaying the date and signature of the Assessor-Recorder.




It has been verified that Inmate Bair, C-95079, is a high school graduate as of June 12, 1962, from (Esparto High School in Esparto, California.

Orig: Central File
cc:   Ed File
      Instructor
→     Inmate

J. Perez
School Registrar
Greystone Adult School
Folsom State Prison

Date:    07/28/2004          **High School/GED**                    GENERAL CHRONO
EDIS Form 08502

*H∂*

# *National Personnel Records Center*

Military Personnel Records, *9700 Page Avenue St. Louis, Missouri 63132-5100*

May 15, 2006

CLIFF BAIR C95079
L3 346 P.O. BOX 600
TRACY, CA 95378-0600

**RE:**       **Veteran's Name: BAIR CLIFF**
              **SSN/SN:**
              **Request Number: 1-1448200489**

Dear Sir:

Thank you for contacting the National Personnel Records Center. We are pleased to respond to your request by providing the enclosed document(s).

Separation documents may include the following information: the type and character of discharge, authority and narrative reason for separation, reenlistment eligibility code, and separation program designator/number. If you require a copy of the separation document that does not contain this information, a "*deleted*" copy must be requested from this Center. A seal has been affixed to the separation document to attest to its authenticity.

If you have questions or comments regarding this response, you may contact us at 314-801-0800 or by mail at the address shown in the letterhead above. If you contact us, please reference the Request Number listed above. If you are a veteran, or a deceased veteran's next of kin, please consider submitting your future requests online by visiting us at http://vetrecs.archives.gov.

Sincerely,

*Dennis M. Pagel*

DENNIS PAGEL
Archives Technician (3D)

Enclosure(s)

**We Value Our
Veterans' Privacy**
*Let us know if we have
failed to protect it.*

*H3*

LEGEND: Insert N/A in the items below which are not applicable

| | | | |
|---|---|---|---|
| 1. LAST NAME – FIRST NAME – MIDDLE NAME | 2. SERVICE NUMBER | 3 a. GRADE, RATE or RANK | b. DATE of RANK (Day, Month, Year) |
| BAIR, Clifford Lee | 688 92 70 | TM3 | 16 NOV 1964 |

**PERSONAL DATA**

| 4. DEPARTMENT, COMPONENT AND BRANCH OR CLASS | 5. PLACE OF BIRTH (City and State or Country) | 6. DATE OF BIRTH | DAY | MONTH | YEAR |
|---|---|---|---|---|---|
| U. S. NAVY  -USN- | KENTFIELD, CALIFORNIA | | 14 | SEP | 44 |

| 7 a. RACE | b. SEX | c. COLOR HAIR | d. COLOR EYES | e. HEIGHT | f. WEIGHT | 8. U.S. CITIZEN | 9. MARITAL STATUS |
|---|---|---|---|---|---|---|---|
| NOT APPLICABLE | MALE | BROWN | BLUE | 71" | 167 | ☒ YES ☐ NO | MARRIED |

| 10 a. HIGHEST CIVILIAN EDUCATION LEVEL (Attained) | b. MAJOR COURSE OR FIELD |
|---|---|
| HIGH SCHOOL  -04- | GENERAL |

**TRANSFER OR DISCHARGE DATA**

| 11. TYPE OF TRANSFER OR DISCHARGE | b. STATION OR INSTALLATION AT WHICH EFFECTED |
|---|---|
| TRANSFER TO RESERVE | U.S.S. GRIDLEY (DLG-21) |

| c. REASON AND AUTHORITY Expiration of Term of Active Obligated Service -203- BuPers Manual, Article C-10304. | d. EFFEC-TIVE DATE | DAY 23 | MONTH SEP | YEAR 66 |
|---|---|---|---|---|

| 12. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | 13 a. CHARACTER OF SERVICE | b. TYPE OF CERTIFICATE ISSUED |
|---|---|---|
| U.S.S. GRIDLEY (DLG-21) | HONORABLE | NOT APPLICABLE |

**SELECTIVE SERVICE DATA**

| 14. SELECTIVE SERVICE NUMBER | 15. SELECTIVE SERVICE LOCAL BOARD NUMBER, CITY, COUNTY AND STATE | 16. DATE INDUCTED | DAY | MONTH | YEAR |
|---|---|---|---|---|---|
| NOT APPLICABLE | NOT REGISTERED | | NOT APPLICABLE | | |

| 17. DISTRICT OR AREA COMMAND TO WHICH RESERVIST TRANSFERRED |
|---|
| NAVAL RESERVE MANPOWER CENTER, BAINBRIDGE, MARYLAND |

**SERVICE DATA**

| 18. TERMINAL DATE OF RESERVE OBLIGATION | 19. CURRENT ACTIVE SERVICE OTHER THAN BY INDUCTION a. SOURCE OF ENTRY | b. TERM OF SERVICE (Years) | c. DATE OF ENTRY |
|---|---|---|---|
| DAY 24 MONTH SEP YEAR 68 | ☒ ENLISTED (First Enlistment) ☐ ENLISTED (Prior Service) ☐ REENLISTED ☐ OTHER: | FOUR | DAY 25 MONTH SEP YEAR 62 |

| 20. PRIOR REGULAR ENLISTMENTS | 21. GRADE, RATE OR RANK AT TIME OF ENTRY INTO CURRENT ACTIVE SERVICE | 22. PLACE OF ENTRY INTO CURRENT ACTIVE SERVICE (City and State) |
|---|---|---|
| NONE | SR | SAN FRANCISCO, CALIFORNIA |

| 23. PLACE OF RECORD AT TIME OF ENTRY INTO ACTIVE SERVICE (Street, RFD, City, County and State) CAPAY, YOLO, CALIFORNIA | 24. STATEMENT OF SERVICE | | YEARS | MONTHS | DAYS |
|---|---|---|---|---|---|
| | a. CREDITABLE FOR BASIC PAY PURPOSES | (1) NET SERVICE THIS PERIOD | 03 | 11 | 29 |
| | | (2) OTHER SERVICE | 00 | 00 | 00 |
| 25 a. SPECIALTY NUMBER AND TITLE  b. RELATED CIVILIAN OCCUPATION AND D.O.T. NUMBER 4-52.181 Ordnanceman (gov.ser. | | (3) TOTAL (Line (1) + line (2)) | 03 | 11 | 29 |
| | b. TOTAL ACTIVE SERVICE | | 03 | 11 | 29 |
| 0000/0000 | c. FOREIGN AND/OR SEA SERVICE | | 03 | 08 | 25 |

| 26. DECORATIONS, MEDALS, BADGES, COMMENDATIONS, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED |
|---|
| Navy Unit Commendation (Ribbon), National Defense Service Medal (Not Issued), Viet-Nam Service Medal (Not Issued). |

| 27. WOUNDS RECEIVED AS A RESULT OF ACTION WITH ENEMY FORCES (Place and date, if known) |
|---|
| NONE |

| 28. SERVICE SCHOOLS OR COLLEGES, COLLEGE TRAINING COURSES AND/OR POST-GRADUATE COURSES SUCCESSFULLY COMPLETED | | | 29. OTHER SERVICE TRAINING COURSES SUCCESSFULLY COMPLETED |
|---|---|---|---|
| SCHOOL OR COURSE a | DATES (From - To) b | MAJOR COURSES c | |
| X NONE X | X NONE X | X NONE X | NTC FOR SN |
| X X X | X X X | X X X | BMR FOR SN |
| X X X | X X X | X X X | NTC FOR TM3&2 |
| X X X | X X X | X X X | NTC FOR PO3&2 |
| X X X | X X X | X X X | X X X X X X |

**VA DATA**

| 30 a. GOVERNMENT LIFE INSURANCE IN FORCE | b. AMOUNT OF ALLOTMENT | c. MONTH ALLOTMENT DISCONTINUED |
|---|---|---|
| ☒ YES ☐ NO | $2.00 | SEPTEMBER 1966 |

| 31 a. VA BENEFITS PREVIOUSLY APPLIED FOR (Specify type) | b. VA CLAIM NUMBER |
|---|---|
| NONE | c. NOT APPLICABLE |

**AUTHENTICATION**

| 32. REMARKS |
|---|
| RECOMMENDED FOR REENLISTMENT X X X X X X X X X X X X X X X X X X X X X X X X NO DAYS LEAVE PAID: FIFTEEN X X X X X X X X X X X X X X X X X X X NO DAYS LOST TIME: NONE X X X X X X X X X X X X X X X X X X X X X NO DAYS EXCESS LEAVE: NONE X X X X X X X X X X X X X X X X X X X X X SOCIAL SECURITY NO. 554 56 4843 X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X X |

| 33. PERMANENT ADDRESS FOR MAILING PURPOSES AFTER TRANSFER OR DISCHARGE (Street, RFD, City, County and State) 5943 Noble Street, Riverside, California | 34. SIGNATURE OF PERSON BEING TRANSFERRED OR DISCHARGED Clifford Lee Bair |
|---|---|
| 35 a. TYPED NAME, GRADE AND TITLE OF AUTHORIZING OFFICER M. E. FITZ-GERALD, LTJG, USNR, Pers. Off. By direction of the Commanding Officer | b. SIGNATURE OF OFFICER AUTHORIZED TO SIGN |

| DD FORM 1 NOV 55 214 | REPLACES EDITION OF 1 JUL 52, WHICH IS OBSOLETE. | ARMED FORCES OF THE UNITED STATES REPORT OF TRANSFER OR DISCHARGE | 2 |
|---|---|---|---|

H4